In Re PETITION FOR A WRIT OF PROHIBITION or in the Alternative for a WRIT OF MANDAMUS.

THE HONORABLE JERRY CARR WHITEHEAD, Petitioner, v. NEVADA COMMISSION ON JUDICIAL DISCIPLINE, Respondent.

No. 24598

February 24, 1995

893 P.2d 866

*Ohlson & Springgate,* Reno; *Hamilton & Lynch,* Reno; *Gentile and Porter,* Las Vegas; *Laura Wightman FitzSimmons,* Las Vegas, for Petitioner.

*Leonard I. Gang,* Carson City, for Respondent.[2]

*Peter Alpert,* Las Vegas; *Gerald Stern,* New York, for Amicus Curiae Association of Disciplinary Counsel.

*Leo Puccinelli,* Elko, for Amicus Curiae Ad Hoc Committee for the Preservation of an Independent Judiciary.

*Geoffrey Giles,* Reno, for Amicus Curiae American Judicature Society.

[2]We are pleased to note that since the filing of this court's Order Granting Petition of September 9, 1994, the Nevada Commission on Judicial Discipline has employed counsel, Leonard I. Gang, Esq., as permanent counsel to the Commission. We again express our hope that the Legislature will continue to provide the Commission with sufficient funding to fully execute its constitutional responsibilities. Although for convenience we have listed Mr. Gang as present counsel for the Commission in this opinion, we wish to make it clear that he has not appeared as counsel of record for the Commission at any time during these proceedings.

72

76

## OPINION

By the Court, STEFFEN, C. J.:

This original petition for a writ of mandamus or prohibition challenges proceedings pending before the Nevada Commission on Judicial Discipline (Commission) on allegations of judicial misconduct against Petitioner, Washoe County District Judge Jerry Carr Whitehead. The petition alleges that the Commission has exceeded its jurisdiction and has failed to conduct its proceedings in accordance with article 6, § 21 of the Nevada Constitution and the Administrative and Procedural Rules of the Nevada Commission on Judicial Discipline, Supreme Court Rules, Part VII (ARJD). For the reasons which follow, we reaffirm our Order of September 9, 1994, where we granted the petition, in part, and directed the clerk of this court to issue a writ (1) prohibiting the Commission from proceeding in excess of its jurisdiction, and (2) mandating that the Commission proceed in this and all other disciplinary matters in a uniform manner in accordance with the views expressed therein. The final writ issued by our Order, although reaffirmed by this opinion, is also clarified or modified in this formal opinion construing the applicable provisions of the Nevada Constitution and the ARJD.

We now issue this opinion reaffirming the granting of the writ and stating our reasons for so doing in order that the Commission will have guidance with respect to the requirements of the

78

ARJD,[3] as the Commission requested of this court, and to set forth in considerable detail the bases for our rulings.

---

[3] We emphasize that this court must interpret the current, permanent Administrative and Procedural Rules of the Nevada Commission on Judicial Discipline, Supreme Court Rules, Part VII (ARJD). The current ARJD have been in effect since 1988 and have applied throughout the instant proceeding. Therefore, any expressions or comments as to possible improvements to the existing rules would be irrelevant with respect to these proceedings.

## TABLE OF CONTENTS

PAGE

SYLLABUS BY THE COURT . . . . . . . . . . . 82

PREFACE . . . . . . . . . . . . . . . . . . 98

PART I: CONFIDENTIALITY . . . . . . . . . . . 100

PART II: THE REAL ISSUES . . . . . . . . . . 123

 A. THE ISSUES RAISED IN THE PETI-
 TION . . . . . . . . . . . . . . . . . 123

 B. UNLAWFUL DISCLOSURES AND
 EXPANSION OF MATTERS AT ISSUE . . . 124

 C. FURTHER ESCALATING EVENTS AND
 ACCUSATIONS . . . . . . . . . . . . . 125

 D. THE "WAR" IN NEVADA AND THE
 CRISIS IN PUBLIC CONFIDENCE . . . . . 127

 E. THE THREAT TO A FAIR, IMPARTIAL,
 AND INDEPENDENT JUDICIARY . . . . . 129

 F. UNIFORM PROCEDURES . . . . . . . . . 130

PART III: THE COMMISSION'S AD HOC
 APPROACH . . . . . . . . . . . . . . . . 131

 A. OBJECTIONS OF COUNSEL . . . . . . . . 131

 B. JUDGE D . . . . . . . . . . . . . . . . 133

 C. JUDGE STRINGFIELD . . . . . . . . . . . 139

 D. CONCLUSION . . . . . . . . . . . . . . . 140

PART IV: JURISDICTION AND PROCEDURE . . . 145

 A. THE "COMPLAINT SEEKING DETERMI-
 NATION OF PROBABLE CAUSE." . . . . . 147

 1. THE CAMPBELL COMPLAINT IS
 NOT MADE UNDER OATH, AS
 REQUIRED BY ARJD 12(1) . . . . . . 149

 2. THE CAMPBELL COMPLAINT IS
 NOT AUTHORIZED BY ARJD 12(2) . . 150

 3. THE COMMISSION RULES DO NOT
 PERMIT THE COMMISSION,

80

PAGE

THROUGH COUNSEL, TO INITIATE PROCEEDINGS BY FILING ITS OWN INITIATING COMPLAINT . . . . . . . 151

4. THE COMMISSION MAY NOT PROCEED TO A PROBABLE CAUSE HEARING ON THE BASIS OF THE CAMPBELL INVESTIGATION AND COMPLAINT BECAUSE CAMPBELL WAS CONSTITUTIONALLY DISQUALIFIED FROM ACTING . . . . . . 157

5. THE NATURE OF THE UNDERLYING ALLEGATIONS OF MISCONDUCT . . . . . . . . . . . . . . . . 157

6. CONCLUSION . . . . . . . . . . . . . 163

B. REMAINING PROCEDURAL CONCERNS . . 163

1. THE PROPER SCOPE OF A PRELIMINARY INVESTIGATION PRIOR TO A PROBABLE CAUSE HEARING . . . . 164

2. THE RESPONDENT JUDGE'S RIGHT TO INSPECTION UNDER ARJD 14(5) . . 168

3. THE SCOPE OF THE COMMISSION'S INQUIRY AT A PROBABLE CAUSE HEARING . . . . . . . . . . . . . . . 170

4. WHETHER PETITIONER COULD RECEIVE DUE PROCESS IN ANY FUTURE PROCEEDING, IN LIGHT OF THE BREACHES OF CONFIDENTIALITY . . . . . . . . . . . . . . . 170

PART V: PETITIONER'S MOTION TO DISQUALIFY THE MEMBERS OF THE COMMISSION . . . . . . . . . . . . . . . . . 173

A. THE HONORABLE NANCY BECKER . . . . 173

B. CHAIRMAN GUY SHIPLER . . . . . . . 174

C. THE REMAINING COMMISSION MEMBERS . . . . . . . . . . . . . . . . . . 175

PAGE

PART VI: ADDENDUM RE DISSENTING VIEWS . . 175

 A. ALLEGED DISTORTIONS OF THE
 RECORD . . . . . . . . . . . . . . . . . 176

 B. CRITICISM OF MEDIA . . . . . . . . . . 179

 C. JUSTICE SHEARING'S ANALYSIS OF
 COMMISSION'S JURISDICTION OVER
 SUBSTANTIVE CHARGES . . . . . . . . . 183

 D. JUSTICE SHEARING'S INTERPRETATION
 OF THE ARJD . . . . . . . . . . . . . . 186

 E. JUDGE GUY'S CONCURRING AND DIS-
 SENTING ADDENDUM . . . . . . . . . . 188

PART VII: CONCLUSION . . . . . . . . . . . . . 190

## SYLLABUS BY THE COURT

*PREFACE*

1. The court has been inundated in this proceeding with thousands of pages of papers and points and authorities and has entertained what is perhaps the longest oral argument in Nevada Supreme Court history. Additionally, the court has concluded that writ relief is absolutely mandated. Therefore, further oral argument and briefing is not warranted, and Petitioner's motion for a further briefing schedule is denied.

2. Delay in resolution of the petition has been occasioned by: (1) the Commission's initial refusal to comply with an order of this court directing the production of documents for this court's *in camera* review; (2) the Commission's procedurally improper and substantively deficient petition for rehearing of this court's opinion in Whitehead v. Comm'n on Judicial Discipline, 110 Nev. 128, 869 P.2d 795 (1994) (*Whitehead I*); and (3) various challenges brought against members of the court.

3. In finally resolving the question that these proceedings were initially undertaken to address, *i.e.*, whether the Commission has exceeded its defined jurisdiction, it is first necessary to address certain of our dissenting colleague's assertions respecting this court's initial orders of confidentiality, and to clarify the real issues and true facts and circumstances underlying this court's consideration and resolution of the petition.

*PART I: CONFIDENTIALITY*

1. Contrary to the position now advanced by JUSTICE SHEARING, this court's initial orders of confidentiality did not violate the Nevada Constitution or the United States Constitution.

2. In response to a formal request for confidentiality stated in Judge Whitehead's initial petition, this court entered an order on July 22, 1993, directing the proceedings in this court to remain confidential. On July 30, 1993, then CHIEF JUSTICE ROSE, JUSTICE SPRINGER and JUSTICE STEFFEN entered a second order specifically reaffirming the prior ruling that Petitioner was entitled to confidentiality. On November 3, 1993, CHIEF JUSTICE ROSE, JUSTICE STEFFEN, JUSTICE SPRINGER and JUSTICE SHEARING all signed an order concluding that Petitioner could elect to waive his right to confidentiality. The four above-named justices observed in part that the issue regarding Petitioner's request to waive confidentiality was before the court "due in part to *serious breaches of confidentiality* by 'unnamed sources' *in apparent violation of both the Nevada Constitution and the rules of this court.*" (Emphasis added.) Further, this order observed that Petitioner "has borne the brunt of the press accounts of the

proceedings against him . . . ." Petitioner subsequently waived his right to confidentiality, and the proceedings before this court thereafter became public.

3. The Board of Governors of the State Bar of Nevada recognized in a public statement respecting this question: "[ARJD] 40(7) allows a judge accused of misconduct to challenge the jurisdiction of the Commission. Judge Whitehead has filed a petition challenging the jurisdiction of the Commission. Until there has been a determination that probable cause exists, proceedings alleging misconduct are to be conducted confidentially."

4. Confidentiality of Commission proceedings is given first priority under the Nevada Constitution which provides: "[t]he supreme court shall make appropriate rules for: (a) the confidentiality of all proceedings before the commission, except a decision to censure, retire or remove a justice or judge." Nev. Const. art. 6, § 21(5). Arguably straining to permit openness prior to a *decision* to *censure, retire or remove,* this court adopted ARJD 16, which provides that Commission proceedings become public following a scheduled hearing, a finding of probable cause by the Commission, and the filing of a formal statement of charges.

5. The Nevada Constitution provides that each matter against a judge will result in either a dismissal or a hearing. Rule 16 assures that whenever the Commission finds at a probable cause hearing that there is reasonable probability that clear and convincing evidence can be presented supporting the charges of judicial misconduct, the public will be made aware of the full extent of the charges through the public filing of a formal statement of charges.

6. Many state judicial disciplinary systems have more restrictive confidentiality provisions and do not permit public awareness of proceedings until a much later time.

7. A challenge to the Commission's jurisdiction filed in this court prior to a Commission finding of probable cause merely shifts the Commission proceedings, temporarily, from the Commission to this court. The policy reasons underlying the constitutional provision for confidentiality of Commission proceedings are as compelling and applicable in pre-probable cause challenges to Commission jurisdiction filed in this court. This court attempted to assure that future Commission proceedings in this matter would retain the confidential integrity required by the Nevada Constitution until such time as a probable cause determination might be reached.

8. Our dissenting colleague's reasoning, were it to prevail, would leave any respondent judge faced with jurisdictional excesses by the Commission in the predicament of having to choose between: (1) forfeiting his or her constitutional right to confidentiality and being publicly tarnished by the proceedings in

our court; or (2) simply acquiescing to whatever sanctions or procedures the Commission might impose irrespective of jurisdictional excesses.

9. The dissent erroneously argues that rules adopted by this court governing confidentiality of Commission proceedings do not supersede NRS 239.010. NRS 239.010 relates to "[a]ll public books and public records of a public agency . . . ." Even if we were to agree with the dubious proposition that NRS 239.010 applies to the judicial branch of government, the reference to "public books and public records" simply has no application to records which have been lawfully declared not to be public by this court. This court's lawful exercise of jurisdiction conferred and mandated by the Nevada Constitution cannot be superseded by a conflicting statute. Any rule adopted by this court under constitutional mandate must, as a matter of law and the hierarchy of law, prevail over any conflicting statutory provision. *See, e.g.,* State v. Connery, 99 Nev. 342, 661 P.2d 1298 (1983) (where rule of procedure is promulgated in conflict with a statute, the rule supersedes the statute and controls); *see also* Nevada Code of Judicial Conduct, Section entitled: "Application of the Code of Judicial Conduct," Subsection F, Commentary.

10. The dissenting justice erroneously asserts that "[c]ourts have consistently held that the filing of a writ petition operates as an automatic waiver of confidentiality." This assertion is inaccurate, misleading, and without support in any of the three cases cited in the dissent as supporting authority.

11. In Nicholson v. State Com'n on Judicial Conduct, 409 N.E.2d 818 (N.Y. 1980), the only state appellate high court decision directly on point, the New York Court of Appeals ruled that "a blanket rule requiring the sealing of all court records involving proceedings by the commission is unjustified in the absence of legislative mandate." In comparing *Nicholson* to the instant case, the following points become clear: (1) the grant of confidentiality in judicial discipline proceedings in Nevada stems from the state constitution rather than legislative enactment at issue in *Nicholson;* (2) the Nevada Constitution directs this court, rather than the Legislature, to adopt rules governing the Commission, including provisions for the confidentiality of all proceedings except the decision to discipline; (3) this court has not adopted a blanket rule making all discipline matters challenged in our court confidential; only jurisdictional challenges filed before a finding of probable cause would be confidential; (4) the Commission and the dissenting justice have even challenged the right of this court to preserve confidentiality through *in camera* review, a position contrary to that taken by the New York Court of Appeals; and (5) the Court of Appeals acknowledged that the

state legislature, which was given authority by the New York Constitution to adopt commission rules, could lawfully enact legislation that would make court proceedings connected to disciplinary proceedings confidential; by a parity of reasoning, this court, given a similar grant by the Nevada Constitution, could lawfully impose confidentiality on pre-probable cause writ proceedings filed in this court challenging the jurisdiction of the Commission. Finally, the Court of Appeals in *Nicholson* expressly recognized, as have we, the inherent power of the courts to seal their own records in appropriate cases. The instant case is such a case.

12. Confidential proceedings in this court challenging Commission jurisdiction prior to a Commission finding of probable cause do not violate the Federal Constitution. The State of Nevada has a compelling interest, enthroned in its constitution, to assure the confidentiality of judicial discipline proceedings until there has been a decision to discipline—interpreted by this court to allow openness upon a finding of probable cause and the public filing of a formal statement of charges. *See* First Amendment Coal. v. Judicial Inquiry & Review, 784 F.2d 467 (3d Cir. 1986) (Pennsylvania has a substantial interest in preserving limited confidentiality); People ex rel. Ill. Jud. Inquiry Bd. v. Hartel, 380 N.E.2d 801 (Ill. 1978) (state constitutional requirement that judicial discipline proceedings be kept confidential must be implemented except as overriding federal due process requirements compel court to do otherwise), *cert. denied,* 440 U.S. 915 (1979); Kamasinski v. Judicial Review Council, 797 F.Supp. 1083 (D. Conn. 1992) (state's interest in prohibiting disclosure prior to determination of probable cause is sufficiently compelling to survive the strictest First Amendment scrutiny); *see also* Kamasinski v. Judicial Review Council, 843 F.Supp. 811 (D. Conn.), *aff'd,* ........ F.3d ......., 1994 WL 723988 (2d Cir. (Conn.) 1994).

13. Closure of court proceedings or records may be necessary to comply with established public policy in the constitution, statutes, rules, or case law; to protect a compelling governmental interest; to obtain evidence to properly determine legal issues; or to avoid substantial injury to a party by disclosure of matters protected by a common law or privacy right not generally inherent in the specific type of civil proceeding sought to be closed. *See* Barron v. Florida Freedom Newspapers, 531 So.2d 113 (Fla. 1988).

14. Landmark Communications, Inc. v. Virginia, 435 U.S. 829 (1978), and Matter of Krynicki, 983 F.2d 74 (7th Cir. 1992), *cert. denied,* ........ U.S. ......., 114 S. Ct. 1068 (1994), do not support the dissenting justice's conclusion that this court's order

of confidentiality was unconstitutional. Neither case suggests that it is unconstitutional to provide for confidential state supreme court proceedings involving a pre-probable cause challenge to a judicial discipline commission's exercise of jurisdiction.

15. Regrettably, we can neither agree with nor understand the dissenting justice's opinion that this court has "more important things to do" than attempt to either prevent or greatly minimize the prospects for reoccurrences of the extremely deleterious influences that have oppressed these proceedings. It is anomalous to stress the importance of the Commission's being able to protect the public from conduct that would bring discredit to the judiciary, and then ignore misconduct that has unquestionably inflicted greater damage on the judiciary than perhaps all previous acts of individual misconduct combined. It is tragic, indeed, when forces are able to orchestrate, with apparent impunity, an unwarranted attack on the one branch of government that must maintain a justified public confidence in its ability to fairly and impartially dispense justice.

## PART II: THE "REAL" ISSUES

### A. THE ISSUES RAISED IN THE PETITION

1. Contrary to assertions of former Commission counsel, whether Judge Whitehead committed judicial misconduct is not now and never was an issue in this original writ proceeding. Such factual determinations are clearly the province of the Commission in the first instance.

2. The petition initially presented this court with relatively non-complex procedural and jurisdictional contentions of arguable merit, including: (1) whether the Commission was exceeding its defined jurisdiction in proceeding to a probable cause hearing on a collection of twelve charges alleged in a complaint drafted by Special Deputy Attorney General Campbell; and (2) whether the Commission was proceeding against Petitioner in a discriminatory manner that neither complied with the governing provisions of the Nevada Constitution and the ARJD, nor conformed to the procedures applied to other judges involved in disciplinary proceedings before the Commission. These matters are no longer the only matters at issue and the proceedings have been unnecessarily prolonged and expanded by a costly, deleterious, orchestration of issues surrounded by invective.

### B. UNLAWFUL DISCLOSURES AND EXPANSION OF MATTERS AT ISSUE

1. This court initially attempted to provide Petitioner and the Commission with a confidential forum in which issues presented

could be quickly resolved in accordance with confidentiality provisions of Nevada Constitution, article 6, § 21(5)(a) and ARJD 5-8.

2. It is difficult for this court to perceive why the restraints that are placed on grand jury proceedings are acknowledged and respected, yet similar provisions for confidentiality prior to a finding of probable cause in the state constitution and rules applicable to Commission proceedings were not accorded the same treatment here. The confidential proceedings before both the Commission and this court were unethically disclosed to the Las Vegas Review-Journal by anonymous sources in blatant disregard of provisions of Nevada law requiring confidentiality and this court's orders specifically directing the maintenance of confidentiality.

## C. *FURTHER ESCALATING EVENTS AND ACCUSATIONS*

1. Almost simultaneously with the initial public disclosures, the Commission reacted radically and defiantly to this court's order directing production of documents for this court's *in camera* review, adamantly refused to comply with the court's order, and accused this court of having entered a "series of secret, illegal and void 'orders,'" and of attempting "to emasculate and usurp the separate constitutional powers of the Commission."

2. A disinformation campaign ensued and focused attacks on this court, as well as Petitioner. Unquestionably, Petitioner has borne the brunt of the unfair and irresponsible publicity.

3. Of utmost concern to this court is that unprecedented, inaccurate, and misleading attacks based largely on unethical disclosures to the media from secret sources have irresponsibly inflicted inestimable damage to public confidence in the judiciary of this state. Contemplative and informed persons will understand need for this court to respond to pernicious, undermining attacks on the Nevada judiciary.

## D. *THE "WAR" IN NEVADA AND THE CRISIS IN PUBLIC CONFIDENCE*

1. Although this case has come to symbolize a crisis in public confidence in the judiciary of this state, the reality is that the factual and procedural history of the proceedings in this court are not what they have been made to appear. The crisis, although portrayed to the public as real, has little or no basis in fact or law and was manufactured, provoked and fostered by media accounts and premature, precipitous public comments, many of which were solicited from outside legal ethicists who have exported views into Nevada that are based upon *ex parte* contacts and

incomplete and inaccurate facts conveyed by unethical disclosures from anonymous sources.

2. Petitioner sought and obtained permission from this court to respond publicly when it became apparent that any pretense toward continued confidentiality would only further erode and damage his reputation and any prospects for a fair and impartial resolution of the allegations against him.

3. The court's allegiance to the rule of law and obligations under the Code of Judicial Conduct will not permit misguided attacks on the independence and integrity of this court and this state's judiciary to go unopposed.

4. It is the duty of the courts to review and decide controversial matters impartially, with as much dispatch and regard for principles of law and fundamental justice as can be expected of any human institution. Judges must ordinarily endeavor to accept with equanimity the inevitable criticisms and often personal, public attacks that are part and parcel of the judicial office. *See* Nevada Code of Judicial Conduct, Canon 3B ("A judge shall not be swayed by partisan interests, public clamor or fear of criticism").

5. The Code of Judicial Conduct also enjoins judges to uphold the law, to promote improvements in the judicial system, to protect and foster respect and public confidence in the judiciary and to "uphold the integrity and independence of the judiciary." *See* Nevada Code of Judicial Conduct, Canon 1; *see also* Nevada Code of Judicial Conduct, Canon 2A ("A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"). The integrity and independence of the judiciary are "indispensable to justice in our society." *Id.*

6. The court would indeed be derelict if it did not at least attempt to disabuse this state's citizens of the orchestrated perception that this court was according favored treatment to Petitioner at the expense of an effective and vital judicial discipline system. Because this court as a general rule may speak as an institution only through its opinions, it has utilized the only available forum to accomplish that task.

E. *THE THREAT TO A FAIR, IMPARTIAL, AND INDEPENDENT JUDICIARY*

1. Amicus American Judicature Society accurately observes that this petition presents the court with a "classic conflict" between "a free and independent judiciary," and the "right and duty of the State through its disciplinary system to sanction judges who engage in improper conduct prohibited by applicable codes." This court realizes, however, that the Society and other

interested members of the public and the bar are not fully aware of all the facts and circumstances demonstrating that, contrary to the intent of the ARJD, the Commission has been employing an *ad hoc* approach to judicial discipline so untethered to the provisions of the Nevada Constitution and the ARJD as to pose a very real and substantial threat to the right of our citizens to a fair, impartial, free, *and independent* judiciary.

2. A definitive interpretation of the procedural provisions governing the Commission is essential to the proper resolution of this proceeding and to the continuation of an effective judicial disciplinary process in this state. This was the primary reason for the court's intervention in the first place. However, in view of the court's obligations under the Code of Judicial Conduct to promote and protect public confidence in the judiciary, this court is also compelled to address issues and problems that have stemmed from concerted, purposeful efforts to erode public respect for the court and these proceedings.

## F. UNIFORM PROCEDURES

1. At the time this petition was filed, this court had been apprised that in proceedings involving another district judge (Judge D), the Commission had not only functioned without regard to its rules or the Nevada Constitution, but that the apparently unlawful procedures that the Commission applied in Judge D's case were remarkably dissimilar from the allegedly unlawful procedures which were subject of the instant petition. The court's initial decision to intervene and stay the Commission proceedings against Petitioner was motivated in major part by the realization that the Commission is proceeding against accused judges on an *ad hoc* basis with little or no regard for adherence to the governing provisions of the Nevada Constitution or the rules adopted by this court for Commission proceedings.

## PART III: THE COMMISSION'S AD HOC APPROACH

## A. OBJECTIONS OF COUNSEL

1. The Commission should not now be heard to complain of this court's consideration of evidence establishing that the Commission has been proceeding against accused judges without regard to Commission procedures and on an individual, *ad hoc* basis, where the Commission itself formally focused this court's attention on procedures applied to Judge D and on whether the Commission has been proceeding against all judges in a uniform manner.

2. The record in an original proceeding includes the record that is created in this court. Although this court does not ordinar-

ily act as a fact-finding tribunal, *see* Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981), and review, consider, or rule upon admissibility of evidence in the first instance, "[t]he procedure in original cases is flexible." *See* Robert L. Stern, *Appellate Practice in the United States* 10 (2d Ed. 1989).

3. Where, as here, the relief sought in this court can only be obtained in the context of an original proceeding, this court may consistently with its prior precedents consider important matters of relevant evidence when that evidence is supported by sufficient indicia of authenticity and reliability, and when its consideration "may possibly make clearer than might otherwise appear, the factual and legal situations involved, to the end that correct determinations may be accomplished." *See* Bowler v. Vannoy, 67 Nev. 80, 87, 215 P.2d 248, 252 (1950).

## B. *JUDGE D*

1. Facts regarding proceedings involving Judge D were included and discussed in a memorandum prepared by JUSTICE STEFFEN well prior to the time the instant petition was filed and before any member of this court, other than JUSTICE YOUNG, who sat on the Commission, had any knowledge of the investigation and proceedings against Judge Whitehead.

2. Although the Commission now contends that it would have a devastating, chilling effect on the work of the Commission if Petitioner Whitehead obtained the names and statements of the witnesses against him, the exact opposite occurred with respect to Judge D who received all such names and statements. The investigation against Petitioner was occurring during the same time period as the investigation and proceedings against Judge D.

3. It is apparent that one set of rules applied to Judge D, and a different set of rules applied to Petitioner Whitehead. Although the Commission did not believe that divulging the names and statements of adverse witnesses to Judge D would cripple and chill the Commission's capacity to fulfill its constitutional duties, in stark contrast to the contemporaneous proceedings against Judge D, the Commission now insists that it would be crippled and rendered ineffective if Petitioner Whitehead were to receive the names and statements of the adverse witnesses to enable him to prepare for a probable cause hearing.

4. It is patently clear that former Commission counsel have deliberately misrepresented to this court, to certain cooperating legal ethicists and, consequently, to the media, that keeping the identity and statements of witnesses confidential from accused judges "has been [a] continually" applied Commission practice.

5. In the case of Judge D, the Commission or its former

counsel (the Attorney General) obviously and properly concluded that Judge D was actually entitled, pursuant to ARJD 14(5), to the names and statements of the witnesses against him. With respect to Petitioner Whitehead, however, the Commission has taken the diametrically opposite position that "[d]isclosure of the Commission's papers will bring about the very harm the Constitution and Commission rules were intended to prevent, *i.e.*, a chilling effect on the free flow of information that the Commission must have in order to receive information from citizens without fear of reprisal."

6. The complaining judge in Judge D's case also expressed grave concern over retaliation by Judge D against all the witnesses now known to Judge D *because the Commission cancelled the probable cause hearing and entered into a confidential plea bargain with Judge D*. The Commission and the Attorney General evinced no concern regarding an impediment to the free flow of information and the prospect of reprisal or retaliation in the case of Judge D, but grave concern about such issues in Petitioner's case.

7. The Commission was highly deferential to the cost involved in holding a probable cause hearing in the case of Judge D but has expressed a willingness to break the bank in its investigation and pursuit of Petitioner. It should be apparent why this court is so concerned about the possibility of selective prosecution or discrimination when the Commission is in a position to bestow favors upon certain judges and inflict what may appear to be inordinate punishment and abuse upon others through the simple expedients of secrecy and disregard of its own rules.

8. Through the simple expedient of methodological change, the Commission provided Judge D with the names and statements of all witnesses against him, while contemporaneously building a stone wall before Petitioner Whitehead under the heading of confidential work product. The Commission then represented to this court that the investigative methods of the Commission concerning Petitioner have been consistent with its other investigations. This type of disparate treatment cannot be tolerated under any system claiming deference to concerns of due process and impartiality.

## C. *JUDGE STRINGFIELD*

1. Judge Stringfield did not receive the benefit of either a dismissal or a probable cause hearing. *See* Nev. Const. art. 6, § 21(7) ("The commission shall, after preliminary investigation, dismiss the matter or order a hearing to be held before it"). Instead, as described in *Whitehead II*, 110 Nev. 380, 873 P.2d

946 (1994), Judge Stringfield was subjected to the will of the Commission administered in secret and without reference to its own rules.

## D. *CONCLUSION*

1. Although the court is reluctant to discuss details in this opinion, further examples could be cited which provide strong support for concluding that the Commission has extensively engaged in proceedings that violate its own rules through *ad hoc,* case-by-case decision-making.

2. It was never the purpose or intent of this court to in any way diminish the ability of the Commission to function effectively. It has, however, become clear to this court that the Commission has been functioning with little regard for its own rules, thus creating a strong potential for unfair, disparate, and even political resolutions of discipline matters coming before it.

3. The framers of article 6, § 21 of the Nevada Constitution determined, and the legislature and the people agreed, that complaints coming to the Commission must, after preliminary investigation, either be dismissed or the Commission must schedule a hearing.

4. In proposing adoption of the current ARJD, the Study Committee stated that the new rules were "designed to foreclose the Commission from secret, inquisitorial processes which result in *ad hoc* decisions neither related to nor tethered by principle."

5. The Study Committee also uncovered past Commission abuses under the old Revised Interim Rules wherein "[p]lanned selective leaks resulted in giving inaccurate and unreliable information to the public, which incited public furor and unjustifiably damaged the reputation of a judicial officer who was never even charged."

6. The Study Committee found that the old Revised Interim Rules were "vague, lack[ed] checks and balances, [and] incorporate[d] no adequate sanctions to deter misconduct by individual commission members."

7. The proceedings against Judge Goldman were conducted *under the old Revised Interim Rules.* In acknowledging that it has been conducting proceedings against Judge Whitehead in the *same manner* that previous proceedings were conducted against Judge Goldman, the Commission has apparently acknowledged that it has been conducting its proceedings against Judge Whitehead in accordance with rules that are no longer in effect, and under which past abuses occurred, rather than in accordance with the current rules which were specifically designed by the Study

Committee to correct past abusive practices and provide procedures that are "accusatory rather than inquisitorial, open rather than closed, and accompanied by due process formalities . . . rather than loose, unstructured and informal." *Whitehead I*, 110 Nev. at 145-47 n.15, 869 P.2d at 806 (quoting Report of Study Committee, ADKT 38 at 8).

8. This court may not justify an *ad hoc* approach to judicial discipline no matter how well-intentioned and benevolent the Commission's actions may be. A constitutional body having the power of life or death over a judge's future may not be allowed to disengage itself from its own rules and the Nevada Constitution. Neither the Commission nor this court is free to disregard what is mandated by the constitution and the Commission's rules.

9. In marked contrast to the instant proceedings, each of the above examples of the Commission's disciplinary activities regarding other judges is characterized by Commission secrecy, thus making it impossible for the public or this court or any other group to know whether the discipline was warranted, whether it was too harsh, too lenient or whether the Commission even had jurisdiction to entertain it.

10. ARJD 31 cannot be read to authorize the imposition of secret discipline, as occurred in the proceedings involving Judge D and Judge Stringfield. An order of censure, removal or retirement, even if consented to by the respondent judge, *must be preceded by a finding of probable cause and the filing of a formal, public statement of charges. See* ARJD 15; 16. Thereafter, the Commission may enter a Rule 31 *public* order of censure, removal or retirement and file a copy of the order with the clerk of this court.

11. In *all cases* where probable cause to proceed to a formal hearing is found, a public, formal statement of charges must be filed, and a public order of discipline must be imposed where the Commission ultimately concludes that discipline is warranted. Thus, under the ARJD, the public is to be properly apprised of the Commission's actions, and the Commission will be held accountable to the public for its actions.

12. Petitioner has been treated in a manner altogether different from the manner in which other judges have been treated by the Commission in the past. It is essential that this court take measures to prevent future such occurrences and to assure that Petitioner not be left as an incidental casualty of a failure to proceed in a uniform manner in accord with the assurances of due process provided by the ARJD.

*PART IV: JURISDICTION AND PROCEDURE*

A. *THE "COMPLAINT SEEKING DETERMINATION OF PROBABLE CAUSE"*

1. The Commission lacks jurisdiction to proceed to a probable cause hearing on the "Complaint Seeking Determination of Probable Cause" (the Campbell Complaint) because it is not made under oath, as required by ARJD 12(1). *See* State v. Judicial Standards Commission, 643 P.2d 210 (Mont. 1982). The Campbell Complaint does not conform to the clear intent of ARJD 12(1) to require charges "to be reduced in writing and attested to by an identified complainant."

2. The Campbell Complaint is not authorized by ARJD 12(2). In order for the Commission to authorize its executive officer to sign and swear to a complaint under ARJD 12(2), some actual complainant must come forward, and after demonstrating exceptional circumstances, request the anonymity available under the rule. Before granting such a request, the Commission must have "substantial reason to believe" that the filing of a complaint in the actual complainant's own name, would cause the complainant "in likelihood [to] suffer untoward risk of embarrassment, harassment, or other detrimental consequences." In the present case there is not even colorable compliance with the rule, nor can it be pretended that the executive officer signed the complaint to protect Judge Breen or former District Attorney Holmes, for they have been most prominent and vocal in publicizing their assertions about Judge Whitehead.

3. The Commission rules do not permit the Commission, through counsel, to initiate proceedings by filing its own initiating complaint. Under Nevada's accusatory system, the Commission cannot initiate probable cause proceedings on allegations that have not been brought before it in a sworn written complaint by an identified complainant. There is nothing in the ARJD that authorizes a Commission prosecutor rather than a sworn complainant to initiate proceedings against a judge. Proceedings must be initiated under ARJD 12 by a sworn complaint signed by a true, identified complainant and not by a prosecutor employed by the Commission.

4. A valid complaint may contain reliable hearsay information and need not be based on personal knowledge. *See, e.g.,* McKenney v. Commission on Judicial Conduct, 388 N.E.2d 666 (Mass. 1979) (state law requirement that complaint be signed under pains and penalties of perjury does not require that signer must have personal knowledge; lack of first hand knowledge could, of course, have bearing on whether complaint is worthy of investigation). Reality dictates that flexibility be allowed in

accepting hearsay aspects to a complaint, especially if the complaint appears reliable in other respects.

5. If a sworn complaint is made up entirely of charges based on rumor and belief, and no corroborating evidence is discovered in a preliminary investigation, the Commission should rule, under ARJD 14(1), that "there is [no] merit to the charges." The mere inclusion of hearsay information in a proper, sworn complaint will not, of course, have any effect on the validity of the complaint if there is otherwise "sufficient cause to proceed."

6. The Commission must be prohibited from proceeding to a probable cause hearing based on Special Deputy Attorney General Campbell's investigation and complaint because he was constitutionally disqualified from acting in this proceeding, either as prosecutor or surrogate complainant.

7. The court makes no judgment whether Petitioner's alleged choreography respecting a change of venue in the *Kinnamon* trial either occurred or constitutes judicial misconduct. Nor does the court infer any opinion respecting the allegations in the Breen complaint that Petitioner "manipulated and persuaded" Valley Bank into firing a law firm that filed a peremptory challenge, hiring another firm, and withdrawing the challenge. It is for the Commission to determine in the first instance whether sufficient cause in fact and law warrants further consideration of any of the allegations in the sworn complaints. With respect to all other charges in the sworn complaints relating to the manner in which Petitioner handled peremptory challenges, this court observes that the administrative nature of the proceedings and the favorable construction to which accused judges are entitled by virtue of ARJD 11(3) should be kept in mind if the Commission is called upon to judge the merits of any complaint relating to the administration of former SCR 48.1.

8. A writ of prohibition must issue prohibiting the Commission from proceeding in any manner based on the Campbell Complaint.

## B. *REMAINING PROCEDURAL CONCERNS*

1. The Commission is authorized under the Nevada Constitution and the ARJD to conduct a preliminary investigation. The preliminary investigation should be no more than what may be necessary to determine whether the specific charges of the sworn complaint have sufficient merit to warrant a probable cause hearing on those charges. The length and breadth of a preliminary investigation should be confined to the narrowest possible activity necessary to satisfy the Commission that there is or is not merit to the specific charges contained in the sworn complaint.

2. We now clarify our order of September 9, 1994, to exclude true attorney work product as material discoverable by a respondent judge. The reference in ARJD 14(5) to "all records of the commission" means exactly that, *i.e.,* "all records of the commission." Similarly, the terminology: "fully advised" as used in ARJD 14(5), means "fully advised." Nonetheless, true attorney work product is not subject to what otherwise appears to be the all-inclusive scope of Rule 14(5). Thus, ARJD 14(5) does not permit discovery of the attorney-investigator's or special prosecutor's work product insofar as it relates to the attorney's mental impressions, conclusions, or legal theories or strategies.

3. The work product privilege, however, may not be asserted as a basis for refusing to disclose the identity and statements or the substance of the statements of witnesses, which must be made available to the respondent judge to enable the judge to prepare for a probable cause hearing irrespective of whether signed statements from such witnesses have been secured.

4. Our ruling is also consistent with ARJD 21 which applies after a finding of probable cause. Rule 21 specifies precisely what must be disclosed to a respondent judge, but is silent as to work product. Therefore, we conclude, Rule 21 also excludes work product in the sense described above.

5. If the Commission should proceed to a probable cause hearing on the basis of the allegations relating to SCR 48.1 contained in the sworn complaints from Judge Breen, and the change of venue matter contained in former District Attorney Holmes' complaint, the Commission may not entertain such proceedings before first providing Judge Whitehead with *all* documents and materials of any kind, including those developed or produced by Campbell, that the Commission would use or intend to use in any probable cause hearing, with the exception of such matters that may be protected under the heading of work product as defined above.

6. Reason dictates that ARJD 15 be construed to permit the Commission to consider, in addition to the respondent judge's evidence and the sworn complaint, whatever other relevant, properly admissible evidence the Commission may have secured or received regarding the specific charges of the sworn complaint, including both documents and the testimony of witnesses.

7. This court firmly rejects any claims that breaches of confidentiality by members of the Commission would not implicate due process concerns. If further proceedings are resumed against Petitioner Whitehead based on the sworn complaints, we will rely on the Petitioner's right to challenge Commission members pursuant to ARJD 6 and 7 to at least initially determine whether each challenged member of the Commission may participate in the

proceedings. To allow the present members of the Commission to sit without reasonable assurances of impartiality would impinge on Judge Whitehead's right to have a fair tribunal and a tribunal free from the appearance of bias.

## PART V: PETITIONER'S MOTION TO DISQUALIFY THE MEMBERS OF THE COMMISSION

1. It is impermissible, under Nev. Const. art. 6, § 21(4), and as a matter of law for Judge Becker to sit as an alternate member of the Commission in any proceedings in which Judge Loehrer is also participating. Judge Becker is not to be faulted for accepting the assignment made by this court.

2. With regard to the other members of the Commission, too many questions of fact remain unanswered which are best left to the Commission to address, at least in the first instance, should the Commission elect now to proceed against Petitioner. As previously indicated, Petitioner would also be afforded the opportunity to challenge members of the Commission under ARJD 6 and 7.

## PART VI: ADDENDUM RE DISSENTING VIEWS

1. Part I of this Opinion addresses in detail JUSTICE SHEARING's erroneous assertions regarding the constitutionality of this court's initial orders directing these proceedings to remain strictly confidential. This addendum rebuts other untenable positions taken in JUSTICE SHEARING's dissenting addendum and addresses an inaccuracy stated in the separate concurring and dissenting addendum filed by Judge Guy.

## PART VII: CONCLUSION

1. Because the Campbell Complaint is procedurally insufficient and clearly invalid under the ARJD, the Commission lacks jurisdiction to proceed to a probable cause hearing against Petitioner based upon that complaint. This court therefore grants Judge Whitehead's petition for a writ of prohibition with respect to the Campbell Complaint.

2. This court also grants Judge Whitehead's petition for a writ of mandamus commanding the Commission in any of its future proceedings against any and all respondent judges, including Judge Whitehead, to proceed in an even-handed and uniform manner consistent with the state constitution and the ARJD as interpreted in this opinion.

3. If judicial discipline proceedings are pursued against Judge Whitehead with respect to the claims asserted in the Breen or Holmes complaints, the Commission is directed to provide Petitioner with all materials generated by Campbell's investigation

including, but not limited to, all materials provided to this court for its *in camera* inspection, which are not strictly attorney work product as defined in this opinion, and which the Commission would use, refer to, or rely upon in any probable cause hearing. The materials supplied to this court for its *in camera* inspection are, by order of the court, to be returned to the Commission.

4. This court expressly retains jurisdiction to carry forward and implement all determinations and rulings it has made in the course of these proceedings or will make in the future.

## PREFACE

On May 20, 1994, this court conducted in this original proceeding what is perhaps the longest oral argument in Nevada Supreme Court history. Since the filing of this petition, the court has virtually been inundated with thousands of pages of pleadings, motions, points and authorities, and other papers and documents submitted by the parties and amici curiae.[4] Moreover, this court has concluded that writ relief is absolutely mandated by the facts and the law applicable to these proceedings. Accordingly, we have concluded that further oral argument and briefing is not warranted.[5]

This petition was filed in this court in July 1993, over one year ago. The Commission's subsequent refusal to comply with this

---

[4] The Commission has pressed this court for an early decision. *See, e.g.,* ADKT 189 (emergency petition filed by the Commission on July 22, 1994, asserting "that a crisis situation exists which justifies the immediate attention and intervention of the Nevada Supreme Court"); see also the Letter of June 20, 1994, from Commission Chairman Shipler to CHIEF JUSTICE ROSE requesting that this court provide prompt "clarification" and "coherent direction" with respect to the ARJD. The Commission has advised that it has "more than one hundred other complaints pending before it," and that it has notified all complainants that it is holding in abeyance all proceedings in judicial discipline matters "[a]s a result of ongoing litigation concerning procedures before the Commission." The propriety or necessity of the Commission's decision to suspend any of its other proceedings is not before this court. Of course, we express no opinion at this time regarding the Commission's decision to hold any particular matter in abeyance. We note, however, that the wheels of justice across the nation do not ordinarily grind to a halt simply because important issues of procedure are under review. Moreover, the Commission has not explained why this court's review of any particular issues in this proceeding necessarily forecloses the Commission's review and rejection of an undoubtedly large percentage of complaints which are subject to out-of-hand dismissal as unfounded, frivolous, or lacking in grounds necessary to properly invoke the Commission's jurisdiction. *See* Shaman, Lubet and Alfini, *Judicial Conduct and Ethics,* § 13.15 at 419 (1990) (nationwide, 75% percent of all judicial disciplinary complaints are rejected as unfounded, frivolous, or lacking proper jurisdiction).

[5] We therefore deny Petitioner's motion of May 27, 1994, requesting a further briefing schedule.

court's order of October 4, 1993, directing the Commission to produce documents for this court's *in camera* review, delayed the progress of this case for over six months. *See* Whitehead v. Comm'n on Judicial Discipline, 110 Nev. 128, 869 P.2d 795 (1994) (*Whitehead I*). This court did not actually receive the documents for this court's *in camera* review until March 18, 1994.

The proceedings were further delayed by the Commission's procedurally improper and substantively deficient Petition for Rehearing of the court's opinion in *Whitehead I*. In that opinion, we rejected the Commission's contention that it is a public body answerable to no other authority except by appeal to this court from such final, dispositive order as the Commission may ultimately render, if it ever sees fit to do so.[6] In Whitehead v. Comm'n on Judicial Discipline, 110 Nev. 380, 873 P.2d 946 (1994) (*Whitehead II*), this court exhaustively reviewed the contentions asserted in the Commission's Petition for Rehearing, and reaffirmed the decision reached in *Whitehead I*. This court further explained that the Commission's Petition for Rehearing contained misleading and inaccurate characterizations of the Commission's prior arguments and the actions of this court.[7]

Further delay was occasioned by various challenges filed against each permanent member of this court (with the exception of JUSTICE YOUNG who voluntarily recused himself without challenge). The Commission, for example, submitted challenges respecting three members of the instant tribunal. After these challenges were rejected by this court, the Commission submitted a procedurally improper motion for reconsideration. As a result, the issues respecting how this court was to be reconstituted were not finally resolved until February 18, 1994. While these matters remained unresolved, this court could of course take no substantive action in the premises. Nevertheless, despite a swelling

---

[6]It will be apparent later in this opinion that, if the Commission constituted a body insulated from challenge unless and until a respondent judge elected to appeal from a Commission decision to discipline, the Commission could essentially function in total secrecy so long as judges were willing to accept the Commission's dictates without complaint. The impact such a system would have on the independence of the judiciary should be evident to everyone.

[7]Unfortunately, the Commission, shortly prior to this court's issuance of *Whitehead II,* expended scarce public funds by mailing to all members of the State Bar copies of various documents, including the Commission's procedurally and substantively deficient Petition for Rehearing. The unprecedented mailing constituted an obvious, and totally misleading attempt to undermine the reasoning of this court's ruling in *Whitehead I*. This court's opinion in *Whitehead II* thoroughly addressed the erroneous and deficient positions taken by the Commission in its Petition for Rehearing.

deluge of motions by both parties, the complications stemming from distorted media reporting, and despite the ever-increasing case load taxing the resources of this court, we have continued to move as patiently and expeditiously as possible toward a final resolution of these drastically transmuted proceedings.

On July 26, 1994, we issued a third opinion in this matter which, among other things, resolved Petitioner's motion seeking removal of counsel for the Commission. *See* Whitehead v. Nev. Comm'n on Jud. Discipline, 110 Nev. 874, 878 P.2d 913 (1994) (*Whitehead III*). This court held that Attorney General Del Papa and counsel associated with her in these proceedings are disqualified from representing the Commission in proceedings against the various judicial officers of this state, including Judge Whitehead. In the present decision (*Whitehead IV*), we now finally reach the questions that these proceedings were originally undertaken to address, namely, whether in entertaining the charges against Judge Whitehead and in following the procedures employed in this matter, the Commission has acted without or in excess of its defined jurisdiction. In finally resolving this question, however, we have concluded that it has also become necessary first to address certain of our dissenting colleague's assertions respecting this court's initial orders of confidentiality, and to clarify for the benefit of the public and the bar the real issues and the true facts and circumstances underlying this court's consideration and resolution of the matter before us.

### PART I: CONFIDENTIALITY

In her dissenting addendum to our September 1994 order, JUSTICE SHEARING changed her previous position and erroneously concluded that "[i]n attempting to keep the proceedings in this case confidential, this court entered an unconstitutional order." We have elected to respond to this point at length because, despite the fact that five of the six judges (Rose, Steffen, Springer, Zenoff, and Guy) who have sat, or continue to sit on this matter have reached a contrary conclusion, JUSTICE SHEARING's about-face on the issue of confidentiality may tend to lend some unwarranted credibility to her current position.[8] More-

---

[8]We note with interest, however, that it appears that our dissenting colleague, JUSTICE SHEARING, has previously also recognized the propriety and constitutional necessity of maintaining the confidentiality of Petitioner's interlocutory filings in this court. In response to a formal request for interim relief made by Petitioner in his initial petition, JUSTICE STEFFEN entered an order on July 22, 1993, directing that the proceedings involving Petitioner in this court and before the Commission should remain confidential. On July 30, 1993, CHIEF JUSTICE ROSE, JUSTICE SPRINGER, and JUSTICE STEFFEN

over, the point is of substantial significance and the precedent established in this case will hopefully serve to minimize future occurrences of the type of strident, acrimonious and accusatory filings and media comments that have permeated, distorted, complicated, transmuted and perverted the instant proceeding.

The distillate of the dissenting justice's position is that the Nevada Constitution provides for the confidentiality of the proceedings before the Commission, but not before this court. She thus concludes that our initial orders staying the Commission's proceedings and entertaining Petitioner Whitehead's pre-probable cause challenge to the jurisdiction of the Commission's proceedings against him in a confidential setting were not constitutional under either our state or federal constitutions. With all due respect, she is wrong.

Turning first to the Nevada Constitution, we note that confidentiality of judicial discipline proceedings is given first priority under the mandate that "[t]he supreme court shall make appropriate rules for: (a) [t]he confidentiality of all proceedings before the commission, except a decision to censure, retire or remove a justice or judge." Nev. Const. art. 6, § 21(5)(a). This court, arguably straining to reach a basis for openness in judicial discipline proceedings prior to the time of a *decision* to *censure, retire or remove* a judicial officer, determined that such proceedings would be made public upon a finding of probable cause by the Commission after a scheduled hearing.[9] *See* ARJD 16. In adopt-

---

entered a second order specifically reaffirming JUSTICE STEFFEN's prior ruling that Petitioner was entitled to confidentiality. On November 3, 1993, CHIEF JUSTICE ROSE, JUSTICE STEFFEN, JUSTICE SPRINGER and JUSTICE SHEARING all signed an order concluding that Petitioner could elect to waive his right to confidentiality. In this order, which we emphasize was signed by four justices including our dissenting colleague JUSTICE SHEARING, this court observed as a preliminary matter that the issue regarding Petitioner's request to waive confidentiality was before the court "due in part to *serious breaches of confidentiality* by 'unnamed sources' *in apparent violation of both the Nevada Constitution and the rules of this court.*" (Emphasis added.) Further, this order observed that Petitioner "has borne the brunt of the press accounts of the proceedings against him . . . ." Petitioner subsequently waived his right to confidentiality, and the proceedings before this court thereafter became public. It is also worthy of note that the Board of Governors of the State Bar of Nevada subsequently issued a public statement noting that "[ARJD] 40(7) allows a judge accused of misconduct to challenge the jurisdiction of the Commission. Judge Whitehead has filed a petition challenging the jurisdiction of the Commission. Until there has been a determination that probable cause exists, proceedings alleging misconduct are to be conducted confidentially."

[9]As noted later in the body of this opinion, there are many state disciplinary systems that provide for confidentiality until such time as a discipline commission makes a recommendation for discipline to the highest court in the state. Public awareness of these proceedings comes at a much later time than under the rules adopted by this court for Nevada's disciplinary scheme.

ing Rule 16, we assured that every time the Commission determined that there was probable cause to believe that clear and convincing evidence could supply an evidentiary basis for imposing discipline, the public would be made aware of the full extent of the charges against a respondent judge.

Rule 16 thus effectively accelerated the point when there would be public awareness of disciplinary proceedings. This court also recognized, however, that there could be times when the Commission might either refuse to accept jurisdiction of a complaint where jurisdiction existed, or accept jurisdiction where it did not exist. Moreover, we recognized that there could be instances when the Commission, like district courts or courts of limited jurisdiction, will exceed its jurisdictional prerogatives in the processing of complaints against judges. The latter contingency could occur to the unauthorized benefit of either the judge or the prosecuting officer. In contemplation of the foregoing possibilities, this court adopted Rule 40(7). The latter rule provides for review of interlocutory orders of the Commission in this court where either a prosecuting officer or a respondent judge concludes that the Commission is acting without or in excess of its jurisdiction.

Obviously, any writ proceeding in this court pursuant to Rule 40(7) which is filed after a finding of probable cause would not be confidential. However, a jurisdictional challenge filed in this court prior to a finding of probable cause would, as here, merely shift the proceedings, temporarily, from the Commission to this court. From the inception of the Commission's assumption of jurisdiction in the Whitehead matter down to the present, the matter has and continues to be under the disciplinary umbrella and official consideration of the Commission. In ordering confidentiality in these writ proceedings, this court did nothing more than assure that future proceedings before the Commission would retain the confidential integrity required by the Nevada Constitution until such time as a probable cause determination may be reached. The policy reasons underlying the constitutional provision for confidentiality were as compelling and applicable in the pre-probable cause challenge in this court as they were before the Commission. A contrary conclusion would allow the Commission to proceed without or in excess of its jurisdiction against a judicial officer knowing that any challenge to its authority would cost the respondent judge the constitutional grant of confidentiality that the judge would otherwise have. In short, our dissenting colleague's reasoning, were it to prevail, would leave any respondent judge faced with jurisdictional excesses by the Commission, in the predicament of having to forfeit his or her constitutional right to confidentiality and be publicly tarnished by the

proceedings in our court, or simply accept whatever sanctions or procedures the Commission might impose irrespective of jurisdictional excesses.

Moreover, imposing such a cost on the respondent judge would continue to invite the ongoing *ad hoc* and secret imposition of discipline that has heretofore characterized virtually every administration of discipline by the Commission since the adoption in 1988 of the current Commission rules until the filing of Judge Whitehead's petition. With only one exception, the Commission has functioned under cover of darkness during the period between the April 1988 effective date of the current Commission rules and the July 1993 filing of the instant petition. We again emphasize that the Nevada Constitution, article 6, § 21(7) provides that after a preliminary investigation of a complaint against a judge, the Commission *shall* either "dismiss the matter or order a hearing to be held before it." In support of the constitutional mandate of dismissal or hearing, this court adopted a Commission rule which, in the absence of dismissal, *required* the Commission to "make a finding whether or not probable cause exists." ARJD 15. Thus, if the Commission determines that either a basis for a finding of probable cause does not exist, or finds after a probable cause hearing, that there is a lack of probable cause to proceed, the Commission must dismiss the complaint, and the confidentiality of the proceedings and the reputation of the judge are thereby preserved.

On the other hand, under ARJD 16, every time the Commission finds probable cause at the required, reported hearing, a formal statement of charges must be prepared and filed as a public document. Thus, the Nevada Constitution provides that each complaint against a judge will result in either a dismissal or a hearing, and Rule 16 provides that every time there is a finding of probable cause, the public is entitled to know.[10]

This court continues to adhere to the principle that confidentiality is mandated by the Nevada Constitution in any pre-probable cause challenge to the Commission's jurisdiction filed in our court. It is sheer folly to conclude, as the dissenting justice does, that even where the Commission functions without jurisdiction, the respondent judge may only seek relief in this court by forfeiting his or her constitutional guarantee of confidentiality. Ironically, the dissenting justice concludes that our order of confidentiality was unconstitutional and void for lack of jurisdic-

---

[10]We note that the recent amendment to article 6, § 21 of the Nevada Constitution does not in any way affect the requirement for either a dismissal or a hearing. Nor does it affect the right of the public, under Rule 16, to be fully informed of a finding of probable cause resulting from the necessary hearing.

tion, but seems to believe that the Commission can function without jurisdiction and be challenged only after the Commission has fully performed its invalid work, irrespective of the cost to the abused judicial officer. We fail to perceive any basis for such reasoning in logic or law.

Oddly, the dissenting justice also recognizes Nevada's right to include a constitutional provision guaranteeing confidentiality of discipline proceedings before the Commission, but then concludes that even while a respondent judge enjoys such a privilege under the constitution, if he or she dares to challenge the Commission's jurisdiction in the only tribunal initially available, there is, *ipso facto,* no longer a compelling interest in maintaining confidentiality. We will proceed to demonstrate that the dissenting justice is simply wrong.

We first note that the dissenting justice, without any authority whatsoever, and with no prospect for finding any, states that any rule adopted by this court pursuant to constitutional mandate governing the Commission proceedings regarding confidentiality, "certainly may not be considered as legal authority for making Nevada Supreme Court records or proceedings secret in the face of contrary statutory authority. This court rule does not supersede NRS 239.010." The latter statute, quoted by the dissenting justice, relates to "[a]ll public books and public records of a public agency . . . ." Even if we were to agree that the judicial branch of government is included within the statutory definition of "public agency," the reference to "public books and public records" simply has no application to records which this court has lawfully declared not to be public. Moreover, the dissenting justice espouses a novel and unique jurisprudence in concluding that the exercise of jurisdiction by this court both conferred and mandated by the Nevada Constitution, is somehow superseded by a conflicting statute. The dissenting justice could just as rationally conclude that a statute purporting to divest the Commission of its rightful constitutional jurisdiction would prevail over the Commission's grant of authority by the constitution. Any rule adopted by this court under constitutional mandate must, as a matter of law and the hierarchy of law, prevail over any conflicting statutory provision. *See, e.g.,* State v. Connery, 99 Nev. 342, 661 P.2d 1298 (1983) (where rule of procedure is promulgated in conflict with a statute, the rule supersedes the statute and controls); *see also* Nevada Code of Judicial Conduct, Section entitled: "Application of the Code of Judicial Conduct," Subsection F, Commentary.

JUSTICE SHEARING quotes at length from State Ex Rel. Bilder v. Township of Delavan, 334 N.W.2d 252 (Wis. 1983) as if the

case had relevance to the matter at hand. It does not other than to show that the courts have the inherent power to close judicial filings when compelling circumstances warrant. The dissenting justice misses the mark in stressing the result in *Bilder* as somehow detracting from the propriety of this court's ruling in the instant case. Bilder, who was a police chief, sought to maintain confidentiality while challenging the disciplinary procedures being followed by the town board. Of significance to the instant proceeding is the statement in *Bilder* that:

> Bilder had the obligation, as the party seeking to close court records, to demonstrate that the administration of justice requires denying public access to court records and to state with specificity the reasons for closure . . . .
>
> We conclude that Bilder has not shown that . . . the circuit court should have exercised *its inherent power to close the court file.*

*Id.* at 262-63 (emphasis supplied). *See also* State v. O'Neill, 78 N.W.2d 921 (Wis. 1956) (recognizes, with numerous citations from other jurisdictions, inherent power of courts to limit requirement for public trials where the administration of justice requires it). There is no reason to doubt the propriety of the ruling in *Bilder;* there was simply no public policy or other compelling reason to close the court files. The instant proceeding is very much to the contrary. Nevada has a strong public policy favoring confidentiality in judicial discipline proceedings until there is credible evidence of wrongdoing against a judicial officer. Indeed, as noted above, the constitutional mandate to this court is to adopt rules for the Commission that would assure "[t]he confidentiality of *all* proceedings before the commission, *except* a *decision* to censure, retire or remove a justice or judge." Nev. Const. art. 6, § 21(5)(a) (emphasis added). In the Whitehead proceeding there never has been a *decision* to impose discipline because there has yet to be a finding of probable cause.

JUSTICE SHEARING fails to discern the reasons underlying Nevada's strong public policy concerning the confidentiality of judicial discipline *proceedings.* Harvard Professor Laurence Tribe, a noted scholar in constitutional law, describes confidentiality in judicial discipline proceedings as "protection vitally needed to encourage collegiality, candor, and courage—both political and intellectual—protection needed not for the benefit of judges but for the benefit of society as a whole." Laurence H. Tribe, *Trying California's Judges on Television: Open Government or Judicial Intimidation,* 65 A.B.A.J. 1175, 1179 (1979). The "protection" referred to by Tribe and guaranteed by the Nevada Constitution is not in any sense unique to Nevada. As this court noted in *Whitehead II,* "twenty-eight states plus the District

of Columbia evidently have a more stringent confidentiality requirement than is presently required in Nevada under ARJD 5 . . . [and] ten jurisdictions 'permit public disclosure only where a supreme court orders a sanction.'" *Whitehead II,* 110 Nev. at 145-47 n.15, 873 P.2d at 959 (citing Shaman, Lubet and Alfini, *Judicial Conduct and Ethics,* § 13.15 at 417 (1990)).

We briefly addressed Nevada's public policy concerning confidentiality in judicial discipline proceedings in *Whitehead III,* where we said:

> The argument of some is, of course, that judges are no different from any other public official and that if any allegations of misconduct are made by anyone, such charges should immediately be open to the public. The counterargument (and the one adopted by the framers of the Nevada Constitution) is that the judiciary depends to a large degree for its effectiveness on the trust and confidence that the people place in that institution's ability to render, day-to-day, fair and impartial decisions. By its very nature, the judiciary deals with disputes that often leave litigants or counsel with negative or agitated feelings. As a result, many complaints may be generated and sent to the Commission about judges that are entirely without merit. If all of these unfounded complaints were available to the public and the media, without any inquiry into their substance, public esteem for the judiciary as a whole would suffer, thus making it more difficult for the one branch of government that should be a safe haven for the impartial and fair resolution of disputes, to inspire public confidence in the integrity of judicial proceedings.

*Whitehead III,* 110 Nev. at 888-89, 878 P.2d at 922.

There are, of course, numerous other reasons supporting Nevada's constitutional policy of providing guarantees of confidentiality prior to a *decision* by the Commission to impose discipline. Unless the Nevada judiciary is ultimately to be staffed only by those who are independently wealthy, most lawyers who sever ties to private practice or other sources of financial security would think twice about aspiring to an elected judiciary where, even after election, future opponents could cite to groundless Commission complaints as a basis for denying an incumbent reelection. *See, e.g.,* Doe v. State Com'n on Judicial Conduct, 520 N.Y.S.2d 513, 515 (N.Y. Sup. Ct. 1987) (although court concluded that judge's request to seal court record was unwarranted under the facts of the particular case, court acknowledged that it had the power to seal its own records in an appropriate case, and that it was not "unmindful of a possible scenario

whereby the Respondent Commission becomes a vehicle for a disgruntled judicial candidate or his supporters to embarrass or inconvenience his successful opponent out of revenge or pettiness"). Thus, a negative campaign challenge could be mounted on inferences drawn solely from frivolous complaints to the Commission. Moreover, in the never, never land espoused by the dissenting justice, if the Commission, functioning without or in excess of its jurisdiction, proceeded against a judge who would be helpless to challenge the Commission's pre-probable cause actions except on pain of public notoriety, there would be an additional chilling effect on potential candidates for judicial office. It must be remembered that, unlike the other two branches of government, the judiciary is generally foreclosed the luxury of compromising claims of contending parties in order to achieve alleviation of the feelings of both. More often than not, the judicial process demands absolute fidelity to the law despite resultant agitated or angered feelings on the part of the losing party. Public confidence in the fairness, impartiality, and independence of the judiciary is essential to the purposes for which the third branch of government was created. *See* Kamasinski v. Judicial Review Council, 797 F.Supp. 1083 (D. Conn. 1992).[11]

We ask the reader to keep in mind that we are not speaking hypothetically! As indicated above, with one exception, in every act of discipline imposed by the Commission under the current Commission rules and prior to the instant proceeding, the Commission has acted *without* jurisdiction in the punishment it has administered. *See, e.g.*, the partial list of instances of misconduct identified in JUSTICE SPRINGER's concurring opinion. Nevada's judiciary will surely languish in a quagmire of disrespect and

---

[11]In *Kamasinski*, the court observed:

> Connecticut's judicial review process is clearly based on the understanding that open proceedings prior to a finding of probable cause would invite chronic, disgruntled litigants to use the JRC proceedings as a forum for collateral litigation of legal claims or theories rejected elsewhere or for the pursuit of vendettas against judges. Without confidentiality at the preliminary stage of judicial conduct review, Connecticut might have difficulty attracting and retaining high quality personnel for its judiciary if judges were to face continual abuse and harassment in JRC proceedings as a consequence of discharging their constitutional duties. Even more ominously, if exposed to complaints in open, preliminary proceedings, Connecticut judges might tend to be intimidated or unduly influenced by belligerent litigants who would be more likely than others to commence a retaliatory campaign of harassment of the judge before the JRC. The Connecticut General Assembly . . . stated in the preamble to the JRC statutes that "the continued independence of the judiciary is indispensable." Conn. Gen. Stat. § 51-51g.

*Id.* at 1092.

suspicion if the constitutional guarantee of confidentiality may be suspended by merely challenging the Commission's jurisdiction prior to a finding of probable cause.[12] Indeed, if a jurisdictional challenge to the operations of the Commission had been filed much earlier, perhaps a far more realistic and even-handed disciplinary system would have processed the list of matters set forth in the SPRINGER concurrence, thus providing a basis for greater public respect for both the Commission and the judiciary. However, if judges "bargained" under the belief that a judicial challenge to the Commission's authority would result in demeaning public notoriety, there is little reason to wonder why the challenge was so long in coming.[13]

---

[12]It is ironic indeed, that, as noted above, the dissenting justice would find a statute preeminent over a conflicting court rule adopted pursuant to constitutional mandate, and then argue, in clear effect, that the constitutional requirement of a dismissal or a hearing is superseded by ARJD Rule 31 that states "[u]pon written consent of the respondent, the commission may order. the respondent's censure, removal or retirement at any stage of the proceedings and this order takes effect immediately. A certified copy of the order must be filed with the clerk of the supreme court and a copy of the order must be served on the respondent." Despite the fact that Rule 31 is included under Section V of the ARJD entitled "PROCEDURE AFTER FINDING OF PROBABLE CAUSE," JUSTICE SHEARING argues that *at any stage of the proceedings* means at any time after the filing of the complaint, including the period prior to a determination of probable cause. Thus, the dissenting justice not only arrogates primacy to her construction of Rule 31 over the constitutional requirement for either a dismissal or a hearing, but then undermines her own claim of preference for openness. If the Commission were free to disregard the constitutional provision that requires it, after "preliminary investigation," to "dismiss the matter or order a hearing to be held before it," then we would have a constitutional body that could grant or withhold favor or punishment under cover of darkness and in accordance with its biases for or against respondent judges—precisely the condition that has prevailed due to the Commission's failure to abide by the current Commission rules.

It should be noted, moreover, that the Commission has compounded the problem even under the SHEARING interpretation of Rule 31 by making no attempt—except on one occasion shortly after the Rule took effect—to comply with the Rule's mandatory requirement that a certified copy of the Commission's consent orders be filed with the clerk of the supreme court. With only that one exception, in *no instance,* including those itemized in JUSTICE SPRINGER's concurring opinion, has the Commission ever filed its consent orders with this court! Neither the public nor this court has been made aware of the allegations of misconduct and the basis for the Commission's *ad hoc* rulings. Public awareness has thus been either totally circumvented or at best greatly restricted by the Commission's practice of eliminating both the constitutionally required probable cause hearing and the filing of consent orders reached through a bargaining process. Moreover, the Commission has provided no basis—other than blind trust—for evaluating the Commission's performance.

[13]It is indeed both ironic and tragic that Petitioner Whitehead, certain other judicial officers, and this court have become the equivalent of sacrificial lambs in the process of enforcing a public disciplinary process as contem-

To our knowledge, there is only one reported appellate court decision that is substantially on point with the instant case. We use the term "substantially" advisedly since the spring from which the right of confidentiality flowed was a state statute rather than the state constitution. In the case of Nicholson v. State Com'n on Judicial Conduct, 422 N.Y.S.2d 701 (N.Y. App. Div. 1979), the Supreme Court, Appellate Division, unanimously concluded (there was one partial dissent to a different part of the ruling among the five judges hearing the appeal) that:

> Clearly, where the Commission's investigation is still in a preformal complaint stage, the confidentiality mandate of the statute warrants sealing of the record. The assertion that a Judge who challenges the Commission forfeits his or her statutory right to confidentiality is totally without merit and would frustrate the clear legislative intent to maintain confidentiality in the initial stages of the inquiry. In effect, such assertion, if adopted, would create an intolerable and unreasonable choice between passive submission to possibly improper proceedings and irreparable damage to reputation. Indeed, Section 45 of the Judiciary Law makes it abundantly

plated by the ARJD. It is far better that a rare pre-probable cause jurisdictional challenge be reviewed in confidence than that the entire disciplinary process be enshrouded in secrecy. As long as judges are given the option of a secret "deal" with limited or no publicity as opposed to public notoriety upon judicial challenge, a closed system will be the rule rather than the exception.

Again, we are not speaking hypothetically. In the case of Judge D, in announcing the public censure of the judge, Commission Chairman Shipler was quoted in the media as saying "[i]f [Judge D] had not agreed to the censure, he could have faced a public hearing in which all the details of the case would have become public information." (Cite omitted to discourage further notoriety occasioned by the Commission's breach of confidentiality.)

Please note that if the Commission had adhered to the constitutional mandate of either a dismissal or a scheduled hearing after preliminary investigation, there would have been a "public hearing" only in the event of a determination of probable cause. Also, assuming a finding of probable cause by the Commission, ARJD 16 would have required the public filing of a formal statement of charges which the Commission would have heard at a later, public hearing unless the judge agreed to a consent order under Rule 31. Finally, if this procedure had been followed, either Judge D would have avoided damaging public criticism by prevailing in a probable cause hearing or, in the event of a probable cause finding, the public and this court would have been fully aware of the charges and the basis for any discipline imposed and the propriety of the Commission's ruling.

The procedure specified by the Nevada Constitution and implemented by this court in the ARJD simply provides for confidentiality and the protection of a respondent judge's reputation by the dismissal of a complaint, or a finding of probable cause for discipline with full public awareness of the charges and the results of the disciplinary process. Thus, no form of discipline may be imposed in the State of Nevada without fully informing the public after a finding of probable cause.

clear that in the initial stages of the investigative process set in motion by the filing of a complaint, it is only at the behest of the Judge who is the subject of the complaint that public disclosure may be made.

Further, the statute explicitly provides for public disclosure at a specific point in the process, to wit, after a hearing pursuant to service of a formal written complaint results in a written determination by the Commission that a Judge be admonished, censured, removed or retired and such written determination has been transferred to the Chief Judge of the Court of Appeals and a copy thereof served on the Judge involved. . . . It ill behooves the Commission to seek to subvert the confidentiality aspect of the statutory mandate by averring a violation on Special Term's part of policy governing public access to the courts, while at the same time utilizing the same statutory requirement of confidentiality to justify refusal to disclose material in its possession. The rationale underlying the propriety of the *in camera* consideration of the Commission's motion to compel further testimony applies with equal force herein. Both obtain force from the same statutory mandate.

*Id.* at 706.

The supreme court decision in *Nicholson,* quoted above, was disapproved by the Court of Appeals of New York in a 4-3 decision. In Nicholson v. State Com'n on Judicial Conduct, 409 N.E.2d 818 (N.Y. 1980) the majority wrote:

The Appellate Division ruled that the scheme of confidentiality for commission proceedings required sealing of the court records. We disagree in this respect. True, the Legislature established strict rules of confidentiality to prevent premature disclosure. But the scheme applies only to matters before the commission and nothing in the statute can be read as applying to matters brought before the court.

The public policy of this State is to insure awareness of judicial proceedings . . . . While in an appropriate case a court may draw on its power to seal its own records . . . *a blanket rule requiring the sealing of all court records involving proceedings by the commission is unjustified in the absence of legislative mandate.* The Appellate Division erroneously substituted its judgment for that of the Legislature in perceiving the need for sealing. Its *rule* is no less than the judicial creation of a category of court proceedings that is to be shielded from public scrutiny. Public access to court records need not and should not signal access to the commission's internal proceedings. Indeed, such precautions as *in*

*camera* hearings, utilized in this case, preserve confidentiality. *If the Legislature deems it necessary to extend the proscription against disclosure to judicial proceedings connected with those of the commission, it may do so.* . . . However, a rule requiring such extraordinary relief should not come from this court.

*Id.* at 825-26 (emphasis added; citations omitted). Judge Fuchsberg, dissenting in part, stated that "fairness again, it seems to me, requires that since 'appearances' more often are the product of the publicity rather than that of the underlying conduct, a Judge should not have to pay the price of privacy for the privilege of pursuing her rights." *Id.* at 827. Finally, Judge Meyer, with whom Judge Gabrielli concurred, declared in dissent:

> I disagree with respect to the sealing of court records and would affirm without modification. The court has inherent power to seal its own records and since refusing to do so unfairly disadvantages a Judge under investigation who wishes to challenge the commission's authority, by requiring him to forfeit his right to confidentiality if he does so, I would hold as did the Appellate Division that the record should be sealed pending completion of the investigation.

*Id.*

Eight of twelve judges who considered the *Nicholson* case concluded that a judge against whom a complaint was filed was entitled to the same right of confidentiality afforded the judge before the discipline commission while challenging the authority of the commission in court. At the very least, this must surely indicate that the issue is one upon which reasonable minds could differ. Nevertheless, we are unwilling to conclude that the Court of Appeals of New York would have decided the issue of confidentiality in the instant *Whitehead* case differently than five of the six Nevada judges who have considered it. First, the grant of confidentiality in *Nicholson* stemmed from a legislative enactment rather than the Constitution of the State of New York. Second, the New York Constitution directed that the legislature rather than the court of appeals adopt rules for the judicial discipline commission. Third, unlike the instant case, the court of appeals declared that the supreme court, appellate division, created a blanket rule that required the sealing of all court records "involving proceedings by the commission." Fourth, the court of appeals sanctioned the use of other methods by the courts in preserving confidentiality. Fifth, the court of appeals recognized that the state legislature, in whom the constitution had placed the right to adopt commission rules, could lawfully adopt a rule that

would make judicial proceedings related to commission proceedings confidential.

Taking the aforestated points *seriatim,* we note that: (1) the grant of confidentiality in judicial discipline proceedings in Nevada stems from the state constitution rather than legislative enactment; (2) the Nevada Constitution directs that this court, rather than the Legislature, shall adopt the rules governing the Commission, including provisions for the confidentiality of all proceedings with the exception of the decision to discipline; (3) this court has not adopted a blanket rule making all discipline matters challenged in our court confidential; only jurisdictional challenges filed before a finding of probable cause would be confidential; (4) the Commission and the dissenting justice have even challenged the right of this court to preserve confidentiality through *in camera* review, a position contrary to that taken by the court of appeals; and (5) the court of appeals acknowledged that the state legislature, which was given authority by the New York Constitution to adopt commission rules, could lawfully enact legislation that would make court proceedings connected to disciplinary proceedings confidential; by a parity of reasoning, this court, given a similar grant by the Nevada Constitution, could lawfully impose confidentiality on pre-probable cause writ proceedings filed in this court challenging the jurisdiction of the Commission. Finally, the court of appeals in *Nicholson* expressly recognized, as have we, the inherent power of the courts to seal their own records in appropriate cases. The instant case is such a case.

Despite the fact that the *Nicholson* cases are the only appellate decisions extant previously dealing with the right of a judge to confidentially petition a court for writ relief on grounds of a judicial discipline commission acting in excess of its authority,[14] the dissenting justice makes the amazingly erroneous statement that "[c]ourts have consistently held that the filing of a writ petition operates as an automatic waiver of confidentiality." She then cites three totally inapposite cases in support of the proposition she espouses. Her first citation is from the dissent in Roberts

---

[14]In Doe v. State Com'n on Judicial Conduct, 520 N.Y.S.2d 513 (N.Y. Sup. Ct. 1987), a New York Supreme Court denied a judge's request to seal court records concerning the judge's challenge to judicial conduct commission proceedings. Citing to *Nicholson,* the lower court observed that "there is neither a blanket rule requiring all court proceedings remain confidential, nor one mandating openness in all cases" and that "*a court may draw on its power to seal its own records in an appropriate case.*" *Id.* at 515 (emphasis added). Under the facts of the particular case before it, however, the court concluded that an order sealing the record was not warranted. In particular, the court noted that conduct alleged had already been publicly disclosed.

v. Com'n on Judicial Performance, 661 P.2d 1064 (Cal. 1983). Aside from the fact that a dissenting opinion does not create law or precedent, Justice Mosk's dissent in *Roberts* hardly supports the proposition of law JUSTICE SHEARING would have her readers believe. In complaining of what Justice Mosk considered an unconstitutional release of information by the discipline commission, he said (in the only statement relating to JUSTICE SHEARING's assertion):

> It might be argued that even if the commission met its responsibility of confidentiality, the recommendation for discipline would become known when it was filed with this court. That is not necessarily so. The material filed with the court does not identify the judge involved; in this instance the case was entitled "Inquiry Concerning a Judge No. 49." Only when the judge files a petition for writ of review, *seeking a hearing in open court,* does his identity become general knowledge. Thus, going public remains the choice of the judge, not of the commission.

*Id.* at 1072 (emphasis added). In *Roberts,* the respondent judge did not file an original writ proceeding challenging the jurisdiction of the commission. Rather, on a writ of review issued by the California Supreme Court, the court considered Judge Robert's petition challenging a recommendation of public censure by the commission on grounds of insufficiency of the evidence and conduct undeserving of discipline. Parenthetically, it may be enlightening to compare the misconduct involved in *Roberts* (which resulted in a public censure approved by the California Supreme Court) with the allegations of misconduct in the instant case. In any event, there is no mention of any waiver of confidentiality—automatic or otherwise—that results from a challenge to a commission's jurisdiction at a time when the law requires the proceedings to be confidential. Instead, Justice Mosk observes that it is only when a judge seeks a *writ of review, seeking a hearing in open court,* that his identity becomes general knowledge. Here, we do not have a writ of review issued by this court pursuant to a petition for an open court hearing to contest sufficiency of the evidence and the propriety of recommended discipline. Justice Mosk's dissent is of no support to the dissenting justice's erroneous proposition in the instant proceeding. Moreover, it should be noted that Justice Mosk indicated that it is only when the respondent judge requests a writ of review, *seeking a hearing in open court,* that the identity of the judge is revealed. Otherwise, the judge's identity remains confidential within the California Supreme Court until such time as the court may determine whether to impose discipline, a system foreign to that in Nevada.

Next, JUSTICE SHEARING cites McKenney v. Commission on Judicial Conduct, 388 N.E.2d 666, 674 (Mass. 1979) as supporting authority. It is not. The respondent judge in *McKenney* filed a *complaint* in the Supreme Judicial Court, Suffolk County, seeking a determination that the complaint filed against him was not in conformity with the applicable statute; the judge also sought an order dismissing the complaint. In relevant part, the court in *McKenney* asked the commission to advise it of the future disposition of the matter and then stated that "[t]his request will not violate the confidentiality of the commission's proceedings because *the judge has made the matter public by his commencement of this action.*" *Id.* (emphasis added). There is no mention of any waiver (intentional relinquishment of a known right) or that the judge insisted in an interlocutory writ petition to have his cause determined under a right of confidentiality granted by the state constitution or other law. Indeed, the court simply stated that the judge made the matter public by commencing his *action*. Again, there is no mention of the word "automatic" as represented by the dissenting justice.

The third and final case cited by the dissenting justice in support of her unwarranted premise is Matter of Owen, 413 N.Y.S.2d 815 (Ct. on the Judiciary 1978). In the first place, this case was decided by the court on the judiciary. It has no precedential value when considered in light of *Nicholson*, a Court of Appeals of New York case decided in 1980. Second, the court on the judiciary in *Owen* merely noted that "[r]espondent waived confidentiality in the course of *joining, as a petitioner,* in an Article 78 Proceeding relating to the charges herein (*Matter of Polansky, et al. v. New York State Commission on Judicial Conduct,* [Sup.Ct.Albany Co., 1977])." *Id.* at 818 (emphasis supplied). Again, this case does not support the general proposition the dissenting justice asserts. Judge Owen did not file a petition on his own behalf requesting, in part, that his name be kept confidential. Indeed, he sought dismissal of discipline proceedings on the basis of "alleged prejudicial publicity emanating from the office of the State Commission on Judicial Conduct." *Id.* Thus, Owen sought relief because the proceedings against him had already been made public (seeking confidentiality was of little moment) and, his right to confidentiality in the court on the judiciary was waived by reason of his joinder in a petition filed by another. The case is inapposite, and at no point does the court on the judiciary suggest that "the filing of a writ petition operates as an automatic waiver of confidentiality." The position asserted as a proposition of law by the dissenting justice is inaccurate, misleading, and without support in any of the three cases she has cited.

The dissenting justice also contends that this court's orders of confidentiality were in violation of the United States Constitution. Again she is wrong. The United States Supreme Court has clearly stated that it was never intended that individual privileges guaranteed by the Federal Constitution be diminished by making their assertion costly. *See* Griffin v. California, 380 U.S. 609, 614 (1965). JUSTICE SHEARING would nevertheless have the right of confidentiality guaranteed to respondent judges by the Nevada Constitution *eliminated* if they dare to temporarily shift the proceedings from the Commission's turf to challenge the Commission's jurisdiction in this court. The issue, therefore, is whether maintaining the confidentiality of pre-probable cause proceedings during the jurisdictional review in this court violates the Federal Constitution.[15] We again conclude that it does not.

We find it instructive to quote at some length from the case of First Amendment Coal. v. Judicial Inquiry & Review, 784 F.2d 467 (3rd Cir. 1986):

> The issue before us is not whether the First Amendment prohibits the state from barring public observation of judicial disciplinary proceedings at all stages. Pennsylvania has provided for disclosure but has limited it to the situation in which discipline has been recommended and the record has been filed with the court.[16] Consequently, we assume, but do not decide, that there is a constitutional right of access to disciplinary proceedings at some stage.

[15]In referring to the shift from the Commission's forum to that of this court as being a "temporary" one, we are, of course referring to those instances where, as here, the jurisdictional challenge results in a remand to the Commission rather than an outright dismissal of the discipline proceedings. It is a fundamental principle of law that if, in a given case, it could be demonstrated that the Commission was acting without jurisdiction, dismissal would be mandatory. As an example based upon historical fact with the Commission, if the Commission were to accept jurisdiction over a non-judge judicial candidate, and interfere with the candidate's election campaign, or elect to publicly censure judges without first receiving a cognizable complaint or giving the respondent judges (who in fact had committed no act of wrongdoing) an opportunity to be heard in a probable cause hearing, this court, upon challenge, would have no alternative other than to dismiss the unlawful exercise of jurisdiction by the Commission. In this historical example, confidentiality was not an issue in brief proceedings in this court because the Commission had already unlawfully released its unlawful sanctions to the media.

[16]We note that, under the rules adopted by this court for the Commission, judicial discipline proceedings become public in Nevada after a finding of probable cause has been made by the Commission and the public filing of a formal statement of charges, a point far earlier in the proceedings than is apparently the case in Pennsylvania.

. . . .

Although we assume a right of access, it does not attach at the same time it might in certain other contexts and at the point the Coalition urges on us here. By analogy to the cases establishing a First Amendment right of access to criminal trials . . . and this court's decision to extend the rationale to civil trials . . . the Coalition maintains that where a constitutional right of access is found to exist, a "presumption of openness" is created. This presumption, the Coalition contends, places the burden on the state to justify restrictions on access by showing a "compelling governmental interest [which the restriction] is narrowly tailored to serve."

All rights of access are not co-extensive, however, and some may be granted at different stages than others. In assuming a right of access, we need not postulate a span as extensive as that in civil and criminal trials as such, but rather may be guided by the unique history and function of the Judicial Review Board.

. . . .

But the cases defining a right of access to trials are, at best, of limited usefulness in the context of the fundamentally different procedures of judicial disciplinary boards. These administrative proceedings, unlike conventional criminal and civil trials, do not have a long history of openness. Recognizing this fact, the Coalition points to time honored judicial removal in open impeachment hearings.

Had the state constitutional convention acted to replace traditional impeachment with a substitute vehicle like the Judicial Inquiry and Review Board, a closer question of public access to the successor proceedings would be presented. But it is clear that the Board's functions are intended to supplement rather than replace the historical methods of judicial discipline: impeachment and removal for conviction of a crime. . . . It was largely the recognition that these traditional methods are cumbersome and ineffective, partly because of their openness, that spurred the constitutional convention to conceive the new judicial disciplinary procedure.

Against this background, the "presumption of openness" gleaned from the history of criminal trials . . . lacks force. Rather, in judicial disciplinary proceedings, what tradition there is favors public access only at a later stage in the process. A temporally based right is no stranger to the law. For example, tradition supports the secrecy of the grand jury, the entity in the criminal justice system to which the Board is most akin. Similarly, sidebar conferences between

lawyers and judges at trial are contemporaneously confidential although they may later appear as part of the transcript. . . .

. . . .

[T]he state has demonstrated a substantial interest in preserving limited confidentiality. That interest rests not only on the reputation of the judiciary as an institution and judges who have been accused but not proved culpable, but also on the need for flexibility so that the Board may efficiently accomplish its purpose.

. . . .

Nor is it a valid objection to say that the confidentiality provision gives more favored treatment to judges than other governmental officials. The reality is that only judges are subjected to such disciplinary procedures; rather than being favored they have been singled out for more rigid oversight than their counterparts in the legislative and executive branches.

*Id.* at 472-73, 476-77 (citations omitted).

As observed by the court in *First Amendment Coal.* with respect to the State of Pennsylvania, the State of Nevada has a compelling interest, enthroned in its constitution, to assure the confidentiality of judicial discipline proceedings until there has been a decision to discipline—interpreted by this court to allow openness upon a finding of probable cause and the public filing of a formal statement of charges. *See, e.g.,* Kamasinski v. Judicial Review Council, 797 F.Supp. 1083 (D. Conn. 1992) (state's interest in prohibiting disclosure prior to determination of probable cause is sufficiently compelling to survive the strictest First Amendment scrutiny); *see also* Kamasinski v. Judicial Review Council, 843 F.Supp. 811 (D. Conn.), *aff'd,* ...... F.3d ......, 1994 WL 723988 (2d Cir. (Conn.) 1994). Until that time, the public policy of this state, as revealed in its constitution, is to maintain the confidentiality of judicial disciplinary proceedings. Moreover, the Third Circuit Court of Appeals has also noted that "we are not presented with the fiat of a single official acting in a discretionary fashion, but with a constitutional provision enacted by a state in conformity with Article IV, § 4 of the federal constitution guaranteeing each state a republican form of government." *First Amendment Coal.,* 784 F.2d at 475.

We do not perceive a basis in the United States Constitution for requiring this court to undermine the constitutional mandate and public policy of this State to assure that pre-probable cause judicial disciplinary proceedings remain confidential during an interlude in the proceedings while a respondent judge challenges

the jurisdiction of the Commission in this court. *See, e.g.*, People ex rel. Ill. Jud. Inquiry Bd. v. Hartel, 380 N.E.2d 801 (Ill. 1978) (state constitutional requirement that judicial discipline proceedings be kept confidential must be implemented except as overriding federal due process requirements compel court to do otherwise), *cert. denied*, 440 U.S. 915 (1979).

The United States Supreme Court, in Landmark Communications, Inc. v. Virginia, 435 U.S. 829 (1978), acknowledged that substantial uniformity in state plans for judicial disciplinary systems suggests four advantages to confidentiality in judicial disciplinary proceedings: (1) it encourages the filing of complaints; (2) it protects judges from injury that could result from publishing unwarranted and unexamined complaints; (3) it maintains confidence in the judiciary as an institution of government by avoiding premature publication of groundless complaints of judicial misconduct; and (4) it facilitates the performance of judicial discipline commissions in various practical aspects. *Id.* at 835-36.

Obviously, if a pre-probable cause jurisdictional challenge by a respondent judge in this court caused the privilege of confidentiality bestowed by the constitution to evaporate, the significant advantages listed as items (2), (3), and to a lesser extent, (4), would disappear.

Moreover, the *Landmark* Court in no sense suggested that maintaining the confidentiality of judicial disciplinary proceedings was unconstitutional. *Landmark* simply held that the First Amendment prevented the State of Virginia from imposing criminal sanctions on third persons, including the media, who are strangers to a discipline proceeding, for divulging or publishing truthful information concerning the confidential proceeding. The High Court noted, with no indications of disapproval, that a number of states punish a breach of the confidentiality requirement by commission members or staff as contempt. The ARJD has a similar provision. *See* ARJD 6.

The *Landmark* Court assumed the validity of confidentiality provisions in the Virginia judicial disciplinary procedures, but held that they could not affect the right of a newspaper to publish confidential information it had received from a source independent of commission participants. The Court did, however, note that much of the risk of injury to a respondent judge, the judicial system, and the operation of a discipline commission "can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings." *Landmark*, 435 U.S. at 845.

We are in complete agreement with the ruling in *Landmark*.

We also agree that except in unique and compelling situations, court proceedings, including proceedings before this court, should be open to public scrutiny. The instant case was, however, such a unique and compelling proceeding. There is no suggestion in this proceeding that Nevada's constitutional requirement of confidentiality in proceedings before the Commission violates any federal constitutional standard. In our view, there is also no reasonable basis for concluding that a confidential challenge to the Commission's jurisdiction in this court during the period when confidentiality before the Commission still applies, would violate any federal constitutional principle. The public policy concerns mandating confidentiality before the Commission would be just as compelling in any such pre-probable cause jurisdictional contest in this court. Moreover, the breaches of confidentiality of the proceedings in this court have been no less destructive or violative of Nevada's constitutional concerns than they would have been before the Commission.

The dissenting justice's reliance on Matter of Krynicki, 983 F.2d 74 (7th Cir. 1992), *cert. denied,* ........ U.S. ......, 114 S. Ct. 1068 (1994), does not support her conclusion that this court's order of confidentiality was unconstitutional. Although the declarations in *Krynicki* regarding presumptions of openness are in accordance with our own views on the subject, they do not provide support for this court's undermining the public policy set by the people in the constitution of this state. We also note that Judge Easterbrook, the author of *Krynicki* observed:

> Requests to seal the briefs reach me a few times every year in my capacity as motions judge. I always deny these motions, informing the parties that they must file public briefs but may add sealed supplements if necessary to discuss in detail materials that they are legally required to keep confidential. Other judges of this court follow the same practice, and I am aware of only one recent case in which briefs were withheld from the public. *A Sealed Case,* 890 F.2d 15 (7th Cir. 1989). That appeal involved a collateral dispute rather than the substance of the case, and we published the opinion to facilitate public scrutiny of our processes.

*Id.* at 75.

First, the *Krynicki* case involved two appeals where the parties wanted the briefs sealed. The instant proceeding is of an interlocutory nature that did not involve appellate briefs. Second, the petition filed by Petitioner Whitehead was an original writ proceeding challenging an interlocutory order of the Commission pursuant to ARJD 40(7). The gravamen of the challenge is that the Commission was proceeding against the respondent judge in

excess of its jurisdiction. In short, the challenge involved "a collateral dispute rather than the substance of the case," *i.e.*, rather than the merits of the complaints against the Petitioner or whether his alleged actions were deserving of discipline. Finally, if the processes of this court had been respected, a published decision would have resulted keeping the name of the petitioning judge confidential while giving the Commission necessary direction with respect to its rules, and the propriety of the course the Commission was following. Thus, in the end, the public would have been able to scrutinize this court's position on the issues brought before us by Petitioner.

The point we desire to emphasize is that this court would never condone any attempt to cover up judicial corruption or impropriety whether attempted by this court or any other court or, for that matter, the Commission which, under its *modus operandi* after the effective date of the current Commission rules and the instant proceeding, has placed itself in a unique position to grant covert favor or disfavor to judicial officers without public accountability or disclosure. It is certainly not our intention to provide the Commission with a means of assuring public notoriety against a judge through the simple expedient of exercising jurisdiction where jurisdiction is not present, thus forcing the judge to seek relief in this court at the cost of unwarranted public obloquy resulting from the forfeiture of his or her entitlement to confidentiality during the jurisdictional challenge.

We have also found apropos to the subject discussion the case of Barron v. Florida Freedom Newspapers, 531 So. 2d 113 (Fla. 1988). In acknowledging the well-established and strong presumption of openness for all court proceedings, including appellate review, the *Barron* court stated that the following factors had to be weighed in determining whether a closure of civil proceedings was proper:

> [C]losure of court proceedings or records should occur only when necessary (a) to comply with established public policy set forth in the constitution, statutes, rules, or case law; (b) to protect trade secrets; (c) to protect a compelling governmental interest [e.g., national security; confidential informants]; (d) to obtain evidence to properly determine legal issues in a case; (e) to avoid substantial injury to innocent third parties [e.g., to protect young witnesses from offensive testimony; to protect children in a divorce]; or (f) to avoid substantial injury to a party by disclosure of matters protected by a common law or privacy right not generally inherent in the specific type of civil proceeding sought to be closed.

*Id.* at 118.

First, we note the obvious and equally well-established principle implicitly acknowledged in *Barron* that courts do have the inherent power to close their proceedings and records when justified by the circumstances. Second, of the six factors itemized in *Barron*, arguably items (a), (c), (d) and (f) would, in each instance, justify the confidentiality orders in the instant case. It is clear, however, that the strong public policy set forth in Nevada's Constitution (item (a) in the *Barron* factors) fully supports this court's decision to entertain Petitioner's writ petition under order of confidentiality. In short, it would have been unthinkable for this court, having provided for confidentiality in the ARJD as required by the Nevada Constitution, and also having adopted a rule allowing a respondent judge to challenge the jurisdictional validity of interlocutory Commission orders, to advise the judge that his or her jurisdictional challenge caused the forfeiture of confidentiality vouchsafed by the Nevada Constitution.

Perhaps the most alarming aspect of the dissenting justice's dissent is her willingness to accept the validity of her lone dissent on this subject as a basis for virtually promoting disobedience to the lawful orders of this court. Indeed, she totally fails to realize that even if her erroneous view on the constitutional validity of this court's orders were correct, until such orders are modified, they are to be obeyed. *See* Matter of Krynicki, 983 F.2d 74, 78 (7th Cir. 1992) ("The confidentiality order is effective until modified; the collateral bar doctrine requires litigants to obey invalid orders while they are outstanding") (citing Pasadena Bd. of Educ. v. Spangler, 427 U.S. 424, 439-40 (1976)). And, in deference to her own opinion in dissent, she concludes that "[w]e all have more important things to do" than to investigate the source of the violation of our orders of confidentiality. Moreover, using an intuition we have cause not to share, she opines that any such investigation would be futile.

Sadly, the dissenting justice does not seem to comprehend or appreciate the extent of the damage inflicted upon the judicial branch of government as a result of the unlawful, unethical violations of this court's orders of confidentiality. Public confidence in the integrity of the judiciary is essential to the effective dispensation of justice by the third branch of government. Although we heartily agree that instances of demonstrated judicial corruption, misbehavior or unethical conduct should be made known to the public, at no time in the instant case has there been a proper basis for concluding that such misconduct exists. It most certainly has never been the jurisdictional prerogative of this court to determine whether, or to what extent, Petitioner Whitehead has been guilty of misconduct, or to place any form of label on the charges asserted against him both within the proce-

dures of the Commission and the news media. Indeed, we strongly disapprove of the dissenting justice's inappropriate characterization of the allegations against him as "serious judicial misconduct." The jurisdiction for determining whether, in the first instance, there has in fact been misconduct of the nature alleged, and, in the second instance, the "seriousness" of that conduct rests exclusively with the Commission. Moreover, one must question the bona fides of our colleague's characterization of Petitioner Whitehead's alleged conduct when compared with the gravity of the misconduct appearing in each of the examples elucidated in JUSTICE SPRINGER's concurring opinion.

In any event, we are unable to view as anything other than most serious, the following injuries resulting from the unlawful, unethical violations of this court's lawful orders of confidentiality: (1) irreparable loss of public confidence in the integrity of this court and certain of its justices; (2) irreparable loss of confidence in the judiciary as a whole; (3) an arguably irreparable damage to Petitioner Whitehead and his entitlement to fundamental due process; (4) an enormous diversion of the scarce resources of this court; (5) a divisive and deleterious division of sentiment within the bench and bar based primarily on distortions of fact and editorial innuendo published by certain irresponsible media sources; (6) a significant waste of the public fisc necessitated by a purposely orchestrated, artificial attack on the propriety of what commenced as a simple writ proceeding; and (7) the capacity of this court to ameliorate the public animus artificially created by the confluence of the unlawful violations of this court's orders and certain cooperating media collaborators who now desire to use their power and influence to minify and excuse the above damage and prevent this court from performing its duty to see that the prospects for a reoccurrence are minimized. The afore-described list is by no means exhaustive. An expanded list could rightfully include the real threat to the independence of the judiciary of this state, a possibly tragic insult and intrusion on the form of respected federalism that should prevail in this nation, and a highly adverse impact on the quality and enjoyment of many lives.

Regrettably, we can neither agree with nor understand the dissenting justice's opinion that this court has "more important things to do" than attempt to either prevent or greatly minimize the prospects for reoccurrences of the extremely deleterious influences that have oppressed these proceedings. It is anomalous indeed to stress the importance of the Commission's being able to protect the public from conduct that would bring discredit to the judiciary, and then ignore misconduct that has unquestionably inflicted greater damage on the judiciary than perhaps all previous acts of individual misconduct combined.

We also need to stress, since we can speak only through our opinions, that the concerns expressed above are not about an unrighteous desire to promote judicial power. This court does not control the police power or the public treasury. Judicial power depends upon public confidence in the fair, sensitive, and meticulously honest use of that power. It is tragic, indeed, when forces are able to orchestrate, with apparent impunity, an unwarranted attack on the one branch of government that must maintain a justified public confidence in its ability to fairly and impartially dispense justice.

## PART II: THE REAL ISSUES

### A. THE ISSUES RAISED IN THE PETITION

Throughout these proceedings, former Commission counsel, on behalf of the Commission, have asserted that the "real issue" in this case is "whether the conduct of Judge Jerry Carr Whitehead violated the Code of Judicial Conduct." According to former Commission counsel, "every action" taken by Petitioner and his counsel has been designed "to deflect this Court's and the public's attention from the real issue—whether Petitioner has violated the Code of Judicial Conduct."[17] Quite to the contrary, whether Judge Whitehead committed judicial misconduct is not now and never has been the issue in this original writ proceeding. Moreover, this court has never suggested that it would decide as a factual matter in this proceeding whether Judge Whitehead is guilty of misconduct, nor do we attempt to reach or resolve that question in this opinion. Such factual determinations are clearly the province of the Commission in the first instance.

Unfortunately, the Commission has refused to recognize that when the instant petition was first filed in this court on July 22, 1993, it presented this court with relatively noncomplex procedural and jurisdictional contentions of arguable merit. These issues primarily involved: (1) whether the Commission was acting without or in excess of its defined jurisdiction in proceeding to a probable cause hearing on a collection of twelve charges alleged in a complaint drafted by Special Deputy Attorney General Campbell; and (2) whether the Commission was proceeding against Judge Whitehead in a discriminatory manner that neither complied with the governing provisions of the Nevada Constitution and the ARJD, nor conformed to the procedures applied to other judges involved in disciplinary proceedings before the Commission. Distressingly, however, these matters are no longer the only matters at issue. As the circumstances discussed below

---

[17]*See, e.g.,* Commission's Opposition to Motion for Appointment of Master/Investigator at 1.

demonstrate, this proceeding has been unnecessarily prolonged and expanded from what otherwise would have been a simple, relatively uncomplicated proceeding, into a costly, deleterious, orchestration of issues surrounded by invective.

## B. *UNLAWFUL DISCLOSURES AND EXPANSION OF MATTERS AT ISSUE*

Upon receipt and review of the instant petition, this court attempted to provide Petitioner and the Commission with a confidential forum in which the issues presented in the petition could be quickly resolved in accordance with the confidentiality provisions of the Nevada Constitution, article 6, § 21(5)(a) and ARJD 5-8. This decision was motivated not only by a desire to accord Petitioner his lawful entitlement to a fair and effective remedy in the event that his contentions proved to have actual merit, but also by a desire to provide constructive guidance to the Commission respecting the meaning of its rules and the conduct of its proceedings.

In the course of these proceedings, the confidential proceedings involving Petitioner both before the Commission and this court were unethically disclosed to the Las Vegas Review-Journal by anonymous sources. The source or sources of the disclosures not only blatantly disregarded the provisions of Nevada law requiring confidentiality, but also disregarded this court's orders specifically directing the maintenance of confidentiality. It is difficult for this court to perceive why the restraints that are placed on grand jury proceedings are acknowledged and respected, yet similar provisions for confidentiality prior to a finding of probable cause in the state constitution and rules applicable to Commission proceedings were not accorded the same treatment here. In any event, since then, the actions of this court have been continuously and inaccurately maligned by seemingly obsessed media outlets and others in an unrelenting public onslaught of fictive accusations and speculation impugning the integrity of Petitioner and this court.

More specifically, in October 1993, a newspaper which enjoys the largest circulation in this state reported that it had learned from anonymous sources that this court had "secretly halted" the Commission proceedings against Petitioner.[18] Public concern over

---

[18]*See State Supreme Court Secretly Halts Probe of Washoe Judge,* Las Vegas Review-Journal, October 10, 1993. Throughout this opinion we will from time to time refer to media accounts respecting the many facets of this case. We consider the extensive media attention devoted to this matter to be relevant in establishing that unlawful, unethical, and improper disclosures and comments have been made to the media, with the predictable and deleterious result that the administration of justice has been impeded and the

"secret" court proceedings was further fueled when the Chief Judge of the Second Judicial District Court, who had also submitted to the Commission allegations of misconduct against Petitioner,[19] apparently opined erroneously that there is no legal authority for filing a case in secret in the Nevada Supreme Court.[20] Shortly thereafter, in an editorial, the same newspaper referenced above characterized this court's proceedings as "wrong, despicable, reprehensible and utterly obscene," and as "judicial terrorism and chicanery."[21]

## C. FURTHER ESCALATING EVENTS AND ACCUSATIONS

Almost simultaneously with the initial public disclosures, all seven members of the Commission reacted radically and defiantly to this court's order directing production of documents for this court's *in camera* review. In a letter addressed to the members of this court, the Commission adamantly refused to comply with the court's order. The Commission accused this court of having entered a "series of secret, illegal and void 'orders,'" and of attempting "to emasculate and usurp the separate constitutional powers of the Commission."[22]

In November 1993, it was reported that the then President-elect of the State Bar of Nevada had commented that this court's actions were "outrageous," and had left the Discipline Commission "bound, gagged and constitutionally raped."[23] Almost daily,

---

judiciary in this state has suffered a loss of public respect and confidence. We wish to make it clear that this court has not relied on any facts related in media coverage as a basis for any other findings and conclusions.

[19]We note that the Chief Judge neglected or elected not to submit his allegations of misconduct "under oath" as required by ARJD 12(1).

[20]See *Secret High Court Ruling to Be Protested,* Las Vegas Review-Journal, October 12, 1993. Chief Judge Brent Adams' reported public declaration is simply in error. *See* Nev. Const. art. 6, § 21(5)(a); ARJD 5(1); *see also* SCR 121; State ex rel. Bilder v. Township of Delavan, 334 N.W.2d 252 (Wis. 1983) (discussing inherent authority of court to limit public access to judicial records when administration of justice requires it). Additionally, as the American Judicature Society has commented in its amicus brief, this court "was correct, if it were going to intervene at all, to request the Commission's papers on a confidential basis and to review them *in camera.*"

[21]See *Secret justice is no justice at all,* Las Vegas Review-Journal, October 17, 1993 (editorial by Thomas Mitchell).

[22]See Commission Letter to the Justices of the Nevada Supreme Court, dated October 14, 1994. The Commission's refusal to comply with this court's orders was the primary subject of this court's interlocutory rulings in *Whitehead I* and *Whitehead II.*

[23]See *Nevada State Bar to Review High Court Flap,* Las Vegas Review-Journal, November 4, 1993. We also note the irony of a letter sent to the members of this court and others from the then President-elect, stating that she had attended the ABA Leadership Forum in Washington, D.C. on

the disinformation campaign continued unrestrained and reached a crescendo of sorts when, in December 1993, and January 1994, two malevolent editorial cartoons were published by this same newspaper—one depicting the Nevada Supreme Court as a psychopathic assassin of judicial ethics, and the other depicting the "Nevada Legal Community" as being held helplessly bound and gagged in the Nevada Supreme Court while thugs dressed in judicial attire executed a "mob hit" on "justice."

The attacks have not only been focused on this court. For having the audacity to file a petition in this court, alleging that for the second time in recent years he has been subjected to the Commission's blatant violation of his rights under the ARJD and the Nevada Constitution,[24] Petitioner has been publicly and relentlessly vilified in the media and accused by the Attorney General—this state's highest law enforcement official acting in the capacity of Commission counsel—of proffering an "endless series of false and baseless arguments" in a "ceaseless effort to obscure the real issue and to deflect any scrutiny of his conduct."[25] Petitioner was also publicly accused by the Attorney General of having made "gross misrepresentations of fact," of "smearing others in order to try desperately to save himself," and of going "around and above the law." *See Whitehead III,* 110 Nev. at 906-07 n.9, 878 P.2d at 933-34 (1994) (SPRINGER, J. concurring). In papers more recently filed in this court, Petitioner's arguments have been further characterized by former Commission counsel as "utterly bizarre and irrational." These papers even go so far as to assert that Petitioner's counsel apparently "feel secure in the belief that this Court has granted them a special dispensation to make any allegation they like, no matter how reckless or defamatory."

We acknowledge that the rhetoric on all sides in this proceed-

---

November 7 and 8, 1993, where the attendees were informed, *inter alia,* that "[i]n regards to the perception of the public, it was brought [to] the group's attention that when one negative comment or statement is communicated to 13 other individuals, it will take 20 positive comments to each individual to overcome that one negative comment, or multiplied by 13, a total of 260 positive comments just to overcome one negative comment." Perhaps this may serve to illustrate the extensive and irreparable nature of the damage that has been unjustifiably and improperly generated over these proceedings.

[24]As Petitioner has repeatedly pointed out in this proceeding, the Commission previously exceeded its jurisdiction and violated its rules when it took action against Petitioner, another district judge, and a candidate for the office of district judge. To the Commission's credit, it later issued a clarification vindicating the three subjects of its unwarranted conclusions and expressing regret for its actions.

[25]*See* Commission's Opposition to Motion to Disqualify CHIEF JUSTICE ROSE at 6.

ing has often approached or exceeded the bounds of professionalism and propriety. It is also true that the Attorney General's actions in this matter have not escaped condemnation by this court, as well as the media. Unquestionably, however, Petitioner has borne the brunt of the unfair and irresponsible publicity. More importantly, it is of the utmost concern to this court that unprecedented, inaccurate, and misleading attacks based largely on unethical disclosures to the media from secret sources have irresponsibly inflicted inestimable damage to public confidence in the judiciary of this state. We suggest that contemplative and informed persons will understand the need for this court to respond to such pernicious, undermining attacks on the Nevada judiciary.

## D. *THE "WAR" IN NEVADA AND THE CRISIS IN PUBLIC CONFIDENCE*

Fortunately, more responsible statements have been issued on behalf of the Board of Governors of the State Bar of Nevada and Officers of the Nevada District Judges Association. These entities have nonetheless recognized that this case has come to symbolize a crisis in public confidence in the judiciary of this state. Although we agree with this assessment, the reality is that the factual and procedural history of the proceedings in this court are not what they have been made to appear, and the crisis, although portrayed to the public as real, has little or no basis in fact or law. Rather, the crisis was manufactured, provoked and fostered by media accounts and premature, precipitous public comments. Many of these comments were solicited from outside legal ethicists who have exported views into Nevada that are based upon *ex parte* contacts and incomplete and inaccurate facts conveyed by unethical disclosures from anonymous sources.

In early November 1993, it became apparent to Petitioner that in the face of this media onslaught any pretense toward continued confidentiality would only further erode and damage his reputation and any prospects for a fair and impartial resolution of the allegations against him. Consequently, Petitioner sought and obtained permission from this court to respond publicly. Thereafter, it became equally apparent that former Commission counsel considered themselves engaged on the Commission's behalf in "a war" to be fought and tried not only in a judicial forum, but also in the media.[26] The public controversy thus intensified. It continues unabated.

---

[26]Specifically, the Attorney General has reportedly indicated that "[w]hatever happens in the federal investigation . . . the war will go on in Nevada." *See FBI Investigates a Nev. Judge Inquiry,* The National Law Journal, April 18, 1994.

Under these circumstances, we have concluded that allegiance to the rule of law and our obligations under the Code of Judicial Conduct will not allow us to permit the misguided attacks on the independence and integrity of this court and this state's judiciary to go unopposed. In our prior three opinions in this matter, we have therefore attempted to correct many of the mischaracterizations that have been conveyed to the public. We are not unaware of those who disapprove of the blunt candor of these previous opinions. Undoubtedly, there are also those who, notwithstanding the "war" described by the Attorney General, would prefer that we simply accept without comment the inaccurate invective directed at this court.

We also realize that no matter how heated, distracting, or unnerving the public debate becomes, it is the duty of the courts to review and decide controversial matters impartially, with as much dispatch and regard for principles of law and fundamental justice as can be expected from any human institution. In what is at best an imperfect judicial system, we fully ascribe to the principle that judges must ordinarily endeavor to accept with equanimity the inevitable criticisms and often personal, public attacks that are part and parcel of the profession to which we are committed. *See* Nevada Code of Judicial Conduct Canon 3B ("A judge shall not be swayed by partisan interests, public clamor or fear of criticism").

At the same time, however, we are enjoined by the Code of our profession to uphold the law, to promote improvements in the judicial system, to protect and foster respect and public confidence in the judiciary and to "uphold the integrity and independence of the judiciary." *See* Nevada Code of Judicial Conduct Canon 1; *see also* Nevada Code of Judicial Conduct Canon 2A ("A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"). As Canon 1 of the Code provides, the integrity and independence of the judiciary are "indispensable to justice in our society."

During this proceeding, perhaps more so than in any other in Nevada judicial history, the attention of this court, the public, and the bar has been focused on these fundamental precepts of judicial conduct. In many respects, and although it was not initially so, this proceeding and the issues we are now compelled to address implicate these fundamental concerns. We have therefore concluded that we would indeed be derelict if we did not at least attempt to disabuse this state's citizens of the orchestrated perception that this court was according favored treatment to Petitioner at the expense of an effective and vital judicial discipline system. Because this court as a general rule may address

pending controversies only through its opinions, we have utilized the only available forum to accomplish that task.

## E. *THE THREAT TO A FAIR, IMPARTIAL, AND INDEPENDENT JUDICIARY*

Additionally, the Commission, through its former counsel, has proclaimed that what is really at issue in this proceeding is nothing less than the People's right to "a fair and impartial judiciary." *See, e.g.,* Commission's Supplemental Memorandum, filed March 17, 1994. We qualify this statement only by adding that it is also about the People's right to a *free and independent* judiciary. As the amicus brief recently submitted by the American Judicature Society accurately observes, this petition presents this court with a "classic conflict" between "a free and independent judiciary," and the "right and duty of the State through its disciplinary system to sanction judges who engage in improper conduct prohibited by applicable codes."[27] Although we basically agree with the Society's characterization, we realize that the Society and other interested members of the public and the bar are not fully aware of all the facts and circumstances surrounding this case that demonstrate that, contrary to the intent of the ARJD, the Commission has been employing an *ad hoc* approach to judicial discipline so untethered to the provisions of the Nevada Constitution and the ARJD as to pose a very real and substantial threat to the right of our citizens to a fair, impartial, free, *and independent* judiciary.[28]

The American Judicature Society also urges this court "to set out the broad ground rules governing the disciplinary process,

[27]This court is grateful for the American Judicature Society's amicus brief. The Society has submitted a responsible, objective, and helpful evaluation of the Commission's procedures and these proceedings. We grant the motion to file the amicus brief submitted by the American Judicature Society, and order the clerk of the court to file it forthwith. We are also grateful for the responsible and helpful amicus brief submitted by Attorney Leo Puccinelli for the Ad Hoc Committee for the Preservation of an Independent Judiciary which was filed by order of this court on May 19, 1994.

[28]In the Amicus Curiae brief of the American Judicature Society, the Society opined that "as a general matter, . . . extraordinary writs should be reserved for those rare occasions where a disciplinary commission is acting so far outside the bounds of its permitted functions that it has become a 'rogue commission.'" Am. Judicature Soc'y's brief at 14. We essentially agree. Unfortunately, as we will partially reveal in this opinion, the Commission has been so functioning. In pertinent part, the term "rogue" refers to: "no longer obedient . . . and hence not controllable or answerable; deviating . . . ." The Random House Dictionary (2d ed. 1987). We hasten to observe, however, that a "rogue commission" may, as here, consist of members who are clearly not "rogues." Without doubt, however, the Commission has been functioning without obedience to, or regard for, the dictates of its own rules of procedure and the Nevada Constitution.

much as it did in its February 18 opinion." Again, we agree that this court's definitive interpretation of the procedural provisions governing the Commission is essential to the proper resolution of this proceeding and to the continuation of an effective judicial disciplinary process in this state. This was a primary reason for this court's intervention in the first place. Moreover, in light of all that has occurred, and in view of our obligations under the Code of Judicial Conduct to promote and protect public confidence in the judiciary, we are also compelled to address many of the issues and problems that have stemmed from concerted and purposeful efforts to erode public respect for the court and these proceedings.

## F. UNIFORM PROCEDURES

As we previously noted in *Whitehead II,* the Attorney General, on behalf of the Commission, has further asserted that "[w]hat is at issue is whether there is one set of rules for some people and another set of rules for others." *Id.* at 421, 873 P.2d at 972. In part because of facts and circumstances that became known to the members of this court prior to the filing of the instant petition, involving separate Commission proceedings against another judge previously identified in *Whitehead II* as "Judge D," the Attorney General unknowingly, but accurately, described what has indeed been one of the foremost concerns of this court since the moment the instant petition was first filed. 110 Nev. at 418, 873 P.2d at 970.

At the time Petitioner filed the instant petition alleging that the Commission was exceeding its jurisdiction and was not complying with the Nevada Constitution and the ARJD, this court had already been apprised, by a well-respected district judge[29] that in the proceedings involving "Judge D," the Commission had functioned without regard to the Commission rules or the Nevada Constitution. It further appeared to at least certain members of this court, and now a majority of this panel, that the Commission proceedings against Judge D were not only conducted without regard to the ARJD, but that the apparently unlawful procedures applied by the Commission in Judge D's case were remarkably dissimilar from the allegedly unlawful procedures which were the subject of the instant petition. Thus, although the Attorney General's pronouncement quoted above was obviously a missive aimed at the proceedings in this court, our initial decision to intervene and stay the Commission proceedings against Petitioner

---

[29]The respected district judge filed the initiating complaint with the Commission against "Judge D," and wrote to the members of this court regarding the procedures employed by the Commission in resolving his complaint.

was motivated in major part by the realization that the Commission was proceeding against accused judges on an *ad hoc* basis with little or no regard for adherence to the governing provisions of the Nevada Constitution or the rules adopted by this court for Commission proceedings. Unfortunately, this proceeding soon escalated into the "war" described by Del Papa because those— including the Attorney General and certain of her staff—who were aware that the Commission was functioning on an *ad hoc* basis, were unwilling to admit that fact forthrightly and to assist this court in resolving the problem in a responsible and professional manner. It is therefore necessary for us to explain in some detail the irrefutable evidence demonstrating that the Commission has applied "different rules depending on who you [the respondent judge] are."[30]

## PART III: THE COMMISSION'S AD HOC APPROACH

### A. OBJECTIONS OF COUNSEL

Before discussing the evidence establishing that the Commission has been proceeding against accused judges without regard to the provisions governing Commission procedures and on an individual, *ad hoc* basis, we first address certain objections tendered by former Commission counsel, Special Deputy Attorney General Donald Campbell. At the oral argument conducted on May 20, 1994, Campbell objected to this court's consideration of this evidence on the ground that it was not evidence of record. We reject Campbell's objections.

First, the Commission itself formally focused this court's attention on the procedures applied to Judge D and on the issue of whether the Commission has been proceeding against all judges in a uniform manner. *See* Commission's Motion for Reconsideration of Confidential Order, filed October 12, 1993, at 3. Specifically, this motion, which was signed by Campbell and other former Commission counsel, represented that the Attorney General had "*in other cases,* at the request of the Commission, investigated judicial discipline complaints," and that "[t]his procedure [used in Judge Whitehead's case] has been routinely followed by the Commission in many cases, including the public censure of [Judge D],[31] with the approval of all members of the Commission, including Supreme Court JUSTICE CLIFF YOUNG." *Id.* (Original emphasis). Thus, the Commission itself tendered

---

[30]*See FBI Investigates a Nev. Judge Inquiry,* The National Law Journal, April 18, 1994 (quotation attributed to Attorney General).

[31] Although the Commission referred to Judge D by name in its motion, we will continue to use the designation "Judge D."

the issue of whether the Commission was applying the same procedures in Petitioner's case, as had been applied by the Commission in other cases including Judge D's case. Under these circumstances, the Commission should not now be heard to complain of this court's consideration of evidence clearly refuting the Commission's claims of uniform, consistent application of its procedures.

Second, in this proceeding, Petitioner has invoked this court's original jurisdiction. Thus, the record in this case includes the record that is created in *this court*. Although it is true that this court does not ordinarily act as a fact-finding tribunal, *see* Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981), and review, consider, or rule upon admissibility of evidence in the first instance, "[t]he procedure in original cases is flexible." *See* Robert L. Stern, *Appellate Practice in the United States* 10 (2d ed. 1989).[32] We are of the view that especially where, as here, the relief sought in this court can only be obtained in the context of an original Supreme Court proceeding, this court may consistently with its prior precedents consider important matters of relevant evidence when that evidence is supported by sufficient indicia of authenticity and reliability, and when its consideration "may possibly make clearer than might otherwise appear, the factual and legal situations involved, to the end that correct determinations may be accomplished." *See* Bowler v. Vannoy, 67 Nev. 80, 87, 215 P.2d 248, 252 (1950) (discussing this court's consideration of evidence in original mandamus proceeding).[33]

---

[32]Early in its history, for example, the United States Supreme Court even conducted jury trials in the exercise of its original jurisdiction. *Id*. at 12 n.36.

[33]We also noted in *Whitehead II* that where there are incontrovertible facts verifiable from records in the building where we sit, our precedents do not require us to disregard them. *See Whitehead II*, 110 Nev. 380, 418 n.35, 873 P.2d 946, 970 (1994) (citing Cannon v. Taylor, 88 Nev. 89, 92, 493 P.2d 1212, 1213 (1972)) (opinion on rehearing); *see also* Eureka Bank Cases, 35 Nev. 80, 98-109, 126 P. 655, 659-664 (1912) (over objection of the state, court heard and considered testimony and evidence relevant to the issue of probable cause to indict in the context of an original proceeding instituted in the supreme court seeking a writ of habeas corpus). In the final analysis, we concluded that our reference to this evidence is necessary because this court is no longer willing to indulge the charade promoted by the Attorney General to the effect that the Commission has been functioning in a consistent manner in the investigation and administration of discipline matters, and that this court has provided a favored and unjustifiable intervention on behalf of Petitioner Whitehead.

## B. *JUDGE D*

In *Whitehead II,* we referred briefly to the Commission's disciplinary methodology concerning Judge D. In this opinion we will dwell at length on that methodology to illustrate the stark contrast between the procedures followed by the Commission with respect to Judge D and Judge Whitehead. We will also demonstrate by references to documents in this court exactly why this court has been seriously concerned at the lack of consistency and adherence to rules by the Commission.

The true name of Judge D and the complaining judge—the judge who brought the initial Commission complaint against Judge D—will remain anonymous in this opinion because the Commission never returned a finding of probable cause, and no formal statement of charges against Judge D was ever filed with the Commission. *See* ARJD 16 (confidentiality ceases only after a finding of probable cause and the filing of a formal statement of charges); *see also* ARJD 5(1). The matter should have remained confidential until there had been a finding of probable cause and the filing of a formal statement of charges as a public document. We nevertheless realize that interested parties may ascertain the name of the respondent judge from press releases issued by the Commission.

The procedural facts discussed herein regarding the Commission proceedings involving Judge D were first revealed to the members of this court in a letter addressed to the members of this court from the well-regarded district judge who filed the initial complaint concerning Judge D's conduct with the Commission. Later, in a court conference held on July 8, 1993, where the complaining judge's letter to the justices was discussed, this court's representative on the Commission elaborated on the complaining judge's description of the procedures that the Commission had applied in Judge D's case. These facts were later memorialized and discussed in a lengthy memorandum prepared by JUSTICE STEFFEN and circulated to all justices of this court.[34]

---

[34]We have directed the clerk of this court to include redacted copies of the letter from the complaining judge and JUSTICE STEFFEN's memorandum as part of the official record of this proceeding for the express purpose of demonstrating the fact that this court, or at least certain of its members, had serious concerns about the way the Commission was functioning immediately prior to Judge Whitehead's filing of the instant petition for writ relief with this court. It should be emphasized that JUSTICE STEFFEN's memorandum does not represent, nor is it intended to be inferred to represent, an authoritative position of the court with respect to the views expressed therein.

The memorandum was dated and circulated on July 23, 1993, one day after JUSTICE STEFFEN first entered the stay order in the instant proceeding. As members of this court's staff will attest, the memorandum was prepared by JUSTICE STEFFEN well prior to the time the instant petition was filed and before any member of this court, other than JUSTICE YOUNG, who sits on the Commission, had any knowledge of the investigation and proceedings against Judge Whitehead.

Two major points must be emphasized with respect to the contrasting procedures applied by the Commission in the matters involving Judge D and Judge Whitehead. First, after receiving a sworn complaint against Judge D, the Attorney General investigated the matter and obtained numerous (reportedly approximately thirty to forty) written, signed statements from percipient witnesses against Judge D. Thereafter, a probable cause hearing was scheduled and Judge D was provided copies of the complaint and all of the statements of the complaining witnesses, thus providing Judge D the identity and statements of all of the potential witnesses against him to enable him to prepare for the probable cause hearing.[35] Although the complaining judge understood that Judge D was entitled to receive the names and statements of the witnesses against him in order to prepare for the probable cause hearing, *see* ARJD 14(5), the Commission cancelled that hearing and entered into a plea bargain with Judge D, a procedure that the complaining judge recognized as a deviation from Commission rules.

In clear contrast, the Commission has maintained on numerous occasions that Judge Whitehead is not entitled to information concerning the identity of witnesses against him, and the contents of their statements. The Commission contends that such disclosure: (1) would have a chilling effect on potential witnesses who cooperate in a Commission investigation; and (2) would have an

---

[35]It is of serious concern to this court that the Attorney General apparently has declared publicly that she has no knowledge concerning "Judge D." *See High court slams probe of judge,* Las Vegas Review-Journal, April 23, 1994, indicating that "Del Papa said that she was not aware of the case [Judge D]." We are reliably advised that a member of the Attorney General's staff performed the investigation concerning Judge D and obtained the numerous signed statements from witnesses. We are further advised that Assistant Attorney General Brooke Nielsen informed the complaining judge that the probable cause hearing had been cancelled. The complaining judge was also given the name, which we need not divulge here, of the Commission member who decided to cancel the probable cause hearing in order to have the matter resolved by negotiation. In the event the Attorney General desires to deny the accuracy of this information, she may do so by filing a sworn statement with the clerk of this court to that effect and the matter may be properly included as a matter for investigation by the special master appointed in these proceedings by this court.

adverse impact on the ability of the Commission to function effectively and in accordance with its constitutional responsibilities.[36] The following statements illustrate these oft-repeated themes stated by the Commission and former Commission counsel as to why it must deny to Petitioner Whitehead the names of witnesses who would testify against him:

1. "The [Commission's] letter of October 14, 1993, was prompted by the Commission's concern *for maintaining the confidences of cooperating witnesses, a confidentiality which had been guaranteed on behalf of the Commission* by its special counsel, and was further prompted by the Commission's concern for maintaining the integrity of the judicial discipline process."

2. "The Commission's desire to protect the confidentiality of privileged material, *the confidences of witnesses,* and the integrity of its discipline proceedings, formed the bases for filing the Commission's Motion for Reconsideration and issuing the Commission's letter of October 14, 1993."[37]

3. *"The confidentiality promised to the witnesses interviewed in this matter is of critical importance in the opinion of the Commission members and counsel. The Commission's inability to ensure that the confidences of witnesses are preserved will severely jeopardize the Commission's ability to function effectively. Such impairment of the Commission's function will have a real and appreciable impact upon the fundamental right of Nevada's citizens, guaranteed under the U.S. Constitution, to a fair and impartial judiciary."*

4. *"The initial confidentiality of judicial discipline proceedings, which is provided for in the Nevada Constitution and the ARJD, exists with equal force for the benefit of witnesses and complainants."*

*See* Commission's Petition for Rehearing or in the Alternative Motion for Amendment of Opinion (received by the court on March 8, 1994; emphasis added).[38]

---

[36]We will consider elsewhere in this opinion the propriety of the Commission's position based upon ARJD 14(5) which provides: "In preparing to oppose a determination of probable cause, the respondent has the right to inspect *all* records of the commission *relating to the disciplinary action against the respondent and* to be *fully* advised as to the contents of the *administrative record considered by the commission determining that there was sufficient reason for a probable cause hearing.*" (Emphasis added.)

[37]It will be recalled that the Commission's letter of October 14, 1993 constituted an outright refusal to obey this court's order of October 4, 1993, requiring the Commission to produce all investigative materials concerning the Whitehead matter for an *in camera* inspection by this court.

[38]Notably, this Petition for Rehearing was signed not only by Commission

The following representations were also made by former Commission counsel:

1. "It is further suggested that the *in camera* inspection [of Commission materials relating to Petitioner Whitehead] will violate federally protected civil rights, including privacy and liberty interests of individual witnesses."

2. "An important purpose for the protection afforded the Commission's papers is to encourage filing complaints and to avoid intimidation of witnesses."

3. "Confidentiality encourages the filing of complaints and the willing participation of citizens and witnesses by providing protection against possible retaliation or recrimination."

4. *"This rule of confidentiality has been continually applied to prohibit the judge who is the subject of the investigation from obtaining this information, for to rule otherwise would impair the Commission's ability to conduct an investigation upon receipt of complaints."*[39]

5. "Disclosure of the Commission's papers will bring about the very harm the Constitution and Commission rules were intended to prevent, i.e., a chilling effect on the free flow of information that the Commission must have in order to receive information from citizens without fear of reprisal."

---

counsel, but by each individual member of the Commission involved in these proceedings. *See Whitehead II*, 110 Nev. at 387, 873 P.2d at 951.

[39]It has been no small source of concern to this court that the Commission and Commission counsel have been so willing to play fast and loose with the facts in these proceedings. The Commission, for example, through Commission counsel, makes the blatantly false assertion here that "[t]his rule of confidentiality [regarding the availability to the respondent judge of witness statements and identity] has been continually applied to prohibit the judge who is the subject of the investigation from obtaining this information, for to rule otherwise would impair the Commission's ability to conduct an investigation upon receipt of complaints." As noted during the oral argument held on May 20, 1994, there was also no factual predicate for the statement of the Commission (each individual member serving in these proceedings) and Commission counsel that this court had accorded "long-standing acquiescence" to the investigative procedures "historically followed by the Commission." Aside from the implications resulting from what would appear to be a violation of ARJD 14(5), we emphasize again that the investigation of Judge D resulted in the Commission providing to Judge D all signed, written statements of the adverse witnesses. All of these statements and the identities of the witnesses were provided to Judge D prior to a scheduled probable cause hearing, which was subsequently cancelled and never held. We also emphasize that Judge D and Petitioner Whitehead were being investigated contemporaneously. Thus, it can hardly be said that the misstatement quoted above was the result of an oversight or dimmed memory.

*See* Motion For Reconsideration Of Confidential Order, filed with this court on October 12, 1993 (emphasis added).

Thus, although the Commission contends that it would have a devastating, chilling effect on the work of the Commission if Judge Whitehead obtained the names and statements of the witnesses against him, the exact opposite occurred with respect to Judge D who received all such names and statements. Moreover, the investigation against Petitioner was occurring during the same time period as the investigation and proceedings against Judge D. It is therefore apparent that one set of rules applied to Judge D, and a different set of rules applied to Petitioner Whitehead. Obviously, the Commission did not believe that divulging the names and statements of adverse witnesses to Judge D would cripple and chill the Commission's capacity to fulfill its constitutional duties. However, as noted above, and in stark contrast to the contemporaneous proceedings against Judge D, the Commission now insists that it would be crippled and rendered ineffective if Petitioner Whitehead were to receive the names and statements of the adverse witnesses to enable him to prepare for a probable cause hearing. Moreover, it is patently clear, as noted previously, that former Commission counsel have deliberately misrepresented to this court, to certain cooperating legal ethicists and, consequently, to the media, that keeping the identity and statements of witnesses confidential from accused judges "has been [a] continually" applied Commission practice.

The second major difference between the proceedings against Judge Whitehead and Judge D is that the Commission or its former counsel (the Attorney General) obviously concluded that Judge D was actually entitled, pursuant to ARJD 14(5), to the names and statements of the witnesses against him.[40] With respect

---

[40]Again we note, without accepting at face value the accuracy of the Las Vegas Review-Journal's attribution to the Attorney General (*see supra* note 35) that Del Papa reportedly denied having any information concerning Judge D. If the report is true, the denial appears to be patently false, and represents one more aspect of this case that should be investigated. A press release issued by the Commission regarding Judge D indicates, at paragraph 7, that "[t]he Attorney General's Office will conduct follow-up investigations at six month intervals to assess the judge's behavior and will report the results of the investigations to the Commission." *See* Exhibit P to Petitioner's Answer to Petition for Rehearing, filed April 22, 1994. Interestingly, this same release, at paragraph 2, specifies an 18-month probationary period imposed against Judge D during which "[t]he Commission must receive no sworn written complaints of judicial misconduct, which can be verified as being supported by probable cause. . . ." This seems to imply that the Commission would determine whether probable cause exists on any such future complaints without convening a probable cause hearing as required by Commission rules. It thus appears that the "probation" imposed against Judge D

to Petitioner Whitehead, however, the Commission has taken the diametrically opposite position that "[d]isclosure of the Commission's papers will bring about the very harm the Constitution and Commission rules were intended to prevent, *i.e.*, a chilling effect on the free flow of information that the Commission must have in order to receive information from citizens without fear of reprisal." The complaining judge in Judge D's case also expressed grave concern over retaliation by Judge D against all the witnesses now known to Judge D because the Commission cancelled the probable cause hearing and entered into a confidential plea bargain with Judge D. The Commission and the Attorney General evinced no concern regarding an impediment to the free flow of information and the prospect of reprisal or retaliation in the case of Judge D, but grave concern about such issues in Petitioner's case. Why?[41]

---

without a finding of probable cause includes the threat of such a finding based upon any future complaint and without giving Judge D the benefit of a hearing and the opportunity to present evidence in opposition to such a finding. Needless to say, this would constitute a blatant violation of Commission rules and a violation of Judge D's fundamental rights to due process. In addition, since the Attorney General monitors Judge D's performance (and "assesses" it for the Commission) while litigating criminal and civil matters before him, there are additional, highly significant problems resulting from this procedure. *See* In Interest of McFall, 617 A.2d 707 (Pa. 1992). These problems have already manifested themselves in this court with petitions in death cases requesting affidavits from members of this court and the Commission to the effect that no member of this court or no trial or other district court judge connected with the cases is, has been, or may be subject, during any of the proceedings, to disciplinary probation administered by the Attorney General.

[41]Of concern to this court in any ongoing "war," as apparently envisioned by the Attorney General, *see supra* note 26, either in this court or in a different forum, will be such considerations as: (1) the relationships and the nature thereof between Commission members, the Attorney General and others respecting Judge D and Petitioner Whitehead; (2) the role that such relationships may have played in the disparate treatment and approach taken in the two proceedings; (3) an objective view of the comparative seriousness between the complaints against Judge D and Petitioner Whitehead; (4) evidence regarding favored treatment and selective prosecution involving Judge D, other judges, and Petitioner Whitehead; (5) evidence concerning why a complaining judge, claiming that duty arising out of Canon 3D (1) of the Code of Judicial Conduct compelled him to complain to the Commission about Petitioner Whitehead, failed to also complain against other judges that he represented to this court were doing the same thing; (6) why the Commission saw fit to provide secrecy to Judge D with respect to the full extent of the charges against him, and has steadfastly opposed attempts to ascertain the sources of unlawful disclosures of confidential materials and documents concerning Petitioner Whitehead; (7) why the Commission voluntarily provided Judge D with the names and statements of the witnesses against him, but stridently opposed giving such information to Petitioner Whitehead on grounds that it would be rendered impotent if it did so; and (8) why the Attorney General reportedly denied having knowledge about the proceedings involving Judge D.

Another interesting difference between the attitudes of the Commission and the Attorney General concerning Judge D and Petitioner is that the Commission was highly deferential to the cost involved in holding a probable cause hearing in the case of Judge D but has expressed a willingness to break the bank in its investigation and pursuit of Petitioner. The explanation concerning the former as opposed to the latter does not wash, and will undoubtedly warrant additional investigation in order to reach the truth of the matter. It should be apparent, however, why this court is so concerned about the possibility of selective prosecution or discrimination when the Commission is in a position to bestow favors upon certain judges and inflict what may appear to be inordinate punishment and abuse upon others through the simple expedients of secrecy and disregard of its own rules.

We are also gravely concerned about the contemporaneous investigative procedures utilized in Judge D's case as opposed to those employed in Judge Whitehead's case. Witnesses interviewed by a member of the Attorney General's staff with respect to Judge D gave written, signed statements which were made available to Judge D in order to enable him to prepare for a probable cause hearing in accordance with ARJD 14(5). Special Deputy Attorney General Campbell, on the other hand, interviewed witnesses and simply memorialized their statements without having the witnesses either write out the statements or sign them. Thus, through the simple expedient of methodological change, the Commission provided Judge D with the names and statements of all witnesses against him, while contemporaneously building a stone wall before Petitioner Whitehead under the heading of "confidential work product." The Commission then represented to this court that the investigative methods of the Commission concerning Petitioner have been consistent with its other investigations. This type of disparate treatment cannot be tolerated under any system claiming deference to concerns of due process and impartiality.

## C. *JUDGE STRINGFIELD*

Judge Stringfield is mentioned by his true name only because he expressly permitted the use of his name and example in providing his affidavit to Petitioner's counsel. *See Whitehead II,* 110 Nev. at 416, 873 P.2d at 968. Unfortunately, Judge Stringfield also bore the brunt of the Commission's functioning in disregard of its own rules. It is clear from the Commission's own pro forma instruction sheet, provided by the Commission to the complaining judge in Judge D's case, that the Commission realizes that "[a]fter the preliminary investigation, the Commission

*must either dismiss the matter or order a hearing.*"[42] (Emphasis added.) The genesis of this requirement is the Nevada Constitution. *See* Nev. Const. art. 6, § 21(7) ("The commission shall, after preliminary investigation, dismiss the matter or order a hearing to be held before it"). Simply stated, Judge Stringfield did not receive the benefit of either a dismissal or a probable cause hearing.[43] Instead, as described in some detail in *Whitehead II,* Judge Stringfield was subjected to the wisdom of the Commission administered in secret and without reference to its own rules.

## D. *CONCLUSION*

Other complaints against judges filed with the Commission have also been resolved by the Commission in an informal, *ad hoc* manner, with accused judges issuing public apologies, simply acknowledging misconduct occurred, or agreeing to some sort of probation supervised by the Attorney General. For example, in the February 1994 edition of the Commission's recently created Newsletter disseminated statewide to all Nevada judges, the Commission has indicated, *inter alia,* that one matter was "closed" after a judge acknowledged the improper use of judicial stationery, and that one complaint was "[p]ending successful completion of stipulated probationary period." Although there are other examples, we are reluctant to discuss their details in this opinion. Suffice it to say that further examples could be cited which provide strong support for concluding that the Commission has extensively engaged in proceedings that violate its own rules through *ad hoc,* case-by-case decision-making.

Indeed, the proceedings involving Judge D and Judge Stringfield, though necessarily discussed, are explored reluctantly in this opinion. We are constrained to do so, however, in order to demonstrate that, from the outset of these proceedings, this court has had serious concerns over the manner in which the Commission has been functioning. Although we had initially hoped to resolve these concerns by simply interpreting the Com-

---

[42] In the letter referenced above addressed to the members of this court, the complaining judge in Judge D's case noted that the Commission's actions with respect to Judge D did not conform to the instructions sent to the complaining judge by the Commission. The Commission's instruction sheet stated:

> The Commission, through its secretary, conducts an initial screening, after which the Commission may reject the matter or order a preliminary investigation by an attorney or an investigator. After the preliminary investigation, the Commission must either dismiss the matter or order a hearing.

[43] We are generously assuming, of course, that there was a complaint properly invoking the Commission's jurisdiction in the first place. We express no opinion as to whether this was actually the fact.

mission's rules without undue embarrassment to the volunteer citizens who sit on the Commission, as discussed above, subsequent events and accusations regarding the motivations of this court have foreclosed that course. Moreover, we have referenced the events and procedures involving Judge D to demonstrate that it was never the purpose or intent of this court to in any way diminish the ability of the Commission to function effectively. It has, however, become clear to this court that the Commission has been functioning with little regard for its own rules, thus creating a strong potential for unfair, disparate, and even political resolutions of discipline matters coming before it. It is also painfully clear to this court with respect to the instant proceeding, that certain undisclosed parties have started a fire where none existed, and have taken special pains to fan the flames.

The framers of article 6, § 21 of the Nevada Constitution determined, and the Legislature and the people agreed, that complaints coming to the Commission must, after preliminary investigation, either be dismissed or the Commission must schedule a hearing. As we previously noted in *Whitehead I,* 110 Nev. at 145-47 n.15, 869 P.2d at 806-07, in submitting the draft rules which were the precursors of the ARJD now in effect, the Study Committee appointed by this court to evaluate Commission procedures stated, among other things:

> To this end [providing due process and prompt open disposition of legitimate charges], they [the proposed new rules] are designed to foreclose the Commission from secret, inquisitorial processes which result in *ad hoc* decisions neither related to nor tethered by principle.

We also noted that the Study Committee had uncovered past Commission abuses under the old Revised Interim Rules wherein "[p]lanned selective leaks resulted in giving inaccurate and unreliable information to the public, which incited public furor and unjustifiably damaged the reputation of a judicial officer who was never even charged." *Id.*

The Commission has consistently maintained that it has been conducting its proceedings against Judge Whitehead in the *same manner* that previous proceedings were conducted against Judge Goldman. *See, e.g., Whitehead I,* 110 Nev. at 147-48, 869 P.2d at 807. Although this court found no evidence of abusive Commission practices in the Commission proceedings involving Judge Goldman, *see, e.g.,* Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), we again emphasize that the proceedings against Judge Goldman were conducted *under the old Revised Interim Rules.*

The Study Committee found that the old Revised Interim Rules

were "vague, lack[ed] checks and balances, [and] incorporate[d] no adequate sanctions to deter misconduct by individual commission members." The Study Committee further identified a number of abusive practices by the Commission operating under the old Revised Interim Rules. Nevertheless, the Commission has apparently acknowledged that it has been conducting its proceedings against Judge Whitehead in accordance with rules that are no longer in effect, and under which past abuses occurred, rather than in accordance with the current rules which were specifically designed by the Study Committee to correct past abusive practices and provide procedures that are "accusatory rather than inquisitorial, open rather than closed, and accompanied by due process formalities . . . rather than loose, unstructured and informal." *Whitehead I,* 110 Nev. at 145-47 n.15, 869 P.2d at 806 (quoting Report of Study Committee, ADKT 38 at 8).

[Headnote 11]

Needless to say, this court may not justify an *ad hoc* approach to judicial discipline no matter how well-intentioned and benevolent the Commission's actions may be. A constitutional body having the power of life or death over a judge's future may not be allowed to disengage itself from its own rules and the Nevada Constitution. There are judges and attorneys on the Commission who must know that if they desire additional options or powers beyond those accorded the Commission under law, they must resort to lawful processes of amendment rather than an abandonment or disregard of existing law.

The noted French philosopher, Voltaire, stated: "That sovereign is a tyrant who knows no law but his own caprice." Even good people with substantial power over the lives of others may become instruments of tyranny by functioning according to caprice rather than law. In marked contrast to the instant proceedings, each of the above examples of the Commission's disciplinary activities regarding other judges is characterized by Commission secrecy, thus making it impossible for the public or this court or any other group to know whether the discipline was warranted, whether it was too harsh, too lenient or whether the Commission even had jurisdiction to entertain it.

Neither the Commission nor this court is free to disregard what is mandated by the constitution and the Commission's rules. In none of the above examples, however, did the Commission either simply dismiss the complaint or schedule and hold a probable cause hearing. As a result, the Commission placed certain judges on probation to the Attorney General, required mediation or special reporting and monitoring, required public apologies or simple acknowledgements of guilt without any deference to the

mandates of the constitution and its own rules. In no instance was there a finding of probable cause and a subsequent public filing as mandated by the Commission's rules. Thus, in each case with the exception of Petitioner Whitehead, full public disclosure never occurred because no hearings were held to determine the issue of probable cause.

In this opinion it is also necessary to dispense with the argument that under ARJD 31, the Commission may impose secret discipline, as occurred in the proceedings involving Judge D and Judge Stringfield, by the simple expedient of confronting a judge and giving him or her the option of consenting to a negotiated or unilaterally imposed form of discipline, thereby avoiding the prospect of a probable cause determination with its resultant notoriety as required by the public filing of a formal statement of charges. ARJD 31 provides:

> Upon written consent of the respondent, the commission may order the respondent's censure, removal or retirement at any stage of the proceedings and this order takes effect immediately. A certified copy of the order must be filed with the clerk of the supreme court and a copy of the order must be served on the respondent.

It is important to note that ARJD 31 is contained in Section V of the ARJD, the section entitled: "PROCEDURE AFTER FINDING OF PROBABLE CAUSE." ARJD 31 was never intended to be an escape hatch through which the discipline system could be manipulated to favor or disfavor respondent judges based upon any number of considerations that could impact the ultimate vehicle selected by the Commission to either provide or avoid public knowledge of the full extent of the Rule 11 charges against a respondent judge. Nor was it intended as a means of intimidating judges to accept a form of discipline where the Commission may realize that Rule 11 violations could never be proved in a probable cause hearing. Simply stated, under the existing rules, Rule 31, appearing in Section V (PROCEDURE AFTER FINDING OF PROBABLE CAUSE), cannot be read to authorize the imposition of secret discipline because an order of censure, removal or retirement, even if consented to by the respondent judge, must be preceded by a finding of probable cause and the filing of a formal, public statement of charges. *See* ARJD 15; 16. Thereafter, the Commission may enter a Rule 31 *public* order of censure, removal or retirement and file a certified copy of the order with the clerk of this court as required by the

rule.[44] The rules contemplate that, in *all cases* where probable cause to proceed to a formal hearing is found, a public, formal statement of charges will be filed, and a public order of discipline will be imposed where the Commission ultimately concludes that discipline is warranted.[45] Thus, under the ARJD, the public will be properly apprised of the Commission's decisions, and the Commission will be held accountable to the public for its actions.[46]

In contrast to the secrecy accorded to past Commission proceedings, in Petitioner's case, his alleged misconduct has been trumpeted from the mountain tops by the media, fed by unethical, anonymous allies. The Commission, specifically charged as guardians of confidentiality until a finding of probable cause, has actually opposed efforts by Petitioner to discover and hold accountable the source of the unlawful disclosures. The Commission's incredible opposition to discovery of the leaks has been facilitated and encouraged by former Commission counsel.

At least in spirit, the Commission and former Commission counsel have contumaciously displayed either an indifference or,

[44]We note, parenthetically, that in only one case processed under the current ARJD where the Commission has imposed any form of discipline by consent of the respondent judge, whether in supposed conformity with Rule 31 or not, has there been a certified copy of a Commission order imposing discipline filed with this court as required by Rule 31.

[45]We note that there is no provision in the ARJD that would prohibit a respondent judge from conceding probable cause to the charges of the sworn complaint at the probable cause hearing. In any such case, however, a public, formal statement of charges would still have to be filed as required under Rule 16. The public would then have complete knowledge of the charges against the respondent judge. Thereafter, if the Commission and the respondent judge were so inclined, a consent order imposing censure, removal or retirement of the judge pursuant to Rule 31 would be entirely permissible. The public would still be fully informed, as a certified copy of any such disposition would have to be filed with this court as a public document in accordance with Rule 31.

[46]In commenting on the power of the Pennsylvania Judicial Inquiry and Review Board to conduct secret proceedings up until the point where it recommends the imposition of a sanction by the Pennsylvania Supreme Court, the court has observed:

> Unaccountable secrecy, with its attendant opportunity to harass, intimidate, favor, raise or lower standards in particular unreported cases, to satisfy their view of what ought to be or not be, is a power beyond any known to our law. A tribunal that operates in secrecy can indulge its suspicions, yield to public pressure, even its whims, send zealous agents with a deliberate intent to find grounds to bring a judge beneath its influence for good or purposes of their own. Their purposes can run the gamut used by secret power to bend compliance to their wishes. Whether they do or not, the existence of the possibility must render them strictly accountable whenever their proceedings surface.

*See* Matter of Chiovero, 570 A.2d 57, 60 (Pa. 1990).

more aptly, a hostility to this court's three-judge order of July 30, 1993, which ordered, in part, that "[t]he Commission and all persons purporting to act pursuant to its authority shall maintain strict confidentiality concerning the proceedings below, and shall maintain the confidentiality of this proceeding before this court."

By virtue of the disparities, attitudes and actions discussed above, we conclude that Petitioner has been treated in a manner altogether different from the manner in which other judges have been treated by the Commission in the past. It is essential that this court take measures to prevent future such occurrences and to assure that Petitioner not be left as an incidental casualty of a failure to proceed in a uniform manner in accord with the assurances of due process provided by the ARJD. In the discussion which follows, we set forth the reasons that this court has also concluded that the Commission has not proceeded against Judge Whitehead in a manner consistent with the meaning and intent of specific provisions of the Nevada Constitution and the ARJD governing the Commission's jurisdiction and procedures.

## PART IV: JURISDICTION AND PROCEDURE

We now turn to the question that these proceedings were originally undertaken to address, namely, whether in entertaining the charges against Judge Whitehead and in following the procedures employed in this matter, the Commission has exceeded its defined jurisdiction. We conclude that the Commission has exceeded its jurisdiction and has failed to proceed in accordance with the meaning and intent of the applicable provisions of the Nevada Constitution and the ARJD.[47]

In *Whitehead I,* this court held that questions concerning Commission jurisdiction (as with similar issues relating to Nevada's district courts and other governmental entities) are subject to this court's review through the traditional procedures for interlocutory writs. Specifically, this court stated:

---

[47]The amicus brief filed by the American Judicature Society concludes with the recommendation that we "interpret the Rules and pass on the procedural aspects of the case, or, more efficiently, dismiss Judge Whitehead's charges without prejudice." Although this is a *writ* proceeding, not an appeal and we do not dismiss or remand in writ proceedings, we are finally in a position to accomplish our original task, thus recognizing, as did the Society, that "[w]hat the Nevada System needs now is . . . an interpretation of the governing Rules as a matter of law." As will shortly be seen, this opinion interprets the rules implicated in this original proceeding and prohibits further proceedings on the faulty Campbell Complaint before the Commission. Whether and to what extent the Commission may elect to proceed on the sworn Breen complaint and the aspect of the sworn Holmes complaint concerning the allegations relating to a change of venue in the *Kinnamon* case is a matter for the Commission to decide.

We regard the Commission as being a constitutionally established "court of judicial performance and qualifications," whose functions, as defined in the "Judicial Department" article of Nevada's Constitution, are essentially of the same fact-finding and law-applying nature that the state Constitution assigns to the District Courts of this State. The Commission's constitutionally-assigned functions do not include defining what constitutes ethical-wrongdoing any more than the District Courts may make authoritative pronouncements as to what conduct constitutes crimes or civil torts. Like the District Courts, the Commission is not free to define its own procedures; however, it certainly would receive an attentive hearing if it ever requested this court to amend some rule we have promulgated, as the District Courts occasionally do. Absent such an amendment, the Commission is obligated to accept and apply both the substantive rules of conduct and the rules of procedure as they are stated by this court, however much Commission members or a prosecutor presenting evidence to them might disagree with the rules in any given case. This is not to say, of course, that the Commission is subservient to this court, any more than are the District Courts; rather, we are saying that the Commission must faithfully perform its constitutionally-assigned functions in the judicial disciplinary process. When it appears that the Commission is being caused to stray outside its jurisdiction, as defined in the substantive or procedural rules we have adopted pursuant to constitutional mandate, the Commission members are no less subject to having their actions subjected to interlocutory judicial review than are judges of the District Courts.

110 Nev. at 160 n.24, 869 P.2d at 815.

The basis for our conclusion that the Commission is proceeding in excess of its lawful jurisdiction is readily seen by reference to the ARJD. Again, we emphasize that this court adopted these rules in 1988 in an effort to correct serious problems which had manifested themselves throughout the history of the Commission, by providing more specific safeguards for due process and greater assurances of professional responsibility on the part of the Commission members and attorneys serving as prosecutors. In direct response to various disturbing occurrences, the ARJD were formulated to address "unwholesome, un-American" practices that an extensive study persuaded us could no longer be tolerated. *Id.* at 145-47 n.15, 869 P.2d at 806-07.

The Study Committee that recommended adoption of the present ARJD was very much concerned that, prior to the enact-

ment of the new rules, the Commission appeared to have been "proceeding on the assumption that they were possessed of unbridled discretion to formulate and act upon their own notions of appropriate judicial conduct without reference to established norms." As discussed above in Part II, in the present case we see a resurgence of this kind of thinking and observe in the Commission's judicial discipline proceedings the kinds of activities that the new rules were intended to obviate. It is the current ARJD, adopted to correct the improper proceedings by the Commission in the past, to which we must refer in resolving the jurisdictional issues raised by Judge Whitehead's petition.

In contrast to judicial discipline systems in some jurisdictions, the system that has been established in Nevada under the current ARJD is accusatory rather than inquisitional. The Study Committee stated in its initial report to this court:

> Proceedings [under the proposed new rules] would be: accusatory rather than inquisitional, open rather than closed, and accompanied by due process formalities (*e.g.* specific accusations, right to challenge biased Commission members) rather than loose, unstructured and informal. [ADKT 38] at 8.
>
> . . . .
>
> Initial complaints, in writing and under oath, must state specifically the nature of the offense (e.g., violation of a section of the Code of Judicial Conduct) and the specific acts which constitute the offense. *Id.* at 10.
>
> Potential injustice is foreclosed [in the new rules] by clearly defining the basis of the complaint and by requiring the charges to be reduced in writing and attested to by an identified complainant. *Id.* at 11.

*See Whitehead I,* 110 Nev. at 145-47 n. 15, 869 P.2d at 806-07 (quoting Study Committee Report submitted in ADKT 38). With these fundamental principles in mind, we proceed with an analysis of the specific procedures followed by the Commission in the proceedings involving Judge Whitehead.

## A. THE "COMPLAINT SEEKING DETERMINATION OF PROBABLE CAUSE"

Petitioner Whitehead contends that the Commission lacks jurisdiction to proceed to a probable cause hearing on the basis of a complaint or charging document styled: "Complaint Seeking Determination of Probable Cause" (the Campbell Complaint), drafted by Special Deputy Attorney General Campbell and filed with the Commission on June 30, 1993. We agree.

The Campbell Complaint is invalid due to violations of the ARJD which are manifest on the face of the document. The Commission chairman has averred, in an affidavit dated August 10, 1993, that the Campbell Complaint is presently the "charging document, the evidentiary sufficiency of which must be established by special counsel at the probable cause hearing." Because the Commission's decision to proceed to a probable cause hearing is entirely based upon this complaint and no other, the invalidity of the Campbell Complaint is sufficient in itself to justify the issuance of a writ prohibiting the Commission from proceeding to a probable cause hearing on the basis of the Campbell Complaint.[48] The Commission, of course, has no jurisdiction to proceed on the basis of an invalid complaint.

The Campbell Complaint must be rejected for four reasons: First, Campbell did not sign the complaint under oath as required by ARJD 12(1). Second, ARJD 12(2) does not authorize the filing of the Campbell Complaint. Third, no provision in the ARJD authorizes the Commission to utilize appointed counsel to initiate discipline proceedings by the filing of an initiating complaint or charging document. Fourth, because the Nevada Constitution and inherent conflicts of interest preclude the Attorney General from serving as counsel to the Commission, Special Deputy Attorney General Campbell's investigation and initiating complaint are not constitutionally authorized; and therefore, the Commission is barred from proceeding to a probable cause hearing on the basis of Special Deputy Attorney General Campbell's unconstitutional activities. Finally, we merely note that it is strongly arguable that the Commission was not constitutionally

---

[48]In composing his complaint, Special Deputy Attorney General Campbell, as Commission counsel, decided to eliminate or incorporate prior complaints into his own complaint. As Campbell averred in an affidavit dated August 11, 1993, he relied on an array of interviews of unnamed witnesses and on "four separate written and verified complaints," namely, the sworn complaints of Judge Peter Breen and former Washoe County District Attorney Dorothy Nash Holmes. In preparing his own, superseding complaint it is apparent that Campbell made certain judgments as to the merits of the sworn complaints already on file. For example, Campbell states in his affidavit that "most of the allegations alleged by Ms. Holmes were *eliminated* as potential charges," but that one charge was "found [to have] *merit*." (Emphasis added.) After having eliminated what he decided did not have merit, Campbell discarded the old complaints and filed a new one of his own. Campbell's decision to do this was apparently ratified by the Commission; otherwise, Chairman Shipler would not have described the Campbell Complaint as the "charging document" upon which the Commission was to rely. Thus, it is clear that if the Campbell Complaint is jurisdictionally deficient, the Commission must be prohibited from proceeding to a probable cause hearing on the basis of that pleading.

constituted at the time it voted to ratify and act upon the Campbell Complaint, another factor militating against its validity.

### 1. *THE CAMPBELL COMPLAINT IS NOT MADE UNDER OATH, AS REQUIRED BY ARJD 12(1)*

ARJD 12, entitled "Initiation of procedure," provides in subsection 1:

> Except as provided in subsection 2, *initial* complaints of judicial misconduct *must* be made *upon oath in writing* and may[49] be made by the person complaining. Such a complaint must contain facts which, if true, would establish grounds for discipline under these rules.

(Emphasis added.)

The Campbell Complaint is without question formally deficient because Campbell did not, as required by ARJD 12(1), sign his complaint under oath; therefore, the Commission has no jurisdiction to proceed on that complaint. ARJD 2(3) defines a "complainant" as the "one who signs a complaint filed with the commission."[50] Campbell is the surrogate "complainant" here and the "one who sign[ed] [the] complaint;" but, aside from being an unauthorized surrogate who did not bring a complaint before the Commission, he did not sign it under oath as required by ARJD 12(1). Consequently, the complaint can be of no legal effect.

To be sure, Commission Executive Director Eve M. King, did append an affidavit to the Campbell Complaint attesting to the truth of the *Campbell* allegations. This is Campbell's pleading, however, and the verification statute, NRS 15.010, contemplates that where a pleading is verified "it shall be by the affidavit of the *party*." (Emphasis added.) Even a vain attempt to salvage the complaint by verification would have required the pleading to be verified by the complaining *party,* Donald J. Campbell. Except in

---

[49]ARJD 12(1) requires that complaints "*must* be made upon oath and in writing and *may* be made by the person complaining." (Emphasis supplied.) The use of the word "may" in the second clause merely means that the complaint "may" be made by the person complaining *or* by the executive officer if the requirements of ARJD 12(2) are met. As we will discuss, the requirements of ARJD 12(2) have not been satisfied.

[50]Although the Campbell Complaint is signed by Donald J. Campbell, Campbell signs as "Special Counsel," ostensibly as counsel for one Eve M. King. It is thus not entirely clear who was intended as the real "complainant." If Eve M. King were to be considered as the complainant, there is certainly nothing in the ARJD that would permit her to make her complaint through her attorney. No matter how the Campbell Complaint is viewed, it does not conform to the formal requirements of the ARJD.

cases of corporate or attorney verification, one person does not verify another's pleading. In any event, Campbell *signed* the complaint but did not swear to it, and King *swore to* the complaint but did not sign it. Thus, it is clear that the Commission may not proceed to the probable cause hearing on the basis of the Campbell Complaint which was not made "under oath" as required by ARJD 12(1). *See* State v. Judicial Standards Commission, 643 P.2d 210 (Mont. 1982) (supreme court issued writ of prohibition barring judicial discipline proceedings based on complaint of misconduct that was not verified in compliance with statute and Commission's own rule). Therefore, the Campbell Complaint does not conform to the clear intent of ARJD 12(1) to require charges "to be reduced in writing and attested to by an identified complainant." *Whitehead I,* 110 Nev. at 145-47 n.15, 869 P.2d at 806 (quoting the Study Committee Report).

## 2. *THE CAMPBELL COMPLAINT IS NOT AUTHORIZED BY ARJD 12(2)*

ARJD 12(2) provides:

> In *exceptional circumstances,* in which the commission has *substantial reason* to believe that a complainant may *in likelihood suffer untoward risk of embarrassment, harassment, or other detrimental consequences,* the commission may *on request, authorize its executive officer* to sign and swear to a complaint on information and belief, in the complainant's stead.

(Emphasis added.) The affidavit of the Commission's Executive Officer Eve King appended to the Campbell Complaint is insufficient to justify a filing under the provisions of ARJD 12(2). Even if Ms. King were considered to be the complainant, it will be shown that she was not in compliance with the requirements of ARJD 12(2).

In order for the Commission to authorize its executive officer to "sign and swear" to a complaint under ARJD 12(2), some actual complainant must come forward and, after demonstrating exceptional circumstances, request the anonymity available under the rule. Before granting such a request, the Commission must have "substantial reason to believe" that the filing of a complaint in the actual complainant's own name, would cause the complainant "in likelihood [to] suffer untoward risk of embarrassment, harassment, or other detrimental consequences." *See* ARJD 12(2).

In the present case, there is not even colorable compliance with

the rule. It does not appear that any request for protection was made by any actual complainant, that there was any substantial reason to believe that the actual complainant would suffer any untoward risks or that the Commission ever took any action which could be said to authorize the executive officer to complain in the true complainant's stead under ARJD 12(2). Certainly, it cannot be pretended that the executive officer signed the complaint to protect Judge Breen or former District Attorney Holmes, for they have been most prominent and vocal in publicizing their assertions about Judge Whitehead. Thus, the Campbell Complaint is not authorized by ARJD 12(2).

### 3. *THE COMMISSION RULES DO NOT PERMIT THE COMMISSION, THROUGH COUNSEL, TO INITIATE PROCEEDINGS BY FILING ITS OWN INITIATING COMPLAINT*

The Nevada Constitution commands this court to adopt appropriate rules for "[t]he conduct of investigations and hearings." *See* Nev. Const. art. 6, § 21(5)(c). As noted above, in furtherance of this constitutional mandate, this court adopted the current ARJD pursuant to the recommendations of a Study Committee that identified and extensively evaluated exigencies peculiar to Nevada's past experience demonstrating a clear necessity for a judicial discipline system in this state that is inherently accusatory rather than inquisitional.

The Nevada Constitution, article 6, § 21(7) provides that "[a]ny person may bring to the attention of the commission any matter relating to the fitness of a justice or judge." Under the accusatory system established by the rules, any such matter may be brought to the attention of the Commission by a person who files a complaint "upon oath in writing" containing "facts, which, if true, would establish grounds for discipline under these rules." *See* ARJD 12(1).

The Commission must consider all such sworn complaints *"brought before it* with a view to determining whether or not there exists sufficient cause to proceed to a probable cause hearing." *See* ARJD 14(1) (emphasis added). Where the Commission "determines that there is merit to the charges and that there is sufficient reason for a probable cause hearing," the respondent judge must be notified that he or she "is required to respond to the *sworn complaint* in writing . . . ." *Id.* (emphasis added). Thus, under Nevada's accusatory system, the Commission cannot proceed with either an investigation or a probable cause hearing

until a sworn complaint has been filed. *See, e.g.,* McKenney v. Commission on Judicial Conduct, 388 N.E.2d 666 (Mass. 1979) (Commission on Judicial Conduct has no authority to investigate alleged judicial misconduct until a complaint has been filed with it); Richter v. State Com'n on Judicial Conduct, 445 N.Y.S.2d 307 (N.Y. App. Div. 1981) (scope of commission investigation is limited to matters contained in complaint; commission was without power to require judge to testify on matters not mentioned in complaint);[51] *see also* New York State Com'n on Jud. Conduct v. Doe, 459 N.E.2d 850 (N.Y. 1984) (subpoena duces tecum was modified to eliminate requests for information not reasonably related to subject matter under investigation; New York law was designed to prevent "investigatory fishing expeditions" and the Commission's receipt or filing of a complaint triggers Commission's authority to commence an investigation into judicial improprieties); Nicholson v. State Com'n on Judicial Conduct, 409 N.E.2d 818 (N.Y. 1980).

In addition, and in contrast to the systems in place in some other jurisdictions, this state's accusatory system only permits the Commission to proceed to an investigation and a probable cause hearing regarding matters stated in "sworn complaints" that are "brought before it," as opposed to complaints that the Commission may have produced on its own resulting from an investigation. The alleged misconduct in the "sworn complaint" is the subject matter of the Commission's inquiry into whether a probable cause hearing is warranted; it is also the subject matter of any actual, subsequent probable cause hearing where the existence of probable cause is in fact determined. *See* ARJD 15 (finding of probable cause must be based, in part, "upon the sworn complaint"). We again emphasize that a respondent judge notified of a probable cause hearing is required to respond in writing to the sworn complaint, and not to expanded charges unspecified within the sworn complaint. *See* ARJD 14(1).

The Commission proceedings based upon the Campbell Complaint have not conformed to the meaning and intent of these

---

[51]The underlying decision of the New York Supreme Court, sitting in Special Term, Greene County, held that in attempting to conduct an investigation against the judge on matters for which a complaint had not been forthcoming, the State Commission on Judicial Conduct expressly exceeded its jurisdiction and thus the judge had established a clear right to issuance of a writ of prohibition. *See* Richter v. State Com'n on Judicial Conduct, 430 N.Y.S.2d 796 (N.Y. Sup. Ct. 1980). In the decision of the New York Supreme Court, Appellate Division, Third Department, cited in the above text, the court held that the judge's testimony before the Commission on these matters rendered the writ proceedings moot.

rules. Under the ARJD it is not the function of the Commission to employ counsel to devise their own charges against members of the Nevada judiciary. The rules provide that initial complaints of judicial misconduct must be made upon oath and in writing. The rules presuppose that concerned citizens will be motivated to submit sworn factual complaints to the Commission and that the Commission will thereafter, under ARJD 14, consider such complaints when they are filed and determine whether they warrant proceeding to a probable cause hearing.

Instead of processing the Breen and Holmes complaints, the Commission allowed Campbell, in the role of a prosecutor, to file his own, new and superseding complaint based upon his own investigation and not on facts stated under oath by actual, identified complainants. The superseding Campbell Complaint is made up of "allegations" which he "culled" not only from the Breen and Holmes complaints, but from other sources which were then incorporated in the complaint "on information and belief." The twelve counts of misconduct alleged in the Campbell Complaint go beyond the specific allegations culled from the Breen and Holmes complaints. The Campbell Complaint alleges misconduct that is not asserted or encompassed within the Breen and Holmes allegations.

There is nothing in the ARJD that would authorize a Commission prosecutor rather than a sworn complainant to initiate proceedings against a judge. After a finding of probable cause, under ARJD 16, a public, formal statement of charges is prepared and filed by a special prosecutor appointed by the Commission; but before this time, proceedings must be initiated under ARJD 12 by a sworn complaint signed by a true, identified complainant and not by a prosecutor employed by the Commission.[52]

In the instant case, however, Campbell filed with the Commission an entire complaint based not on facts known to him but on his information and belief as to what misconduct he believed Judge Whitehead had engaged in. Campbell's belief is stated to

---

[52]There is a great difference between hiring legal counsel and appointing a "prosecutor" who, under ARJD 16, is charged with preparing a "formal statement of charges" and conducting an investigation preparatory to the "formal hearing" provided for in ARJD 21. Nothing in the rules prevents the Commission from hiring counsel to advise it concerning its first and crucial determination relating to whether the initial sworn complaint filed by a "complainant" (and not by counsel or a prosecutor) has "merit," but such "pre-probable cause" counsel certainly is not empowered to file an initial complaint unless counsel has actual knowledge of judicial misconduct independent of his employment by the Commission and files such a complaint without regard to his assignment with the Commission.

have been acquired by examining Commission files and by interviewing a number of unnamed witnesses. There are no affidavits or other statements from these witnesses, and the only information that was conveyed to Judge Whitehead by the Campbell Complaint was comprised of Campbell's own charges, prepared from what he had culled from the Breen and Holmes complaints and learned during his secret investigation of Judge Whitehead.

Usually, a complainant required by the ARJD to state facts under oath would be providing particulars stemming from the complainant's own personal knowledge. A *fact* (Latin, *factum* "thing done"), as used in this rule, will usually or preferably represent actions and conduct, "things done," that are *known* to the complainant, and not by some third party who was *informed* or *believed* that some facts exist that may constitute misconduct. For example, if Judge Whitehead were being accused by some lawyers of intimidating them by asking them why they had filed a peremptory challenge against him, one would naturally expect that the aggrieved lawyers would be the complainants and that they would be the ones who state facts showing the nature of the claimed intimidation. *See* SCR 202(2) ("A lawyer having knowledge that a judge has committed a violation of . . . rules of judicial conduct . . . shall inform the appropriate authority"); *see also* Nevada Code of Judicial Conduct Canon 3D(1); In re Hampton, 775 S.W.2d 629, 630-31 (Tex. 1989) (under Texas law, sworn presentments on personal knowledge were required to institute inquiry into judicial conduct).

Notwithstanding the natural expectation that an accused judge should be faced by actual accusers rather than by persons who had merely been told about alleged acts of misconduct, we nevertheless would supply a liberal construction to the rules and hold that a valid complaint may contain reliable hearsay information and need not be based on personal knowledge. *See, e.g.,* McKenney v. Commission on Judicial Conduct, 388 N.E.2d 666 (Mass. 1979) (*state law requiring complaint to be signed under pains and penalties of perjury does not require signer to have personal knowledge; however, lack of first hand knowledge could have bearing on whether complaint is worthy of investigation*). Although usually complainants will be speaking from their own personal knowledge, reality dictates that flexibility be allowed in accepting hearsay aspects to a complaint, especially if the complaint appears reliable in other respects. A complaint based in part on hearsay might be adjudged adequate by the Commission if, for example, the dates, names and times relating to charged misconduct were in some way stated and made available to a respondent judge so that he or she would be in a position to

answer to the charges. Proceedings run contrary to the ARJD, fairness, and due process when they are initiated by a complainant and then pursued by the Commission to a probable cause hearing on the basis of charges wholly uncorroborated by known fact, and supported entirely by hearsay, rumor or belief.

As required by ARJD 14, every complaint that is filed with the Commission is subject to an adjudication *by the Commission* of the merits of the complaint. Each complaint must be judged on its own merits, and in most instances an uncorroborated complaint based principally on rumor or hearsay would likely be rejected by the Commission as not being based on *facts*. On the other hand, a complaint which, although largely based on hearsay information, clearly gave the respondent judge specific notice of the nature of the charges, with names, dates and places, would probably be upheld. Our point is that the fairest and most reliable way to initiate proceedings for judicial discipline under the ARJD is to have a complainant who has actual knowledge of judicial misconduct come forward and state under oath facts which establish grounds for discipline; but still, the Commission might under certain circumstances proceed on complaints that did not meet this ideal, provided that fair notice was given to the judge of the nature of the charges.[53]

The Campbell Complaint is comprised of allegations which Campbell claims to have culled[54] from a variety of sources,

---

[53]It is common in criminal practice to allow complaints to be filed by police officers or other persons who do not have first-hand knowledge of criminal acts. In such cases, however, a trained prosecutor screens and authorizes such proceedings. In judicial discipline cases the main protection against improper charges being filed against judges is the requirement that a complainant state *facts* under oath, and great care must be given to insure the reliability of these statements. This is the reason that ARJD 14(1) demands that the "commission will consider all complaints *brought before it* with a view to determining whether or not there exists sufficient cause to proceed to a probable cause hearing." When the Commission receives an unsworn complaint or one based entirely on hearsay it would be proper for the Commission to advise a would-be complainant of the requirements of ARJD 12 and that sworn facts must be presented if the Commission is to proceed. Again we emphasize that the Nevada Commission is not an inquisitional or investigatory tribunal; it is an adjudicatory tribunal. Only a properly-sworn complaint can trigger judicial discipline proceedings.

[54]The Commission freely admits that Campbell did not base any of the allegations in his complaint on his own knowledge, but, rather, that "counsel culled these allegations from both the many complaints on file and the evidence gathered in the investigation, [and then] drafted a proposed complaint, and requested that a probable cause hearing take place."
The rather perplexing quoted language leads us to wonder whether the

including parts of complaints which he had eliminated and hearsay information which he had obtained from a number of unidentified witnesses whom he interviewed in a wide-ranging investigation of Judge Whitehead. When Judge Whitehead asked the Commission to provide him with information relating to the source of Campbell's information, it refused to do so. Accordingly, Judge Whitehead has been deprived, in some measure at least, of the names of his accusers and the nature of their accusations against him. If a sworn complaint is made up entirely of charges based on rumor and belief, and no corroborating evidence is discovered in a preliminary investigation, the Commission should rule, under ARJD 14(1), that "there is [no] merit to the charges." The mere inclusion of hearsay information in a proper, sworn complaint will not, of course, have any effect on the validity of the complaint if there is otherwise "sufficient cause to proceed."

As noted previously, prior to a finding of probable cause, the Commission is not authorized to hire a special prosecutor to investigate, expand upon, and supersede a sworn complaint "brought before" the Commission. The ARJD makes no provision for such a procedure; we therefore disapprove of this practice in the instant case.

However, as we discuss below, the Commission is, of course, permitted to conduct whatever "preliminary investigation" may be necessary in order to ascertain, under ARJD 14, whether the allegations of a sworn complaint have sufficient merit to warrant the scheduling of a probable cause hearing. Moreover, once the Commission has found probable cause to proceed, a more thorough investigation may be indicated in the prosecution of a formal statement of charges, but the preliminary investigation attendant to the initial complaint is primarily a screening device to prevent unfounded or capricious prosecutions from going forward and to determine whether the specific charges of the sworn

---

Commission or Campbell confused or intermingled the sworn complaint requirements of ARJD 12(1) with the language of ARJD 16, which provides that *after* a finding of probable cause, "the commission must designate a prosecuting attorney who must sign and file with the commission a formal statement of charges signed under oath by the prosecuting officer." Although Campbell's Complaint was unsworn, it does provide a form of formality and authoritative preparation that approaches the formal statement of charges that must be prepared after a finding of probable cause. Under the ARJD there is no authority granting the Commission the right to hire a "prosecutor" until after a probable cause finding, and, certainly, no prosecutor or any other attorney is given the power to sign pleadings other than the formal statement of charges mentioned in ARJD 16.

complaint have sufficient merit to warrant a probable cause hearing on those charges. We therefore hold that the accusatory system established by the ARJD does not permit the Commission to initiate probable cause proceedings on allegations that have not been brought before it in a sworn written complaint by an identified complainant. The Commission, therefore, cannot proceed to a probable cause hearing based upon the Campbell Complaint.

4. *THE COMMISSION MAY NOT PROCEED TO A PROBABLE CAUSE HEARING ON THE BASIS OF THE CAMPBELL INVESTIGATION AND COMPLAINT BECAUSE CAMPBELL WAS CONSTITUTIONALLY DISQUALIFIED FROM ACTING*

As we held in *Whitehead III*, the Attorney General and her deputies are constitutionally disqualified from acting in the capacities in which they have served the Commission in the proceedings involving Judge Whitehead. 110 Nev. 874, 878 P.2d 913 (1994). We have held that the Attorney General cannot be the advisor to the Commission and at the same time appear before the Commission as a prosecutor; nor can the Attorney General be the Commission's probation officer. We cannot, so to speak, have the prosecutor in the jury room. Consequently, aside from all other considerations, the Commission must be prohibited from proceeding to a probable cause hearing based on Special Deputy Attorney General Campbell's investigation and complaint because he was constitutionally disqualified from acting in this proceeding, either as prosecutor or surrogate complainant.

5. *THE NATURE OF THE UNDERLYING ALLEGATIONS OF MISCONDUCT*

In view of the widespread public interest generated in these proceedings, and the Commission's expressed desire for some direction from this court, we believe it is proper to attempt to provide some guidance to the Commission regarding the nature of the charges that have been made in the Campbell Complaint, as well as in the Breen and Holmes complaints. Our analysis is intended to provide some insight to the Commission concerning the views of this panel in the event that the Commission conducts future proceedings against Petitioner or other judges who may have followed practices similar to the alleged practices of Judge Whitehead in peremptory challenge matters.

All but two of the charges in the Campbell Complaint and in

the Breen and Holmes complaints[55] relate to the manner in which Judge Whitehead routinely and openly deported himself in handling peremptory challenges. At the time all of the complaints were filed, peremptory challenges were governed by a version of SCR 48.1 which has since been amended to clarify the procedures formerly permitted by the rule. The "SCR 48.1" to which we refer in this opinion is the former, pre-amendment rule, the rule by which Judge Whitehead was bound. There is no suggestion in this record that Judge Whitehead at any time or in any way acted in violation of former SCR 48.1. There is nothing that suggests that Judge Whitehead performed any of his judicial functions in other than a frank and open manner; in fact, as stated in the Campbell Complaint, Judge Whitehead freely discussed his peremptory challenge practices while instructing at legal seminars.[56] Further, although Campbell charges Judge Whitehead with willful misconduct, there is no indication or charge that Judge Whitehead believed that there was anything irregular, much less

---

[55]The Breen and Holmes complaints are the only sworn complaints filed with the Commission. The only portion of the six hundred-page Holmes complaint that was salvaged by Campbell did not, as do the rest of the complaints in this case, relate to Judge Whitehead's manner of administering peremptory challenges under the former SCR 48.1. As incorporated into the Campbell Complaint, the referenced Holmes' charge is that "Judge Whitehead telephoned Deputy District Attorney Larry Guy Sage and asked him to stipulate to move the Kinnamon trial to Elko, Nevada" and that by "seeking to choreograph a change of venue before a prospective jury panel was even seated, Judge Whitehead created the appearance that he was attempting to retaliate against [defense counsel] Mr. Mausert by seeking to have him held financially responsible for the additional costs which would result if such a change of venue would occur."

In one of the Breen complaints, the charge is made that Judge Whitehead "manipulated and persuaded" Valley Bank to fire the firm which filed a peremptory challenge against the judge, to hire another firm, and to withdraw the peremptory challenge. We make no judgment as to whether Judge Whitehead's alleged choreography in the Kinnamon trial either occurred or constitutes judicial misconduct. Nor do we infer any opinion with respect to the allegations of the Breen complaint relating to the Valley Bank matter. It is for the Commission to determine in the first instance whether sufficient cause in fact and law warrants further consideration of any of the allegations in the sworn complaints. For present purposes, we restrict our discussion to the charges out of which all other complaints arise, the manner in which Judge Whitehead handled peremptory challenges.

[56]We conclude as a matter of law that the allegations of misconduct stemming from Judge Whitehead's comments at a continuing legal education seminar do not state grounds for discipline under ARJD 11. Changes in procedure and law frequently result from free and open discourse and criticism voiced at such events. Judges must be accorded the right to free speech so long as their exercise of that right does not entail conduct violative of the Canons of the Nevada Code of Judicial Conduct. No such prohibited conduct is implicated in the allegations relating to Judge Whitehead's participation in the CLE course.

ethically incorrect, about his administrative practices under former SCR 48.1. Finally, and quite significantly we think, the peremptory challenge practices out of which the Whitehead accusations arose are practices of a nature that apparently have been regularly engaged in by many Nevada judges for many years, in several departments of Judge Whitehead's own district and throughout the state.[57]

The nature of the two kinds of charges levied against Judge Whitehead were succinctly described as applicable to multiple judges by Chief Judge Brent Adams of the Second Judicial District Court, Washoe County, in a letter to this court dated May 13, 1993. Chief Judge Adams identified "two specific problems which have been the subject of repeated complaints." First, wrote Judge Adams, "judges or their administrative assistants have contacted lawyers ex parte inquiring why a peremptory challenge was made." Second, the "other problem has been designation by the preempted judge of the new presiding judge." All but two of the charges in the Campbell Complaint relate to Judge Whitehead's manner of administering SCR 48.1 and either to (1) his having contacted lawyers or parties "inquiring as to why a peremptory challenge was made" or (2) his procedures in the "designation . . . of a new presiding judge."

The ambiguity and uncertainty inherent in former SCR 48.1 and its statutory predecessor, NRS 1.230, have over the years led to a certain amount of disagreement among judges and lawyers. This reality was well-described in a letter written to the chief justice on May 18, 1993, from Richard Horton, a veteran trial lawyer. In his letter, Mr. Horton referred to the May 13, 1993, Adams letter and stated that he wished to add "his voice to that of others that we do need and for many, many years have needed the proposed rule change to discourage judges who have been challenged from questioning counsel about the challenge and from selecting the judge to then hear the case." Mr. Horton claimed to have had "more than enough personal experience with the situation to know that it is a serious and ongoing problem and has been for the 43 years I have been practicing."[58] Mr. Horton supported

---

[57]The mere fact that these practices have not been uncommon and have been going on for a long time does not mean that the practices were appropriate or that they were not susceptible of being conducted in such an untoward manner as to constitute judicial misconduct. That the practices were not uncommon is, however, some indication that those who engaged in them may not be guilty of "willful misconduct."

[58]There appears to be no question but that the two mentioned practices were not uncommon throughout the state and to some degree had been problematical over the years. The "problem" certainly existed in other than the "several departments" of Chief Judge Adams' and Judge Whitehead's district. (Attorney Schumacher wrote to us on May 24, 1993, that in Chief

the amendment of SCR 48.1: (1) to prohibit challenged judges from contacting parties or counsel, and (2) to eliminate the portion of the rule requiring challenged judges to appoint their successors. Following the recommendation of lawyers and judges and the Bar, this court amended SCR 48.1. On August 15, 1993, after reciting as a fact that SCR 48.1 presented "a problem or a potential problem[] [that] exists *throughout the state,*" we amended the rule to resolve the disagreement among judges and "make it clear" that challenged judges should not contact challenging attorneys.[59] (Emphasis added.) The amendment adopted by this court also changed the rule so that challenged judges would no longer be required or permitted to select their successors. *See infra* note 63.

In discussing the practice of judges, "throughout the state," who contacted lawyers, "inquiring" about peremptory challenges, we should first note that this long-established practice does not fit well into the category of "willful misconduct" on the part of any of the "offending" judges. It may be argued that these judges should have recognized that it was not good form to ask lawyers why they filed a challenge. After all, lawyers had the right to file a peremptory challenge *without* stating why they did it. However, judges who engaged in this "offending," but not uncommon, practice might advance a number of legitimate reasons for making such inquiries, and the mere contact, *of itself,* may not constitute misconduct.[60] It should be remembered that

---

Judge Adams' district she was "aware of a number of incidents of concern that involve at least three Departments.") Chief Judge Becker, of the Eighth Judicial District Court, Clark County (who has served as a member of the Commission sitting in judgment of Judge Whitehead), advised this court in a letter dated May 14, 1993, that, although she was "not certain it is a substantial problem with the Bar," in her district "some judges do this routinely and take a peremptory challenge as a personal affront." Interestingly, Chief Judge Becker also advised the court that it was necessary "to *make clear to the judiciary*" that judges should not engage in the practice of contacting challenging attorneys. (Emphasis added.)

[59]A "judge against whom a peremptory challenge is filed shall not contact any party or attorney representing any party." SCR 48.1 as amended, August 15, 1993.

[60]Under the rather anomalous and ambiguous situation that predated the 1993 rule amendment, challenged judges may have wanted, justifiably, to inquire of a challenging attorney as to whether they should automatically disqualify themselves in future cases or to engage in some other legitimate and perfectly ethical discussion. The mere contact, *of itself,* was not prohibited by the rule and was not, *of itself,* ethically objectionable. It is the nature of the contact that might bring it within the field of judicial misconduct. For example, an abusive or coercive approach by a judge could very possibly be seen as a violation of the broad Code provisions relating to the "high standards of conduct" expected of a judge.

Mention has been made of the "ex parte" quality of such inquiries, but it

once a timely challenge was filed under the former version of SCR 48.1, the challenged judge was no longer the presiding judge in the case and had "lost the power to do anything further in the case except to transfer the action to another judge."[61] Sisson v. Georgetta, 78 Nev. 176, 180, 370 P.2d 672, 674 (1962) (citations omitted). Thus, a judge's separate contact with the lawyers in a case after the judge had been removed, would at least arguably have been permissible under the former rule. Moreover, it would have constituted judicial misconduct only if the contact were made in such an offensive or improper manner as to be unbecoming a judge, or contrary to accepted high standards of conduct expected of a judge, and thus violative of the Code of Conduct. If a lawyer or other person has claimed to be deterred or chilled[62] or otherwise offended or prejudiced by a contact with Judge Whitehead, and that complainant has come forward and stated facts under oath which would establish a willful violation of the Code of Conduct, then there would be cause for concern. We infer no opinion as to whether such a complaint has been filed in this case.

The second aspect of former SCR 48.1 that caused problems statewide and through the years was the rule's mandate that the challenged judge "shall transfer the case to another department of the court." SCR 48.1(6).[63] Evidently, the specific practice that has bothered lawyers and judges with respect to this rule is the practice of the challenged judge contacting the nonchallenging

appears that the judge's not including the other attorney in these contacts has little or nothing to do with the problem. The lawyer who is contacted by a judge about that lawyer's reasons for a challenge would not likely be interested in or offended by his opponent's not being a party to the contact. When former SCR 48.1 was in effect, a discipline complaint against a judge would have more likely been based upon the judge's unethical abuse of his station as a judge in improperly accosting the lawyer and demanding in an objectionable manner an explanation for actions which, by rule, called for no explanation.

[61]There are no allegations in any of the "complaints" that any of the conduct by Petitioner related to peremptory challenges that were untimely.

[62]The terms, "deterring" and "chilling" are taken from the Campbell Complaint. The much-repeated, emotive phrase "bullying lawyers" was coined by the news media to describe the accusations made in the "leaked" Campbell Complaint. The word "bullying" does not appear in any of the Commission documents, and the repetitive use of this extravagant and judgmental term is illustrative of the type of damage that has been inflicted on Judge Whitehead's reputation and to his chances of receiving due process in this matter. Whether any of the complaints in this record state "information" or a "belief" which if properly charged would show possible violations of Canons 1 and 2 arising out of Judge Whitehead's manner of administering SCR 48.1 is a matter of conjecture; and we make no judgment on the point because of the clear facial invalidity of the Campbell Complaint, i.e., the charging document.

[63]Under the amended rule the clerk will "randomly reassign the case to another judge within the district." SCR 48.1(2)(a).

attorney concerning the transfer process. Even though challenged and removed from the case, judges still had the duty and discretion to transfer the case to any department they might choose. The practice of judges' calling the nonchallenging attorney to obtain suggestions regarding a successor judge may certainly be viewed as objectionable, but it apparently has not been an isolated practice and was not expressly forbidden by SCR 48.1. As previously noted with respect to contact with challenging lawyers, judges contacting nonchallenging lawyers might be perceived (prior to the rule amendment) as acting appropriately or inappropriately, depending upon the circumstances. For example, a challenged judge (who under the old rule, had the sole and unrestricted authority in choosing a replacement) may have benignly contacted a nonchallenging lawyer to obtain assurances that the new judge to whom transfer was planned would not also be subject to a second peremptory challenge, and thus another occasion for delay. At least in theory, a transfer to any judge not otherwise disqualified, should not result in prejudice to any party because judges are held to a standard of fairness and impartiality. On the other hand, there are ways a judge might possibly have run afoul of the Code of Judicial Conduct in the process of designating a replacement judge. Each case is different, and that is why if charges of judicial misconduct are to arise out of practices employed under the former rule, the complaint should contain a fairly precise statement of *fact*, specifying what the judge is accused of doing wrong.

We also consider ARJD 11(3) to be of importance in this respect. That rule provides: "When applied for purposes of determining whether misconduct has occurred, the provisions of the Nevada Code of Judicial Conduct must, considered as penalty provisions, be strictly construed in favor of the respondent judge." It should also be remembered that ARJD 9 provides that the Commission "has no jurisdiction to review or to base charges upon differences of opinion between judges as to matters of law or policy, or as to other issues committed to judicial or administrative discretion."

It is certainly arguable that the judges in Judge Adams' district, who were engaged in the kinds of activities of which he complained, were merely applying their own interpretation to the ambiguities in former SCR 48.1 and not engaging in "willful misconduct." Under the old rule there were "differences of opinion" among the judges as to how SCR 48.1 should be administered. As discussed above, however, a judge might go beyond the limits of propriety while carrying out any administrative function; still, the administrative nature of these proceedings

and the favorable construction to which accused judges are entitled by virtue of ARJD 11(3) should be evaluated and considered if the Commission is called upon to judge the merits of any complaint relating to the administration of former SCR 48.1.

## 6. CONCLUSION

ARJD 40(7) expressly authorizes review by this court of interlocutory orders of the Commission when it is charged with acting without or in excess of its jurisdiction. On July 6, 1993, Donald J. Campbell issued a document entitled, Notice of Probable Cause Hearing, which "required" Judge Whitehead "to respond" to the Campbell Complaint and to appear at a certain time and place for a probable cause hearing based upon the Campbell Complaint. The notice and order issued by Mr. Campbell were both without and in excess of the Commission's jurisdiction.

In *Whitehead I,* we settled any question relating to this court's power of interlocutory review, citing along with other authority the case of People ex rel. Harrod v. Illinois Cts. Com., 372 N.E.2d 53 (Ill. 1977), a case in which the Illinois Supreme Court declared that it had "both the authority *and the responsibility*" to determine whether the proceedings before the Discipline Commission were beyond the Commission's constitutional grant of authority and, if so, to declare such actions invalid. (Emphasis supplied.) Today we declare the actions of the Nevada Commission on Judicial Discipline to be invalid and order that a writ of prohibition issue prohibiting the Commission from proceeding in any manner based on the Campbell Complaint. We therefore direct the clerk of the court to issue a writ (1) prohibiting further prosecution of the Complaint Seeking Determination of Probable Cause now pending and (2) mandating that any further Commission proceedings against Judge Whitehead be conducted in accordance with the Administrative Rules of Judicial Discipline (the ARJD), as construed below.

## B. REMAINING PROCEDURAL CONCERNS

As discussed above, Petitioner Whitehead has contended that the Commission has violated his rights to due process of law by treating him in a discriminatory way, inconsistently with the ARJD, and in a manner unlike comparable discipline proceedings involving other judges. "If due process is to be secured, the laws must operate alike upon all and not subject the individual to the arbitrary exercise of governmental power . . . ." *The Constitution of the United States of America: Analysis and Interpretation* 1407 (Lester S. Jayson et al., eds., 1973). If an individual is pursued by the application of laws or regulations that are applied to that

person alone, rather than by general provisions which affect all equally, then the guarantees of due process of law are surely implicated. *Id.; see* Marchant v. Pennsylvania R.R., 153 U.S. 380, 386 (1894). *See also* In re Greene, 403 S.E.2d 257 (N.C. 1991) (because a judge's interest in continuing in public office is an individual interest of sufficient importance to warrant constitutional protection, Commission proceedings must meet basic requirements of due process, including the right to an adequate and fair hearing). It cannot now be denied that the Commission has been functioning without regard to its own rules of procedure and the Nevada Constitution or that Petitioner Whitehead has indeed been treated in a manner quite different from the manner in which the Commission has treated other similarly situated judges in the past.

We have concluded, as discussed above, that Petitioner has not been accorded his rights under the Nevada Constitution and the ARJD, and that the Commission's proceedings thus far in this matter must be nullified. We now turn to the problem of assuring that the Commission provides Petitioner Whitehead and other accused judges with the process to which they are entitled in any proceedings hereafter instituted. To that end, we interpret for the first time the proper scope of the Commission's preliminary investigation prior to the probable cause hearing, and other provisions of the ARJD relevant to this proceeding. We then turn to the question of whether Petitioner can receive fair and impartial treatment before the present Commission, emphasizing in the process, the importance of the constitutional mandate of confidentiality in Commission proceedings.

### 1. *THE PROPER SCOPE OF A PRELIMINARY INVESTIGATION PRIOR TO A PROBABLE CAUSE HEARING*

We reject Judge Whitehead's contention that the Commission must determine "from the complaint itself," without any preliminary inquiry whatever, whether a basis exists to proceed to a probable cause hearing. We further reject, however, the Commission's evident contention that the Nevada Constitution authorizes a preliminary investigation encompassing whatever wide-ranging inquisition the Commission or its investigators may choose to pursue.

This court is obligated under the state constitution to adopt rules for the Commission pertaining to "[t]he conduct of investigations . . . ." *See* Nev. Const. art. 6, § 21(5)(c). Moreover, article 6, § 21(7) provides, in pertinent part, that "[t]he commis-

sion *shall,* after *preliminary investigation,* dismiss the matter or order a hearing to be held before it." (Emphasis added.)

Although there is no express definition within the rules of "preliminary investigation," the proper scope of a pre-probable cause "preliminary investigation" must be interpreted by reference to the current rules, in particular ARJD 12 and ARJD 14(1) and (4). In *Whitehead II,* we observed:

> We have not yet interpreted the meaning of "preliminary." However, the dictionary definition of the term includes: "1. preceding and leading up to the main part, matter, or business; introductory; preparatory: *preliminary examinations.* 2. something preliminary, as an introductory or preparatory step, measure, contest, etc." The Random House Dictionary (2nd ed. 1987).

110 Nev. at 411-12 n.26, 873 P.2d at 965-66. Clearly, the constitutional provision for a preliminary investigation refers to an investigation of a type that is substantially different from an exhaustive survey and interrogation of persons who may know a respondent judge and have some basis for cooperating in the furtherance of complaints against the judge.

Obviously, the preliminary investigation must begin with the sworn complaint. Under ARJD 12(1), unless the complaint contains facts which, if true, would establish grounds for discipline under the rules, *i.e.,* facts establishing one or more of the grounds for discipline set forth in ARJD 11,[64] the complaint must be dismissed. Although, under *exceptional circumstances,* and *on request,* the Commission's executive officer may sign and swear to a complaint on information and belief, such a surrogate complaint must precisely reflect the charges contained in the sworn complaint first submitted to the Commission by the party who is the actual complainant. The complaint that thus survives a preliminary screening for ARJD 11 grounds, must be evaluated

---

[64]ARJD 11 provides:

**Grounds.** Grounds for discipline by censure or removal are:

1. Conviction of any felony or of any misdemeanor involving moral turpitude.

2. Any acts or omissions amounting to any public offense which tend to corrupt or to impair the administration of justice in any court.

3. Any acts or omissions in the performance of judicial or administrative duties which contravene express provisions of the Nevada Code of Judicial Conduct. When applied for purposes of determining whether misconduct has occurred, the provisions of the Nevada Code of Judicial Conduct must, considered as penalty provisions, be strictly construed in favor of the respondent judge.

4. Willful and persistent failure to perform the duties of office.

5. Habitual intemperance.

further to assess whether an investigation or inquiry may be necessary to determine if the charges have sufficient credibility to warrant the scheduling of a probable cause hearing. In many instances, a contact with the complainant or even the judge complained against, may satisfy the Commission representative concerning the credibility of the charges and the proof that may be adduced in support of the charges at the probable cause hearing. The complainant will almost always be the source of determining the extent to which further contacts or inquiry beyond that with the complainant may be necessary.

Since the sworn complaint must specify facts which, if true, would establish ARJD 11 grounds to invoke the Commission's jurisdiction, the complainant must possess information in support of the sworn charges. There will be instances, however, where the Commission may determine that further preliminary investigation beyond the contact with the complainant may be necessary in order to ascertain the merit of the charges. By way of an example, if a complainant should swear that he is aware of a judge having accepted a bribe, and upon questioning, the complainant advises the Commission representative of the names of two persons who were witnesses to the event, it would be appropriate for a Commission investigator to contact the named persons in order to ascertain the extent of their information and its credibility.[65]

---

[65]Judge Becker, who has been serving as a member of the Commission in this case, saw rather clearly the function of the preliminary investigation or inquiry into the merits of an initial complaint when she advised us in her statement to the court dated March 9, 1994, that the Commission was bound to make such inquiry into the merits of sworn complaints because "[o]therwise, a judge could be burdened inappropriately by having to come before the Commission in a formal Probable Cause Hearing where the facts would demonstrate that a hearing was not necessary and warranted. This can only be eliminated by a preliminary investigation." The constitutional reference to a preliminary investigation is reflected in the requirements of the ARJD that the Commission must make a preliminary determination of "sufficient cause" before proceeding. These early inquiries will, as indicated in the text, ordinarily be comprised of a review of the written content and legal sufficiency of the complaint (whether, pursuant to ARJD 12(1), it contains facts which, if true, would establish grounds for discipline under these rules), and perhaps limited personal or telephonic inquiries directed to the complainant and other percipient witnesses to the specific charges of misconduct contained in the sworn complaint. In rare cases, a more substantial pre-probable cause investigation might be called for *after* the filing of a sworn complaint, but before the employment of a prosecutor under ARJD 16. Naturally some investigation by a prosecutor may become necessary and proper after a finding of probable cause when, in accordance with ARJD 16, "the commission must designate a prosecuting attorney who must sign and file with the commission a formal statement of charges signed under oath by the prosecuting officer."

It would not be appropriate, however, at this preliminary stage, to launch an investigation designed to produce other possible complainants. In other words, the preliminary investigation must be confined to that which is necessary to satisfy the Commission that there is sufficient merit to schedule a probable cause hearing on the precise charges specified in the sworn complaint. It would be inappropriate for the Commission, upon ascertaining that there is reasonable merit to the precise charge of bribery in the hypothetical posed, to have the investigator launch an investigation among other persons, including attorneys and judges, who may be able to provide information upon which to base additional, unrelated complaints. ARJD 14(1) provides that the Commission "will consider all complaints *brought before it* with a view to determining whether or not there exists sufficient cause to proceed to a probable cause hearing." (Emphasis added.) The same provision also provides that if the Commission determines that there is sufficient reason for scheduling a probable cause hearing, the respondent judge must respond *"to the sworn complaint."* (Emphasis added.) ARJD 5(4) provides in part that "[w]henever there is not an adequate factual or legal basis for further proceedings before the commission, the commission must dismiss them . . . ." ARJD 14(4) also provides that in the event the Commission concludes there is insufficient cause to proceed to a probable cause hearing, and notoriety has resulted from *the complaint,* or *"the inquiry or proceedings related thereto,"* the Commission must issue information to the public indicating the lack of cause to proceed. (Emphasis supplied.) The emphasized language in ARJD 14 demonstrates two salient points. First, the Commission acts on accusations in complaints that are brought to it, as opposed to complaints that the Commission may produce through an investigation. Second, the rule implies that any inquiry or investigative proceedings must be confined to the sworn complaint.

In summary, then, a preliminary investigation or other inquiry should be no more than what may be necessary to determine whether the specific charges of the sworn complaint have sufficient merit to warrant a probable cause hearing on those charges. In effect, the length and breadth of a preliminary investigation should be confined to the narrowest possible activity necessary to

satisfy the Commission that there is or is not merit to the specific charges contained in the sworn complaint.[66]

## 2. *THE RESPONDENT JUDGE'S RIGHT TO INSPEC-TION UNDER ARJD 14(5)*

ARJD 14(5) provides:

> In preparing to oppose a determination of probable cause, the [accused judge] has the right to inspect all records of the commission relating to the disciplinary action against the [accused judge] and to be fully advised as to the contents of the administrative record considered by the commission determining that there was sufficient reason for a probable cause hearing.

In *Whitehead II*, we discussed the Commission claim respecting attorney-client and work product privilege, and observed that in some states there is no protection provided for work product. We cited to an American Judicature Society publication which quoted the director of the judicial discipline commission in Kentucky as follows: "work product protects little, if anything. All information gathered must be given to the judge under Rule 4.170(4) of our rules before formal charges are filed." *See Whitehead II*, 110 Nev. at 413, 873 P.2d at 967 (citing Judith Rosenbaum (with the assistance of Jeffrey M. Shaman and Katherine Levin), American Judicature Society, *Practices and Procedures of State Judicial Conduct Organizations*, ch.8 at 28 (1990)).

In our Order Granting Petition filed September 9, 1994, we indicated that we would follow the Kentucky Supreme Court Rule 4.170(4) and make all work product subject to discovery by the respondent judge. We now clarify our earlier ruling to exclude true attorney work product as material discoverable by a respondent judge. Under the accusatory system established by Nevada's rules, ARJD 14(5) is construed not to permit discovery of the attorney-investigator's or special prosecutor's work product insofar as it relates to the attorney's mental impressions, conclusions, or legal theories or strategies. However, work product may not be asserted as a basis for refusing to disclose the identity and statements or the substance of the statements of witnesses. We thus emphasize that whether (as with Judge D), the Commission

---

[66]Despite various contrary comments from ethicists and others published in the media, at no time has this court approved, inferred, or implied, the absurd proposition that the Commission has no right to perform a preliminary investigation prior to a probable cause hearing.

or its counsel elects to investigate by taking signed statements from witnesses or, as with Judge Whitehead, elects to have the investigator or prosecutor forego the taking of signed statements and simply take notes regarding the substance of a witness's information and expected testimony, all such materials are properly the subject of discovery by a respondent judge. In other words, the identity of witnesses and the substance of their information and testimony must be made available to the respondent judge in order to prepare for a probable cause hearing irrespective of whether signed statements from such witnesses have been secured. This ruling is also consistent with ARJD 21 which applies after a finding of probable cause. The latter rule specifies precisely what must be disclosed to a respondent judge, but is silent as to work product. We therefore interpret Rule 21 to exclude work product in the sense described above.

Even where the Commission's attorney-investigator or special prosecutor interviews a potential witness but concludes that said witness has no information relevant to the subject of investigation, the identity of the witness must be revealed along with a statement indicating that the witness has no relevant information and will not be called to testify. Discovery concerning the latter category of non-percipient witnesses is essential in order to provide assurance that the scope of the investigation is confined to that permissible under our ruling with respect to preliminary investigations. Simply stated, we conclude that the reference in ARJD 14(5) to "all records of the commission" means exactly that, i.e., "all records of the commission." Similarly, the terminology: "fully advised" as used in ARJD 14(5), means "fully advised." However, true attorney work product, as defined above, shall not be subject to what otherwise appears to be the all-inclusive scope of Rule 14(5).

If the Commission should proceed to a probable cause hearing on the basis of the allegations relating to SCR 48.1 contained in the sworn complaints from Judge Breen, and the change of venue matter contained in former District Attorney Holmes' complaint, the Commission may not entertain such proceedings before first providing Judge Whitehead with *all* documents and materials of *any kind,* including those developed or produced by Campbell.[67]

---

[67]In keeping with our ruling, however, to the extent any of the Campbell materials may be properly placed in the category of work product as defined in this opinion, such material need not be delivered to Judge Whitehead. We further direct the clerk of this court to return to the Commission the materials previously submitted to this court for its *in camera* review.

### 3. *THE SCOPE OF THE COMMISSION'S INQUIRY AT A PROBABLE CAUSE HEARING*

Petitioner contends that at any probable cause hearing, under ARJD 15, the Commission may not receive or consider matters or evidence except the sworn complaint, the respondent judge's response and supporting documents, and testimony of witnesses presented by the respondent judge. Although the literal terms of the rule could be so construed, we reject this contention.

ARJD 15 provides: "A finding of probable cause is a determination that, in reasonable probability, the evidence available for introduction at a later formal hearing could clearly and convincingly establish grounds for disciplinary action within the commission's jurisdiction." At a probable cause hearing, unless the Commission hears what that evidence is, it cannot form a reasonable belief of whether evidence available for introduction at a later formal hearing would clearly and convincingly establish ARJD 11 grounds for discipline. To form this "reasonable belief," the Commission in many instances will have to consider something other than the allegations in a sworn complaint and the evidence presented by the accused judge. Reason dictates that ARJD 15 be construed to also permit the Commission to consider, in addition to the respondent judge's evidence and the sworn complaint, whatever other relevant, properly admissible evidence the Commission may have secured or received regarding the specific charges of the sworn complaint, including both documents and the testimony of witnesses.

### 4. *WHETHER PETITIONER COULD RECEIVE DUE PROCESS IN ANY FUTURE PROCEEDING, IN LIGHT OF THE BREACHES OF CONFIDENTIALITY*

It is fundamental to our system of jurisprudence that due process requires an impartial tribunal. This is true in civil, criminal and administrative matters, and whether the matter is tried before judges or juries. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). This same fundamental principle applies to the actions of the Commission.

The issue of moment raised by Petitioner and opposed by the Commission and former Commission counsel is whether a breach of Petitioner's right to confidentiality has adversely impacted his right to a fair and impartial tribunal and therefore his rights to due process.[68] During oral argument on this issue, Special Deputy

---

[68]As noted, after being relentlessly subjected to distorted publicity and calumny produced by the interplay of unlawful and inaccurate disclosures

Attorney General Campbell argued categorically that due process is not implicated in a breach of confidentiality. Moreover, Campbell maintained that even if one or more members of the Commission were the source of distorted and unlawful leaks to the press, there would be no due process concerns because any discipline imposed against Petitioner would have to be supported by substantial evidence of record discernible by this court on appeal. Aside from the fact that such a view is not supportable under any principles of law with which we are familiar, we note that Campbell, in effect, would have this court accept the proposition that a biased judge in a civil, criminal, or administrative proceeding would not impact due process because any judgment or decision would have to reflect the presence of substantial supporting evidence of record. Ergo, as long as there is sufficient evidence to support a judgment, decision, or verdict on appeal, Campbell apparently maintains that we need not be concerned about the absence of due process at the trial or evidentiary hearing level. We conclude that such an argument is patently meritless.

It should be clear beyond cavil that if the source of the unlawful leaks proves to be one or more members of the Commission, Petitioner could not receive a hearing free of actual bias and hostility.[69] Given the hostile, distorted, and unrelenting attack on Petitioner by certain media sources, a Commission member's contribution to that form of calumny would poison any hearing Petitioner would receive before the Commission. Moreover, even if there is no showing of actual bias, the rule is well established that even the appearance or likelihood of bias is sufficient to deny a litigant due process of law. *See* Peters v. Kiff, 407 U.S. 493 (1972).

Campbell also contended that due process concerns are inde-

---

and media collaborators, Judge Whitehead finally asked this court to waive his right to confidentiality. We do not view the judge's attempt at self-preservation to be in any sense a legal waiver of any right he possessed to have these proceedings maintained in confidence. Nor do we view any such waiver as having any legal effect upon his entitlement to due process of law.

[69]During oral argument on this issue, Special Deputy Attorney General Campbell argued that there was no relationship between a breach of confidentiality and Petitioner's due process rights. Indeed, when confronted with a hypothetical assuming that the leaks could be traced to one or more members of the Commission, Campbell maintained that even if such a situation existed, due process would not be implicated because there must be actual bias on the part of the Commissioners. Apparently, Mr. Campbell was contending that under the hypothetical, a Commissioner's involvement in the leaks would merely be indicative of implied bias. This would indeed be a highly dubious proposition in a situation where the nature and extent of the unlawful disclosures approach those encountered in the instant case. In any event, even the appearance of bias is sufficient to warrant the removal of Commission members.

pendent and not co-extensive with concerns regarding confidentiality, referring by way of example to highly publicized cases in which trials are nevertheless permitted to go forward. This argument misses the mark. Even in cases involving extensive pre-trial publicity, the issue of selecting an impartial and unbiased jury is of serious importance, and courts will not hesitate to overturn convictions reflecting the improper influence of jurors by media reports. *See generally,* Sheppard v. Maxwell, 384 U.S. 333 (1966).[70]

Campbell further insisted that due process would not be impacted in the case of a hypothetical Commission member who was the source of the unlawful leaks because the Commission's final determination to discipline must in any event be sustainable by record evidence on review by this court. This interesting theory implying that a lack of due process in the Commission is of no significance because of the availability of appellate review is simply without any merit. As this court observed in Matter of Ross, 99 Nev. 1, 13, 656 P.2d 832, 839 (1983):

> [I]t should be noted that the United States Supreme Court has made it clear that the fullest review by this court would not "cure" a defective adjudicatory proceeding below. As the Court held in [Ward v. Village of Monroeville, 409 U.S. 57 (1972)], a "trial court procedure [may not] be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance." 409 U.S. at 61-62.

Suffice it to say, we firmly reject any claims that breaches of confidentiality by members of the Commission would not implicate due process concerns.

Although it could be inferred from the Commission's adamant opposition to efforts to discover the sources of the unlawful, pernicious disclosures, that the Commission or certain of its members could be the source of those disclosures, this court is unwilling to draw such a damning inference. If further proceedings are resumed against Petitioner Whitehead based on the

---

[70]Special Deputy Campbell appears to be confusing the concept of pre-trial publicity with breaches of confidentiality. It is true that undue media attention, standing alone, is not a sufficient basis for trial delay, and that pre-trial publicity does not amount to a per se violation of due process, providing the members of the jury or forum hearing the cause are nevertheless capable of performing their function impartially. However, to conclude that due process is not implicated or offended when jurors or judges themselves are the source of antagonistic press leaks about the accused is clearly untenable.

sworn complaints, we will rely on the Petitioner's right to challenge Commission members pursuant to ARJD 6 and 7 as the basis for at least initially determining the propriety of each such challenged member of the Commission to participate in the proceedings. To allow the present members of the Commission to sit without reasonable assurances of impartiality after all that has happened, would impinge on Judge Whitehead's right not only to have a fair tribunal but to also have a tribunal free from the appearance of bias.

## PART V: PETITIONER'S MOTION TO DISQUALIFY THE MEMBERS OF THE COMMISSION

Petitioner requests this court: (1) to declare that all persons who have acted as members of the Commission in this matter be disqualified from continuing to act in any matter relating to Petitioner; and (2) to declare all proceedings heretofore conducted against him to be null and void.[71]

We conclude that the Honorable Nancy Becker must be disqualified as a matter of law. With regard to the other members of the Commission we conclude that too many questions of fact remain unanswered which are best left to the Commission to address, at least in the first instance, should the Commission elect now to proceed against Petitioner. We will, however, discuss selected contentions raised by Petitioner in order to provide the Commission with guidance for any future proceedings.

### A. THE HONORABLE NANCY BECKER

Judge Nancy Becker is a resident of Clark County. Article 6, § 21(4) of the Nevada Constitution states: "An appointing authority shall not appoint more than one resident of any county." The provision is clearly intended to provide accused judges with assurances of geographic diversity on the Commission panel. At the time this court appointed Judge Becker as an alternate member of the Commission, and she agreed to act as an alternate, District Judge Sally Loehrer, *also a resident of Clark County,* had already been appointed to the Commission as a permanent member. Judge Loehrer continues to act as a permanent member of the Commission. It is therefore impermissible, under the state constitution and as a matter of law for Judge Becker to sit as an alternate member of the Commission in any proceedings in which

---

[71]In light of our conclusions stated in Part IV of this opinion, we decline to resolve this latter request at the present time.

Judge Loehrer is also participating.[72] *See also* Nev. Const. art. 6, § 21(8) (the supreme court shall appoint substitutes from among *eligible judges*).

## B. *CHAIRMAN GUY SHIPLER*

Petitioner urges as grounds for Chairman Shipler's disqualification his economic interest in the outcome of these proceedings, an appearance of impropriety in violation of Canon 2, and his exhibition of actual bias against Judge Whitehead. We conclude that the allegations of economic interest and the appearance of impropriety involve too many issues of fact which must be determined before this court could properly rule on these grounds. With regard to Chairman Shipler's actual bias against Petitioner, the question is much closer. As evidence of Shipler's actual bias against Petitioner, Petitioner draws this court's attention to a letter of April 18, 1994, directed to all members of the bar and judiciary of this state, purportedly signed by Chairman Shipler. The author of the letter, written on Commission letterhead, seeks to "assist" the bench and bar in their "understanding" of the "legal issues" in this case. This assistance is provided in the form of affidavits from sitting district court judges and legal ethicists who have prejudged the disciplinary matter now pending before the Disciplinary Commission.

In one of the referenced affidavits, a sitting Nevada district court judge, Brent T. Adams, testifies under oath that "Judge Whitehead had engaged in serious conduct constituting serious ethical violations of the Nevada Code of Judicial Conduct" and that "conduct by Judge Whitehead undermines the integrity of our legal system." Judge Adams testifies further that he "*know[s]* that the allegations of Count I, Count II, Count III, Count IV and Count V are accurate and readily provable." In a similar affidavit apparently endorsed by Chairman Shipler if he actually signed the cover letter, another sitting district court judge, Peter I.

---

[72]In our order appointing Judge Becker as an alternate to JUSTICE YOUNG we did not order that she sit in *all* cases irrespective of constitutional limitations, nor did we order that she sit in this case. However, in fairness to Judge Becker, we note that she agreed to serve as an alternate at the request of this court. Moreover, this court was not sufficiently attentive to the fact that it was likely that the appointment of Judge Becker as JUSTICE YOUNG'S alternate would result in the unconstitutional presence of two judicial appointees from the same county. In the future, this court will endeavor to appoint alternates from counties other than the two counties in which either of the permanent members resides. We thus wish to dispel any implications of impropriety on the part of Judge Becker whose service as a member of the Commission in these proceedings was the direct result of her willingness to accept an assignment from this court.

Breen, testifies that "unethical practices of Judge Whitehead" are matters of "common knowledge."

Thus, in the author's purported attempt to "clarify both factual matters and the legal issues in this case," he has apparently expressed and adopted a belief that Petitioner is guilty of all charges, despite the fact that the Commission has yet to even determine whether there is probable cause to proceed against Petitioner. Although statements to the press attributed to Shipler would, if true, indicate that both Shipler and the other members of the Commission did indeed subscribe to the referenced letter and materials, we decline to ascribe accuracy or authenticity to such reports, electing instead to rely on the procedural safeguards available to Petitioner for ascertaining the truth of these factual matters in the event the Commission decides to continue its disciplinary proceedings against Petitioner.

## C. *THE REMAINING COMMISSION MEMBERS*

We also decline to presently resolve in this writ proceeding Petitioner's challenges to the other Commissioners. The issues presented in this respect are inherently factual in nature, and the Commission rules provide a means through which Petitioner may challenge any of the other members of the Commission for cause. *See* ARJD 3(6); *see also* ARJD 3(8). Despite our concerns regarding the due process implications involved in having any members of the Commission who have heretofore participated in the Whitehead proceedings continue to sit in any further proceedings against Petitioner, we trust that the challenging procedures available to Petitioner will effectively resolve these concerns.

## *PART VI: ADDENDUM RE DISSENTING VIEWS*

Reasonable minds can legitimately differ over legal and factual matters implicated in these proceedings, and we respect our dissenting colleagues' prerogative to voice responsible disagreement with this court's opinion. JUSTICE SHEARING's November 22, 1994, dissenting addendum, however, sets forth a number of remarkable assertions which are so contrary to our understanding of the facts and the law that we are compelled to respond lest our silence be construed as according those assertions undeserved credibility. In Part I of this opinion, we have already addressed in detail JUSTICE SHEARING's erroneous assertions regarding the constitutionality of this court's initial orders directing these proceedings to remain strictly confidential. In this addendum, we rebut other untenable positions taken in JUSTICE SHEARING's dissenting addendum and we address an inaccuracy advanced in the separate concurring and dissenting addendum filed by Judge Guy on November 23, 1994.

## A. *ALLEGED DISTORTIONS OF THE RECORD*

JUSTICE SHEARING relates she is "appalled at the distortions of the record in the majority opinion." Although we are not told specifically what these appalling, alleged distortions might be, our colleague does accuse this court of having distorted the record "to make it appear" that the Commission has conducted its proceedings "in an outrageous manner, in violation of the United States Constitution, the Nevada Constitution, the Commission rules, and the principles of fairness." JUSTICE SHEARING maintains that the record, viewed objectively, does not support the proposition that the Commission has been operating in violation of the provisions governing its proceedings.

We have carefully and extensively documented precisely how the Commission has been operating in violation of the Commission rules and state constitutional provisions governing Commission proceedings, not just in this matter, but in numerous other matters as well. The Commission's proceedings regarding "Judge D" and Judge Stringfield are but two examples, and it would serve no purpose here to restate the unrefuted facts we have related above regarding those matters. We do observe, however, that the people's recent adoption of a state constitutional amendment regarding the Commission's jurisdiction is highly instructive of the Commission's clear failure to conduct its past proceedings in accordance with the Nevada Constitution and the Commission rules.

In the recent November 1994 election, the People of the State of Nevada voted to amend article 6, § 21 of the Nevada Constitution, so as to expand the Commission's constitutional jurisdiction to impose discipline, and to require this court to adopt rules for the exercise of that expanded jurisdiction. The Ballot Question Explanation provided to Nevada voters explained:

> The commission's authority to discipline *is limited to the actions of censure, removal, or retirement.* Adoption of the amendment would allow the commission to utilize other forms of discipline in addition to censure, removal, or retirement.

(Emphasis added.) Under the constitutional amendment recently approved by the voters, this court is now commanded to make appropriate rules for the Commission's imposition of forms of discipline other than censure, removal, or retirement. *See* 1993 Nev. Stat. 2971. Thus, the amendment recognizes that neither the Nevada Constitution nor the Commission rules have ever provided for the Commission's imposition of forms of discipline other than censure, removal, or retirement. Quite plainly, and as the Ballot Question Explanation to the voters pointed out, the

Commission's authority under the state constitution and the rules prior to the effective date[73] of this recent amendment was limited to the actions of censure, removal, or retirement. *See* Lake v. Lake, 17 Nev. 230, 238, 30 P. 878, 880 (1882) ("[i]t is settled that affirmative words in a constitution, that courts shall have the jurisdiction stated, naturally include a negative that they shall have no other") (citing Marbury v. Madison, 5 U.S. 137 (1 Cranch) (1803)).

This opinion and JUSTICE SPRINGER's concurring opinion, however, are replete with examples demonstrating that, in fact, prior to the effective date of this amendment, the Commission routinely imposed forms of discipline other than censure, retirement, or removal in a manner wholly inconsistent with the procedures established by the Commission rules. Our dissenting colleague is well aware that prior to the enactment of the recent amendment, such other forms of discipline were utilized by the Commission, including agreements that jurists accused of unethical campaigning issue public apologies.

Such other forms of discipline evidently have been employed: (1) without constitutionally required hearings, *see* Nev. Const. art. 6, § 21(7) ("[t]he commission shall, after preliminary investigation, dismiss the matter or order a hearing to be held before it"); (2) without required Commission findings of probable cause, *see* ARJD 14, 15; (3) without required public filings of formal statements of charges, *see* ARJD 16 and 17; (4) without required written decisions explaining the nature of the proceedings, findings of fact, conclusions of law on issues presented by the formal statements of charges, *see* ARJD 30, 31; and (5) without the filing of certified copies of the orders with the clerk of this court, *id.* Yet, the dissenting addendum proclaims, incredibly, that we have resorted to "distortions" "to make it appear" that the Commission exceeded its authority under the Nevada Constitution and the Commission rules.

Moreover, JUSTICE SHEARING's analysis of the Commission rule governing consent orders ignores the language, as well as the intent of the rule. It is true that ARJD 31 authorizes the Commission to order disciplinary action, upon the "written consent" of the respondent judge, "at any stage of the proceedings." The rule provides in full, however:

> Upon written consent of the respondent, the commission may order *the respondent's censure, removal or retirement*

[73]The amendment became effective on Wednesday, November 23, 1994. *See* Torvinen v. Rollins, 93 Nev. 92, 560 P.2d 915 (1977) (state constitutional amendment becomes effective on date votes are canvassed); NRS 293.395(2) (canvass of votes occurs on fourth Wednesday of November after election).

at any stage of the proceedings and this order takes effect immediately. A certified copy of the order must be filed with the clerk of the supreme court and a copy of the order must be served on the respondent.

(Emphasis added.) Prior to the adoption of the recent constitutional amendment, the *only* forms of discipline that the Nevada Constitution specifically authorized the Commission to impose were censure, removal, or retirement. *See* Nev. Const. art. 6, § 21(1) ("[a] justice of the supreme court or a district judge may . . . be censured, retired or removed by the commission on judicial discipline"). Similarly, the only forms of discipline that ARJD 31 specifically authorized the Commission to impose upon the written consent of the respondent judge were censure, retirement, or removal.

ARJD 31 contains the further requirement that a copy of any consent order must be filed with the clerk of this court. Thus, consistent with the limited authority vested in the Commission by the Nevada Constitution prior to the recent amendment, ARJD 31 did not authorize the Commission to order the imposition of lesser forms of discipline by means of the secret, abbreviated, informal procedures that have been employed by the Commission.[74]

Because the dissenting addendum does not identify precisely what facts or circumstances have allegedly been distorted in this opinion, we are of course unable to refute JUSTICE SHEARING'S general allegation with any degree of specificity. We have certainly not distorted the fact, however, that the Commission has in the past on numerous occasions imposed discipline other than censure, retirement or removal in blatant violation of the Nevada Constitution and the Commission rules. We can perceive no principled bases for endorsing the obvious fiction that the Commission has been abiding by the Nevada Constitution and the Commission rules.

Despite JUSTICE SHEARING'S accusation of unspecified distortions, we remain confident that the factual and legal premises underlying our decision are authentic, reliable, and sound. We

---

[74]This is not to say that the Commission was completely foreclosed from imposing *any* discipline except censure, retirement or removal. Incident to an order of censure, for example, the Commission might have also justifiably required the issuance of a public apology. Similarly, in deciding that a judge should be removed or retired, the Commission may also have adjudicated the judge's entitlement to an enhanced disability pension. Depending upon the particular case, it might well have been within the Commission's jurisdiction to impose conditions or sanctions not enumerated in the constitution but which were shown to be necessary and incidental to the effective implementation of an order of censure, retirement or removal.

are also confident that objective observers will realize that the mere labelling of this opinion as an appalling distortion of the record does not make it so. Such hollow, vacant accusations add little to the public's reasoned understanding of the sensitive issues in this proceeding, and can only serve to further inflame the volatile, hostile atmosphere that has sadly permeated public perceptions of this matter.

## B. *CRITICISM OF MEDIA*

We are admonished by JUSTICE SHEARING for responding to the comments and criticisms of the media. Based upon persuasive case authority, JUSTICE SHEARING quite convincingly builds a strong case for the proposition that, under the First Amendment, the media must be permitted to promote judicial accountability unencumbered by the threat of criminal contempt of court. We are in full accord with the authority cited in JUSTICE SHEARING's dissenting addendum holding that the judiciary is generally not empowered to stifle media criticism and interfere with First Amendment rights of the media through the exercise of the judicial contempt power. Nothing of that sort has occurred in this case, however.

This opinion does *not* hold, threaten, or even suggest that the media should be subject to this court's contempt power. Rather, we have simply attempted to correct misapprehensions and inaccuracies fostered by and in the media. It is difficult to understand how the dissenting justice can be so "appalled" at unspecified, alleged "distortions" in this opinion, and yet so accepting and tolerant of the unrelenting flood of deceptive reports and commentary pertaining to this matter that have been unleashed in the media.

The dissenting justice discusses both the right and the importance of the media covering judicial matters, and quite rightly notes that judges are not above criticism. Indeed, we would venture to say that a responsible media has an obligation to inform the public of judicial misconduct. Moreover, we consider it both proper and healthy that the media report and editorialize on the wisdom of judicial rulings. The First Amendment guarantee of freedom of the press is a powerful and highly cherished right in this nation. We note, however, that it is a right that is frequently abused by powerful media interests that fail to keep faith with the public trust implicit in the guarantee of press freedom under the First Amendment.

Our dissenting colleague asserts that "[b]y and large . . . the reporting [on the instant proceeding] has been of a factual nature and correct. Nothing in the majority opinion provides evidence to

the contrary." This incredible statement leads us to wonder whether our colleague has bothered to read the onslaught of variously biased, distorted, false and irresponsible articles, editorials, and cartoons appearing in a major media source in this state. The fact that most of the articles and editorials contained distortions, half-truths, unjustifiable inferences and outright misrepresentations unmistakably reflective of extreme bias and inobjectivity, may be proved beyond all doubt by any objective body interested in pursuing the matter. Despite our colleague's tempting invitation to compare coverage to facts, we nevertheless elect not to devote additional time to the subject beyond that which already appears in our previous opinions in this proceeding.[75]

Moreover, the apparent need of the dissenting justice and a majority of this court to take the rare measure of addressing the subject of an irresponsible lead media source that has concentrated on creating a totally unwarranted and highly deleterious public perception of the instant proceeding represents a recognition that even the media should not be above evaluation and criticism.

Unfortunately, the media may serve or disserve the public; it may enlighten or disinform; it may properly or improperly destroy reputations and institutions; it may rightly or wrongly influence public opinion; it may expand or suppress knowledge; it may publish facts or characterize fiction as facts; it may pursue righteous or unrighteous agendas; it may promote enlightening and healthy public discourse or stifle objective assessment by

---

[75]We do note, however, that a recent news article is highly illustrative of inaccuracies reported in this matter. The article characterizes the Majority ruling as having "nullif[ied] the complaints the Judicial Commission was to investigate regarding Whitehead," and as having "told the commission it must follow new, more restrictive rules if it again tried to investigate Whitehead . . . ." Amazingly, the article also quotes the immediate past chairman of the Commission as having characterized what has happened in these proceedings as "a crime." *See, Judicial Panel's Image Hurt,* Nevada Appeal, December 12, 1994.

Of course, the rules governing the Commission and interpreted and applied in the Majority Opinion are not "new." The Majority did not pull these rules out of thin air to apply to the *Whitehead* matter; they have been in effect and on the books since April 29, 1988. The Majority ruling simply requires the Commission to obey the rules governing its proceedings that have been in effect for well over six years. Moreover, the Majority has not "nullified" the above-noted portions of the initial sworn complaints filed by Judge Breen and former District Attorney Holmes which initiated the Commission proceedings at issue. The Majority has ruled only that the Commission may not proceed on the subsequent, unsworn, invalid "Complaint Seeking Determination of Probable Cause" prepared by Special Deputy Attorney General Campbell. Under the Majority ruling, the Commission is free to pursue those portions of the sworn Breen and Holmes complaints noted above.

denying a public platform to sources it seeks to destroy or ridicule; it may justify or betray the public trust underlying the creation of the First Amendment freedom of the press.

By no means do we intend our expressions as a blanket indictment of the media or a faltering respect for freedom of the press. Fortunately, the vast majority of the media sources that serve Nevada's citizens are responsible in their news coverage and their desire to factually, fairly, and objectively inform. Nevertheless, because of the enormous damage inflicted by a demonstrably irresponsible newspaper, we leave the subject with some food for thought written by Lee C. Bollinger, Dean of the University of Michigan Law School:

> Putting aside for the moment the fact that we also have an interest in encouraging people to enter public affairs, it simply is wrong to suppose that the pain inflicted by defamatory statements about public officials and figures is not our responsibility or concern. It should always be open to people to object to the way the world works under the rules we create, and not be dismissed by the claim that they have chosen to continue living in that world and, therefore, can be taken as having assented to it.
> * * * *
>
> But as important as this concern is about the minimization of the private interests sacrificed to the principle of press autonomy, there are even more serious matters to worry about. We must also consider how press freedom might, instead of enhancing public discussion and decision making, actually prove to be a threat to it—a threat to quality decision making, a threat to *democracy*, a threat to the very values the First Amendment (as defined by *New York Times v. Sullivan* and its successors) is supposed to further.
>
> There is no guarantee that the press will not abuse the freedom it possesses under the autonomy model. And there are many ways in which it might do so. The press can exclude important points of view, operating as a bottleneck in the marketplace of ideas. It can distort knowledge of public issues not just by omission but also through active misrepresentations and lies. It can also exert an adverse influence over the tone and character of public debate in subtle ways, by playing to personal biases and prejudices or by making people fearful and, therefore, desirous of strong authority. It can fuel ignorance and pettiness by avoiding public issues altogether, favoring simple-minded fare or cheap entertainment over serious discussion. Even if the pressures for low-quality discussion come from the people themselves, as to some extent they do, the press acts harm-

fully by responding to those demands and hence satisfying and reinforcing them. It matters not whether the press is the instigator of what is bad or the satisfier of inappropriate demands originating in the people. In either case, the press can be an appropriate locus for reform.

Of course, all these concerns become more serious as the number of those who control the press become fewer, and as more and more members of the general population turn to a few outlets for information about the world—both phenomena having undeniably occurred in the twentieth century. The value the First Amendment places on many speakers is not based on a premise that more speakers result in less bias in any one, rather it is assumed that more speakers mean more people who have a self-interest in correcting the biases of others, despite the fact that they are biased themselves. As the number of those who control the gateway to public discussion decreases, this natural corrective is lost. It is, of course, a widely known fact of this century that, for example, the total number of daily newspapers has declined sharply and that the number of towns and cities across the country with competing papers has been reduced to a mere handful. Coupled with this phenomenon is the increased reliance by citizens on massive media enterprises for information about the world.

These would seem to be the sorts of worries that ought to command our attention.

Lee C. Bollinger, *Images Of A Free Press*, 25-27 (1991) (footnotes omitted).

JUSTICE SHEARING insists that the "media is doing its job in reporting on our proceedings and has every right and obligation to express opinions." Further, she notes that "Judges as persons, or courts as institutions, are entitled to no greater immunity from criticism than other persons or institutions." *Dissenting Addendum* at 3 (quoting Bridges v. State of California, 314 U.S. 252, 289 (1941) (Frankfurter, J., dissenting)). Again, we are not in disagreement with these sentiments. We are of the view, however, that the media also holds no special immunity or dispensation from criticism and correction.

The quest for the truth and fairness is the essence of judicial process. JUSTICE SHEARING would seemingly deprive the court of the right and obligation to promote that objective by responding to inaccurate, unfair, and misleading media attacks through the only vehicle available to the court, its written opinions. She apparently views media reports and commentary—no matter how

vile, malicious, misleading, or inaccurate—as forever above reproach and deserving of no condemnation or response from the court. Yes, media coverage should rarely warrant a response by the court. We simply cannot ascribe to the notion, however, that this court should never attempt to set the record straight where the public's perceptions of the judiciary have been manipulated through unfair, incorrect, and misleading reports and comment.

As we have stated above, under the Code of Judicial Conduct, there are times when a court not only has the right but also the obligation to speak out candidly and truthfully. This is especially so where, as here, inaccuracies fostered through media coverage have provoked what many—including respected members of the bench and the bar—have perceived as a crisis of public confidence in the state judiciary. Neither this court, nor the media should be above or immune from candid criticism. What is sauce for the goose is sauce for the gander. Despite the very real threat that a malevolent, manipulative newspaper may pose to an entire branch of government and those who are extending themselves to honorably function therein, we will devote no further effort to the subject in this protracted opinion.

## C. *JUSTICE SHEARING'S ANALYSIS OF COMMISSION'S JURISDICTION OVER SUBSTANTIVE CHARGES*

JUSTICE SHEARING states: "I agree with the majority's assertion that whether Judge Whitehead's alleged conduct is within the Commission's jurisdiction is a factual determination that is clearly within the province of the Commission."

The elementary ruling actually announced by this opinion is that factual determinations regarding whether a judge has committed acts of judicial misconduct are clearly the province of the Commission in the first instance. Additionally, we agree as a general proposition that the Commission in the first instance should entertain and resolve challenges to its jurisdiction to act. We have not held, however, that it is exclusively the province of the Commission to determine its own jurisdiction, or that proceedings in excess of the Commission's jurisdiction are not challengeable in this court by way of an interlocutory, extraordinary writ. Nor does this opinion hold that a respondent judge is not entitled to petition this court for relief through an exercise of the court's discretionary intervention by way of extraordinary writ under circumstances similar to those in the instant proceeding. *See* ARJD 40(7) ("[r]eview of interlocutory orders of the commission, which are considered either by the prosecuting officer or the respondent judge to be without or in excess of jurisdiction,

may be sought by way of petition for an appropriate extraordinary writ").

JUSTICE SHEARING also asserts that this opinion "appears to suggest" that Judge Whitehead "should be exonerated," and that "one premise of the majority opinion is that other judges in Washoe County and throughout the state routinely engaged in the conduct alleged in the complaint against Judge Whitehead." Further, JUSTICE SHEARING states that "[i]t is unconscionable to suggest that the conduct described is not serious enough to be within the jurisdiction of the Commission on Judicial Discipline." We have not made any such suggestions in this opinion. To the contrary, we have specifically stated, "[w]hether and to what extent the Commission may elect to proceed on the sworn Breen complaints and the aspect of the sworn Holmes complaint concerning the allegations relating to a change of venue in the *Kinnamon* case is a matter for the Commission to decide." *See supra* note 47. Elsewhere, we make it clear that we have made *no judgment* as to whether Judge Whitehead's alleged actions respecting a change of venue in the *Kinnamon* case "either occurred or constitutes judicial misconduct. . . . It is for the Commission to determine in the first instance whether sufficient cause in fact and law warrants further consideration of any of the allegations in the sworn complaints." *See supra* note 55.

Additionally, and contrary to JUSTICE SHEARING'S assertion, this opinion clearly acknowledges that the mere fact that it has not been uncommon in the past for judges to engage in peremptory challenge practices *similar* to those out of which the Whitehead accusations arose "does not mean that the practices were appropriate or that they were not susceptible of being conducted in such an untoward manner as to constitute judicial misconduct." *See supra* note 57. We have indicated, in an effort to be helpful to the Commission, that the fact that these types of practices were not uncommon is "some indication that those who engaged in them may not be guilty of 'willful misconduct.'" *Id.* This, however, does not amount to a suggestion that Judge Whitehead should be exonerated. We again emphasize that we express no judgment as to whether Judge Whitehead committed acts constituting judicial misconduct as charged in the sworn Breen and Holmes complaints, complaints upon which the Commission remains free to proceed in the manner specified above.

The significant concerns and focus of this opinion relate to the invalidity of the Campbell Complaint, the Commission's failure to follow rules that have been in effect for over six years, and the resulting disparate treatment of respondent judges accused of misconduct. Engrossed in a fanciful flight of speculation concern-

ing the seriousness of allegations of misconduct that thus far lack even a finding of probable cause, and that were improperly alleged in an inadequately sworn, unsigned, invalid complaint unconstitutionally prepared by an agent of the Executive Branch, the dissenting justice has apparently missed or ignored the major point of this opinion, *i.e.*, that the Commission has not been proceeding against accused judges in a uniform manner and has not been obeying the Nevada Constitution and the Commission rules.

As we have previously emphasized, we express no opinion respecting whether Judge Whitehead actually engaged in conduct constituting judicial misconduct as alleged in the sworn Breen and Holmes complaints. Our dissenting colleague has apparently found and concluded, however, without even the benefit of a probable cause hearing, that "Judge Whitehead appears to be alone in contacting the *non-challenging* attorneys and delegating to them the choice of their next presiding judge." (Original emphasis.) Further, the dissenting justice states that she is aware of no disagreement "among judges or attorneys over whether such conduct constitutes improper behavior," and that it is "unconscionable" to suggest that such conduct is not within the Commission's jurisdiction. Thus, despite the dissenting addendum's remonstrations to the contrary, it appears that JUSTICE SHEARING is quite willing to usurp and invade the province of the Commission to determine in the first instance whether Judge Whitehead actually committed an act constituting judicial misconduct.

Further, unlike this opinion, JUSTICE SHEARING's dissenting addendum appears to have concluded, prematurely and as a matter of fact and law, that Judge Whitehead engaged in prohibited *ex parte* contacts. As we have observed, it is at least arguable that a judge's *alleged* contact with the lawyers in a case after the judge has been removed may not constitute a prohibited *ex parte* contact. *See* Nev. Code of Judicial Conduct Canon 3B(7) ("A judge shall not initiate, permit, or consider ex parte communications . . . outside the presence of the parties concerning a *pending or impending proceeding*") (emphasis added). This opinion leaves it to the Commission in the first instance to address many of Judge Whitehead's jurisdictional arguments, including his contention that upon the filing of a timely peremptory challenge, a district judge's jurisdiction over a case is terminated, and that, therefore, *ex parte* contacts are not prohibited because the case is no longer pending or impending before that judge. *See, e.g.,* Sisson v. Georgetta, 78 Nev. 176, 370 P.2d 672 (1962).

## D. *JUSTICE SHEARING'S INTERPRETATION OF THE ARJD*

JUSTICE SHEARING accuses the Majority of failing to recognize that "a complaint could be construed as either a simple letter written by a lay person in non-legal language and notarized by a notary public, or as a document drafted by a lawyer or judge with technical legal language pursuant to the Nevada Rules of Civil Procedure." Nothing could be further from the truth. Our decision simply cannot reasonably be construed as prohibiting either type of complaint. This opinion does not prohibit what JUSTICE SHEARING describes as informal "letter complaints," or "formal complaints." As long as a complaint is made upon oath, in writing, by the person complaining,[76] and alleges facts which, if true, would constitute judicial misconduct, the rules, as well as this opinion, will permit it. This opinion does not preclude "everyone but lawyers, judges, and a tiny minority of lay persons from initiating disciplinary proceedings against a judge." Nor have we required that "a lay person must submit a formal legal document." Nor have we "force[d] each Commission member to rely solely upon his or her individual efforts at sorting through a lay person's documents in order to eliminate redundant material and clarify the legal and factual issues for consideration." The dissenting addendum's insinuations to the contrary are entirely specious.

JUSTICE SHEARING observes that the filing of the Campbell Complaint in the name of the Commission Administrator, Eve King, is "typical of other jurisdictions." This is quite true. Such a superficial comparison of procedures, however, is highly misleading. Unlike the accusatory system of judicial discipline established in Nevada, the constitutional provisions, statutes, and rules governing judicial discipline proceedings in many other jurisdictions specifically authorize the use of an "Administrator's Complaint," or a similar device, as a means of permitting a Commission to *initiate* an investigation on its own motion. *See, e.g.,* Nicholson v. State Com'n on Judicial Conduct, 409 N.E.2d 818, 824 (1980) (pursuant to state constitutional and statutory provisions, the New York Commission may receive, *initiate,* investigate and hear complaints, and may, on its own motion,

---

[76]As we have explained, in "exceptional circumstances," where there is a "substantial reason" for concluding that it is likely that a complainant may suffer an "untoward risk of embarrassment, harassment, or other detrimental consequences," ARJD 12(2) will permit the Commission's Executive Officer to sign and swear to a complaint upon information and belief, in the actual complainant's stead.

initiate an investigation upon the filing of written complaint signed by the administrator). In these types of jurisdictions, the discipline commissions function in a "inquisitional" manner.

As we have emphasized above, in contrast to judicial discipline systems in some other jurisdictions, the system that has been established in Nevada under the current ARJD is "accusatory" rather than "inquisitional." We have further emphasized that the Study Committee appointed to evaluate changes in the old, unworkable Revised Interim Rules extensively evaluated exigencies peculiar to Nevada's past experience, and concluded that these exigencies demonstrated a clear necessity for a judicial discipline system in Nevada that is inherently accusatory rather than inquisitional.

We agree with JUSTICE SHEARING that our interpretation of the rules must be consistent with and guided by the underlying policies and purposes of the rules and that the rules should not be construed so as to attribute to the drafters an intent resulting in absurdities or defeating the underlying purpose of the enactment. It is well settled in Nevada that the courts should follow the intent of the drafters in resolving any ambiguities in the law. *See* McKay v. Bd. of Supervisors, 102 Nev. 644, 650-51, 730 P.2d 438, 443 (1986). Although JUSTICE SHEARING reads ambiguities into many of the governing provisions, she nonetheless has absolutely failed to acknowledge or appreciate the intent of the drafters expressed in the policies, purposes, and recommendations articulated by the Study Committee that proposed the basic procedural structure for Commission proceedings ultimately approved by this court and incorporated into the ARJD. As a result, the dissenting addendum concludes erroneously that the Nevada Commission rules must be interpreted so as to authorize our Commission to act in the same manner as some other Commissions in some other jurisdictions with inquisitional judicial disciplinary procedures quite unlike Nevada's.

Nothing could be more clear than the intent of the drafters evident in the policies, purposes, and recommendations expressed in the Study Committee's Report. The Committee proposed distinctive judicial discipline procedures for this court's adoption, which were devised to correct problems peculiar to Nevada's past experience. With minor changes, this court approved and adopted the basic procedural structure proposed by the Study Committee, a structure premised on the policies and concerns stated in the Study Committee Report. Quite simply, for reasons emanating from Nevada's past experience, Nevada has a system of judicial discipline procedures quite different from the

systems found in the jurisdictions cited in JUSTICE SHEARING'S dissenting addendum. We have interpreted the Commission rules in light of the intent of the drafters to create procedures providing an accused judge with a *full measure* of due process. Moreover, we have interpreted the ARJD in light of the intent of the Study Committee and this court to create a system that is "accusatory rather than inquisitorial, open rather than closed, and accompanied by due process formalities . . . rather than loose, unstructured and informal." *See Whitehead I,* 110 Nev. at 145-47 n.15, 869 P.2d at 806-07 (quoting Report of Study Committee, ADKT 38 at 8). Thus, JUSTICE SHEARING inappropriately relies on Commission procedures and actions approved in other jurisdictions with very dissimilar constitutional provisions, statutes and rules of disciplinary procedure.

While we do not disagree that interpretations of comparable rules by other jurisdictions can be instructive and helpful in many instances, this court first and foremost must endeavor to interpret our own rules in a manner consistent with the purposes, policies, recommendations, and intent explicitly stated by the Study Committee that proposed the basic procedures ultimately promulgated by this court. The fundamental flaw in JUSTICE SHEARING'S interpretation of the ARJD is traceable to her failure to heed this elementary rule of construction and to acknowledge the plain intent underlying the ARJD.

There are other aspects of the dissenting addendum with which we take issue. We have confined our response to the above-described assertions contained in JUSTICE SHEARING'S dissenting addendum because they in particular are so fundamentally at odds with our view of the facts and the law, and because further clarification of our rulings that have been so unfortunately misinterpreted may enable the Commission to avoid future prejudicial errors.

## E. *JUDGE GUY'S CONCURRING AND DISSENTING ADDENDUM*

In his separate concurring and dissenting addendum, Judge Guy states:

> I dissent from that part of the Majority Opinion stating that the Commission and a judge may not agree to a judge's censure, removal, or forced retirement *without a public probable cause hearing.*

(Emphasis added; footnote omitted.) Thus, Judge Guy has apparently misconstrued our holding to mean that the Commission's probable cause hearings must be open to the public. We hasten to correct this misapprehension.

Under the present rules, probable cause hearings are not public. *See* ARJD 5(1) ("[a]ll proceedings must be confidential until there has been a determination of probable cause and a filing of formal statement of charges"). Additionally, pursuant to ARJD 16, confidentiality ceases only *after* the Commission returns a finding of probable cause, designates a prosecuting attorney, and a formal statement of charges is signed under oath and filed with the Commission by the prosecuting attorney. ARJD 16 provides in part:

> *In all cases in which probable cause for disciplinary action is found* by the commission, the commission must designate a prosecuting attorney who must sign and file with the commission a formal statement of charges signed under oath by the prosecuting officer. **Thereupon, confidentiality ceases. The formal statement of charges is a public document.**

(Emphasis added.)

Moreover, as we have emphasized repeatedly in our opinions, the Nevada Constitution commands that the Commission, after a preliminary investigation, either dismiss the complaint or schedule a hearing. Nev. Const. art. 6, § 21(7). The constitution also requires the confidentiality of Commission proceedings except a decision to censure, retire or remove a justice or judge. Nev. Const. art. 6, § 21(5)(a). Thus, "in all cases" a formal statement of charges—a public document—must be filed after the Commission conducts a probable cause hearing and returns a finding of probable cause. Prior to the filing of the formal statement of charges, the Commission proceedings are confidential.

It would be perfectly proper, of course, for a respondent judge, *at the scheduled probable cause hearing,* to concede the issue of probable cause, thus enabling the Commission, should it elect to do so, to dispense with the presentation of evidence. This opinion does not rule out this possibility. In such a case, however, the Commission would nonetheless be obligated under ARJD 15 and 16 to determine independently the existence of probable cause and designate a prosecuting attorney, who, in turn, would remain obligated to file and sign, under oath, a public document constituting a formal statement of the charges. This procedure assures that this court and the public will be made aware of the actual charges upon which the finding of probable cause is based.

[Headnote 49]

After a finding of probable cause and the public filing of the

formal statement of charges, a respondent judge may thereafter consent to his or her censure, removal, or retirement at any stage of the proceedings. *See* ARJD 31.[77] Nevertheless, even where a respondent judge concedes the existence of probable cause at the probable cause hearing and thereafter consents to an order of censure, removal, or retirement, the Commission "must" also, "after reaching a decision that discipline should be imposed . . . *prepare and adopt a written statement of the nature of the proceeding, findings of fact, and conclusions of law on the issues presented by the formal statement of charges* and the answer thereto, if any." *See* ARJD 30 (emphasis added). Thereafter, a certified copy of the order of censure, removal, or retirement must also be filed with the clerk of the supreme court. *See* ARJD 31.

### PART VII: CONCLUSION

Because the Campbell Complaint is procedurally insufficient and clearly invalid under the ARJD, we conclude that the Commission lacks jurisdiction to proceed to a probable cause hearing against Petitioner based upon that complaint. We therefore grant Judge Whitehead's petition for a writ of prohibition with respect to the Campbell Complaint.

The Commission has not conducted its investigation and proceedings relating to Petitioner in the same manner accorded to other respondent judges in the past. We therefore grant Judge Whitehead's petition for a writ of mandamus commanding the Commission, in any of its future activities concerning any and all respondent judges, including Judge Whitehead, to proceed in an even-handed and uniform manner consistent with the state constitution and the ARJD as interpreted in this opinion. Accordingly,

---

[77]We again emphasize that ARJD 31 appears in Section V of the ARJD entitled: "PROCEDURE AFTER FINDING OF PROBABLE CAUSE." Rule 31 was never intended to permit the circumvention of the required probable cause hearing and the subsequent public filing of a formal statement of charges. It is thus seen that whenever any form of discipline is imposed upon a respondent judge, there will be a complete *public* record for evaluation by this court and interested members of the public and the media. Any meaningful analysis of a respondent judge's misconduct and the propriety of the Commission's response thereto could not occur without public disclosure of both the specification of charges and the rationale for the Commission's choice of discipline. The current Commission rules have required such disclosure from the time of their adoption by this court in 1988. We further note that the constitutional amendment to article 6, § 21 of the Nevada Constitution, adopted by the people at the most recent election, will not result in any change in these procedures. Following the promulgation of appropriate rules by this court, the constitutional amendment will merely enable the Commission to exercise greater latitude in forms of discipline to be defined in the rules.

should charges of judicial misconduct be pursued against Judge Whitehead with respect to the claims asserted in the Breen or Holmes complaints, the Commission is directed to provide Petitioner with all materials generated by Campbell's investigation including, but not limited to, all materials provided to this court for its *in camera* inspection, which materials are, by order of this court, to be returned to the Commission.[78]

We expressly retain jurisdiction to carry forward and implement all determinations and rulings that we have made in the course of these proceedings or will make in the future.[79]

SPRINGER, J., and ZENOFF, SR. J., concur.[80]

SPRINGER, J., concurring:
I concur fully in the majority opinion,[1] but I write separately to

---

[78]Such materials would, however, exclude Campbell's attorney work product as defined in the body of this opinion, unless any part of such product would relate to or reveal a basis for, challenging any member of the Commission to sit in further proceedings against Petitioner Whitehead. In the latter event, such writings or memoranda must also be provided to Petitioner.

[79]On March 10, 1994, the Commission moved this court for an order disqualifying attorney Vivian Lynch and the law firm of Hamilton and Lynch from any further participation in this matter. The Commission also sought an order referring Lynch to State Bar Counsel. We perceive no *ex parte* communication or conduct on the part of attorney Lynch which warrants disqualification or referral to State Bar Counsel under the circumstances present here. *See* Cronin v. District Court, 105 Nev. 635, 781 P.2d 1150 (1989). Accordingly, we deny the motion.

In light of this court's holdings as set forth in the opinions and other orders issued herein, we deny as moot the Commission's motions of September 24, 1993, October 18, 1993, and November 24, 1993, seeking dismissal and a remand. We further deny as moot Petitioner's motion of October 18, 1993, to strike the Commission's response to the petition and to issue a permanent writ of mandamus or prohibition and for other sanctions.

Cause appearing, any pending and heretofore unresolved motions by the parties seeking leave to file replies are granted. We hereby direct the clerk of this court to file those replies forthwith. All other pending motions are denied because they either seek relief encompassed within the specific directives and relief granted by this court in its prior orders and opinions, or because they request relief considered by this court to be unwarranted under the circumstances.

[80]THE HONORABLE THOMAS L. STEFFEN, then Vice-Chief Justice, assigned THE HONORABLE DAVID ZENOFF, Senior Justice, to sit in the place of THE HONORABLE ROBERT E. ROSE, Chief Justice. Nev. Const., art. 6, § 19; SCR 10.

The Governor appointed The Honorable Addeliar D. Guy, Judge of the Eighth Judicial District Court, to sit in place of THE HONORABLE CLIFF YOUNG, Justice, who recused himself. Nev. Const., art. 6, § 4.

[1]The writs in this case were issued on September 9, 1994. Notice of remittitur has issued, and except for certain "housekeeping" matters, as to which we have reserved jurisdiction, the case has been closed since this time. After issuance of the writs and prior to today's filing of these formal

express my own views on the matter. I write now in order to perform the duty imposed upon me by the Code of Judicial Conduct, which commands that judges shall "strive to enhance and maintain confidence in our legal system."

For almost a year and one-half now, the supreme court panel which decided this case (made up of two sitting justices, one retired justice and one district court judge) has been publicly disparaged for having allowed Judge Whitehead to seek judicial review of unorthodox judicial discipline proceedings against him, all in a manner specifically provided for in the applicable rules. This concurring opinion is the best (and only) way that I know of for me to "strive" to restore and maintain the public's "confidence in our legal system," as I am required to do by the Code of Judicial Conduct.

Obviously, I cannot hope in this one writing to reverse the effect of the many false and misleading statements that have tended to foster negative impressions of our court and of Judge Whitehead's attempt to seek prescribed and established legal remedies; but I do hope, at least, that I can convince patient readers of this opinion that Judge Whitehead acted in full accordance with the law when he petitioned for this court's review of improper actions that were being taken against him by the discipline Commission and that this court acted properly in undertaking the requested review.

Let me begin by giving a very simple statement of the case that will set the stage for the rest of this opinion:

> Judge Whitehead did not ask that this court exonerate him; all he asked was that the Discipline Commission be confined to acting within the rules promulgated for its governance. The court has entertained Judge Whitehead's petition for review, as provided for under ARJD 40(7), and has required that all proceedings against him be conducted in accordance with the currently applicable rules. That is all.

---

opinions, certain supplements to the September 9 order were filed by JUSTICES SHEARING and SPRINGER and by Judge Guy. Among these was my Addendum of October 28, 1994, which I was prompted to file because I did not believe that our writ-granting order of September 9 adequately instructed the Commission on matters that I believed should have been made known to it prior to the time of our issuing a formal, published opinion. I was concerned that in the interim the Commission might ill-advisedly involve itself in other actions that might unnecessarily call for further judicial review. I note that the Commission has taken no such action. In this concurring opinion, I publish the views expressed in my October 28 Addendum relating to the incapacity of certain members of the Commission to sit in impartial judgment of Judge Whitehead. I will also refer briefly to the "uneven" and discriminatory manner in which the Commission has administered its powers of judicial discipline in the past; however I will not protract this opinion with all of the data that I have now compiled on that rather unsettling subject.

This court's simple, run-of-the-mill, procedural ruling has caused the court to be subjected to an unprecedented array of destructive criticism and public condemnation. It is not easy to understand how all of this came to pass, but I will try to explain. First, however, I want to present a summary, comprised of thirteen numbered paragraphs, by which I will give an overview of the case.

1. To understand this case, it is vital to understand the procedures that the Commission *should have* followed in this judicial discipline matter. These procedures are clearly set forth in the Administrative and Procedural Rules for the Judicial Discipline Commission (ARJD). The rules are simple and easy to understand:

a. Discipline proceedings can be commenced *only* by the filing of "initial complaints" which "*must* be made *upon oath* in writing" and "made by the person complaining." ARJD 12 (emphasis added).

b. The Commission has the *duty* to "consider all complaints brought before it" and the *duty* to "determine whether or not there exists sufficient cause to proceed to a probable cause hearing." ARJD 14.

c. The constitution (article 6, section 21(7)) requires that the Commission *shall* either "dismiss the matter or order a hearing to be held before it." Judges against whom sworn complaints have been filed have the *right,* under the constitution and the ARJD, to have the Commission timely "consider" sworn complaints and either dismiss them or order a hearing to be held.

2. By failing to "consider" and timely act upon sworn "complaints brought before it," namely, sworn complaints filed in the summer of 1992 by Dorothy Nash Holmes and Judge Breen, the Commission has denied to Judge Whitehead significant rights that are given to him by Nevada's constitution and by the ARJD. Now, some two and one-half years after the sworn complaints were filed, the Commission *still* has not acted on these complaints in the manner clearly specified and required by the ARJD.[2]

3. The Commission did more than just deny Judge Whitehead his right to timely disposition of the Holmes and Breen complaints in the manner required by ARJD 14, it

---

[2]The Commission is required by ARJD 14 to act on the Breen and Holmes complaints. These complaints have now been pending for about two and one-half years. Whether the Commission will dismiss or proceed on these two and one-half year old complaints is a matter that remains to be decided by the Commission.

sidetracked the procedures prescribed by the rules and devised its own, unique method of handling this particular case. Rather than simply ordering a probable cause hearing on the sworn complaints, as provided in the rules, the Commission elected to adopt an entirely new set of procedures, tailored for this case alone.

4. The first new tactic applied to Judge Whitehead was for the Commission to hire (some six months after the first sworn complaint was put on file) a former professional federal prosecutor (one Donald Campbell) to launch a massive "investigation" of Judge Whitehead. The investigation obviously was not related to the Commission's duty to make a preliminary ruling as to the merits and "sufficiency" of the Holmes and Breen complaints, because the Commission has never made the required ruling on these sworn complaints and apparently has never intended to do so. The only other possible explanation for the Commission's institution of a sweeping investigation of Judge Whitehead would be for the improper purpose of trying to uncover possible misconduct on the part of Judge Whitehead that could be included in a complaint that the Commission instructed Mr. Campbell to prepare and file *after* the investigation was done.

5. Special Deputy Attorney General Campbell later testified that the "result" of what he called his "fact-finding mission" (which was conducted over a six-month period by three investigators at a cost to the State of at least $40,000.00) was that "most of the incidents of misconduct alleged by Ms. Holmes were eliminated as potential charges," and that after interviewing "many witnesses" he was able to "verify the specific allegations detailed by Judge Breen." There has been no explanation as to why it was thought necessary to spend this much time and money just to "verify" the "allegations" of Judge Breen.

6. After the completion of his fact-finding mission, Mr. Campbell prepared and signed his own complaint based on the "information and belief" obtained from the "many witnesses" which he and his team of investigators had interviewed. The Campbell Complaint does not conform to the ARJD. Mr. Campbell did not sign his complaint "upon oath" as required by ARJD 12; and there is a serious question as to whether his hearsay complaint conforms to the ARJD requirement that initial complaints must be made by the "person complaining" (rather than outside "investigators") and must contain "facts" (rather than rumors, "information" or "belief") which "establish grounds for discipline." *Id.*

7. Shortly after filing his unsworn complaint, Mr. Campbell issued to Judge Whitehead a "Notice of Probable Cause Hearing," notifying the judge that "a complaint has been filed against [him]" and advising him that he was "required to respond, in writing, within thirty (30) days" to Mr. Campbell's complaint. Mr. Campbell's "Notice" also required Judge Whitehead to be present at a probable cause hearing to be held on September 7, 1993.[3]

8. At the time that Judge Whitehead received the Campbell order requiring him to respond to the Campbell Complaint and to appear for a hearing based on that complaint, the following jurisdictional and procedural problems were evident: (1) Neither Mr. Campbell nor the Commission itself had the jurisdiction to order Judge Whitehead to "respond" to the unsworn Campbell Complaint and to appear for a probable cause hearing on a complaint that was invalid on its face. (2) The Holmes and Breen sworn complaints had sat dormant for a year without the required ARJD 14 ruling on their sufficiency having been made. (3) There was no apparent legal or constitutional authority for the Commission to conduct the mentioned, six-month, three-investigator, $40,000.00 inquisition *before* a ruling had been made on the sufficiency of *any* sworn complaint.

9. Judicial review of jurisdictional questions and irregularities such as those described in the previous paragraph is invited by ARJD 40(7), which specifically provides for "[r]eview of interlocutory orders of the commission" on the application of either a judge or the Commission's prosecuting officer. Judge Whitehead therefore was simply filing an ARJD 40(7) petition seeking review of the interlocutory order that required him to respond to the unsworn Campbell Complaint and seeking review of the illegal and irregular proceedings that had been instituted against him. Judge Whitehead did not seek exoneration or dismissal of charges, or the prohibition of lawful proceedings against him. At that point in time, it does not appear from the record that Judge Whitehead had ever been informed that the properly-filed Holmes and Breen complaints were in existence.

10. After receiving the Whitehead petition, this court (JUSTICES ROSE, STEFFEN and SPRINGER) ordered:

---

[3]In fairness to Mr. Campbell and Attorney General Frankie Sue Del Papa, I should note that I do not assert that either he or she set out consciously to violate the ARJD in the manner described in the text. It appears, rather, that they may have incorrectly thought that they were following the practices which had been condoned in the past by this court.

a. that the Commission not act further on the Campbell Complaint until the Whitehead petition had been reviewed and

b. that the confidentiality[4] to which Judge Whitehead was entitled be preserved until the court ruled on the jurisdictional and procedural questions raised by Judge Whitehead.

11. When Judge Whitehead challenged the Commission's unauthorized, newly-innovated practices in the present writ proceedings, the Commission's unexpected and ill-founded response was to deny the authority of this court to give any hearing to Judge Whitehead's claims of jurisdictional excesses and to refuse to obey this court's orders. This contempt of court and denial of the supreme court's clearly-defined authority to review Commission actions under ARJD 40(7) that are claimed to be irregular, coupled with the Commission's extended efforts to prevent two of the justices of this court from hearing the case and its filing of a series of completely meritless pleadings, occasioned long and unnecessary delays in this case. (Although I consider these actions to have been ill-conceived, I do not wish to question either Mr. Campbell's or the attorney general's motivation and good faith. Intemperate public statements and legal oversights aside, we must give some understanding and even respect to the zealousness with which these two advocates sought to advance the interests of the Commission as they saw them.)

12. When this court finally finished dealing with the Commission's seeming defiance and contempt of court, the case was easily and readily disposed of merely by ordering the Commission not to proceed against Judge Whitehead on the defective Campbell Complaint and by ordering that, in the future, the Commission must comply with its own rules.

---

[4] ARJD 5 provides that "*[a]ll* proceedings *must* be kept confidential until there has been a determination of probable cause and filing of formal statement of charges." (Emphasis added.) When JUSTICES ROSE, STEFFEN and SPRINGER signed the order requiring that the confidentiality to which Judge Whitehead was entitled be maintained, their reasoning was that if a judge wished to claim that the Commission was not following its rules or was denying due process, such a judge should not have to waive confidentiality in order to assert his or her right to interlocutory review. That a judge is entitled to challenge jurisdictional excesses of the Commission by filing an ARJD 40(7) petition *without* waiving the ARJD 5 right to confidentiality is now the law of this state. JUSTICES ROSE, STEFFEN and SPRINGER were acting in an entirely proper and legal manner when they signed the mentioned confidentiality order. In December of 1993, after making its own independent evaluation of the issue, the Board of Governors of the State Bar publicly signified its agreement with our reasoning.

13. The *Whitehead* matter is now back in Commission hands; but, unfortunately, two of the Commissioners are not qualified to sit in judgment of Judge Whitehead: one, because he has been engaging in *ex parte* conferences with the prosecutor and doing "useful" legal research for the prosecution; and the other, because he has written an open letter to all judges and lawyers in the state in which he expresses his opinion as to the merits of the case. If these two Commissioners continue to insist on sitting in judgment of Judge Whitehead, such a state of affairs obviously will introduce further impediments to Judge Whitehead's getting due process of law.

There is, obviously, nothing out of the ordinary in a court's ordering that a governmental body must operate in accordance with its own official rules. That such a ruling could have become the source of controversy and adverse commentary that it has in this case *is* out of the ordinary and a matter deserving of some explanation. I will now explain.

The story begins in October of 1993, immediately after this court affirmed an order directing the Commission to provide Judge Whitehead with discovery of investigative documents relating to his case, as provided for in the ARJD. The Commission refused to comply with court orders, and confidential Whitehead documents were "leaked" by "unnamed sources" to an "investigative reporter" for the state's largest newspaper. The reporter called the court to see what the justices thought about the leak. When a justice expressed his opinion that the unnamed sources, who had leaked documents which were confidential by reason of the constitution and court rule, were "unethical," the reporter's response was: "Then, there must be a lot of unethical people in high places." From that time on, justices of this court have had their eyes open for unethical "people in high places" who had access to confidential documents and who might have been responsible for the leaks and other subversions of the legitimate judicial discipline process.

Soon afterward, we began to witness a pattern of false or very misleading public statements by certain "people in high places" who issued periodic and very similar public statements relating to the Whitehead case. The pattern of what may appear to some as "orchestrated" misstatements about the case contains three recurrent themes: (1) the actions of the supreme court are described as being legally unsupportable; (2) the actions of the supreme court are described as having put an end to all Whitehead proceedings, thus preventing the Commission from "performing its constitutional duty"; and (3) the actions of the

supreme court are described in terms of its members having corruptly based their judicial decisions on personal or political favoritism rather than on legal considerations. One person who helped to convey these three inaccurate impressions was no one less than the chief justice of the supreme court himself, ROBERT ROSE.

One of the strange paradoxes of this case is that the chief justice would join the attack against his own court even though he himself has sided with the majority in making some very important decisions in the case. Before the chief justice disqualified himself, he signed a very important and significant order, as chief justice, that ordered that the case be kept confidential until it was decided whether Judge Whitehead's challenge to the Commission's jurisdiction and procedural irregularities were of substance. On July 30, 1993, the chief justice signed an order (joined by JUSTICES STEFFEN and SPRINGER) which ordered that "[t]he Commission and all persons purporting to act pursuant to its authority shall maintain strict confidentiality concerning the proceedings below, and shall maintain the confidentiality of this proceeding before this court." Like the other members of the court who signed the order, the chief justice correctly saw at the time that because there had been no determination of probable cause, ARJD 5 required that "all proceedings," including the proceedings before this court, must be kept confidential. It is a bit hard to understand, then, how it could be that the chief justice would later (after he became disqualified to sit on the case)[5] publicly condemn other, unspecified rulings of this court as being "wrong" and "improper."

As time progressed, the chief justice's reported attacks on the court's rulings (including, apparently, those in which he had joined) and his adverse comments concerning Judge Whitehead and his attorneys became more extravagant. Of all the "people in high places" who have been conveying misimpressions of this case and thus undermining the parties' rights to orderly justice administered in a dispassionate setting, JUSTICE ROSE's reported

---

[5]On the subject of CHIEF JUSTICE ROSE's withdrawal from this case, I would note that he did not recuse himself until after he had defeated a challenge to JUSTICE SHEARING made on the basis that Judge Whitehead was the judge sitting on a large lawsuit in which JUSTICE SHEARING's husband was a party. On August 24, 1993, CHIEF JUSTICE ROSE innovatively took care of this challenge simply by entering a one-judge order removing Judge Whitehead from the Shearing case, thus ending any challenge to JUSTICE SHEARING, the dissenting justice in this case. When JUSTICE ROSE did this, Judge Whitehead could not have been legally or properly removed from the Shearing case, absent proof of demonstrable bias or other established legal ground.

violation of his duty not to comment publicly about pending judicial matters could be seen as the most prejudicial. This is so principally because the reported remarks of the chief justice were necessarily attended by credibility and significance by reason of their source, the highest judicial officer in the state.

There was a time when, in my own mind, I was inclined to put the blame for the public misportrayal of this case on the news media. The more I thought about this, however, the less sense it made to me. Why, I asked myself, would the news media ever deliberately engage in such a false and unwarranted attack on the supreme court's efforts to address and adjudicate Judge Whitehead's challenge to improper Commission procedures? The answer is that they would not. The media were merely echoing what they were being told by "people in high places," who seemed to be credible. If I were an "investigative reporter" or any agent of the news media, and a bevy of highly-placed persons told me that the court's decisions were "wrong" and not based on the law, in all likelihood I would believe these kinds of statements when they came from such seemingly reliable sources.

It is ordinarily not ethically permissible for a judge to comment publicly on a pending case. Compliance with the Code of Judicial Conduct limited the options of the court panel that was considering Judge Whitehead's petition. We were ethically constrained to avoid unseemly public response to unfounded attacks. For this reason the only version of this case that the media has had available to it was that given to it by "people in high places," who apparently did not consider themselves bound by ethical prohibitions against making public comments on a pending case. When a newspaper was asked to correct public misstatements, the request for journalistic fairness, quite remarkably, was used by the Commission as a basis for trying to disqualify two members of this panel.

It is almost as though the patterned statements from highly-placed sources were scripted. Ever-recurring expressions like "whitewash," "good-old-boy" and "bullying lawyers" have become formulaic in the reporting of this case. Whether CHIEF JUSTICE ROSE and the other "people in high places" that I am about to discuss were accurately quoted and whether they acted in concert, I, of course, will not presume to say.

Although media reports indicate that others in high places have breached their obligation to protect Judge Whitehead's right to confidentiality and his rights to due process and the presumption of innocence, I will limit my discussion of "people in high places" to the chief justice, the attorney general, a chief district judge, the president of the state bar and a leading member of the Judicial Discipline Commission.

Attorney General Frankie Sue Del Papa was, during much of this litigation, acting as counsel for the Discipline Commission; she therefore is more easily forgiven than some of the others for taking the extremely partisan positions that she has taken. She could have used more restraint in some of the public comments that she has made. She certainly had no business issuing a press release in which she described Judge Whitehead as a "person who would resort to gross misrepresentations of fact and to smearing others to try desperately to save himself"; and, like-wise, it was a bit extreme for her office to employ such expressions as "[t]he fix is in" when speaking of this court.[6] Still, although excited and unrestrained utterances directed against the court cannot be condoned, they can be understood when spoken in the heat of battle by a zealous and disappointed advocate. Recalling my own years as an advocate, I do not question the sincerity of these statements, only their professional propriety.

District Judge Brent Adams, while he was chief judge of the Second Judicial District Court, reportedly made a number of improper public comments about this case while it was pending before this court. I find this conduct much less understandable than that of the attorney general, who was acting as counsel for the Commission. A chief judge who was personally involved in the effort to advance charges against Judge Whitehead certainly should not have gratuitously intruded himself into the case in order to put pressure on the appellate court that was adjudicating Judge Whitehead's challenge to those charges. According to press accounts, Judge Adams publicly "rap[ped]" the supreme court, charging that the court had prevented the Commission from "perform[ing] its constitutional duty," and that it had done so with "no legal authority." If indeed Judge Whitehead's judicial colleague, Judge Adams, was a potential witness against him and did make such untoward and prejudicial public statements, it is no wonder that legally untrained reporters accorded credence to Judge Adams' statements rather than comprehending and report-ing the impropriety of such conduct on his part. So far as appears, the media were not even aware of Judge Adams' surrep-titious role as one of the judges who was generating discipline complaints against Judge Whitehead.

Another of the "people in high places" that reportedly contrib-uted to the public denigration of this court is Discipline Commis-sion member Alan Lefebvre.

---

[6]Over a year ago my chambers received a telephone call from a television news reporter advising that I was being given an opportunity to respond to an attorney general staff member's charge that the "fix was in" with the supreme court in the *Whitehead* case. I declined this opportunity; and, thanks to the prudence of the television news staff, these intemperate allegations never became public.

Commissioner Lefebvre was quoted in a news article bearing the headline, "High court accused of special deals." The lead line of this story was, "Nevada Supreme Court rulings favoring a Reno Judge *stemmed from political alliances rather than any concern for the law,* a Nevada Judicial Discipline Commission member claims." (Emphasis added.) Commissioner Lefebvre reportedly "explained" to the press that if Judge Whitehead "did not have very close personal ties" to two of the justices, the decisions of this court "would not have occurred." Much like the allegations by the chief justice that members of this court were covering up for Judge Whitehead and were out to "win" the case for him, Mr. Lefebvre's charge was both irresponsible and false. I regard the statement about supposed "very close personal ties" to be a gross distortion of reality; and when publicly proclaimed by a member of the Discipline Commission, these kinds of groundless implications are very destructive to the court and to our entire judicial system. They provide justification for media representatives to have a "field day" with the supreme court and with Judge Whitehead, especially when fortified by the chief justice, the attorney general, a chief judge and the president of the state bar.

Finally, among the "people in high places" who have had a high level of influence with the press in matters concerning Judge Whitehead and this court, I list Nevada Bar Association President, Margo Piscevich. Shortly before she was sworn in as president and while she was still president-elect of the Bar Association, Ms. Piscevich is reported to have made the public outburst that in the Whitehead case this court had "bound, gagged and raped the Commission." Ms. Piscevich is also reported to have publicly condemned this court's decisions as "outrageous" and said that she was "not aware of any lawyer who is not disgusted" with the court. Such immoderate criticisms of the court, attributed to a high bar official by the largest newspaper in the state, did damage to the court and to the orderly administration of justice in exactly the ways that SCR 177 is intended to prevent. The reputation of the court was damaged despite the fact that the State Bar's Board of Governors later issued a formal resolution confirming that both our action in undertaking review of Judge Whitehead's petition and our order preserving confidentiality pending review were entirely lawful. The public indictments of this court attributed to Ms. Piscevich strongly reinforced the ill-founded misconception that not only had the court unlawfully prevented the Commission from performing its constitutional duty, it had done so in a manner that was biased and corrupt. President Piscevich's reported remarks received vastly more publicity than the Board of Governor's subsequent

repudiation of them. Once more I am forced to say that, given the credibility that a person in Ms. Piscevich's position ordinarily possesses, it would be difficult to fault those members of the media who have uncritically accorded great weight to her words as reported.

I now continue with a somewhat more in-depth analysis of this case, which I set out in the following separate, numbered sections.

1. *Constitutional Foundation of the Commission.* The Judicial Discipline Commission was created in 1976 by constitutional amendment. Nev. Const. art. 6, § 21. The Commission is given the extraordinary power of being able to censure judges or to *remove* them from office.[7] The Constitution provides that "any person" can complain about the "fitness" of a judge, and that when this happens, the Commission shall, after a "preliminary investigation," either "dismiss the matter" or order that certain *hearings* be held before it. The Constitution also provides that the supreme court *shall* "make appropriate rules" for "the confidentiality of all proceedings" and make rules providing for the grounds for censure and the "conduct of investigations and hearings."

2. *Nature of the Commission.* That the Commission is a judicial body, a hearing tribunal, should not require any further explanation or discussion. Some misunderstanding of this simple concept may have been generated in the minds of some by the use of the term "preliminary investigation" in the Constitution. The term necessarily relates to the preliminary inquiry and consideration that the Commission may conduct before it makes its first, critical decision as to whether it is going to dismiss a sworn complaint or proceed to a probable cause hearing. ARJD 14. All parties in this case now agree that the purpose of any *preliminary* inquiry or "investigation" is to protect judges against having to defend against unfounded or frivolous complaints.[8] Certainly the

---

[7]In other states, *e.g.*, California, the Commission is not given such great power, and the ultimate power to remove a judge from office is vested in the state supreme court. Commissions in other states are given powers to investigate and make recommendations to the Supreme Court. They are quite different from our Commission; and for this reason, citations to California judicial discipline cases are not of much value here.

[8]The term "preliminary investigation" refers to the preliminary screening inquiry that the Commission may decide to engage in before it makes the crucial decision as to whether a given complaint has "merit." This preliminary investigation should not be confounded with the investigation that the Commission's "prosecuting attorney" will necessarily be making in preparation for a formal hearing or even, in some cases, like the *Goldman* case, in counsel's preparation for a probable cause hearing on a sworn complaint. Goldman v. Bryan, 104 Nev. 644, 764 P.2d 1296 (1988). There seems to be

use of "preliminary investigation" does not make of the Commission an inquisitorial body that first investigates and then holds a hearing on charges based on what it found out in its own investigation.[9]

---

no dispute that a "preliminary investigation" is indicated only in cases where there is doubt as to the "sufficiency" of a sworn complaint and where there is a need to "protect" the subject of a complaint from unauthentic or unfounded complaints.

During oral argument, Assistant Attorney General Nielsen agreed with the court that there was "nothing wrong" with a preliminary investigation, "*as long as you do it for the benefit of the judge.*" (Emphasis added.)

During oral argument, prosecutor Campbell also recognized that a "preliminary investigation" was related to the Commission's preliminary decision as to the sufficiency of a sworn complaint and to the need for the Commission in certain cases to look more deeply into a complaint in order to protect the judge against improper charges. Mr. Campbell gave an illustration of when a preliminary investigation might be proper and necessary:

> How would you feel, if after serving on the bench for years, someone had filed a completely false or in large measure materially misrepresenting document with the Commission saying that you had violated all manner and sorts of the Code of Judicial Conduct and we or the Commission accepted that at face value? Wouldn't you be appalled?

During argument, the court agreed with Mr. Campbell that all complaints should not be accepted on "face value" and that "before you accept [a complaint] on face value, you look into it to *protect* the judge and made sure it is a valid complaint." (Emphasis added.)

In its Answer to Judge Whitehead's petition, the Commission also recognized that the function of a preliminary investigation was that of "weeding out those complaints" which were not adequately supported. The same Answer pointed out that the Commission's investigation of Judge Whitehead had been "focused on a single offending and recurring practice of *ex parte* contacts." This contention is consistent with Mr. Campbell's announced purpose, which was "to verify the specific allegations of misconduct detailed by Judge Breen." It is important to keep in mind that protection of an accused judge is the *sole* purpose of the "preliminary investigation" referred to in the Constitution.

[9]With regard to the problem of a disciplinary body's mixing up inquisitional and judicial functions, I would note here that the American Bar Association has addressed this problem in its November 1993 publication "Model Rules for Judicial Disciplinary Enforcement." These model rules provide for a "disciplinary counsel" who is absolutely prohibited (Rule 10) from having any "ex parte contacts" with "members of the commission." The model rules also provide for an "investigative panel" of three members which can conduct investigative activities but does not sit in later judgment of an accused judge. The Nevada rules provide for an independent "prosecuting attorney" but only *after* a finding of probable cause. In the *Goldman* case, the Commission, under the *old* rules, hired *independent* counsel to prepare for the probable cause hearing. 104 Nev. 644, 764 P.2d 1296. The Commission did not, of course, employ its then legal advisor, the attorney general, in this prosecutorial capacity. The Commission's employing independent counsel to conduct the probable cause hearing in the *Goldman* case is entirely different from using a "special deputy attorney general" to conduct a full-

3. *Operational History of the Commission*. Historically, the Commission got off to a bad start. It "misconceive[d] its constitutional purpose" and began misbehaving when it started to act as a "secret inquisitional body meeting behind closed doors investigating acts of judicial wrongdoing" and hired an investigator/prosecutor to conduct open-ended investigations against targeted judges. *See* Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 869 P.2d 795 (1994) (*Whitehead I*). In 1979, before the enactment of the new ARJD procedural rules, at least four jurists were "investigated" by an out-of-state Commission Inquisitor in investigations marked by "[p]lanned, selective leaks [which] resulted in giving inaccurate and unreliable information to the public which [ ] incited public furor and unjustifiably damaged the reputation of a judicial officer who was never even charged." *Id.* at 147, 869 P.2d at 806. It appears now (as will be explained) that the Commission has not only reverted to the untoward inquisitional practices of the past, it has abandoned the procedures provided for in its rules and at some time during the past four years adopted the policy of conducting its disciplinary proceedings in secret.

4. *Reaction of the Court to Past Commission Abuses*. In response to the mentioned Commission abuses, the supreme court, pursuant to its constitutional rule-making powers, appointed a special committee to propose "corrective measures" designed to "foreclose future opportunities for such abuses of power." This Study Committee (comprised of lawyers, judges, legislators, former prosecutors, a former chairman of the Commission, a former attorney general and a political science professor), in its report to the court, recounted the abuses of power that the Commission had been engaging in and addressed these abuses by recommending changes in the procedural rules that would "provide a fair and open forum governed by clear and explicit rules." *Whitehead I,* 100 Nev. at 146 n.15, 869 P.2d at 806 n.15.

5. *"Corrective Measures."* The "clear and explicit rules" drafted by the Study Committee to foreclose "future opportunities" for abuses of power, provided for "proceedings [that] would then be accusatory rather than inquisitorial, open rather than closed, and accompanied by due process formalities . . . rather than loose, unstructured and informal." *Id.* The Study Committee also recommended that "[i]nitial complaints, in writ-

---

scale Commission investigation *before* the Commission has even made its required ARJD 14 ruling on the merits of a sworn complaint and before a decision had been made to proceed to a probable cause hearing. If, as stated in the dissenting addendum, Mr. Campbell was hired as the "Commission's own attorney," this kind of practice necessarily compromises the Commission's capacity to act as an impartial hearing tribunal.

ing and under oath, must [ ] state specifically the nature of the offense" and be "attested by an identified complainant." *Id.*

6. *The New Procedural Rules: ARJD.* Largely as the Study Committee proposed, the new rules were placed in final form and adopted in 1988, setting up an "accusatorial" system whereby an "initial" complaint "must be made upon oath" by the "person complaining."[10] Once a complaint is filed, a complained against judge has the right to have the Commission "consider" the complaint "with a view to determining whether or not there exists sufficient cause to proceed to a probable cause hearing." ARJD 14. If no "sufficient cause" exists, the Commission must dismiss the complaint; otherwise, it must order that a probable cause hearing be held on the sworn complaint. In making this dismiss-or-go-ahead determination, the Commission may, *for the protection of the judge* (taking care not to compromise its obligation to sit as an impartial tribunal), engage in whatever preliminary inquiries might be necessary in making the required determination as to the sufficiency of a sworn complaint. In most cases, of course, the sufficiency determination can be made merely by reference to the sworn complaint alone. If a probable cause hearing is ordered and probable cause is found, the Commission then acts very much like a criminal court. After probable cause has been found the Commission must designate an outside "prosecuting attorney," who has the responsibility, *independent of the Commission,* to investigate and prosecute the case before the Commission, which sits as an independent hearing tribunal. It is rather apparent that the Commission "jumped the gun" by hiring a prosecutor before it had even ruled on the sufficiency of a sworn complaint. It also should be apparent that, if the Commission would only follow the rules, complaints of substance would become known to the public and press at an early date, immediately following an expeditious hearing and determination of probable cause. There would be no secret discipline. Complaints without substance would not languish for years, tormenting judges and their families. Evidently the Commission has not wished to give up clandestine practices, but instead appears to continue to assert its claim to be able to operate almost interminably in secret, as it has been doing in the Whitehead case prior to the leak of confidential Commission proceedings.

7. *History Repeats Itself: Present Day Aberrations.* The "clear and explicit" ARJD were specifically tailored to "foreclose" the kinds of abuses of power that were evident in the late

---

[10]The only exception to the rule requiring a complaint to be signed under oath by the person complaining is the provision under ARJD 12(2) which allows the executive officer to swear to a complaint under "exceptional circumstances," which do not apply here.

1970s; and it was with no little amazement that members of this court received (even before the Whitehead case) word of secret hearings and other closed-door proceedings again being conducted by the Commission. See, for example, the "Judge D" case (*see* Whitehead v. Comm'n on Jud. Discipline, Docket No. 24598 (Order Granting Petition, September 9, 1994)). Revelations coming to light in the present case clearly showed that the Commission had adopted procedures that in many ways were more harmful than the inquisitions of the past. The most disturbing of Commission practices were those of bringing judges before the Commission in secret sessions. In these closed-door sessions, under the threat that charges against them would be disclosed to the public, judges make secret deals with the Commission, by the terms of which they had to submit to informal disciplinary sanctions (such as probationary supervision by the attorney general) which allowed judges to avoid any public disclosure of the judicial discipline proceedings.[11] As might be expected, and as a

---

[11]One of the most significant things that has come to light in these proceedings is confirmation that the Commission has been conducting secret hearings that are contrary to its rules. These cabals are, in addition to being in violation of ARJD rules, contrary to the letter and spirit of this state's open-meeting laws. I trust that after the issuance of this opinion, the Commission will no longer engage in procedures that, for lack of a better descriptive term, I have come to call "Let's-make-a-deal." Let me give an illustrative example of what I mean:

> A complaining judge files a sworn complaint against an erring judge, charging serious judicial misconduct which the complaining judge believes should result in removal from office. The Commission does not serve the complaint on the respondent judge, but, rather, instructs the judge to appear for a secret "Let's-make-a-deal" hearing. The judge who filed the complaint is never told about the secret hearing, and neither is anyone else. The accused judge pleads for mercy, tells the Commissioners that he will do almost anything if they will not make the complaint public. The Commission decides it will keep mum if the judge will agree not to be bad any more, to visit a counselor and to submit to probation under the supervision of the attorney general. The secret deal is done, and the complaint is dismissed. The public never knows. The judge who filed the sworn complaint walks away, shaking his head, wondering what in the world has happened to his complaint.

The foregoing example is a composite narration based on fact. The described procedure is bad for the judges, and it is bad for the citizens of this state. It is bad for judges because this type of secret coercion is very demeaning and can lead to serious abuses, even though the judge "agrees" to the secret discipline. It is bad for the system because the complainant is frustrated, the press and the general public are denied access to the proceedings, and abuses in the form of unwarranted dismissals of valid complaints are inevitable in any secret penal system. The ARJD rules do *not* permit these kinds of secret proceedings.

If a judge deserves to be disciplined, she or he deserves to be disciplined in public and not in secret. This does not mean that a judge is not allowed under ARJD 31, and after there has been a finding of probable cause (ARJD: "V

natural consequence of secret deals being made by the Commission, we are again seeing (reminiscent of the abuses in the 1970s) the "planned, selective leaks" of the past, coupled with the also predictable hiring of secret investigators to look into all aspects of a targeted judge's personal and professional life.

8. *"Distortions of the Record."* The dissenting justice has written[12] that she is "appalled" by certain, unidentified "distortions of the record," which she claimed to find in the majority opinion. I would ordinarily not use the word "distortion" to describe a colleague's opinion because the word denotes an intentional perversion or twisting of the truth; however, now that the dissenting justice has used the word "distortion" to denigrate the majority opinion, I feel justified in using the word to describe the dissenting justice's suggestion that the Commission's departure from its own rules is in some way a product of its not being able to understand the ARJD. I too am "appalled" (overcome by dread) when I read the dissenting justice's florid suggestion that all is well with the Commission and that it "has been trying to resolve matters as fairly and expeditiously as possible under rules that have many gaps and leave much room for interpretation." Nothing could be further from the truth. Anyone who has read *Whitehead I*[13] and *Whitehead II*[14] and who is aware of the history of Commission abuses, past and present, will readily understand that the present rules were carefully and successfully designed to

Procedure *After* Finding of Probable Cause" contains the applicable ARJD Rule 31), to "plea bargain" and in cases of contested fact to offer to plead guilty in exchange for a specific disposition. The procedure provided for in ARJD 31 is open and not secret and permits a respondent judge to give a "written consent" to being censured or removed from office. Where the Commission enters an order under this rule, a "certified copy of the order must be filed with the clerk of the supreme court"; thus, because probable cause has been found and because the rule requires filing of a copy of the Commission's order with the court, the entire proceedings become a matter of public knowledge. I would assume that those who value open government, such as the Nevada Press Association, will concur in this view.

[12]In footnote 1 to this concurring opinion, I have referred to a series of supplemental orders filed by JUSTICES SHEARING and SPRINGER and Judge Guy. On November 22, 1994, JUSTICE SHEARING filed in this case a document entitled "Dissenting Addendum to Order Granting Petition," in which JUSTICE SHEARING expressed her disagreement with the court's order granting the writs. *See* Majority Opinion, n.1. This mentioned dissenting addendum was the subject of widespread news coverage and expressed the substance of the dissenting justice's views. When I refer to statements by the "dissenting justice," I am referring to statements made in the mentioned November 22 "Dissenting Addendum."

[13]Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 869 P.2d 795 (1994).

[14]Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 873 P.2d 946 (1994).

prevent the repetition of previous improprieties and purposefully drafted to set out the plain and simple procedures outlined above. The Commission's regressive return to the pre-ARJD abuses of the 1970s (expensive and time-consuming inquisitions of targeted judges, secret disciplinary hearings and, arguably, contrived leaks) has absolutely nothing to do with "gaps" in the rules or any difficulty in the "interpretation" of the rules. This opinion demonstrates that the new rules set out clearly how the Commission should conduct disciplinary proceedings. The new rules are easy to understand and easy to follow. Anyone who tries to blame the *rules* for what the Commission has been doing either has not read the rules very carefully or (to borrow the term from the dissenting justice) is guilty of a "distortion of the record."

9. *The Commission's "Side" of the Case.* This final numbered section will deal with what I would call the Commission's "side" of the case. It is not easy to identify exactly what, if any, position the Commission might be taking at this time. I say this because it has totally abandoned the two positions that it so forcefully maintained when this case began, namely: (1) that the Supreme Court has no power to "interfere" with the Commission, and that, consequently, the court was acting improperly and outside of its lawful powers when it decided to review jurisdictional excesses and procedural improprieties in the manner provided by ARJD 40(7); and (2) that the Commission is a super-agency[15] that is "beholden only to the people" and, conse-

---

[15]The Commission initially took the position that it was a super-agency "created as totally independent from any control by anyone in the three established branches of government," and that "no action of the Commission, however wrongful or prejudicial, is subject to any control or review whatever, unless and until a 'final' order is entered at the conclusion of its disciplinary proceedings in a given case." The Commission adopted an even more extreme position when it made the claim that it was not subject to the orders of this court and did not have to obey them. The Commission insisted that this court's orders were "unwarranted intrusions into the Commission's 'constitutional duty'" and therefore "void." *Whitehead I,* 110 Nev. at 799-800, 869 P.2d at 135. These assertions are of considerable interest and value in any attempt to understand the nature of this powerful political body. We must bear in mind that this body is made up mostly of lawyers and judges and that most of the members owe their positions to political appointments that are dependent upon the current political alignments of the Supreme Court and the Board of Governors of the State Bar Association. Like other political bodies with great powers, the Commission is subject to the temptation to exceed its powers. It is the "nature of the beast." Fortunately, political bodies of this kind must subordinate their power impulses to the rule of law. Given the nature of this political body, it is really quite understandable that the members of the Commission were so resistant in this case to the idea that they were subject to judicial review or to any other kind of "interference" with their perception of absolute power. However sincerely these beliefs may have been embraced, the Commission has done much damage to the Nevada judiciary by its persistent refusal to recognize the existence of judicial superintendence over the Commission's exercise of power.

quently, not required to obey the orders of this court. Unless I am mistaken, the Commission has now fully abandoned these extreme and, of course, untenable positions. Since these positions comprised the major thrust of the Commission's resistance to the *Whitehead* petition for jurisdictional review, I have some difficulty in defining for the readers of this opinion just what the remaining arguments of the Commission are.

Although the Commission has abandoned its super-agency theory and its claim that it does not have to obey the orders of this court, I find in the dissenting addendum an allusion to two other possible issues that might remain unresolved in the minds of some. These matters have already been resolved by the court's past opinions; but, still, there may be some benefit in discussing them. The questions are: (1) whether the Commission had the power to proceed on the basis of a "charging document" prepared and signed by (but not "under oath" of) a special deputy attorney general who calls himself "special counsel" to the Commission; and (2) whether the Commission has the power to institute a full investigation directed against a judge prior to the Commission's required threshold determination that there is "sufficient cause to proceed to a probable cause hearing" based on a sworn complaint. ARJD 14.

With regard to the first question, relating to the legitimacy of the Campbell Complaint, the dissenting addendum tries to defend the Campbell Complaint by arguing that just because the rules require that a "person complaining" must file a complaint *under oath,* this does not necessarily mean that the Commission is precluded from proceeding on a complaint that is *not* under oath. The dissenting addendum argues that the Campbell Complaint (which the dissenting justice gives a new name, "formal complaint," to distinguish it from the "initial complaint" provided for in ARJD 12) is a proper "charging document" (to use Chairman Shipler's term) for initiating discipline proceedings under the ARJD. This cannot be. ARJD 12 plainly provides that "initial complaint[s]" must be filed "upon oath" by a "person complaining." "Complaint" is specifically defined in ARJD 2 as the "*sworn* written charge alleging judicial misconduct." (Emphasis added.) Mr. Campbell did not swear to his complaint; and by its nature (because it is based on thirdhand information and not made by the "person complaining") the Campbell Complaint is not consistent with the spirit of the ARJD.

It is very difficult for me to follow the dissenting justice's argument that the Commission should now be permitted to "proceed" on a completely new species of unsworn complaint that is not mentioned or provided for in the Commission's rules of procedure. It is difficult for me to understand how it can possibly be maintained that this strange "second kind of complaint" or

"formal complaint" (as the dissenting justice calls it) can afford a basis for proceeding under the ARJD. The majority was clearly correct when it ordered that Judge Whitehead could not be required to respond to such a fugitive, "second kind of complaint."

The other possible Commission contention that still may linger relates to the inquisitional powers of this judicial tribunal and to whether the Commission had the right to conduct the kind of massive investigation of Judge Whitehead, *when* it did and *as* it did in this case. The previously-mentioned Study Commission report clearly decried these kinds of inquisitions; and, by prescribing the accusatorial procedures contained in the ARJD, this court expressed its disapproval of the practice of targeting a judge for investigation rather than proceeding to "consider" sworn complaints in the manner required by the constitution and by ARJD 14. Still, the dissenting justice (citing inapplicable cases from California, a state in which inquisitional practices are part of the disciplinary process) argues that the Nevada Commission has the power to hire an investigator to do the kind of pre-investigation that was done here, before the Commission has determined, pursuant to ARJD 14, that an initial, sworn complaint has "merit." I have explained in some detail in footnote 8 that it is understood by both sides of this litigation that the purpose of a "preliminary investigation" is limited to those unusual circumstances in which the Commission decides that further inquiry must be made into the merits of a sworn complaint in order to protect a judge against suspect or factually unsupportable complaints. The subject needs no further elaboration here.[16]

Having discussed the nature of the Commission and its operations, past and present, in a manner that I think will cast some unaccustomed light on what has been a very dark and obscure subject, I turn now to a discussion of two of the categories which I put forward in my Addendum of October 28, namely:

1. *The Commission's Uneven Administration of Judicial Discipline*. The administration of judicial discipline in this state has been very "uneven," if not politically motivated and discriminatory. Whether this unevenness, this lack of uniformity and fairness in the application of judicial discipline, is caused by favoritism, oppressive attacks upon political enemies or is merely the natural outcome of conducting penal proceedings in a secret or hidden manner, I shall not attempt to resolve. I merely summarize the facts that I have learned in the course of my judicial

---

[16]The unasked and unanswered question here is, of course, whether it was necessary, in order to "protect" Judge Whitehead, to have three investigators investigate him for six months.

duties and that are verifiable from public records and historical sources.

2. *The Incapacity of Present Commissioners to Sit in Judgment of Judge Whitehead.* A person who assists the prosecution cannot sit in judgment of the accused; and a person who publicly prejudges the guilt of an accused cannot sit in judgment of the accused. Two Commissioners fall into the foregoing categories; and the Commission seems to be approving of and ratifying their actions, thus putting the impartiality of the remaining members of the Commission in question.

## I.

### UNEVEN ADMINISTRATION OF JUDICIAL DISCIPLINE: "COBWEBS"[17] AND SELECTIVE PROSECUTION

That the judicial discipline apparatus in this state has been malfunctioning is hardly a matter of debate. It is not necessary to dwell on the causes of the breakdown in judicial discipline, except, perhaps, to remind the reader that when penal proceedings are improperly conducted in secret and are permitted to escape the critical eye of public scrutiny, the natural, if not inevitable, result is that some guilty persons will escape deserved punishment and that some less-favored persons will be the subject of overly-zealous action against them.

Although some of the many citable examples of undisciplined judicial misconduct can be attributed to the unwillingness of a complainant to come forward to "bell the cat,"[18] I would blame many instances of unpunished judicial misconduct on the ability of some offending judges to "make a deal" with the Commission. I do not know the specific details of the secret "deals" that have been made and which could not have been made if the Commission had been following the ARJD; but I do know that the judges who made the deals have not been subject either to being adjudicated as guilty of judicial misconduct or to suffering the constitutionally-prescribed punishments of censure or removal. I note that the newly-innovated procedures created for Judge Whitehead did not encompass the advantages attendant to the making of secret deals.

Whatever else might be said about the manner in which this

---

[17]"Laws like to cobwebs, catch small flies,
Great ones break them before your eyes."
Benjamin Franklin, *Poor Richard* (1734).

[18]"Old Mouse: 'What Big Whiskers had said is all very well, but pray tell me, *who is going to bell the cat?*'" Aesop, "Belling the Cat," *My Book House* (The Bookhouse for Children, Chicago, Toronto, 1925).

case was handled, there is one thing that is absolutely clear: Judge Whitehead was treated *differently* from any other judge when the Commission decided to adopt a new, "second kind" of procedure that was tailored for Judge Whitehead and for Judge Whitehead alone. I see many ways in which the Commission treated Judge Whitehead differently from other judges; one that strikes me is the one just mentioned. Judge Whitehead was not allowed to play "Let's-make-a-deal." Since the secret "Let's make-a-deal" game had become the general Commission practice (*e.g.*, "Judge D"), one wonders why the Commission did not play the game with Judge Whitehead and why Judge Whitehead was not given the advantage of some of the attractive deals that other judges had been given.

Another striking difference in the way Judge Whitehead was treated is that no other judge has been the subject of a six-month investigation by three paid investigators (Donald Campbell, Bryan K. Scott and J. Colby Williams) and subject to prosecution by means of a new, "second kind" of seventeen-page, twelve-count complaint prepared by a professional prosecutor.

In my study of the recent actions of the Judicial Discipline Commission, attendant to the preparation of this and other related opinions, I have become conversant with a number of instances in which serious judicial misconduct has, for reasons that certainly are not yet clear to me, been ignored by the Commission. I have learned of a number of instances of apparent and, in some cases, formally charged cases of judicial misconduct. Among a number of cases that appear to be unpunished judicial misconduct, I can mention a few: the case of a judge's casting a Spanish-speaking person into jail "until he learned to speak English," the case of a judge's being charged with a repeated "pattern" of racial and gender bias, the case of a judge's being convicted of drunken driving, and the case of a judge's using his judicial office to try to influence a prosecutor to give favored treatment to two friends. In these cases, either charges were dismissed without a hearing or no charges were brought at all. Why three investigators, six months of investigation and over $40,000.00 in investigation fees were invested in the Whitehead case and in none of the just-mentioned kinds of cases is a matter that the reader might want to ponder.

I see the historical record of the Discipline Commission as being illustrative of the Franklin aphorism that is quoted in the margin. There is substantial force to an argument that a number of "great ones" have broken through the disciplinary cobweb, leaving for the Commission's ardent attention only the "small flies," and the flies that do not enjoy the political good favor of the Commission. In each incident of apparent judicial misconduct

which I have sampled above there has been no formal disciplinary sanction imposed by the Discipline Commission against any offending judge.

## II.
### BIASED AND THEREFORE DISQUALIFIED MEMBERS OF THE COMMISSION

#### A. BIAS OF COMMISSIONER LEFEBVRE

I have learned through an examination of the secret documents which the Commission fought to keep from the court, but finally agreed to deliver, that Commissioner Lefebvre has been collaborating with the prosecution. These documents revealed that Mr. Lefebvre had, with respect to the Whitehead matter, been acting in an executive capacity, as an investigator (advising the hired prosecutor as to whom he should interview) and as a prosecutor (submitting legal research to the prosecutor which Mr. Lefebvre thought would be "useful" in the Whitehead prosecution). Also, according to these documents, Mr. Lefebvre had been engaging in "multiple" *ex parte* conferences with the prosecutor concerning the Whitehead matter, and Mr. Lefebvre prepared for Mr. Campbell a legal brief containing "legal research" intended for use by the prosecution.[19]

---

[19]Among the secret documents which the Commission finally divulged under threat of punishment for contempt was a letter which Commissioner Lefebvre wrote to the prosecutor hired to prosecute Judge Whitehead. The letter contained a number of legal citations to be used in the prosecution of Judge Whitehead and some tactical advice that Mr. Lefebvre advised the prosecutor to employ in investigating Judge Whitehead. This document, which I call the "Lefebvre Brief," is dated March 26, 1993, a date falling within the period that prosecutor Campbell was investigating Judge Whitehead and preparing charges against him. Commissioner Lefebvre claims that he was merely harmlessly conferring with one of the Commission's attorneys; but his brief belies this claim because Mr. Lefebvre states in the brief that his intent is to be "useful" to Campbell in his prosecutorial activities. I must also note that Mr. Campbell's assigned task was not that of a legal advisor to the Commission (the attorney general's office was doing this); but, rather, prosecutor Campbell's function was, as a "special deputy attorney general," to investigate and prosecute Judge Whitehead, that is to say, to file a complaint and prosecute that complaint before a hearing tribunal upon which Mr. Lefebvre was to sit.

The Lefebvre Brief offers suggestions as to whom the prosecutor should interview and is accompanied by copies of "several cases" which Commissioner Lefebvre believed the prosecutor might find "*useful* to add to [his] research" in prosecuting Judge Whitehead (*e.g.*, Roberts v. Commission on Judicial Performance, 661 P. 2d 1064 (Cal. 1983); McCartney v. Commission on Judicial Performance, 526 P.2d 268 (Cal. 1974); Geiler v. Commission on Judicial Qualifications, 515 P.2d 1 (Cal. 1973)). (Emphasis added.) I do not know how valuable Commissioner Lefebvre's prosecution brief was to

The approach taken by the dissenting justice to the problem of Mr. Lefebvre's aiding the prosecution is to dismiss Mr. Lefebvre's lurid conflict of interest summarily by saying (in a rather unmannerly way) that my position on this matter is an "absurdity." The dissenting addendum pretends that when Mr. Lefebvre was conferring with Mr. Campbell about matters relating to the investigation and prosecution of Judge Whitehead, he was merely "talking to the Commission's own attorney." I will avoid such questionable manners and will not call my colleague's position "absurd," but I would point out that Mr. Campbell was not at the time in question acting as Mr. Lefebvre's attorney nor as the Commission's "own attorney." Mr. Campbell, in whatever other capacity he may have been acting, was certainly acting as an investigator and a prosecutor of Judge Whitehead, and as such he should not have been discussing the case, *ex parte,* with members of the hearing panel who were going to hear the case.[20]

One who is being "useful" to the prosecution cannot be said to be "impartial"; and Commissioner Lefebvre's being "useful" to the prosecution in the matter stated above is a denial of due process.[21]

---

prosecutor Campbell, but the mere fact that Mr. Lefebvre was providing "useful" legal support for the prosecution certainly should be enough in most people's minds to keep him from sitting in judgment of Judge Whitehead.

Finally, I would note that prosecutor Campbell's billings to the attorney general show that Mr. Campbell had "multiple telephone conferences" with Mr. Lefebvre. Judge Whitehead's lawyers were never included in any of these *ex parte* conferences between Campbell and Lefebvre, and Judge Whitehead's attorneys were not served with the Lefebvre Brief.

[20]Special Deputy Attorney General Campbell himself tells us, under oath, that after he was hired in "early March" of 1993, he "began a 'preliminary investigation'" of Judge Whitehead. Based upon the "evidence gathered in the investigation," Mr. Campbell proceeded to "draft[] a proposed complaint, and requested that a probable cause hearing take place." Mr. Campbell's activities appear to have been limited to those of being an investigator and prosecutor and the person whose sole duty it was to file and prosecute charges against Judge Whitehead. Mr. Campbell was seemingly hired to investigate and prosecute Judge Whitehead and acted at all times in this role and not as the Commission's "own attorney." By deciding to help out with the prosecution, Commissioner Lefebvre rather clearly forfeited his right to sit in judgment of Judge Whitehead.

[21]It is very well established in this country that "a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). This Commission cannot possibly be seen as a "fair tribunal" for so long as a person who has been active in preparing the prosecution's case is sitting in judgment of the accused.

Over the years, the United States Supreme Court has recognized this "basic requirement" of due process in a number of cases. For example, in Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1985), the Supreme Court vacated the judgment of the Alabama Supreme Court because one of the

I am willing to join with the majority in leaving, for now, the matter of Mr. Lefebvre's disqualification to the Commission itself; but it is very difficult for me to see how Mr. Lefebvre can be permitted to sit in judgment in any matters relating to Judge Whitehead.

## B. *BIAS OF CHAIRMAN SHIPLER: THE "SHIPLER LET-TER"*

Under date of April 18, 1994, on letterhead bearing the title "Nevada Commission on Judicial Discipline," Commission Chairman Guy Shipler sent out a letter written on behalf of the Discipline Commission, which he signed as "Chairman" and transmitted to all "Members of the Nevada Bar and Judiciary." The letter, later released to the news media, comprises a direct commentary on the merits of the Whitehead case; and its announced purpose was to explain to the world what the White-head case was all about, or, as Mr. Shipler put it, "to clarify[22] both factual matters and the legal issues in this case." Mr. Shipler, I should note, apparently was completely unaware of how grossly improper it was for him, as one of Judge White-head's judges, to be talking about the merits of a case that was to be heard before him as the chairman of the Commission. Chair-man Shipler also seems to be unaware of the impropriety inherent in his publicly "clarifying" or explaining the facts of this case, at a time when the case was awaiting his decision as a judge.

One of the ways in which Mr. Shipler chose to "clarify" the facts and the law of the case that was going to be heard before him at a later time was to present to the public, and to the many

---

justices on the Alabama court had joined in an opinion affirming an insurance bad faith award without disclosing that he was a plaintiff in a similar action. The Supreme Court held that even though the Alabama jurist's conduct did not show *actual* bias (as does Mr. Lefebvre's prosecutorial activity), the Alabama jurist's conduct nevertheless violated the insurance company's right to an impartial tribunal because it created the appearance that the Alabama justice had not held "the balance nice, clear and true." *Id.* at 825 (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1926)). In the present case, we are not dealing with the *mere appearance* of bias, we are dealing with a person who has actually expressed bias in the clearest of terms by way of his announced intention to be "useful" to the prosecution.

[22]Mr. Shipler's saying that his letter was intended to "clarify" factual and legal issues appears to be an artless attempt to come within ARJD 8 which provides for "public statements" to be made *by the commission* to "clarify the *procedural* aspects of the disciplinary proceedings." (Emphasis added.) On its face, the letter in question is a statement by the chairman and not by the Commission, and the letter does not state that its purpose is to clarify "procedural aspects of the disciplinary proceedings." Rather, it is a bland expression by Mr. Shipler that he and Judge Breen believe Judge Whitehead to be guilty of "unethical conduct."

lawyers and judges who received the letter, an affidavit of District Judge Peter Breen in which Judge Breen testifies under oath that it is "common knowledge" that Judge Whitehead has been guilty of "unethical practices."[23] The Breen affidavit accompanying Mr. Shipler's letter testifies as to the nature of Judge Whitehead's allegedly improper procedures under SCR 48.1 and claims that Judge Whitehead is guilty of "violations of Canons One and Two of the Nevada Code of Judicial Conduct." The Shipler letter makes special mention of the enclosed "affidavit[] of the Honorable Peter Breen," stating that it and the other affidavits accompanying the letter "provide explanation" regarding the judicial discipline action. Commission Chairman Shipler thereby makes known to the world the Commission's "position" and his own belief that Judge Whitehead is guilty as charged.

As this court explained in its previous *Whitehead* opinions, the function of the Judicial Discipline Commission is that of an impartial hearing tribunal; and, again, the role of a Commissioner is the role of a *judge*. In our system of justice and under the Code of Judicial Conduct, a judge (including a commissioner/judge) is not permitted to comment on or pass judgment on the merits of a pending case prior to its being heard and still remain in the position of a judge who will ultimately decide the case. For a judge to adopt and disseminate publicly his or her own opinion, or the authoritative, sworn testimony of others, relative to the guilt or innocence of an accused is totally unacceptable under our system of justice; and such conduct by one who is supposed to sit in impartial judgment is certainly a clear basis for disqualification to sit in any case. If a judge in a criminal case were to send out a letter on official letterhead, stating in the letter that its purpose was to clarify "factual matters" or "legal issues" relating to a pending criminal case or for the purpose of dispensing authoritative opinions that the defendant was guilty as charged, no one

---

[23]I note that Canon 2B of the Code of Judicial Conduct prohibits a judge from testifying voluntarily "as a character witness." It seems to me (unless Mr. Shipler published Judge Breen's affidavit without the judge's permission) that Judge Breen may have improperly attested to matters relating to Judge Whitehead's character if he testified publicly that Judge Whitehead was guilty of "serious ethical violations." I note further that in November of 1993, Judge Breen issued a *press release* about this case in which he self-righteously explained that it was "incumbent" upon him to "complain of violations of the Canons of Judicial Ethics [sic]," thereby representing that in his opinion Judge Whitehead was guilty of some wrongdoing. Judge Breen publicly "challenged Whitehead" to a duel, stating that he was "willing to meet at a public forum" "with all press and public invited and Judge Whitehead in attendance" for a "full discussion of the complaints and subsequent related events." These kinds of impermissible public statements by Judge Breen about a pending case are comparable to the objectionable public statements made by Judge Adams and other "persons in high places" that are discussed in the text.

would give a second thought to the necessity for removing such a judge from the case. "Judge" Shipler had no business commenting at all on a case that was scheduled to be decided by him, much less to endorse and publish Judge Breen's sworn affidavit that Judge Whitehead was guilty of "unethical practices."

The Commentary to Canon 3B(9) makes it clear that the "requirement that judges abstain from public comment regarding a pending or impending proceeding continues during any appellate process and until final disposition." The same Commentary makes it clear that "in cases such as a writ of mandamus where the judge is a litigant [Chairman Shipler is a litigant in the writ proceedings now before us] in an official capacity, the judge must not comment publicly." Furthermore, the Commission's own rules prohibit this kind of conduct and provide that "[a]t all times, however, the commission . . . must refrain from any public or private discussion about the merits of any pending or impending matter . . . ." ARJD 8. There is no conceivable justification for Chairman Shipler's writing and then publishing this letter; and in doing so Mr. Shipler has violated the Code of Judicial Conduct as well as the procedural rules of his Commission (the ARJD).[24]

I do not dissent from the majority opinion, which, at this juncture would allow Chairman Shipler to continue to sit in the Whitehead matter. I am interested to see if the Commission will vote to permit Chairman Shipler to continue to sit in judgment of Judge Whitehead, given the comments and opinions which are expressed in Shipler's open letter of April 18, 1994.

## C. *BIAS OF REMAINING COMMISSIONERS BASED ON THE SHIPLER LETTER*

When I wrote my concurring Addendum, filed October 28, 1994, I gave the benefit of the doubt to the Commission and wrote on the assumption that the Commissioners (being mostly judges and lawyers who are aware of the ethical principles being violated by Commissioners Lefebvre and Shipler) did not join in or ratify Chairman Shipler's public commentary on this case or his expression of the "Commission's position" on the case. Sending out an open letter commenting on the merits of the Whitehead case is so

---

[24]Certainly, if Chairman Shipler were a juror, he would not be permitted to sit on a case after publicly expressing his opinion in the manner that he did. NRS 16.090 expressly provides for the exclusion of any juror who has "formed or expressed an unqualified opinion or belief as to the merits of the action." NRS 16.090 merely expresses the common sense of the matter. We do not want people who have opinions or express opinions about a person's guilt or innocence to be sitting in judgment of that person. The impartiality of judges and jurors must remain "nice, clear and true." *Aetna Life,* 475 U.S. at 825 (citing Tumey v. Ohio, 273 U.S. 510, 532 (1926)).

clearly violative of Commission rules and of common fairness and decency that I had wanted to believe the Commission members were *not* advised in advance that the Chairman was going to send out this opprobrious letter in the Commission's name. On October 29, 1994, Chairman Shipler announced publicly that "the decision to send a letter to the lawyers explaining the commission's position in the case against Whitehead was made by all the commissioners," saying further that he would not have sent out such a letter "without consulting other commissioners." If this is true, and all of the Commissioners joined in publicly "explaining" all about the "case against Whitehead," then I submit that none of the Commissioners who joined in sending this letter should be allowed to sit in judgment of Judge Whitehead.

## IV.
### *SUMMARY AND CONCLUSION*

Judge Whitehead filed a petition under ARJD 40(7), which expressly invites review of "interlocutory orders" of the Commission.[25] Judge Whitehead's petition did not seek exoneration or termination of disciplinary proceedings against him; he merely objected to the Commission's proceeding against him on a facially defective complaint and asked the court to review what he claimed were improper inquisitional activities on the part of the Commission. This court issued two writs by which the Commission was prohibited from proceeding on the mentioned invalid complaint and was ordered to proceed in the future in accordance with its rules. There is nothing to prevent the Commission from proceeding on the Breen or Holmes complaints, or on any other legally-sufficient complaint, if the Commission should choose to do so.

The unorthodox and unauthorized procedures adopted by the Commission in this case cannot in any way be tied to "gaps" or any other perceived weakness in the procedural rules. The rules enacted in 1988 tell the Commission exactly how it is supposed to

---

[25]ARJD 40(7) was

partially based on recognition of problems that a prosecutor for the Commission had faced in obtaining a speedy, authoritative answer to a jurisdictional issue that related to a Reno municipal judge. ARJD 40(7) was, of course, also adopted in the recognition that the prior Commission practices, in which investigations concerning illusory or unfounded charges about innocent judges had languished while the subject judges and their families were subjected to torments occasioned by untruthful "leaks" to the press, could no longer be tolerated. It is most difficult to raise a legitimate question or challenge to the sound policy which supports the enactment of ARJD 40(7) and the constitutional and precedential authority which supports the rule.

*Whitehead I,* 110 Nev. at 154-55, 869 P.2d at 812.

proceed: The Commission *must* act on all sworn complaints.[26] The Commission *may* engage in a limited "preliminary investigation" if it questions the legal or factual sufficiency of a sworn complaint on file. The Commission *must* proceed to a probable cause hearing if it determines that a sworn complaint has merit.[27] There is nothing difficult to understand about any of this, and it is hard for me to understand what prompted the Commission to pursue the unprecedented and completely unauthorized way of proceeding that it adopted in this case, apparently under the pretense that it was "protecting" Judge Whitehead from becoming the victim of a "misrepresenting" complaint. The Commission's position that its investigation, during which it played cat-and-mouse with Judge Whitehead for a year, was merely to protect Judge Whitehead against "misrepresenting" complaints is simply not tenable.

At all times since the summer of 1992 the Commission has had pending before it two properly-sworn complaints. ARJD 14 imposes upon the Commission the *duty* to act on these complaints and either dismiss them or "proceed to a probable cause hearing." To date, the Commission has ignored these complaints and denied to Judge Whitehead his *right* to have these complaints disposed of in a timely manner. Instead of simply dismissing or proceeding to a probable cause hearing, the Commission mysteri-

---

[26]It must be emphasized and clearly kept in mind that Judge Whitehead was deprived of a very critical right when, instead of ruling on the "merit" of the sworn Holmes and Breen complaints, as it was required to do by ARJD 14, the Commission decided to engage in a long-term, sweeping investigation of Judge Whitehead. If the Commission had followed its rules, it might very well have ruled that the Holmes and Breen complaints did not have sufficient merit because they were based on hearsay "information" and were not made by the actual "person complaining." (For example, the Breen complaint merely states that Judge Breen had in his possession certain "information which indicates a substantial likelihood" that Judge Whitehead had violated the Code of Conduct. Judge Breen then goes on to give information about complaints that other, actual complainants might have had.) In considering the Holmes and Breen complaints (both based only on "information" about the complaints of others) the Commission could very well have ruled that these complaints lacked "merit" and that the potential complainants (whose names are revealed in the Holmes and Breen complaints) should come forward and file their own, first-hand sworn complaints.

[27]I would note here that although the present rules do not provide for the employment of an independent prosecutor to prosecute at a probable cause hearing, I can see that in certain cases it might be advisable and proper for the Commission to have independent counsel employed for this purpose, *after* it has decided to proceed to a probable cause hearing on a *sworn* complaint. As indicated in the text, there is a big difference between the actions of independent counsel preparing for a probable cause hearing (as in the *Goldman* case) and the impermissible hiring of a professional prosecutor to conduct a six-month investigation of a judge for the purpose of creating a factual basis for the prosecutor to make his own complaint.

ously decided to investigate Judge Whitehead and then have its "special counsel" file a new "second kind" of complaint. In any event, this discipline matter is now two and one-half years old, and *still* the Commission has not taken the action required by ARJD 14.

Although it is a side issue and one already finally disposed of by this court, I again remind the reader that ARJD 5 provides that a judge is entitled to confidentiality and that "[a]ll proceedings must be confidential until there has been a determination of probable cause and filing of formal statement of charges." I suppose that it could be argued that the price of filing such a challenge with this court ought to be having to give up the right of pre-probable cause confidentiality; but the rules do not say this, and this court ruled (JUSTICES ROSE, STEFFEN and SPRINGER) that, as stated in ARJD 5, a judge is entitled to confidentiality in "[a]ll proceedings" until probable cause has been found. There is no way under these circumstances that the three mentioned justices can be said to have improperly "interfered" with the judicial discipline process.[28]

In conclusion, let me restate what now must be obvious: Far from "interfering" with the Commission's performance of its constitutional duties, this court has acted only with respect to one, invalid complaint, prohibiting the Commission from proceeding on that complaint because it did not conform to Commission rules. Since the summer of 1992, two properly-sworn complaints have been pending before the Commission; but the Commission has failed to dismiss or proceed on these complaints as required by ARJD 14. The Commission is, of course, free to proceed on these complaints or on other proper complaints.

For doing what its members were elected to do (hearing a writ matter authorized by ARJD 40(7) and decreeing that proceedings

---

[28]I fully understand that there are those who, despite the constitutional mandate, do not believe in confidentiality at any stage of judicial discipline proceedings and who think that *all* complaints of any kind should be subject to immediate release to the public. This would result in hundreds of unfounded complaints against judges being made public and to unnecessary degradation of the judiciary; nevertheless, I can understand the argument for full publicity, and I abhor the secrecy which has characterized the Commission's activities over the past several years. The point must be made, however, that whatever position the reader of this opinion might have on this question, it is very clear that at the time Judge Whitehead filed his petition, and at the present time, the Constitution and ARJD 5, command the preservation of confidentiality, at least until after probable cause has been found. Thus, I submit, it should be very clear that this court (JUSTICES ROSE, STEFFEN and SPRINGER) had no choice (prior to a probable cause determination) other than to try to maintain confidentiality until this court had a chance to review the charges of jurisdictional excesses and due process violations brought by Judge Whitehead.

remain confidential until the writ could be acted upon) this court has been repeatedly excoriated and charged not only with making wrong legal decisions but with being corrupt as well. Perhaps the worst aspect of this case is that a jurist who exercised his clear legal right to seek our review has been subjected to continuing, improper public degradation. Judge Whitehead's energies have been diverted for several years from the job the people of this state elected him to do; and huge amounts of public resources have been expended on this case, which, if litigated in the ordinary and expected way, would have been over long ago. Notwithstanding all of this, something will have been gained if the Commission has learned the legitimate scope of its jurisdiction and the attorney general has learned that her zeal and determination must be confined by respect for the rule of law. We look forward to working with all of the parties to this litigation on a more amiable basis in the future.

GUY, D. J., concurring in the result:

I concur with the results expressed in the Majority Opinion, and the issuance of the Writ of Prohibition preventing further proceedings based upon the Campbell complaint. The Commission may proceed in this matter under the rules presently in existence and under the guidelines of the Majority Opinion. The Majority Opinion does not divest the Commission's jurisdiction over a properly sworn to complaint with affidavits, statements or documents.

The initial issues in this matter were relatively uncomplicated. These issues became convoluted by the almost weekly filing of voluminous and acrimonious motions, responses and requests, over the last nine months, by counsel from *both* sides. Had it been possible to have given some of these motions or requests immediate consideration, none of the elected members to this court would have been sitting on this case. Other problems are more detailed in the Majority Opinion.

I do not believe there is any great disparity from what I have stated in this concurring opinion from that stated by the Majority in their reference to my previous dissent regarding a public hearing after there has been an admittance of the charges by the accused judge. There would really be nothing more to be accomplished by a public hearing. The filing and publishing of a public notice which would contain the charges that the judge admitted, to the justification for the punishment which would be either public censure, removal or forced retirement. It should not be necessary to duplicate Campbell's work product to arrive at a sworn to complaint, if that would be the end result. Especially is this so, if there is a victim who will swear to the complaint.

Under present rules, I believe that an initial sworn to complaint based upon information, rumor and belief may be sufficient for the Commission to commence a rudimentary investigation to establish whether there is a factual issue present, and an aggrieved complainant who is willing to attest to the facts necessary for the Commission to proceed to a possible disciplinary adjudication or acquittal.

Confidentiality in judicial disciplinary proceedings is instituted for various reasons, some of which are:

(1) the maintenance of a free judiciary;
(2) the protection of the complainant; and,
(3) the protection of the judge, and the Commission.

It is conceivable that a judge may retaliate against an attorney and/or his client, should the judge become aware that a complaint has been filed. Confidentiality of the complainant should be maintained for the protection of the complainant until such time as the Commission decides to proceed in a formal complaint against the judge. The complainant who exercises his right to challenge a judge should not be placed in the position of being punished for having filed a complaint. Confidentiality, however, ceases once the Commission has decided to have a formal hearing to determine probable cause. The judge must be able to rebut, admit or offer an explanation to the charges made by the complainant. There is no longer a need for confidentiality. One has the right to face his or her accuser.

In this matter, if the restraint on information was for the purpose of preserving the integrity of the proceedings so that the accused judge could have a fair and equitable hearing, those efforts were sadly undermined by blatant breaches of confidentiality. Breaches of confidentiality are, in my opinion, made for the following reasons:

a. To place one side in an advantageous position;
b. To force the Commission, and in this case the Supreme Court, to rule in a way that is advantageous to the so-called "discloser;"
c. To let someone know that the "discloser" has access to confidential facts; or
d. To bring to light what one might perceive to be an unfair happening.

Rarely are such disclosures more beneficial than detrimental.

In the instant case, the breach of confidentiality has caused two of the state's leading newspapers, and at least one television station, to release opposing comments as to what this Court should or should not do and how this Court should proceed. The

issue of confidentiality, being so controversial, has caused serious damage to this Court, the Commission, and the parties involved.

The premature and often biased disclosures have prolonged the orderly procession of this case; created unnecessary distrust between this Court and the Commission; polarized members of the judiciary and the bar; and, caused members of the media to "take up the gauntlet" on behalf of either the Petitioner, the Commission, or the Court. The most unfortunate aspect of the premature disclosures is that they have caused the accused judge to be tried in the media without a hearing. As aforestated, breaches of confidentiality are rarely more beneficial than detrimental. I therefore strongly urge that confidentiality never be abolished.

The question has arisen whether there should be an investigation to determine who caused the breaches of the confidentiality mentioned in *Whitehead II*. Upon further reflection, my present view is that if an investigation is conducted, nothing would be accomplished other than to prolong this agonizing experience. It would further increase the width of the chasm rather than closing it.

Regardless of this breach or any other mishap in this matter, the Commission and this Court must continue their functions with intelligence, integrity and trust for one another. Each must take whatever procedures it perceives necessary to uphold the rules and prevent breaches with the goal being fundamental fairness and justice to all parties. I do not believe that any further investigation will identify the discloser or enhance integrity, intelligence or trust. However, all parties should be put on notice that future violations of confidentiality will be dealt with harshly.

I would strongly hope and suggest that the Commission would consider the breaches of confidentiality, if it is within their organization, as extremely serious. I would further suggest that anyone who may have information concerning any breaches by a Commission member, submit that information to the Commission in order that the Commission may take whatever action deemed necessary.

One of the issues raised in this matter was the jurisdiction of the Commission to hear the factual matters of the complaint. I believe that such petitions or motions that attack jurisdiction of the Commission should first be heard by the Commission for its determination. If the accused believed that the Commission's ruling was incorrect, the accused is then in a position to present his writ to the Supreme Court. In the matter at hand, the issue of the Commission's jurisdiction was never brought before the Commission. This case was a case of first impression. Hopefully this procedure or a similar procedure will evolve.

One of the primary reasons for this protracted hearing was because Petitioner requested production of all evidence and documents considered by the Commission. It was at this juncture in the proceedings that the Commission refused to furnish the Petitioner with any statements, affidavits or documents containing facts regarding the charges alleged in the Campbell complaint. ARJD 14(5) directs the production of all such documents, affidavits and statements. There are in fact no affidavits, statements, or documents for the Commission to turn over to Petitioner. There are only summations and conclusions of witnesses' statements which are labeled work products.

Once again, if the Commission decides to proceed against the accused judge, all of the affidavits, documents and statements must be given.

The present disciplinary procedures are unnecessarily conflicting, burdensome, and have caused excessive delays in these proceedings. The Majority has set out in great detail some of the problems that exist in the execution of the existing procedural rules.

I strongly believe that the Commission and a judge may not agree to a judge's censure, removal or forced retirement without a public probable cause hearing.[1] When the judge agrees to the facts contained in the complaint, there is nothing further to be gained other than embarrassment or ridicule by conducting a public hearing of the judge, while overlooking that he or she may have given many credible years of service to the public in his or her capacity as a judge. The Nevada Code of Judicial Conduct (NCJC) has far too many minor offenses which if followed to the strict interpretation by the Majority, would result in nothing more than a public scourging.

The initial function of the Commission is to protect the innocent judge and to censure or remove a judge should this be necessary upon such a decision. There would be a public notice filed censuring, removing or forcing the judge to retire as required by the code. The judge should not be forced to participate in a public hearing as he has already admitted culpability. We do not normally force defendants in criminal matters to go to trial after pleading guilty. We should not do so in these proceedings. The public notice of a censure, removal or forced retirement would be both economically and morally sufficient. This public

---

[1]Upon written consent of the respondent, the commission may order the respondent's censure, removal or retirement *at any stage of the proceedings* and this order takes effect immediately. A certified copy of the order must be filed with the clerk of the supreme court and a copy of the order must be served on the respondent. ARJD 31 (emphasis added).

notice would of course contain those charges that the judge admitted and the reasons for the actions taken by the Commission.

Petitioner is the first accused judge to challenge the Commission. This challenge has shown that there are problems in the ARJD, and in the application of the NCJC. Such applications may have resulted in ad hoc hearings and decisions as stated by the Majority.

With respect to the ad hoc proceedings of the Commission mentioned by the Majority, I suggest that due to the harshness and ambiguities of the ARJD and NCJC the Commission may have resorted to ad hoc proceedings. The Preamble of the NCJC in part states:

> . . . The text of the Canons and Sections is intended to govern conduct of judges and to be binding upon them. *It is not intended, however, that every transgression will result in disciplinary action. Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the text and should depend on such factors as the seriousness of the transgression, whether there is a pattern of improper activity and the effect of the improper activity on others or on the judicial system.*

(Emphasis added.)

It would appear that the preamble suggests some type of procedure for minor transgressions. ARJD 10 permits suspension only when there is a criminal indictment or information pending or when the judge is adjudged insane or mentally incompetent. ARJD 11[2] gives grounds for discipline by censure or removal. ARJD 30(2),[3] Decision to discipline, however, seems to provide

---

[2]Grounds for discipline by censure or removal are:

1. Conviction of any felony or of any misdemeanor involving moral turpitude.

2. Any acts or omissions amounting to any public offense which tend to corrupt or to impair the administration of justice in any court.

3. *Any acts or omissions in the performance of judicial or administrative duties which contravene express provisions of the Nevada Code of Judicial Conduct.* When applied for purposes of determining whether misconduct has occurred, the provisions of the Nevada Code of Judicial Conduct must, considered as penalty provisions, be strictly construed in favor of the respondent judge.

4. Willful or persistent failure to perform the duties of office.

5. Habitual intemperance.

(Emphasis added.)

[3]1. Within 20 days after reaching a decision that discipline should be imposed, the commission must prepare and adopt a written statement of the

that the Commission can only discipline by public censure, removal from office or forced retirement. This strict reading as suggested by the Majority would force every complaint which is found to be a violation, whether it be a minor or a major violation of the NCJC, would go to a public hearing. This is not what is suggested in the preamble.

The NCJC and the ARJD must be reconsidered and offenses separated between major and minor offenses. Something less than public censure, removal or retirement should be available for minor offenses. There should be a statute of limitation governing the time allowed within which a complaint may be filed. The Campbell complaint referred to matters that occurred in 1988 and 1989.

Rather than go through the rules one by one, I believe a committee to review the rules and procedures should be appointed *immediately* to remove ambiguity and to prevent another prolonged controversy such as this.

I would recommend that a complaint against a judge be filed by the victim of the accused misconduct, or at least by someone who can swear to the accuracy of the facts and not by information and belief.

I would further suggest an initial preliminary investigation be commenced immediately after the filing of the complaint. Such a preliminary investigation could very well be conducted by members of the State Bar of Nevada who usually do not practice before the accused judge, and who have no biases, for or against the judge. The investigation should be to discover facts concerning the allegations. It should not be a shotgun investigation in hopes of finding iotas of evidence to bolster a weak complaint, but rather to ascertain the truth and facts as alleged in the complaint. The complainant should remain confidential unless the accused is ordered to the informal hearing stated "infra."

---

nature of the proceedings, findings of fact, and conclusions of law on the issue presented by the formal statement of charges and the answer thereto, if any. The commission may include its decision a summary of evidence admitted. When the foregoing have been formulated, any sitting commission member who wishes to dissent or protest must be allowed 10 days for the purpose. Upon filing, the commission must promptly service a copy of the foregoing on the respondent.

2. Upon adoption and filing of a decision which orders the censure, removal or retirement of a respondent, the commission must file a certified copy of it with the clerk of the supreme court, who must notify appropriate authorities.

3. Upon expiration of the time for appeal, the commission's adoption of the report which orders retirement or removal operates to vacate the office of the respondent. Pending appeal, the salary and authority of the respondent to exercise any of the duties of office immediately cease, and the respondent must exercise no judicial powers.

The State Bar could keep a roster of these "non biased" attorneys, to be made available to the Commission upon request.[4] Hopefully such an investigation would also include an interview with the accused judge, keeping confidential the name of the accuser. These preliminary investigations should be without compensation to investigating counsel other than for reimbursement for actual expenses and a stipend of not more than one hundred dollars ($100.00). This investigation should end with affidavits of facts, documents where necessary, and the investigator's recommendation to the Commission. The Commission should schedule a time for the hearing for the consideration of the affidavits, facts and recommendations of the investigator. This meeting should be attended by at least six of the seven Commission members. After consideration, the Commission would then decide whether to go forward or dismiss the complaint.

Should the Commission decide to proceed further, a confidential informal hearing would take place. The accused judge would receive a copy of the original complaint, and a copy of all the affidavits and/or statements that were accumulated by the preliminary investigator. Fundamental justice demands nothing less. The accused judge may respond by filing with the Commission any affidavits, statements or documents believed by the judge to assist the Commission in determining whether there should be a formal probable cause hearing. The accused may attend this informal hearing but is not obligated to do so. Should the Commission, with six (6) or more of its members present, decide that a formal probable cause hearing must be held, it should be scheduled and accomplished within ninety (90) days after this hearing and notice to the accused judge. Notice and a sworn to complaint should be delivered to the accused not more than two (2) weeks after the informal hearing. A reply would not be necessary.

A special prosecutor, not the same person who conducted the informal investigation, should be appointed to prepare the formal complaint and to prosecute the complainant's case before the Commission.

This formal hearing for probable cause will be open to the public and shall follow the civil practice rule, if not covered by the ARJD. Compensation for the special prosecutor should be at the prevailing rate of attorneys practicing in Carson City, Nevada.

The Commission should have its own attorney to assist them in conducting their regular business. Compensation for this attorney

---

[4]Every judge and every attorney licensed to practice law in this state is obligated to cooperate with the commission when called upon to assist in any investigation or hearing or to testify concerning any matter as to which privilege as an attorney is not claimed. ARJD 4.

should be reasonable and on par with attorneys for other governmental part time committees. If the Commission should decide that it needs a full time attorney, it should justify its request as other government committees, by submission to the Legislature.

The operating budget of the Commission should be provided for in the budget of the Supreme Court. It would be an independent budget for which the Supreme Court's only responsibility is to assist the Commission in preparing it. It should be submitted to the Legislature as any other budget, and subject to an annual audit. The Commission should be able to apply independently of the Supreme Court for additional funds, justifying that necessity to the state interim finance committee.

In so far as practical, the operation of the Commission should be independent to the Supreme Court. The Court of course may from time to time amend the rules and disciplinary factors as they become necessary.

I strongly urge that challenges to the Commission, whether jurisdictional or procedural, should first be made to the Commission. The Commission, which is composed of judges, lawyers and laymen, would initially consider any challenges to its authority. Only writs of prohibition to challenges of jurisdiction should be made to the Supreme Court after a determination by the Commission. Other challenges which are denied should be a part of the record on appeal, if necessary.

The Commission must be allowed to do its constitutional duties promptly and not be delayed, as this matter has been, for several months of in-fighting between the parties in this Court.

SHEARING, J., dissenting:

I would dismiss Judge Whitehead's petition for writ of mandamus or prohibition.

I would hold that the Judicial Discipline Commission has jurisdiction to proceed to a probable cause hearing based on the complaint prepared by special counsel Donald Campbell.

I would hold that Judge Whitehead has been furnished with all of the documents required to be furnished under ARJD 14(5) at this stage of the proceedings.

I would hold that if probable cause is found for Judge Whitehead to answer at a formal hearing, that he be furnished with all the discovery provided under ARJD 21, including special counsel's notes of relevant interviews, with the exception of any communications or documents to which the attorney-client privilege or the work product privilege applies.

I would rescind the order for a special master.

## INTRODUCTION

I am disappointed that the majority has chosen to make every inference of fact and interpretation of rules against the Nevada Judicial Discipline Commission and/or its counsel. The majority makes it appear that members of the Judicial Discipline Commission and/or its counsel conducted themselves or their proceedings in this case in an outrageous manner, in violation of the United States Constitution, the Nevada Constitution, the Commission rules and principles of fairness. The record does not support such a proposition. I see nothing in the record which warrants any conclusion other than that the Commission has attempted in good faith to perform the sensitive and difficult job of protecting the rights of both the judge and the citizens of this State. It appears that the Commission has attempted to resolve the matter as fairly and expeditiously as possible under rules that have many gaps and leave much room for interpretation.

Unfortunately, the majority has attributed numerous opinions on the applicable law to me to which I do not subscribe and which my previous statements do not justify. I do not question a litigant's right to challenge the jurisdiction of any agency or commission by way of a writ proceeding when that agency or commission acts in excess of its jurisdiction. I simply do not believe that the Petitioner has shown that intervention by way of an extraordinary writ is warranted in this proceeding.

The majority has stated, ''[p]erhaps the most alarming aspect of the dissenting justice's dissent is her willingness to accept the validity of her lone dissent on this subject as a basis for virtually promoting disobedience to the lawful orders of this court.'' There is no justification for this statement. I do not presently nor have I ever promoted disobedience to the orders of this court. I simply disagree with the view of the majority on the applicable law and the appropriate orders in this case and it is my right and duty to express my opposing view. This expression is not equivalent to advocating disobedience to the orders of this court. Ironically, on the one hand the majority accuses me of not recognizing its authority; on the other hand, it accuses me of changing my previous position when I do recognize its authority and agree to provide the relief Judge Whitehead requests, that the order of confidentiality be lifted. While I disagree with the original order, I recognize the force of that order until it is modified.

I fully appreciate the policy arguments in favor of confidentiality of judicial discipline proceedings. I support screening out frivolous charges before public disclosure. However, the majority fails to recognize that there is a vast difference between

proceedings before this court and proceedings before the Commission. The issue of the openness of *Commission* proceedings is not before this court; the issue of the openness of court proceedings is before this court. Proceedings in our *courts* should be open to public scrutiny. I am very concerned about the spectre of judicial proceedings that are so secret that their very existence is not known to the public and therefore cannot be challenged.

The majority also accuses me of having already concluded that Judge Whitehead is guilty of the charges. There is no justification for this accusation. I recognize that the charges are merely allegations and that no determination has been made as to their truth or falsity.

The majority also devotes a substantial portion of its opinion to criticism and discussion of the news media because "allegiance to the rule of law and our obligations under the Code of Judicial Conduct will not allow us to permit the misguided attacks on the independence and integrity of this court and this state's judiciary to go unopposed."

I disagree wholeheartedly with the majority view that this court should respond in its opinions to the comments and criticisms of the media, in addition to addressing the litigants' arguments. While no public official enjoys being criticized by the media, one of the media's most important responsibilities is to report on the actions of public officials and to criticize them if necessary. This court has the responsibility to decide cases and controversies. United States Supreme Court Justice Murphy suggested the appropriate response of a public official to criticism almost fifty years ago. "Silence and a steady devotion to duty are the best answers to irresponsible criticism." Craig v. Harney, 331 U.S. 367, 383 (1947) (Murphy, J., concurring).

Attacking the media does not protect the "independence of the judiciary," as the majority suggests. The Supreme Court of Maine implies that it achieves the opposite result.

> Independence of the judiciary is not inconsistent with accountability for judicial conduct. Lawless judicial conduct—the administration, in disregard of the law, of a personal brand of justice in which the judge becomes a law unto himself—is as threatening to the concept of government under law as is the loss of judicial independence. We see no conflict between judicial independence and judicial accountability. Indeed, a lack of judicial accountability may itself be the greatest danger to judicial independence.

Matter of Ross, 428 A.2d 858, 861 (Me. 1981).

It is equally doubtful that the majority's attacks on the media are likely to "promote and protect public confidence in the

judiciary." As Justice Black wrote for the Court in Bridges v. State of California, 314 U.S. 252, 270-71 (1941):

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

In his dissenting opinion, Justice Frankfurter added:

> Judges as persons, or courts as institutions, are entitled to no greater immunity from criticism than other persons or institutions. Just because the holders of judicial office are identified with the interests of justice they may forget their common human frailties and fallibilities. There have sometimes been martinets upon the bench as there have also been pompous wielders of authority who have used the paraphernalia of power in support of what they called their dignity. Therefore judges must be kept mindful of their limitations and of their ultimate public responsibility by a vigorous stream of criticism expressed with candor however blunt.

*Id.* at 289.

As for the editorials and "malevolent editorial cartoons," to which the majority takes offense, I suggest that the court has attributed to them wholly undeserved significance. It should be remembered that freedom of the press "covers something more than the right to approve and condone insofar as the judiciary and the judicial process are concerned. It also includes the right to criticize and disparage, even though the terms be vitriolic, scurrilous or erroneous." Pennekamp v. State of Fla., 328 U.S. 331, 370 (1946) (Murphy, J., concurring).

The media is doing its job in reporting on our proceedings and has every right and obligation to express opinions. Chief Justice Burger noted the important role of the media in judicial administration as follows:

> "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." Although it is assumed that judges will ignore the public clamor or media reports and editorials in reaching their decisions and by tradition will not respond to public commentary, the law

gives "[j]udges as persons, or courts as institutions . . . no greater immunity from criticism than other persons or institutions." The operations of the courts and the judicial conduct of judges are matters of utmost public concern.

"A responsible press has always been regarded as the handmaiden of effective judicial administration . . . ."

Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 838-39 (1978) (quoting Mills v. State of Ala., 384 U.S. 214, 218 (1966), *Bridges*, 314 U.S. at 289, and Sheppard v. Maxwell, 384 U.S. 333, 350 (1966)).

## COMMISSION JURISDICTION OVER SUBSTANTIVE CHARGES

The majority suggests that former Commission counsel inserted into this case the issue of whether the alleged conduct of Judge Whitehead violates the Code of Judicial Conduct. This suggestion ignores the fact that Judge Whitehead alleged as one of the grounds in his petition for the writ that his alleged conduct has no "legal or ethical relevance to the Code of Judicial Conduct and the function of the Nevada Commission on Judicial Discipline" and "[t]herefore the Commission is without jurisdiction to impose discipline for such an alleged violation." Once this court agreed to intervene by way of extraordinary writ to determine the matter of jurisdiction, it had an obligation to resolve the jurisdictional issues raised by the petition, one of which is that the alleged conduct does not violate any provisions of the Code of Judicial Conduct. Therefore, the charges against Judge Whitehead are examined in some detail.

Paragraphs 4, 5, 9, 10 and 15-18 of Counts 1 through 3 of the complaint describe these factual allegations:

4. That beginning at a time, the precise date of which is unknown, but on or about June 24, 1986, Judge Whitehead intentionally embarked upon a scheme to deter and punish counsel in the exercise of their absolute right to challenge him by means of filing a peremptory challenge pursuant to Supreme Court Rule 48.1.

5. The mechanics of the scheme as conceived and employed by Judge Whitehead were as follows. First, Judge Whitehead would obtain a copy of the peremptory challenge and note the name of the challenging attorney and the name of the opposing, non-challenging, attorney. Then, Judge Whitehead would initiate an *ex parte* contact with the opposing, non-challenging, attorney and permit that attorney to select the new judge to preside over the case or controversy.

9. A specific occasion on which Judge Whitehead

engaged in this scheme was in connection with Case No. 86-1277, *Frandsen v. MGM Grand Hotel—Reno, et. al.*

10. On or about June 24, 1986, John Frankovich, Esq., counsel to defendant MGM, filed a peremptory challenge to the presiding judge, Jerry Carr Whitehead. Thereafter, and upon receiving notice of the peremptory challenge, Judge Whitehead personally telephoned Robert McQuaid, Jr., Esq., counsel for the plaintiff, and asked him to select the next presiding judge. This telephone conversation was initiated by Judge Whitehead outside the presence of the defendant MGM and their counsel, and was engaged in without their knowledge or consent.

15. Yet another specific occasion on which Judge Whitehead engaged in this scheme was in connection with Case No. 84-3606, *In the Matter of the Civil Actions filed against Montessori Schools, Limited, et al.*

16. On or about September 16, 1988, David Grundy, Esq., counsel for one of the defendants in the Montessori case, filed a peremptory challenge to the presiding judge, Jerry Carr Whitehead. Following an order to quash the challenge, Judge Whitehead summoned defense counsel, David Grundy, Esq., Don Nomura, Esq., Robert McQuaid, Esq., and Plaintiff's counsel, Peter Chase Neumann, Esq., to the Judge's chambers on or about October 15, 1988, for a meeting. As a result of this off-the-record discussion, Judge Whitehead stated that he would "voluntarily" transfer the case to any court in any judicial district desired by plaintiff's counsel, Mr. Neumann. After announcing his decision, Judge Whitehead dismissed all defense counsel so that he and Mr. Neumann could discuss the matter alone and arrive at the selection of a judge.

17. On or about December 16, 1988, defense counsel learned of Mr. Neumann's selection when they received an "Order Transferring Cases" which named Judge David R. Gamble of the Ninth Judicial District Court as the new judge.

18. Judge Whitehead's abdication of his judicial power to Mr. Neumann by allowing him to select the next presiding Judge graphically illustrates the inherent danger in this scheme. For, after the assignment to Judge Gamble, it became known that Mr. Neumann had previously been a partner of Judge Gamble in a real estate venture and had also loaned Judge Gamble a significant sum of money to help finance Judge Gamble's recent election campaign.

The conduct alleged in these paragraphs can be divided into three separate categories: (1) Judge Whitehead repeatedly initi-

ated contact with the non-challenging attorney; (2) Judge Whitehead engaged in conversations with the non-challenging attorney outside the presence of the challenging attorney, in other words, on an *ex parte* basis; and (3) instead of choosing the next presiding judge himself, Judge Whitehead delegated that task to the non-challenging attorney.

The majority claims that other judges in Washoe County and throughout the State of Nevada engaged in the same conduct. Actually, there is not a shred of evidence in the record which suggests that any single other judge on even one occasion ever allowed the *non-challenging* attorney to select the next presiding judge, or that a judge who had a peremptory challenge filed against him or her thereafter engaged in any *ex parte* communications with the *non-challenging* attorney. Several judges and attorneys have complained that some judges: (1) initiated contact with the *challenging* attorney; (2) engaged in conversations with the *challenging* attorney regarding the reasons for the peremptory challenge (when the peremptory challenge rule does not require that any reason be given); and (3) proceeded to choose the next judge to preside over the case.

Former SCR 48.1 authorized a challenged judge to choose the next judge to preside over a case; thus, this behavior did not violate the Code of Judicial Conduct. This authority was a source of discomfort for many members of the bench and bar, however, since the challenging attorney frequently suspected that the disqualified judge may have been offended by the peremptory challenge, and may have taken that into account in selecting the next presiding judge. Because this discomfort was virtually inherent in the process, irrespective of the judge or the party, the process itself was flawed. This court recognized that fact and amended SCR 48.1 on August 15, 1993, to provide that the next presiding judge be selected at random rather than by the disqualified judge.

Attorneys were troubled when a judge would contact the challenging attorney and ask, in effect, ''Why did you decide to exercise your peremptory challenge against me?'' If the purpose of the communication was to intimidate the attorney from exercising the peremptory challenge in the future, or to retaliate by making the attorney feel uncomfortable or worse, this communication would clearly be a violation of the Code of Judicial Conduct. Even if the disqualified judge called the challenging party without any animosity or ill will, but rather with the noble aim of seeking constructive criticism for self-improvement, there would still be an *ex parte* communication if the contact were made before the judge had reassigned the case. It is this latter scenario which various judges and attorneys note was not unusual among the judges of the state. The question is whether such an *ex parte* communication is sanctionable.

Canon 3B(7) proscribes *ex parte* communications except in certain situations which are not applicable to the scenario described above. In interpreting its comparable canon, the Florida Supreme Court stated, "[t]his canon was written with the clear intent of excluding all *ex parte* communications except when they are expressly authorized by statutes or rules." In re Inquiry Concerning a Judge: Clayton, 504 So.2d 394, 395 (Fla. 1987). The Supreme Court of Oregon considered *ex parte* communications in similar circumstances and concluded that since the *ex parte* communication "apparently had no impact on the parties, the attorneys, or the merits of the cases," and since "we cannot say that by itself the contact had a significant impact on the public's confidence in the judiciary," no punishment beyond an admonition was required. In re Conduct of Schenck, 870 P.2d 185, 208 (Or. 1994).

Nonetheless, "[r]egardless of how well-intentioned the judges may be, these 'routine' types of *ex parte* communications can expose the court system in general, and the individual judge in particular, to precisely the types of charges which Canon 3 is designed to prevent. Judges must refrain from taking actions which increase the potential for harm to both their own reputations and careers and the court system in general. . . . By their very one-sided nature, *ex parte* communications raise questions about motivations and impartiality which can never be resolved to everyone's satisfaction." Matter of Kaufman, 416 S.E.2d 480, 485 (W.Va. 1992).

The court in In re Thoma, 873 S.W.2d 477, 499 (Tex. Rev. Trib. 1994), stated that *ex parte* communications "suggest to the citizens of our state that judges, who are sworn to impartiality, are entitled to implement an 'open door policy,' which may be available to a select predetermined constituency. An 'open door policy,' or the disposition of any case for reasons other than an honest and open appraisal of the facts and law as disclosed by the evidence and the advocacy of both parties, undermines the integrity of the courts, breeds skepticism and distrust, and thwarts the principles on which the judicial system is based." The problem with *ex parte* communications is not that the member of the "select constituency" would be offended by the absence of the other party. The problem is that the non-participating attorney and that attorney's client would be offended, and, more importantly, that the appearance of integrity of the courts would be undermined for all.

Thus, even this relatively benign type of *ex parte* communication is looked upon with disfavor. Moreover, while Judge Whitehead claims that other Nevada judges engaged in behavior similar to that with which he is charged, there is no indication in the record that any other Nevada judge did any more than engage

in this "benign" type of *ex parte* communication. This "benign" communication, while still objectionable, is nevertheless quite different from contacting the non-challenging attorneys and delegating to them the choice of the next presiding judge as Judge Whitehead is alleged to have done.

Even if it were true that other judges engaged in the conduct attributed to Judge Whitehead, and even if the Commission had expressly considered and dismissed similar charges (of which there is no evidence), that would be of no relevance to the case against Judge Whitehead. As the New York Court of Appeals stated in Sardino v. State Commission on Judicial Conduct, 448 N.E.2d 83, 85 (N.Y. 1983):

> Although we doubt that many Judges follow the practices of this petitioner we agree with the commission that such evidence would be irrelevant.
>
> Each Judge is personally obligated to act in accordance with the law and the standards of judicial conduct. If a Judge disregards or fails to meet these obligations the fact that others may be similarly derelict can provide no defense. Indeed one of the obvious reasons for establishing a permanent Commission on Judicial Conduct is to elevate judicial performance by insuring that the practices in the various courts comply with the high standards required of judicial officers.

The court further stated in In the Matter of Harris, 529 N.E.2d 416, 416 (N.Y. 1988), "we do not accept petitioner's contention that, by way of sanction, the Commission was obliged to give him only a warning, because it had done so previously in connection with a similar charge involving another Judge." "Selective prosecution" simply does not constitute a defense to a charge of judicial misconduct.

The conduct with which Judge Whitehead is accused would not only violate Canon 3B(7) of the Code of Judicial Conduct, it would also violate SCR 48.1 as it existed at the time the alleged conduct took place. I do not see, as the majority alleges, how the former SCR 48.1 is ambiguous. While the Rule may not have been good policy, neither was it unclear. The majority is wrong when it states "[t]here is no suggestion in this record that Judge Whitehead at any time or in any way acted in violation of former SCR 48.1." SCR 48.1 required that the challenged *judge* select the next presiding judge. If the allegations in the complaint are true, Judge Whitehead did not choose the next presiding judge, but instead delegated that task to the non-challenging attorney. A judge is not free to delegate his or her responsibilities to whomever he or she wishes. If a judge could delegate the selection of a

new judge to an attorney with a strong interest in the matter, he could equally plausibly delegate his criminal sentencing function to the victim's family, or have his bailiff rule on objections to evidence. He has no such authority. Clearly, when former SCR 48.1 required the challenged judge to select the next presiding judge, it referred to Judge Whitehead himself and not some third party.

The majority suggests that a judge is not prohibited from contacting attorneys after a peremptory challenge is filed because the filing of the challenge terminates the judge's jurisdiction over that case. Under former SCR 48.1, a judge's jurisdiction over the case was not terminated by the filing of the challenge. Even after deciding if the challenge was timely filed, the judge still had the duty to assign a new judge to preside over the case. Quite plainly, the conduct alleged in the complaint relates to conduct before jurisdiction ends since Judge Whitehead is alleged to have asked the non-challenging attorney to choose the next presiding judge.

The same allegations in the complaint which would violate Canon 3B(7) of the Code of Judicial Conduct would also violate Canons 1 and 2A of the Code. This is not surprising, since "the behaviors encompassed by each canon are not separable into rigid and distinct categories. Nevertheless, the canons are not mere platitudes. They direct each judge in conducting himself or herself in office, and guide the Court in determining when judicial misconduct has occurred." Matter of Seaman, 627 A.2d 106, 121 (N.J. 1993).

Canon 1 provides, "[a] judge shall uphold the integrity and independence of the judiciary." Canon 2A provides, "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." If the allegations in the complaint are established, then Judge Whitehead has not complied with Canons 1 and 2A of the Code because his alleged behavior will have violated former SCR 48.1 and have detracted from public confidence in the integrity, independence, and impartiality of the judiciary.

It is apparent that allowing the non-challenging attorney to select the new judge would deter a litigant from exercising his or her right to file a peremptory challenge. The complaint also alleges, however, that Judge Whitehead sought to deter peremptory challenges by stating his intended response to peremptory challenges publicly. Specifically, the allegations in the complaint are:

> 22. As this scheme or "procedure" became more widely known, it had a chilling effect upon the right of litigants and their counsel to exercise peremptory challenges to Judge

Whitehead pursuant to SCR 48.1. Not all litigants, however, were dissuaded. Therefore, beginning on or about February 14, 1991, at a "Bridge The Gap" seminar held in Reno, Nevada, Judge Whitehead began to publicly declare his personal antagonism to SCR 48.1. Specifically, Judge Whitehead left open the possibility that the exercise of a peremptory challenge against him could result in an unfavorable assignment to a new department as a means by which he would punish those exercising their rights under SCR 48.1.

23. Judge Whitehead's commentary served to undermine the public's confidence in the impartiality, integrity, and independence of the judiciary in that newly admitted members of the Bar were intimidated and feared retaliation if they exercised their right to challenge Judge Whitehead. Thus, the Judge thereby committed a violation of Canons 1 and 2A of the Nevada Code of Judicial Conduct.

. . .

25. The following year, on or about February 27, 1992, at another "Bridge The Gap" seminar held in Reno, Nevada, Judge Whitehead again attempted to dissuade newly admitted members of the Bar from exercising their rights to challenge him.

26. During the seminar, a member of the audience, Myra Sheehan, Esq., questioned Judge Whitehead concerning the manner in which a judge could be challenged. Judge Whitehead responded in a hostile tone, making known his personal offense to the exercise of SCR 48.1 and warned that he would permit the opposing counsel to select the new judge on an *ex parte* basis.

The majority has concluded "as a matter of law that the allegations of misconduct stemming from Judge Whitehead's comments at a continuing legal education seminar do not state grounds for discipline under ARJD 11." I disagree. The allegation is not that Judge Whitehead simply expressed his opinion of SCR 48.1 or sought a change in the rule. The allegation is that Judge Whitehead threatened attorneys assigned to his court with punishment if they exercised their legal right to avail themselves of SCR 48.1. This is a judge publicly declaring that the law must not be applied in his court or those who seek to invoke the law will suffer adverse consequences.

This conduct clearly constitutes intimidation and threatened retaliation. Before discussing the applicable case law, however, it is necessary to review some of the allegations in the complaint that show actual retaliation against the challenging attorney or litigant beyond simply allowing the non-challenging attorney to select the next presiding judge.

The facts alleged in Counts 8 through 11 of the complaint are as follows:

38. Judge Whitehead's personal antagonism toward and desire to punish those who exercised their right to challenge him under SCR 48.1 was clearly displayed in Case No. 92-03314, *Boyer v. Valley Bank of Nevada*.

39. For many years the firm of Beasley, Holden & Brooks had acted as trial counsel to Valley Bank of Nevada. While acting in this capacity, Ms. Gayle Brooks, a partner in that firm, legitimately exercised the right to peremptorily challenge Judge Whitehead on July 15, 1992.

40. Instead of promptly reassigning the case, however, Judge Whitehead telephoned Ms. Brooks' partner, Mr. James Beasley. During the conversation which followed, Judge Whitehead opined that the good working relationship that had existed between his court and the Beasley firm might be in jeopardy. Judge Whitehead went on to explain that Mr. Beasley's partners, Pete Holden and Gayle Brooks, had both recently filed peremptory challenges against him in two different cases. Judge Whitehead then suggested that Mr. Beasley find out the underlying reasons for the peremptory challenges and report back to him once he had done so.

. . .

44. Following the telephone call from Judge Whitehead, Mr. Beasley inquired of Mr. Holden and Ms. Brooks as to their reasons for filing the peremptory challenges. On July 22, 1992, as requested by Judge Whitehead, Mr. Beasley reported back to the Judge in his chambers and divulged the underlying reasons for the peremptory challenges. In the case of Mr. Holden, the peremptory challenge was filed after consultation with the client. In the case of Ms. Brooks, the peremptory challenge was filed, in part, due to the impression that Judge Whitehead had created a hostile judicial environment for female attorneys.

. . .

48. Dissatisfied with the answers given by Mr. Beasley as to why he was challenged, Judge Whitehead refused to reassign the *Boyer* case. Instead, he set out to make his dissatisfaction with the Beasley, Holden & Brooks firm known to their clients, the directors of Valley Bank of Nevada. Sometime shortly after July 23, 1992, Judge Whitehead personally visited the offices of Mr. Ernest Martinelli who was then Vice-Chairman of the Board of Valley Bank of Nevada. During that meeting, Judge Whitehead complained to Mr. Martinelli that the peremptory challenge filed by Beasley, Holden & Brooks was the first he

had ever received and constituted a "black mark" on his career. Judge Whitehead further stated that he was curious as to what he had done to so upset the Bank since he had been a "good friend" to the Bank over the years and had been a substantial source of business referrals. Judge Whitehead then asked Mr. Martinelli to look into the matter and get back to him.

. . .

53. When Mr. Martinelli did not report back to Judge Whitehead as requested, Judge Whitehead instituted yet another *ex parte* contact with Valley Bank of Nevada. On July 28, 1992, Judge Whitehead summoned John Sande, a director of Valley Bank of Nevada, to his chambers. Judge Whitehead again raised the issue of Ms. Brooks' peremptory challenge and complained that it was unfair in light of his relationship with the Bank. Mr. Sande, like Mr. Martinelli, was asked to "check into the matter" and report back to Judge Whitehead.

54. At the time of the above referenced meeting, Judge Whitehead had still not reassigned the *Boyer* case.

55. As Judge Whitehead could have easily forecasted, his *ex parte* contacts with members of Valley Bank's board of directors resulted in serious consequences for the law firm of Beasley, Holden & Brooks.

56. By the following Monday, August 3, 1992, Valley Bank had relieved the firm of Beasley, Holden & Brooks of all responsibility as their counsel in the *Boyer* case. In their place, Valley Bank of Nevada retained the firm of Vargas & Bartlett. At the time that Vargas & Bartlett entered the case, Judge Whitehead's son, Jeffrey, was a lawyer with that firm. Vargas & Bartlett's first act as counsel for Valley Bank was to withdraw the peremptory challenge which had been filed nearly three weeks before.

The majority states that it is a "matter of conjecture" whether any of the conduct alleged here would amount to violations of Canons 1 and 2 of the Code of Judicial Conduct. To the contrary, one does not have to be a scholar of judicial ethics to recognize that the conduct alleged in these paragraphs, if true, amounts to judicial misconduct of an extremely serious nature, whether in Nevada or any other jurisdiction. Any Nevadan, and certainly any member of the Nevada bar, can understand that if Judge Whitehead caused a law firm to lose Valley Bank of Nevada as a client merely because it dared to exercise a legal right which it was entitled to exercise, then Judge Whitehead engaged in a very serious retaliation indeed for what he perceived to be a challenge to his authority.

This pattern of retaliatory conduct is expressly prohibited by several canons throughout the Code of Judicial Conduct:

**Canon 1**
**A judge shall uphold the integrity and independence of the judiciary.**
**Canon 2**

. . .

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge.

. . .

**Canon 3**

. . .

B. Adjudicative Responsibilities.

(1) A judge shall hear and decide matters assigned to the judge except those in which disqualification is required.

(2) A judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor or fear of criticism.

. . .

(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.

. . .

(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

(a) Where circumstances require, *ex parte* communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the *ex parte* communication, and

(ii) the judge makes provision promptly to notify all other parties of the substance of the *ex parte* communication and allows an opportunity to respond.

(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

(c) A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges.

(d) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.

(e) A judge may initiate or consider any *ex parte* communications when expressly authorized by law to do so.

(8) A judge shall dispose of all judicial matters promptly, efficiently and fairly.

. . .

E. Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

. . .

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

. . .

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding.

(Emphasis added.)

When Judge Whitehead was presented with a peremptory challenge by Ms. Gayle Brooks on July 15, 1992, Judge Whitehead had an obligation to act on the motion *promptly*. It should have been clearly understood that in Nevada, under SCR 48.1 as it was then in effect, a party had a right to one peremptory challenge of a

judge. The Supreme Court of Missouri in Matter of Buford, 577 S.W.2d 809, 828 (Mo. 1979), stated:

> No judge has *any right* to impede, forestall, or delay sustaining a motion for change of judge when it is timely filed in proper form and presented to the court. And this is so regardless of what the judge may think the movant's motives may be. In short, a party's motives have nothing to do with the matter. Nor is it of any consequence that the judge may feel personally slighted by the motion. . . . it should be obvious that no judge has any right to penalize any party or lawyer because the lawyer frequently or routinely disqualifies a particular judge.

The complaint alleges that instead of promptly sending the case to another judge, Judge Whitehead embarked on a personal vendetta. "The use of judicial power as an instrument of retaliation is a serious violation of the Code of Judicial Conduct." Matter of Boles, 555 N.E.2d 1284, 1288 (Ind. 1990). A recent Missouri case describes the potential consequences when a judge engages in such behavior:

> His pique at his colleagues and at the attorneys has unduly burdened the judicial system and jeopardized the ability of some attorneys to represent their clients to the fullest extent of their abilities. Far from inspiring litigants' confidence in the integrity and impartiality of the judicial system, his actions have undoubtedly led them to doubt that the system adheres to those ideals.
>
> The Code of Judicial Conduct exists to protect the public and maintain public confidence in the judicial system. When a judge undertakes a willful pattern of discourtesy, abuse and vendetta against both his colleagues on the bench and those who appear before him as officers of the court or persons whose legal needs require impartial resolution, he erodes the very foundation of the system.

In re Elliston, 789 S.W.2d 469, 484 (Mo. 1990).

The Iowa Supreme Court has considered a case similar to the case involving Judge Whitehead, concluding that the judge's behavior constituted a violation of the Code of Judicial Conduct. When a lawyer from a leading law firm was at odds with an Iowa judge and began requesting recusals, that judge considered those requests an "affront to his integrity." Matter of the Inquiry Concerning Eads, 362 N.W.2d 541, 548 (Iowa 1985). The Iowa Supreme Court found that for a period of approximately two years the judge carried out a campaign of intimidation against the

lawyer. The campaign expanded to other members of the law firm when they supported their partner.

The Iowa Supreme Court concluded that this behavior violated Canons 1, 2, 2A, 2B and 3A(3) of the Code of Judicial Conduct. It quoted with approval the Commission's findings that "the judge's conduct toward [the lawyer] and members of his firm was reprehensible. . . . His course of conduct substantially caused injury to the firm and its clients and may have affected the outcome of litigation. It certainly adversely affected the client's perceptions of the impartiality and fairness of the judiciary." *Id.* at 550. In reviewing the Commission's findings, the court held that "the fact cannot be denied under the present record that [the judge] improperly instituted and then carried on an inexcusable campaign against a lawyer. In doing so, he was guilty of serious and substantial breaches of fundamental canons of judicial conduct." *Id.* at 551.

In Judicial Inquiry and Review Board of Supreme Court of Pennsylvania v. Fink, 532 A.2d 358 (Pa. 1987), a judge interjected himself into the attorney-client relationship as Judge Whitehead is alleged to have done. There, the judge "rather than acting as an impartial arbiter, . . . demand[ed] a private meeting with the plaintiff's son and attempted to convince the son that his father's lawyer was not to be trusted. Having undermined the attorney-client relationship, he then attempted to use the son to impose a solution to the case which the judge favored and which was contrary to the relief requested by the father and the disfavored attorney. Finally, to add injury to injury, when the attorney found out what the judge had told his client's son, and when [the attorney] suggested that the judge was biased against him (which he obviously was) and requested recusal, the judge held the attorney in contempt. Not only is such judicial conduct unacceptable; it rises to the level of outrageousness." *Id.* at 365.

ARJD 11(3) provides, "[w]hen applied for the purposes of determining whether misconduct has occurred, the provisions of the Nevada Code of Judicial Conduct must, considered as a penalty provision, be strictly construed in favor of the respondent Judge." The majority suggests that this rule is "of importance" in this case. To the contrary, this rule has virtually no impact on this case because the alleged conduct so clearly violates the Code of Judicial Conduct. A reading of the Canons and the cases interpreting the Canons shows that if the alleged conduct is proven, serious violations have occurred.

In a recent Arizona Supreme Court case, Matter of Peck, 867 P.2d 853, 861 (Ariz. 1994), the court stated that "[r]espondent's failure to recuse himself and his initiation of *ex parte* contacts were not minor transgressions. . . . Under our system of govern-

ment, judges hold office subject to rules of conduct that are designed to ensure a basic concept of fairness—that judges will dispense justice, not favors or revenge. In the final analysis, Respondent's actions violated not only the Code but this most basic concept of justice. Removal from office is therefore appropriate." Many judges throughout the country have been disciplined for Code violations less serious than those alleged in the present complaint.

The majority states that it appears that Judge Whitehead acted in a "frank and open manner," that he "freely discussed his peremptory challenge practices" and "there is no indication or charge that Judge Whitehead believed that there was anything irregular, much less ethically incorrect" in his behavior. The majority seems to suggest that these facts make Judge Whitehead less culpable. Ignorance of the law is no more an excuse for a judge than it is for a lay person; it could be persuasively argued that it is even less of an excuse for a judge!

The majority also suggests that because the practices were not uncommon (although the record does not support this assertion), the pervasiveness of these practices is "some indication that those who engaged in them may not be guilty of 'willful misconduct.'" The majority misstates the legal standard for willful misconduct. Willful misconduct occurs when "a judge commits acts (1) which he knows, or should know, are beyond his authority (2) for reasons other than the faithful discharge of his duties." McCullough v. Commission on Judicial Performance, 776 P.2d 259, 261 (Cal. 1989). Although a judge must act in "bad faith in order to commit wilful misconduct, he need not necessarily seek to harm a particular litigant or attorney; disregard for the legal system in general will suffice." *Id.* at 262. *See also* Goldman v. Nevada Com'n on Judicial Discipline, 108 Nev. 251, 294, 830 P.2d 107, 135 (1992).

If the alleged conduct took place, Judge Whitehead *knew or should have known* that he was acting beyond his authority. He also knew or should have known that conduct violating multiple provisions of the Code of Judicial Conduct cannot be described as falling within the faithful discharge of a judge's duties. Thus, it would constitute no defense to a charge of willful misconduct that Judge Whitehead engaged in the alleged conduct openly and publicly, or even that he took pride in his behavior.

There has been no hearing to determine if the charges against Judge Whitehead are true, and the trier of fact must presume that he is innocent of the charges unless and until evidence is presented to convince the trier of fact otherwise. However, to interpret the Code of Judicial Conduct in such a way as to condone the conduct described in the complaint against Judge Whitehead does

a grave disservice to the judges, attorneys, litigants, and citizens of this State. It is unconscionable to suggest that the conduct described is not serious enough to be within the jurisdiction of the Commission on Judicial Discipline.

## INTERPRETATION OF THE ADMINISTRATIVE AND PROCEDURAL RULES FOR THE NEVADA COMMISSION ON JUDICIAL DISCIPLINE

The majority has accused the Commission of violating several provisions of the ARJD and the Nevada Constitution. The universal standard for interpreting rules is that they "must be applied according to the underlying policies and purposes and 'may not be construed in a way that would attribute to the [drafters] an intent that would result in absurdities or would defeat the underlying purpose of the enactment.'" Matter of Almeida, 611 A.2d 1375, 1380 (R.I. 1992). For other cases noting this standard, see Oakley v. State, 105 Nev. 700, 702, 782 P.2d 1321, 1322 (1989) and cases cited therein. In interpreting the ARJD and the Nevada Constitution according to this standard, it cannot be said that the Commission has acted improperly in its handling of the complaints against Judge Whitehead.

There is nothing unusual or sinister about the fact that the ARJD do not specifically address every potential issue in a judicial disciplinary proceeding. See Matter of Almeida, 611 A.2d at 1382 (noting that "[s]tatutes by and large do not encompass every potential factual situation that may arise"). While the rules cover the most basic and important issues that arise, in many respects they form only an outline, lacking the level of detail evident in the Nevada Rules of Civil, Criminal or Appellate Procedure. Even these more detailed rules are not perfectly complete. As Justice Jackson noted in his well-known concurrence in Hickman v. Taylor, 329 U.S. 495, 518 (1947), "all such procedural measures have a background of custom and practice which was assumed by those who wrote and should be by those who apply them."

The majority adopts, on occasion, the illogical principle that what is not specifically authorized in the ARJD is expressly forbidden. This principle is nowhere to be found in the Rules, custom, or case law. When an issue of first impression is presented to the Commission, the Commission is free, at least in the first instance, to address that issue in any manner which is reasonable and consistent with the ARJD and the purpose and intent behind the formation of the Commission. Based on the record before this court, it appears that the Commission has acted in accordance with the applicable rules, and has interpreted them

in a manner which is reasonable and consistent with the interpretation of similar rules by other courts.

When the Commission chooses a course of action which is not inconsistent with its rules, and which is consistent with actions of other Commissions across the United States, it is unreasonable for this court to assert that the only possible interpretation of the Commission's rules is the interpretation which this court chooses. This court has afforded great deference to an administrative body's interpretation when that interpretation is within the statutory language. Thus, this court should defer to the Commission's interpretation of the rules. State ex rel. Nevada Tax Comm'n v. Safeway Super Service Stations, 99 Nev. 626, 630, 668 P.2d 291, 294 (1983). In addition, the Nevada rules were drafted based on rules that other jurisdictions already adopted for their judicial discipline bodies. Thus, other jurisdictions' interpretations of comparable rules are instructive in the interpretation of our rules. Contrary to the majority's assertion, the rules in other states are not that different from Nevada's rules. Each state deals with the same types of concerns and attempts to do so in a fair and principled manner. Deferring to the Commission's interpretation of the rules makes even more sense when that interpretation concurs with the interpretation of other jurisdictions.

Judicial disciplinary proceedings begin with the filing of a complaint. ARJD 2(3) defines a "complaint" as a "sworn written charge alleging judicial misconduct by or disability of a judge." Under the definition, a complaint could be construed as either a simple letter written by a lay person in non-legal language and notarized by a notary public, or as a document drafted by a lawyer or judge with technical legal language pursuant to the Nevada Rules of Civil Procedure.

A lay person and an attorney have two different concepts of the word "complaint." When a lay person is upset about a department store purchase, for example, he or she wonders where to go to lodge his or her "complaint." In contrast, attorneys know that when they file a "complaint" in court, the complaint must comply with a myriad of technical requirements.

The ARJD refer to both of these types of "complaints." ARJD 12 provides:

### Rule 12. Initiation of procedure.

1. Except as provided in subsection 2, *initial* complaints of judicial misconduct must be made upon oath in writing and may be made by the person complaining. Such a complaint must contain facts which, if true, would establish grounds for discipline under these rules.

2. In exceptional circumstances, in which the commis-

sion has substantial reason to believe that a complainant may in likelihood suffer untoward risk of embarrassment, harassment, or other detrimental consequences, the commission may on request, authorize its executive officer to sign and swear to a complaint on information and belief, in the complainant's stead.

(Emphasis added.)

If the word "complaint" in these rules unambiguously referred to the formal variety, i.e., a "complaint" filed in court, then the drafters of the rules would not likely have used the words "initial complaint" in Section 1 of ARJD 12. The most reasonable interpretation of the meaning of "complaint" as it is used in the rules is that the ARJD contemplate both an "initial complaint" and a later, more formal "complaint" prepared by an attorney for the Commission if necessary to clarify the issues.

This interpretation is consistent with procedures followed by jurisdictions across the United States. An initial complaint is nothing more than a notarized letter. In fact, some jurisdictions refer to it as the "letter complaint." It is also proper for an attorney or judge to submit a more formalized document as the initial complaint. However, to hold that a lay person must submit a formal legal document precludes everyone but lawyers, judges, and a tiny minority of lay persons from initiating disciplinary proceedings against a judge. This is clearly not consistent with Article 6, Section 21(7) of the Nevada Constitution, which provides that "[a]ny person may bring to the attention of the commission any matter relating to the fitness of a justice or judge." The ARJD were drafted after Article 6, Section 21(7) of the constitution, and it must be assumed that the drafters were aware of the provisions of the constitution.

There is no requirement under ARJD 12 that the notarized letter contain "evidence"—even a formal legal complaint does not qualify as "evidence." All that the letter must contain is a description, in lay person's language, of facts, which, if true, would establish grounds for discipline. An initial complaint "cannot be expected to be a lawyer's model of clarity and detail." Matter of Agerter, 353 N.W.2d 908, 916 (Minn. 1984). It is not even necessary that the individual wishing to initiate proceedings submit the notarized letter himself or herself. The words "*may* be made by the person complaining" clearly contemplate that an individual may ask an attorney or other agent to submit the notarized letter on his or her behalf. ARJD 12(1) (emphasis added).

The purpose of the requirement in ARJD 12(2) that the initial complaint be made upon oath is also clear. The oath discourages the filing of frivolous complaints by forcing would-be complain-

ants to swear that they are not making false statements. Nonetheless, there is nothing wrong with an individual sending an unsworn letter to the Commission (in fact, such action is protected by the First Amendment), but the effect of the rule requiring the oath is that an unsworn letter cannot form the basis for the commencement of disciplinary proceedings. If an unsworn letter were submitted to the Commission, the Commission could quite properly advise the would-be complainant to notarize the same letter and resubmit it.

The second type of complaint, which various jurisdictions label differently, but which I refer to here as the "formal complaint," is typically drafted by an attorney for submission to the Commission to clarify the legal and factual issues. I use the term "formal complaint" because the Nevada rules use the term "formal statement of charges" to describe a similar, but separate document which is prepared after a probable cause hearing and before a formal hearing. An attorney typically drafts the pre-probable cause "formal complaint" after the allegations of the initial complaint have been adequately investigated and the attorney is ready to present the case to the Commission. The Commission then determines whether or not a probable cause hearing is warranted.

The formal complaint is a legal document generally drafted in the same format as required by the rules of civil and/or criminal procedure. The purpose of the formal complaint is to clarify the legal and factual issues for the Commission to consider. Despite the protestations of the majority that a "formal complaint" is not contemplated under the Nevada rules, other jurisdictions have seen no reason to force each Commission member to rely solely upon his or her individual efforts at sorting through a lay person's complaints in order to eliminate redundant material and clarify the legal and factual issues for consideration. Everyone, not only the Commissioners, but also the accused judge and counsel for both sides, benefits from addressing the relevant issues by presentation in a legal format.

Like formal complaints in civil or criminal proceedings, the formal complaint in a judicial disciplinary proceeding is typically a sworn document. The fact that the formal complaint in this case was filed in the name of the Commission administrator, Eve King, is typical of how formal complaints are filed in other jurisdictions. In fact, many jurisdictions refer to this formal complaint as the "administrator's complaint." There is nothing in the Nevada rules indicating that the administrator or the attorney preparing a formal complaint must swear to it. Moreover, it cannot be reasonably suggested that the issue is of any consequence. The initial sworn complaint is necessary to commence

the proceedings, and additional documents which clarify the issues after the investigation help everyone and are not inconsistent with the rules.

There was nothing improper about the formal complaint prepared by special Commission counsel Donald Campbell. Based on the sworn initial complaints and the subsequent investigation of the charges in those complaints, counsel clarified the factual and legal issues, benefitting both the Commission and Judge Whitehead. To suggest that the method of signing this document is jurisdictional is, at the very least, elevating form over substance.

The majority correctly notes that Article 6, Section 21(7) of the Nevada Constitution states that after the Commission receives a complaint, a "preliminary investigation" must take place after which the Commission shall "dismiss the matter or order a hearing to be held before it." While the ARJD do not use the words "preliminary investigation," the Rules clearly contemplate that such an investigation should take place. The proper scope of this preliminary investigation is undefined.

The majority employs the phrase "confined to the narrowest possible activity" to describe the scope of the preliminary investigation. In its analysis of what such an investigation encompasses, the majority refers to the Random House Dictionary as its single source of authority. Random House defines "preliminary" as: "1. preceding and leading up to the main part, matter, or business; introductory; preparatory; preliminary examinations. 2. something preliminary, as an introductory or preparatory step, measure, contest, etc." I see nothing in this definition which suggests that "preliminary" means "narrow," "non-thorough," "incomplete," or "non-exhaustive." The majority apparently does, however, because it concludes that a preliminary investigation is "substantially different from an exhaustive survey and interrogation of persons who may know a respondent judge and have some basis for cooperating in the furtherance of complaints against the judge." The majority suggests that the Commission may conduct a more thorough investigation only after the probable cause determination, and that the preliminary investigation is "primarily a screening device to prevent unfounded or capricious prosecutions from going forward." The majority thus seems to suggest that the preliminary or "non-thorough" investigation will prevent an unfounded prosecution from going forward. I fail to see how a non-thorough investigation will prevent unfounded and capricious prosecutions, especially if the initial complaint is based on hearsay.

The majority opinion does not make clear how much of the Campbell investigation information the Commission may use if it

decides to proceed against Judge Whitehead. The majority characterizes the Campbell investigation as overly broad and implies that the Commission must start the investigation anew based upon the sworn initial complaints. However, the majority has also ordered that all of the notes from the Campbell investigation be turned over to Judge Whitehead. This suggests that the Commission is free to use the results of the Campbell investigation since Judge Whitehead would not be entitled to discovery of those results if they were irrelevant.

ARJD 15 suggests the proper scope of a preliminary investigation. It states in part that "[a] finding of probable cause is a determination that, in reasonable probability, the evidence available for introduction at a later formal hearing could clearly and convincingly establish grounds for disciplinary action within the commission's jurisdiction."

It would make a mockery of this rule to hold that a preliminary investigation must be halted before enough information has been gathered to determine whether or not clear and convincing evidence of judicial misconduct within the Commission's jurisdiction exists. The scope of investigation required to reach this point necessarily varies with the facts and circumstances of each case. For example, while in Ryan v. Commission on Judicial Performance, 754 P.2d 724, 727 (Cal. 1988), the preliminary investigation consisted of sworn interviews with over one hundred people, other preliminary investigations can be resolved with only one telephone call.

ARJD 15 also implies that the investigation must explore all avenues which might reasonably lead to information relevant to the determination of probable cause. If, for example, only two of five reasonable avenues are explored, it might appear that there was enough evidence to eventually meet the "clear and convincing" standard. A determination at that point could not meet the "reasonable probability" standard, however, since the three unexplored avenues of investigation might have yielded exculpatory evidence. Thus, the preliminary investigation is not complete until all reasonable avenues of investigation have been pursued. To hold otherwise would render the Commission powerless in its mission to ensure the integrity of the judiciary while simultaneously protecting judges from specious charges.

It is probably unusual for an accused judge to volunteer relevant information concerning an investigation into his or her conduct to a Commission investigator. Given this reality, along with the fact that once the judge becomes aware of the investigation, he or she often attempts to contact potential witnesses ahead of the investigator, most investigators choose not to contact the accused judge during the course of the investigation. There is

nothing objectionable in this. There is no requirement that a judge receive notice of a preliminary investigation prior to its completion. *See* Kloepfer v. Commission on Judicial Performance, 782 P.2d 239 (Cal. 1989); Ryan v. Commission on Judicial Performance, 754 P.2d 724 (Cal. 1988).

I am not suggesting that an investigation may properly reach into any and all aspects of a judge's life based on the prospect that a violation *unrelated* to the initial complaint might be discovered. The investigator may only pursue reasonable leads. Reasonable in this context means "reasonably related to a proper subject of inquiry." New York State Com'n on Judicial Conduct v. Doe, 459 N.E.2d 850, 852 (N.Y. 1984); Nicholson v. State Commission on Judicial Conduct, 409 N.E.2d 818, 825 (N.Y. 1980). A practical example demonstrates this point. An initial complaint from a citizen states that a judge requested a bribe in exchange for a favorable result. The preliminary investigation begins, and the investigator is led to evidence of other incidences where the judge has "traded justice" for money or other consideration. These other incidences are plainly "reasonably related to a proper subject of inquiry." It would undermine the Commission's mission if the Commission were not allowed to follow up on evidence of similar conduct in other cases assigned to that judge.

On the other hand, if, in the course of the bribery investigation, the investigator learns that the judge routinely had cases under submission for more than three years, the investigator may not expand the investigation into this area of inquiry. The latter revelation is not reasonably related to the original subject of inquiry, namely bribes. A new initial complaint would be necessary to trigger an investigation on the subject of delay.

I am concerned about the majority's implication that only the exact facts alleged in the complaint may be investigated or charged. If, for example, one or more complaints were filed alleging that on a particular day or days a judge was drunk on the bench, the holding of the majority would suggest that the Commission may not investigate anything more than what happened on the particular days alleged in the complaints. I believe that this is an unduly narrow construction of the rules and that this construction frustrates the Commission's mandate. I also believe that, on the basis of a complaint, the Commission should be not only free, but *obligated* to investigate whether drunkenness on the bench is a pattern or an isolated incident with that particular judge. Determination of that fact is vital in order to determine whether that judge is fit to continue in the occupation.

Applying this interpretation of the ARJD to the facts and circumstances of this case is not difficult. The initial complaint suggested that Judge Whitehead engaged in a practice of *ex parte*

communications, most of which were apparently for the purpose of intimidation and retaliation against litigants and counsel who exercised peremptory challenges against him. Any investigation of the initial complaints on which charges were eventually brought would have been properly confined to this pattern of alleged judicial misconduct. All twelve counts of the subsequent formal complaint address alleged incidents that relate to this practice. It therefore appears that the investigation was thorough and at all times within its proper scope.

It must be noted that there were additional initial complaints of alleged misconduct against Judge Whitehead that were not related to *ex parte* conversations after a peremptory challenge. The Commission chose not to file a formal complaint on those charges. Had the Commission determined that those allegations had merit, however, it could have charged these unrelated charges in a single formal complaint. In any event, there is nothing improper about the fact that those other charges were investigated.

The majority vehemently objects to allowing judges, when faced with an allegation of judicial misconduct, to negotiate a consent order, a settlement, or a "plea bargain" with the Commission rather than contest the charges. In fact, it appears that such a resolution is the rule, rather than the exception, in judicial disciplinary proceedings in Nevada and throughout the nation. *See, e.g.,* Matter of Drury, 602 N.E.2d 1000, 1010 (Ind. 1992) (stating that "[t]ypically, the respondent judge and the Commission agree to an appropriate sanction, negating the necessity for a formal hearing"); Geiler v. Commission on Judicial Qualifications, 515 P.2d 1, 8 (Cal. 1973) (noting that "[a]lthough formal proceedings of the Commission have been few, the potentiality of such proceedings has proven to be the vital element of the Commission's efficacy"). The United States Supreme Court has specifically endorsed the practice of resolving judicial disciplinary matters through the processes named above as one of the theoretical benefits of confidential judicial disciplinary proceedings. Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 835-36 (1978) (noting that "[w]hen removal or retirement is justified by the charges, judges are more likely to resign voluntarily or retire without the necessity of a formal proceeding if the publicity that would accompany such a proceeding can thereby be avoided").

It is clear that the drafters of the ARJD were neither unaware of "plea bargaining" nor found it objectionable, since they explicitly provided for it in ARJD 31:

> **Rule 31. Consent orders.** Upon written consent of the respondent, the commission may order the respondent's

censure, removal or retirement *at any stage of the proceedings* and this order takes effect immediately. A certified copy of the order must be filed with the clerk of the supreme court and a copy of the order must be served on the respondent.

(Emphasis added.) The majority is aware of this provision, but nonetheless spends many pages criticizing the Commission's resolution of the Stringfield and "Judge D" cases. To circumvent the clear language and obvious meaning of ARJD 31, the majority claims that the words "any stage of the proceedings" really mean "any stage of the proceedings after a probable cause hearing and the filing of formal charges."

The majority's support for this proposition is the fact that ARJD 31 is the last of sixteen rules located under the heading "V. Procedure After Finding Probable Cause." It is unreasonable to assume that the drafters of the ARJD intended anything different than what is clearly stated in the rule, or that they attached greater significance to the order and placement of the rules than to their contents. There is nothing improper where the Commission resolves cases through an ARJD 31 consent order.

The majority appears convinced that the Judicial Discipline Commission follows different rules for different judges. There is nothing in the record that substantiates this conclusion. It is true that JUSTICE STEFFEN entered a letter into the record from a judge who complained that after a probable cause hearing had been scheduled, witnesses subpoenaed, and after receiving copies of the complaints against him, "Judge D" negotiated a plea bargain with the Commission. The judge was unhappy that the Commission had not held a probable cause hearing. He recognized that it was proper for the Commission to provide "Judge D" with a copy of the complaints in order for the judge to prepare a proper defense, but he felt that the complainant should have had an opportunity to testify before the Commission. He objected to plea bargaining by judges, as did JUSTICE STEFFEN in his memorandum to the other justices.

On the basis of the information in the complaining judge's letter in the "Judge D" case, the majority now accuses the Commission of providing "Judge D" with discovery which the Commission unfairly refused to give Judge Whitehead. There is nothing in the record which supports the view that the Commission treated the two judges differently and the complaining judge's letter belies any difference in treatment. The judge's letter states that his complaint "consisted of seven pages . . . together with a list of approximately 20 individuals" who had complained of "Judge D's" conduct. According to the complaining judge, "Judge D" "properly" received a copy of his complaint, as well

as other written complaints against him. The record reflects that Judge Whitehead also received a copy of the complaints against him. It is difficult to see how, on the basis of this, that the Commission discriminated against Judge Whitehead.

Although the record is far from complete in Judge Stringfield's case (because we only have Judge Stringfield's statement of events), it appears that the Commission took a practical approach to resolving what was essentially a disagreement between the County Clerk and Judge Stringfield, not a disciplinary matter. Instead of coldly declining to act, it suggested that the parties mediate with Judge Beko to resolve the problem. This conduct is far from "sinister," as the majority suggests. The Commission wisely attempted to aid the judiciary by encouraging the parties to resolve their conflicts with the assistance of a third party, rather than by allowing a public slugging match to develop between two officials, one of whom was a judge. There is nothing in this scenario which suggests that the Commission treats judges inequitably. Each case must be evaluated on its own merits.

The majority objects not only to the fact that consent orders were entered in other cases, but also to the terms of those orders. Specifically, the majority objects to orders that disciplinary measures such as mediation, arbitration, probation, public apologies, etc., be taken. The majority supports its argument by pointing to Article 6, Section 21(1) of the Nevada Constitution, which provides that a judge may only be "censured, retired or removed by the commission on judicial discipline." The Constitution was subsequently amended in 1994 to explicitly provide for lesser forms of discipline. The former language, however, does not prohibit the Commission from imposing a lesser form of discipline, such as a consent order, at any stage of the proceedings. Even if the former language did prohibit the Commission from imposing a lesser form of discipline, where a judge has consented to a lesser form of discipline, the prior proceedings are not invalidated.

Language similar to Section 21(1) in Article 6 of the Nevada Constitution is found in most state constitutions or in statutory provisions creating judicial discipline commissions. Several state supreme courts throughout the country have agreed that lesser forms of discipline not specifically set out in the provisions may be imposed. The approach of the Rhode Island Supreme Court in Matter of Almeida, 611 A.2d 1375, 1380 (R.I. 1992), is typical:

> In order to ensure the integrity of the Judiciary, we find that there are sanctions and remedial actions available that may not be expressly stated as one of the enumerated categories of § 8-16-4. Mere exclusion of every possible potential

sanction does not mean that the Legislature specifically intended to limit possible courses of action. Rather, certain remedies may be implicit within the general categories of § 8-16-4 and necessary for the orderly interpretation and implementation of the statute. The enumerated categories of possible recommendations are guideposts rather than strict limitations on the extent of sanctions the commission may recommend.

*See also* Matter of Buckson, 610 A.2d 203, 217 (Del.Jud. 1992) (recognizing that "the power to remove implicitly carries with it the power to impose less severe sanctions short of removal").

In addition, the types of lesser disciplinary measures employed by the Commission, such as consent orders, are typical of those employed by other judicial disciplinary bodies throughout the country. The Vermont Supreme Court in In re O'Dea, 622 A.2d 507, 517 (Vt. 1993), noted "the trial court administrative judge shall develop a program of training and counseling for respondent so that his inappropriate conduct . . . will not recur. . . . Our consent to such an assignment will depend upon the effectiveness of these measures as conveyed to us by the trial court administrative judge." Similarly, in In re Turner, 421 So.2d 1077, 1080 (Fla. 1982), the court stated, "[t]he conduct of Judge Turner as described herein brings the Judiciary into disrepute and this file will remain open and the future conduct of this Judge will be monitored by the Commission."

These measures are not only typical of measures taken by judicial disciplinary bodies in other states, they are consistent with the purpose behind imposing sanctions in cases of judicial discipline. Sanctions are not imposed because the Commission seeks vengeance or retribution. "Those concepts have no place in a disciplinary system designed to assure the orderly administration of justice in the public interest. Any sanction must be designed to preserve the integrity and independence of the judiciary and to restore and reaffirm the public confidence in the administration of justice." Matter of Ross, 428 A.2d 858, 868 (Me. 1981). Moreover, sanctions should be selected with an aim to "correct[] any deficiencies found by taking the least severe action necessary to remedy the situation." Cornett v. Judicial Retirement and Removal Commission, 625 S.W.2d 564, 568 (Ky. 1981) (citation omitted).

JUSTICE SPRINGER, in his separate concurrence, implies that the Commission has been dilatory in acting on the complaints against Judge Whitehead. JUSTICE SPRINGER states,

Now, some two and one-half years after the sworn complaints were filed, the Commission *still* has not acted on

these complaints in the manner specified and required by the ARJD.

Apparently he has forgotten that the Commission was expressly forbidden to take any action whatsoever by an order of this court entered on July 22, 1993. That order provided as follows:

> IT IS HEREBY ORDERED that pending the determination of this petition on its merits, all proceedings before and actions of the Nevada Commission on Judicial Discipline and the actions of those acting on behalf of the Commission relating to this matter, including the filing of an answer to a purported "complaint," the holding of a hearing to determine probable cause, and the conducting of any further investigative activities, are stayed.

Had the Commission taken any action with respect to Judge Whitehead after this order was filed, it would have likely been subject to a contempt citation.

On the basis of the information before this court, it appears that the Nevada Commission on Judicial Discipline has conformed to the word, spirit and purpose of the ARJD and the provisions of the Nevada Constitution to improve the quality of the judiciary.

## DUE PROCESS CONSIDERATIONS

Judicial disciplinary proceedings are neither civil nor criminal in nature, but *sui generis,* designed to protect the citizenry by insuring the integrity of the judicial system. In re Gillard, 271 N.W.2d 785, 812 (Minn. 1978). Of course, due process requirements apply to judicial disciplinary proceedings. In fact, the full panoply of procedural guarantees provided by the ARJD exceeds the minimum requirements of constitutional due process for judicial disciplinary proceedings. " '[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances" but is "flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (citations omitted).

Even if actual violations of the ARJD have occurred in this case, those violations would neither invalidate the entire proceeding nor cause the Commission to somehow lose jurisdiction of the matter. In no case would the judge be exonerated. *See* In re O'Dea, 622 A.2d 507, 512 (Vt. 1993).

A party must suffer actual and substantial prejudice before a lack of proper procedure implicates due process. This concept is as important a concept in judicial disciplinary proceedings as it is in civil, criminal and other administrative contexts. "Procedural

rules designed to foster the orderly transaction of business before the Court do not confer substantive rights on a litigant." Matter of Buckson, 610 A.2d 203, 218 (Del. Jud. 1992). A procedural due process claim does not even approach becoming colorable until a showing of prejudice has been made. As the United States Supreme Court in American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538-39 (1970), stated:

> The Commission is entitled to a measure of discretion in administering its own procedural rules in such a manner as it deems necessary. . . . [T]here is no reason to exempt this case from the general principle that "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of *substantial prejudice* to the complaining party."

(Citations omitted) (emphasis added). Even if any of the alleged violations of the ARJD had actually taken place, the majority has failed to show how, if at all, the Judge was thereby actually and substantially prejudiced.

If this were a criminal case, then the petitioner could not, pursuant to the Nevada or the United States Constitutions, be punished unless he were convicted by an unanimous jury. This is not a criminal case. I note this because the majority has cited the criminal case of Sheppard v. Maxwell, 384 U.S. 333 (1966), apparently for the proposition that the extensive publicity surrounding this case means that it may not be possible to seat a jury not influenced by media reports. The majority fails to take into account the fact that there is no jury in this case. Not only is there no jury, but the trier of fact, the Judicial Discipline Commission, already had access to all the information. It makes no sense to say that the media reports of information which the trier of fact already possessed have biased that trier of fact.

Even if this were a criminal case, pre-trial publicity would not prevent a criminal defendant from having to stand trial. At most, a criminal defendant might have his conviction reversed on the ground that the trial itself was conducted in such an unfair manner that it amounted to a denial of due process. However, these circumstances are extremely rare. See Murphy v. Florida, 421 U.S. 794, 799 (1975) (finding that the cases "cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process"), and Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554 (1976) (asserting that

"pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial"). Even the few criminal defendants who have obtained reversals on this basis have been subject to retrial on the same charges.

Thus, pre-trial publicity is clearly relevant in the context of a criminal jury trial, since the notion that jurors approach a trial with an open mind is fundamental to the concept of a jury trial. However, pre-trial publicity in the context of a judicial disciplinary proceeding is irrelevant. The Commission members already have substantial knowledge of the case and accurate information available to them. They are, therefore, the group *least* likely to be prejudiced by inaccurate news accounts.

The Nevada Constitution clearly grants the Judicial Discipline Commission both investigatory and judicial functions. This contrasts with the functions of the courts of this state, which do not have the responsibility to perform investigations. Because of this difference in assigned functions, analogizing Commission functions to court functions can be misleading. By the time the Commission holds an evidentiary hearing, its members already have substantial knowledge of the case and have made some decisions based on that knowledge.[1] Both this court and the United States Supreme Court have clearly held that no due process violation necessarily occurs where hearings are conducted by a group of individuals who approach the hearings with a substantial knowledge of the case. *See* Rudin v. Nevada Real Estate Advisory Commission, 86 Nev. 562, 565, 471 P.2d 658, 660 (1970) (holding that as a general proposition, the combination of investigating, prosecuting, and judging functions does not constitute a denial of due process); Whitehead v. Com'n on Judicial Discipline, 110 Nev. 874, 921, 878 P.2d 913, 942-43 (1994) (SHEARING, J., dissenting, quoting Withrow v. Larkin, 421 U.S. 35, 47-53 (1975)). Plainly, Petitioner's due process rights are not implicated by any pre-trial publicity.

I agree with the majority that Judge Whitehead would be free to challenge any Commission member for cause at the probable cause hearing. Although ARJD 3(6) and (7) explicitly apply to formal hearings only, I believe that by implication they should apply to probable cause hearings as well. ARJD 3(6) provides:

> Any member of the commission or sitting alternate member may be disqualified upon challenge for cause by the

---

[1]Many jurisdictions have separated the investigatory and adjudicatory functions of their judicial discipline commissions. There is little doubt that this separation enhances the appearance of fairness, if not actually ensuring more impartial proceedings. The Nevada Constitution does not separate the functions of the Commission. In any case, due process can certainly be had whether the Commission's functions are separated or not.

respondent or by counsel prosecuting the formal statement of charges. A challenge must be heard by the commission, and the commission may disqualify any commissioner who by reason of actual or implied bias would, in the opinion of a majority of the members present, either be prevented from adjudicating the matter in a fair and impartial manner or, by reason of facts creating an appearance of impropriety, be prevented from adjudicating the matter in a manner consistent with maintenance of public confidence in the commission.

ARJD 3(7) allows challenges for implied bias on any of the grounds for which jurors may be challenged under NRS 16.050. NRS 16.050 sets forth eight grounds for a challenge, including "[t]he existence of a state of mind in the juror evincing enmity against or bias to either party." While Petitioner is free to assert a challenge for cause, as in any hearing, the Commission may also properly overrule the challenge if it is not supported by substantial evidence.

The fact that Petitioner and his counsel have publicly attacked the Commission members numerous times is not a basis for an implied or actual bias challenge, since such challenges must be based on something other than what has taken place during the proceedings. *See, e.g.,* U.S. v. Grinnell Corp., 384 U.S. 563, 583 (1966). Commissioners, like judges, are men and women presumed to be "of fortitude, able to thrive in a hardy climate." Craig v. Harney, 331 U.S. 367, 376 (1947). If the rule of law were otherwise, an accused judge could simply hurl epithets at successive sets of commissioners, challenge them for cause, and then have each disqualified. This is not the rule of law in any jurisdiction.

I have no doubt that the members of the Commission and their counsel recognize that criticism from accused judges is to be expected. "It is the nature of the work. It has been said that the public should be concerned when Commission counsel is not criticized by individual judges under investigation and their counsel. Judges hold powerful positions. Lawyers everywhere are reluctant to cooperate. Attacks on Commission counsel are so common, they are taken in stride and given due weight." Affidavit of Gerald Stern in support of Motion to File Amicus Curiae Brief of the Association of Judicial Disciplinary Counsel (filed May 19, 1994).

Allegations of judicial misconduct are frequently the subject of extensive publicity before the judicial disciplinary proceedings are completed, indeed, often before those proceedings have begun. Nevertheless, an excess of publicity has never formed the basis for a dismissal of the proceedings. Time and again, without

exception, disciplinary proceedings have moved forward to the extent warranted by the evidence of misconduct itself. *See, e.g.,* In re Zoarski, 632 A.2d 1114, 1120 (Conn. 1993); In re Hill, 568 A.2d 361, 368 (Vt. 1989); Council on Probate Judicial Conduct re Kinsella, 476 A.2d 1041, 1054 (Conn. 1984); Roberts v. Commission on Judicial Performance, 661 P.2d 1064, 1071 (Cal. 1983). Publicity, no matter what its source, certainly does not present any obstacle to providing Judge Whitehead with a fair hearing, fully consistent with the requirements of due process.

The majority has also alleged that members of the Commission, especially Chairman Guy Shipler, may have exhibited actual bias towards Judge Whitehead. With regard to Judge Whitehead's challenge of members of the Commission based upon actual bias, the majority states:

> Despite our concerns regarding the due process implications involved in having any members of the Commission who have heretofore participated in the Whitehead proceedings continue to sit in any further proceedings against Petitioner, we trust that the challenging procedures available to Petitioner will effectively resolve these concerns.

This suggestion that members of the Commission who have been involved in these proceedings thus far are somehow disqualified from continuing to act because they have formed an opinion regarding the matter is contrary to the law regarding disqualification in Nevada and elsewhere. Concerning disqualification of judges, this court has stated that "[e]ven where the court's prior judicial and administrative actions may support an inference that the justices in question possess legal opinions at odds with appellant's views of the court's constitutional authority, that fact does not constitute a legally cognizable ground for disqualification." Goldman v. Bryan, 104 Nev. 644, 654, 764 P.2d 1296, 1302 (1988).

Like judges, Commission members form opinions and make decisions; that is their job. Although a judge may have a strong opinion on the merits of a cause or a strong feeling about the type of litigation involved, the expression of such views does not establish disqualifying bias or prejudice. Ainsworth v. Combined Ins. Co. of America, 105 Nev. 237, 257, 774 P.2d 1003, 1018 (1989) (citing In re Guardianship of Styer, 536 P.2d 717 (Ariz.App. 1975)). In *Goldman* and *Ainsworth,* this court made it clear that a judge may not be disqualified as biased where that judge acquired information about the case in his or her official capacity. Only information gained from *extrajudicial* sources may form a basis for disqualification.

In *Ainsworth,* this court stated regarding allegations of bias that "although former CHIEF JUSTICE GUNDERSON's response does

indicate that . . . [he had] adverse judicial impressions of the respondent insurance company . . . his response recites no facts supporting a reasonable inference of preconceived bias against the insurance company stemming from an extrajudicial source *at or prior to the date this case was decided.*" *Id.* at 258, 774 P.2d at 1018. In *Goldman,* this court quoted with approval from Tynan v. U.S., 376 F.2d 761 (D.C.Cir. 1967), *cert. denied,* 389 U.S. 845 (1967):

> [A] federal statute respecting disqualification, "never contemplated crippling our courts by disqualifying a judge," solely on the basis of a state of mind "acquired from evidence presented in the course of judicial proceedings before him. Any other construction would make the statute an intolerable obstruction to the efficient conduct of judicial proceedings, now none too speedy or effective." *Id.* at 765 (*citing* Craven v. U.S., 22 F.2d 605, 608 (1st Cir. 1927).

*Goldman,* 104 Nev. at 655 n.8, 764 P.2d at 1303 n.8. *Goldman* and *Ainsworth* as well as numerous other cases[2] make it clear that to disqualify a judge on the basis of bias, that bias must have been present before any complaints were filed with the Commission, or must have emanated from an extrajudicial source during the proceedings.

Judge Whitehead has accused the Commission and/or its counsel of violating a duty to maintain confidentiality. He argues that since it did not maintain confidentiality, the Commission is thereby disqualified to act. The majority has implied that the Commission might be disqualified because Commission counsel argued against conducting an investigation. Presumably, the majority infers that if the Commission counsel believed that an investigation should not be conducted, then something is rotten in

---

[2]*See also* United States v. Grinnell Corp., 384 U.S. 563, 583 (1966) (to be disqualifying, alleged bias must stem from an extrajudicial source); United States v. Conforte, 457 F.Supp. 641, 657-58 (D.Nev. 1978), *modified on other grounds,* 624 F.2d 869 (9th Cir.), *cert. denied,* 449 U.S. 1012 (1980) (where *origin* of judge's impressions was inextricably bound up with judicial proceedings, judge's alleged bias did not stem from an extrajudicial source); Davis v. Board of School Com'rs of Mobile County, 517 F.2d 1044, 1050 (5th Cir. 1975), *cert. denied,* 425 U.S. 944 (1976) (if a party could successfully challenge a judge based upon allegations of bias against that party's attorney, it "would bid fair to decimate the bench" and lawyers, once in a controversy with a judge, "would have a license under which the judge would serve at their will"); State v. Rome, 685 P.2d 290, 296 (Kan. 1984) (in disciplinary proceedings, supreme court justices were not required to disqualify themselves under Code of Judicial Conduct because the court was involved in litigant's removal from judicial office); United Nuclear Corp. v. General Atomic Co., 629 P.2d 231, 323 (N.M. 1980), *appeal dismissed,* 451 U.S. 901 (1981) (under New Mexico constitution, as well as under Code of Judicial Conduct, alleged bias must be personal, not judicial).

Denmark. I see no basis for disqualifying a Commission member unless actual bias is shown. Judge Whitehead alleges that the Commission members are actually biased because they leaked unfavorable reports about this case to the media. There is not one iota of evidence that the Commission or its counsel were responsible for any disclosures to news media. On the contrary, there is evidence that some of the disclosures may have come from complainants and some from the court itself.[3]

JUSTICE SPRINGER suggests the unique concept that a Commission member may be disqualified for speaking with the Commission's own attorney. This is an example of the type of confusion which occurs when the functions of the Commission and the courts are confused. As mentioned earlier, the Commission, unlike the courts, has an investigatory and an adjudicatory function. If a judge were to have an *ex parte* contact with a district attorney prosecuting a case, that contact would be improper because the judge's only role is adjudication. The Commission, however, is charged with investigation as well as adjudication. The fact that the Commission hired an attorney to conduct the investigation instead of conducting an investigation itself does not transform that attorney's status from investigator to independent prosecutor. In fact, Commission members have every reason to expect free and open communication with the Commission investigator.

## PRODUCTION OF DOCUMENTS

Rule 14(5) of the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline provides:

---

[3]The vast majority of the publicity concerning this case occurred after this court's order opening the proceedings. Newspaper articles prior to November 3, 1993, are interesting both for what they do and do not contain. First, it is likely that the media has at least one source within the court itself since an article appearing in the *Las Vegas Review-Journal* on October 12, 1993, stated "JUSTICES THOMAS STEFFEN and CHARLES SPRINGER favored Whitehead's position, while CHIEF JUSTICE ROBERT ROSE and JUSTICE MIRIAM SHEARING were neutral." This information was not available to the Commission. In addition, a newspaper reporter has given me information concerning the status of this court's internal proceedings on this case of which I had not been informed by my colleagues and of which I was otherwise unaware. Another indication that the Commission was not the source of the "leaks" is that none of the articles correctly reported which charges were included in the Commission's complaint. For example, the *Review-Journal* article of October 14, 1993, speculated that the complaint included an accusation that Judge Whitehead changed the custody of a child without a hearing. The complaint did not include this accusation. Other articles reported on other charges which were not included in the complaint. If the reporter had a source in the Commission, he or she would have been disabused of this incorrect information.

> In preparing to oppose a determination of probable cause, the respondent has the right to inspect all records *of the Commission* relating to the disciplinary action against the respondent and to be fully advised as to the contents of the administrative record considered by the commission determining that there was sufficient reason for a probable cause hearing.

(Emphasis added.)

The language of this rule is certainly not an example of excellent legislative draftsmanship. The word "and" in the middle suggests that it provides the judge with two separate and independent rights: (1) "to inspect all records of the commission" and (2) "to be fully advised as to the contents of the administrative record." The problem with this language is that the second right appears to add nothing to the first. After inspecting all records of the Commission, the "inspector" is, by definition, fully advised as to the contents of the administrative record.

Since the second right is redundant, I focus my attention on the first. The majority assumes that "records of the commission" include notes that special counsel Donald Campbell took while interviewing potential witnesses. This interpretation is inconsistent both with the Rule's plain language and with similar language in contexts other than judicial disciplinary proceedings.

According to case law, when an attorney creates documents or other sources of information for a commission, those documents become "records of the commission" only if they become part of the basis for the commission's decision on the merits. *See, e.g.,* Matter of Krynicki, 983 F.2d 74, 75 (7th Cir. 1992); Matter of Special March 1981 Grand Jury, 753 F.2d 575, 577-78 (7th Cir. 1985).

Thus, if the special counsel had submitted or read his notes to the Commission so that they could be considered on the issue of whether to hold a probable cause hearing, the notes would become "records of the commission" and would be discoverable by the Judge. Because the Commission's attorney took neither of the above actions, his notes maintain their original character as his own private notes and, therefore, do not come within the scope of ARJD 14(5). Thus, under the present rules, there is no basis for the assertion that these notes are discoverable by the Judge.

The majority seems to indicate that the Commission's investigator was obligated to take a written statement from potential witnesses. There simply is no such requirement in the rules. Nor do the rules contain any requirement that an investigatory interview be partially or fully transcribed. Nor must the investigator ask each informant if he or she is willing to become a witness.

Conversely, neither is there anything in the rules which would prohibit an investigator from taking these actions. The manner in which an investigator conducts the investigation is traditionally a matter of the investigator's discretion. Contrary to the repeated insinuations of the majority, there is nothing "unusual," "improper," or "sinister" about the fact that an investigator in one Commission case asked interviewees for written statements, whereas another investigator in a different investigation did not. There is no rule specifying how investigations take place.

Special counsel Campbell's notes contain two different categories of information which do not fall within the scope of ARJD 14(5) and so may not be obtained by Judge Whitehead, at least before the probable cause hearing. First, the notes contain the names of interviewees who wish to keep their identities confidential to the extent permitted by the rules. Second, the notes contain opinions and impressions, i.e., the attorney work product, of the special counsel. The majority now acknowledges that the attorney work product should be excluded from discovery. However, the majority still maintains that the rest of the material collected in the investigation, including the material falling into the first category, should be turned over to Judge Whitehead. Of course, if the Commission may not use the results of the Campbell investigation and must conduct a new investigation, as the majority suggests, there is no justification whatsoever for turning over the notes of the Campbell investigation to Judge Whitehead. However, even if the Commission is not required to conduct a new investigation, I do not agree that the ARJD authorize discovery of all material except for the attorney work product at this time.

Courts around the country have discussed the reasons behind permitting the use of confidential informants in investigations, including investigations involving judicial disciplinary matters. The reasons include (1) protecting the source of information from recrimination by the accused judge, and (2) increasing the flow of relevant information. *See* Irons v. F.B.I., 880 F.2d 1446, 1449 (1st Cir. 1989); In re Elliston, 789 S.W.2d 469, 473 (Mo. 1990); People ex rel. Illinois Judicial Inquiry Bd. v. Hartel, 380 N.E.2d 801, 805 (Ill. 1978).

Both of these concerns are valid, and in cases that are resolved before a formal hearing takes place, ARJD 14(5) serves both purposes effectively with few, if any, untoward consequences. However, in those cases which progress to the formal hearing stage, the drafters of the rules apparently believed that the countervailing considerations of allowing the judge to know the identity of his accusers and their allegations are of greater importance than permitting interviewees to remain confidential or "unrevealed." This is apparent in ARJD 21(2), which provides:

### Rule 21. Discovery

. . .

2. The commission's obligation under this rule extends to material and information in the possession or control of any persons who, on behalf of the commission, have participated in any investigation of the charges.

The contrast between ARJD 14(5) and ARJD 21, which apply at two different stages of the proceedings, clarifies that the accused judge is not entitled to all of the investigator's records until *after* the probable cause hearing. To hold otherwise is to render the difference in language between the rules meaningless.

## ORDER OF CONFIDENTIALITY

On July 22, 1993, at the inception of this case, this court ordered that "all proceedings before this court shall remain strictly confidential, and the petition and all other documents, exhibits and pleadings related thereto, as well as any further documents submitted for filing in this matter, shall be filed under seal. . . ." On November 3, 1993, at Judge Whitehead's request, this court ordered that the previous order requiring confidentiality be lifted. Ordinarily where there is no order of confidentiality, the issue of confidentiality of the proceedings before this court would be a moot issue. However, the majority of this court has issued the following order: "We expressly retain jurisdiction to carry forward and implement all determinations and rulings that we have made in the course of these proceedings or will make in the future."

Once this court issued the order granting Judge Whitehead's request, there was no basis for it to retain jurisdiction. If new proceedings are instituted against Judge Whitehead before the Commission, and Judge Whitehead challenges those proceedings, a new petition would be required. This court would then have jurisdiction over the case. The only possible justification for retaining jurisdiction now is the order issued in Whitehead v. Commission on Jud. Discipline, 110 Nev. 874, 890, 878 P.2d 913, 923 (1994), that a special master be appointed "to conduct such investigations as shall be necessary to determine the sources of the unlawful breaches of confidentiality that have occurred in these proceedings and the extent to which they may have impacted Petitioner's due process rights."

I disagree that the retention of jurisdiction is required or authorized. This proceeding is over. Judge Whitehead has succeeded in requiring the Commission to begin anew if it chooses to pursue disciplinary proceedings against him. Thus, this court has no basis for consideration of alleged violations of the Judge's due

process rights. If the Commission opts to proceed anew on charges against Judge Whitehead, he would be entitled to due process in that new proceeding, including a fair and impartial tribunal. If he were deprived of due process in that new proceeding, any deprivation would be resolved either in that proceeding or in subsequent appellate review. Thus, the majority's decision to retain jurisdiction as it relates to Judge Whitehead's due process rights is unjustified.

Apparently, the majority decided to retain jurisdiction in order to conduct an investigation into violations of the order of confidentiality. I suggest that this court reconsider conducting any such investigation, since it had no basis for attempting to keep the records of this proceeding confidential in the first place. There is no authority to issue such an order either in the Nevada Constitution, our statutes, the common law, or in the United States Constitution.

The majority insists that the Nevada Constitution mandates that all the proceedings in this court relating to Judge Whitehead's petition for a writ be kept confidential. The plain language of the Nevada Constitution contains no such mandate.

The majority finds this "mandate" in Article 6, Section 21(5)(a) of the Nevada Constitution. It provides:

> 5. The supreme court shall make appropriate rules for:
> (a) The confidentiality of all *proceedings before the commission,* except a decision to censure, retire or remove a justice or judge.

(Emphasis added.)

The majority recasts this simple grant of rule-making authority as a "strong public policy" of this state to maintain confidentiality. This interpretation finds no support in the language of the constitutional provision. In fact, there is a countervailing public policy of open government, particularly concerning proceedings in open court.

Proceedings before the Nevada Supreme Court are not "proceedings *before the commission,*" any more than a petition to quash a grand jury subpoena is a "matter[] occurring before the grand jury." Special March 1981 Grand Jury, 753 F.2d 575, 578 (7th Cir. 1985). The proceedings before this court *concern* the proceedings before the Commission, but the proceedings are not themselves included in the constitutional provision providing for confidentiality before the Commission itself. Similarly, ARJD 5(1), which provides, "[a]ll proceedings must be confidential until there has been a determination of probable cause and a filing of formal statement of charges," applies only to proceedings before the Commission, not to those before this court. A rule that

this court adopted specifically to govern *Commission* proceedings certainly may not be considered as legal authority under which Nevada Supreme Court records or proceedings may be sealed and kept secret contrary to law.

Furthermore, this court has already interpreted Article 6, Section 21(5) of the Nevada Constitution in a manner inconsistent with the majority's view that this constitutional provision grants the judge complete confidentiality until the decision to censure, retire or remove a justice or judge. This court adopted ARJD 5(1), which makes judicial discipline proceedings public after probable cause is found. At the time ARJD 5(1) was adopted, this court did not interpret Article 6, Section 21(5)(a) to *require* confidentiality until the final decision "to censure, retire or remove. . . ." Rather, the reasonable interpretation which this court made in adopting ARJD 5(1) was that this court may make rules *regarding* confidentiality, not that confidentiality is mandated. Now the majority has altered that interpretation of our constitution. This alteration is not in accordance with our prior interpretation and is unwarranted.

I do not question the authority of this court to review certain matters "in camera" when necessary in order to protect the rights of parties or witnesses. However, I strongly question the authority of this court to conduct secret proceedings in which the legal issues in the action and the very existence of the action are hidden from the public. Even if Judge Whitehead, or any judge accused of misconduct, had an absolute right to confidentiality (which I dispute), that confidentiality could be preserved by a less drastic measure than that chosen by the majority. The name of the judge and any facts identifying the judge could be deleted from the case entirely. Instead, the majority selected the remedy of surrounding the court proceedings in total secrecy. Holding secret proceedings to decide vital issues of law and public policy is contrary to law and tradition in this state and country.

Nevada statutes provide that both court records and proceedings in open court be made public. NRS 1.090; NRS 239.010.[4]

---

[4]Nevada Revised Statutes 1.090 and 239.010 provide:

**1.090 Public sittings.**

The sitting of every court of justice shall be public except as otherwise provided by law; but the judge of any court may exclude any minor during any criminal trial therein except such minor be on trial, or when testifying as a witness, or when he shall be a law student preparing to apply for a license to practice law.

**239.010 Public books and public records open to inspection.**

1. All public books and public records of a public agency, a university foundation or an educational foundation, the contents of which are not otherwise declared by law to be confidential, must be open at all times during office hours to inspection by any person, and may be fully

The majority suggests that NRS 239.010, requiring public access to public records, does not apply to the judicial branch of government. Indeed, the majority states that applying the statute to the judicial branch is a "dubious proposition" and contradicts the clear language of the statute. NRS 1.020 specifies that this court, as well as the district and justice courts, are courts of record. Given the language of the statutes, I have difficulty seeing how the records in any of these courts are not considered "public records."

The majority goes on to state that NRS 239.010 "simply has no application to records which have been lawfully declared not to be public by this court." There seems to be some implication that this court has an unfettered right to seal any records it pleases. The law does not provide this court with that power. This court must conform to certain standards before it is free to close any proceedings. *See* Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 510 (1984).

The mandate of the common law, in addition to the legislative mandate, keeps court proceedings open to the public. The Seventh Circuit noted this in Matter of Krynicki, 983 F.2d 74, 75 (7th Cir. 1992):

> [W]hen proceeding in common law fashion courts must reckon with the corpus of the common law. Judicial proceedings in the United States are open to the public—in criminal cases by constitutional command, and in civil cases by force of tradition. . . . What happens in the halls of government is presumptively open to public scrutiny. Judges deliberate in private but issue public decisions after public arguments based on public records. The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat; this requires rigorous justification.

(Citations omitted.)

That proceedings are open to the public is true no matter how

---

copied or an abstract or memorandum may be prepared from those public books and public records. Any such copies, abstracts or memoranda may be used to supply the general public with copies, abstracts or memoranda of the records or may be used in any other way to the advantage of the public agency, university foundation or educational foundation or of the general public.

2. As used in this section:

. . .

(b) "Public agency" means any officer of the state or a county, city, district, governmental subdivision or quasi-municipal corporation and any office of this state.

strong the apparent justification for holding secret proceedings. The *Krynicki* court continued as follows:

> Public argument is the norm even, perhaps especially, when the case is about the right to suppress publication of information. Briefs in the *Pentagon Papers* case . . . and the hydrogen bomb plans case . . . were available to the press, although sealed appendices discussed in detail the documents for which protection was sought. The Court denied a motion to close part of the oral argument in the *Pentagon Papers* case (citations omitted).
>
> The occasional withholding of the name of a litigant also does not shield the facts and arguments of the case. The parties present public arguments leading to a public decision (citations omitted).
>
> Have the litigants in today's two cases done more to justify the sealing of the briefs than the litigants in cases such as *Pentagon Papers,* where disclosure was said to threaten the national security, and *The Progressive,* where disclosure was said to threaten the survival of mankind? Not exactly.

*Id.* at 76.

The litigant in this case, like the litigants in *Krynicki,* has "not exactly" justified sealing the records of these proceedings. Everyone can appreciate that the petitioner would prefer that the records not be made available to the public. After all, those records contain allegations of serious judicial misconduct likely to be of interest to the news media. However, the fact "[t]hat journalists are interested in the events underlying litigation is neither unusual nor deplorable. Judicial proceedings are not closed whenever the details are titillating, and open only when the facts are so boring that no one other than the parties cares about them." *Id.* at 78.

"Public argument" as mentioned in *Krynicki* encompasses the public's ability to review the basis of an important court decision contemporaneously with the court's review of that decision. Allegations of a district court judge's intimidation and retaliation are of significant public interest. There is also a strong public interest in understanding (1) why Judge Whitehead thought that he should not have to answer the allegations contained in the Commission's complaint, and (2) why the Nevada Supreme Court might see fit to grant his wishes. The Judge's interest in maintaining his privacy does not amount to a compelling governmental interest sufficient to overcome these interests. *See, e.g.,* Miller v. Indiana Hospital, 16 F.3d 549, 551 (3rd Cir. 1994); Smith v. U.S. Dist. Court for Southern Dist. of Illinois, 956 F.2d 647, 649-50 (7th

Cir. 1992); Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1074 (3rd Cir. 1984).

Judge Whitehead is not the first judge in the United States who has resorted to the courts both to attack disciplinary proceedings against him and keep allegations against him secret from the press and the public. Most judges have been unsuccessful in this attempt. Other courts have consistently refused to grant confidentiality to judges challenging judicial discipline proceedings. *See, e.g.,* Roberts v. Commission on Judicial Performance, 661 P.2d 1064, 1072 (Cal. 1983) (Mosk, J., dissenting); McKenney v. Commission on Judicial Conduct, 388 N.E.2d 666, 674 (Mass. 1979); Matter of Owen, 413 N.Y.S.2d 815, 818 (N.Y.Ct.Jud. 1978), Nicholson v. State Commission on Judicial Conduct, 409 N.E.2d 818, 825-26 (N.Y. 1980).[5]

There was no legal basis for providing Judge Whitehead with a special dispensation contrary to the statutes and the common law. As the Third Circuit stated in Bank of America National Trust and Savings Association v. Hotel Rittenhouse, 800 F.2d 339, 345 (3rd. Cir. 1986), "[w]e cannot permit the expediency of the moment to overturn centuries of tradition of open access to court documents and orders."

For the reasons discussed above, secret supreme court proceedings violate statutory and common law. More importantly, such proceedings violate the supreme law of the land, the Constitution of the United States. The reasoning in a series of cases beginning with the United States Supreme Court opinion in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), makes clear that holding secret proceedings without certain safeguards violates the First Amendment to the United States Constitution as applied to the states by the Fourteenth Amendment.

The United States Supreme Court has held that the public and press have a First Amendment right of access to the following judicial proceedings: (1) criminal trials, even in unusually sensitive circumstances such as the testimony of minor victims of sexual offenses; (2) the voir dire examination of jurors; (3) California-style preliminary hearings; and (4) Puerto Rican preliminary hearings. See, respectively, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), Globe Newspaper Co. v.

---

[5]The majority quotes extensively from the lower court ruling in Nicholson v. State Commission on Judicial Conduct, 422 N.Y.S.2d 701 (N.Y.A.D. 1979) which granted confidentiality. The New York Court of Appeals reversed that determination. The majority seems to regard as significant that some judges believed confidentiality was appropriate. Our jurisprudence is not developed through opinion poll. The state's highest court rejected the claim of confidentiality. I do not agree that the majority's attempt to distinguish the *Nicholson* holding is valid.

Superior Court for Norfolk County, 457 U.S. 596 (1982), Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984), Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1 (1986), and El Vocero de Puerto Rico (Caribbean Intern. News Corp.) v. Puerto Rico, ...... U.S. ......, 113 S. Ct. 2004 (1993).

The United States Supreme Court has established a two-part test which lower courts have applied to determine whether a qualified First Amendment right of access applies. In applying this test, lower courts have consistently held that the First Amendment clearly protects public and media access to civil proceedings. *See* Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1067-71 (3d Cir. 1984); Matter of Continental Illinois Securities Litigation, 732 F.2d 1302, 1308-16 (7th Cir. 1984). The first part of the test requires a court to determine whether access to a particular type of judicial proceeding or document has historically been available. The second part requires a court to determine whether access serves an important function in monitoring prosecutorial or judicial misconduct. The test is easily applied to this proceeding.

In his discussion of the history of maintaining open judicial trials, Chief Justice Burger noted that "historically both civil and criminal trials have been presumptively open." *Richmond Newspapers,* 448 U.S. at 580 n.17. None of the historical sources that he relied upon in making that determination suggest that appellate proceedings, either civil or criminal, have been excluded from that tradition. It appears that, at least since 1267, *all* judicial proceedings have been presumptively open:

> Sir Edward Coke declared in the early Seventeenth century that the Statute of Marlborough of 1267 required court proceedings to be held in public: "These words [In curia Domini Regis] are of great importance, for all Causes ought to be heard, ordered, and determined before the Judges of the King's Courts openly in the King's Courts, whither all persons may resort . . . ." 2 E. Coke, Institutes of the laws of England 103 (6th ed. 1681).

*Publicker Industries,* 733 F.2d at 1068.

The tradition of public access to court proceedings was followed in the new American colonies. For example, "the 1682 and 1776 Pennsylvania Constitutions both provided that '*all* courts shall be open,'" Gannet Co., Inc. v. DePasquale, 443 U.S. 368, 386 n.15 (1979) (citation omitted) (emphasis added). Thus, it appears that access to public proceedings has historically been available. Therefore, the first part of the two-part test is satisfied.

Additionally, the Eleventh Circuit has held that the maintenance of a dual-docketing system like the one used in this case (in which some documents are made public, but some are filed in secret), is an unconstitutional infringement on the right of access of both the public and the press. U.S. v. Valenti, 987 F.2d 708, 715 (11th Cir. 1993) (citing CBS, Inc. v. U.S. Dist. Court for Cent. Dist. of California, 765 F. 2d 823, 826 (9th Cir. 1985)). After acknowledging that closed proceedings are not absolutely precluded, but must be rarely employed, and then only when cause for holding closed proceedings outweighs the value of holding open proceedings, the *Valenti* court stated:

> Thus, in determining whether to close a historically open process where public access plays a significant role, a court may restrict the right of the public and the press to criminal proceedings only after (1) notice and an opportunity to be heard on a proposed closure; and (2) articulated specific "findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."

*Id.* at 713 (quoting Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 510 (1984)).

The second inquiry concerns "whether public access plays a significant positive role in the functioning of the particular process." Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 8 (1986). In Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), the United States Supreme Court identified societal interests in open trial court proceedings that are so relevant to the immediate proceedings that they bear recitation at length.

Openness of court proceedings gives "assurance that the proceedings [are] conducted fairly to all concerned, and . . . discourage[s] perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Id.* at 569.

Openness encourages public acceptance for both the means of achieving justice and its results. It prevents justice from taking place in a covert manner. It provides a significant therapeutic value as an outlet for community concern, hostility and emotion. It also prevents an unexpected outcome from causing the public to believe that, at best, the system has failed, or at worst, has been corrupted. *Id.* at 571.

Openness of court proceedings further encourages public confidence in the judiciary, because "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.* at 572. "The educative effect of public attendance is a material advantage. Not only is respect for the law increased and intelli-

gent acquaintance acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy." *Id.* (quoting 6 J. Wigmore, Evidence § 1834, at 438 (1976)).

"[T]he function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Id.* at 593 (Brennan, J., concurring) (quoting Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 492 (1975)). "[P]ublic access to court proceedings is one of the numerous 'checks and balances' of our system, because 'contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.'" *Id.* at 592 (Brennan, J., concurring) (quoting In Re Oliver, 333 U.S. 257, 270 (1948)). "Open trials assure the public that procedural rights are respected, and that justice is afforded equally. Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law." *Id.* at 595. In his concurrence, Justice Blackmun stated:

> [T]he public has an intense need and a deserved right to know about the administration of justice in general; about the prosecution of local crimes in particular; about the conduct of the judge, the prosecutor, defense counsel, police officers, other public servants, and all the actors in the judicial arena; and about the trial itself.

*Id.* at 604. There can be little doubt that considerations such as openness and public access serve an important function in this case and for this court. Accordingly, the second part of the two-part test is satisfied, thereby mandating public access to this proceeding.

The First Amendment creates a presumption of public access to all court proceedings. However, the First Amendment presumption can be overridden if "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." Washington Post v. Robinson, 935 F.2d 282, 290 (D.C. Cir. 1991) (citation omitted).

The majority quotes Barron v. Florida Freedom Newspapers, Inc., 531 So.2d 113 (Fla. 1988), to show that there are circumstances under which closure of court proceedings is appropriate. However, this court's action would not be appropriate even under the guidelines outlined in that case. In *Barron,* the court stated:

> We conclude that the following factors must be considered to determine a request for closure of a civil proceeding.
> First, a strong presumption of openness exists for all court

proceedings. A trial is a public event, and the filed records of court proceedings are public records available for public examination.

Second, both the public and news media shall have standing to challenge any closure order. The burden of proof in these proceedings shall always be on the party seeking closure.

Third . . . .[6]

Fourth, before entering a closure order, the trial court shall determine that no reasonable alternative is available to accomplish the desired result, and, if none exists, the trial court must use the least restrictive closure necessary to accomplish its purpose.

Fifth, the presumption of openness continues through the appellate review process, and the party seeking closure continues to have the burden to justify closure.

*Id.* at 118.

Closure of the proceedings in this case did not meet the criteria in *Barron*. First, this court's actions kept the very existence of the proceedings secret. This contravenes the first *Barron* factor and nullifies the second—because neither the public nor the news media can challenge a closure order of which they are unaware. Further, no alternatives were considered, and the *most* restrictive, rather than the least restrictive closure necessary to accomplish the purpose was immediately implemented. This appears to contravene the fourth factor in *Barron*.

In this case, the only interest in favor of secrecy is the interest of the accused judge and the judiciary in general to maintain the confidentiality of charges against judges. I have been unable to locate even a single case in which a court determined that the interests in favor of confidentiality of public officials accused of wrongdoing outweighed the other compelling interests elaborated upon in *Barron* and elsewhere.[7]

---

[6]The third factor, quoted by the majority, sets out a list of when certain parts of court proceedings may justifiably be closed.

[7]The case of State ex rel. Bilder v. Delevan Tp., 334 N.W.2d 252, 261 (Wis. 1983) is instructive in that a police chief challenging discipline proceedings demanded confidentiality of court proceedings because the contents of the documents would be "extremely damaging to [his] character, reputation and future career in law enforcement." Judge Whitehead has made similar claims. The Wisconsin court concluded that Bilder's interest in his reputation was not sufficient to overcome the public policy of open court proceedings and did not support the exercise of the court's inherent power to close the file. *Id.* Moreover, the court added that "Bilder is not an ordinary citizen. He is a public official subject to close public scrutiny." *Id.* at 261-62 (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 344 (1974); Garrison v. State of La., 379 U.S. 64, 77 (1964)). "By accepting his public position

All of the "compelling interests" in this case favor granting complete public access to these court proceedings, thereby fostering the interests protected by the First Amendment, and protecting those rights set out in our state statutes and constitution. Although the majority considers my suggestion that Judge Whitehead relinquished his right to confidentiality when he chose to seek relief in this court to be "sheer folly," I maintain that the constitution and laws of this state and country mandate such a result.[8]

In an attempt to keep the proceedings in this case confidential, this court entered an unconstitutional order. When that order was violated, this court sanctioned the violators. There is no basis for applying sanctions for violation of an unconstitutional order. I would rescind the order appointing a master and return jurisdiction of the entire matter to the Nevada Commission on Judicial Discipline where it should have remained all along.

---

Bilder has, to a large extent, relinquished his right to keep confidential activities directly relating to his employment as a public law enforcement official." *Id.* at 262.

The majority focuses on the fact that *Bilder* recognizes the inherent power of the courts to close proceedings. *Bilder* actually recognizes that the power of the court to close proceedings is limited and that confidentiality is even less appropriate when the conduct of public officials is involved.

[8]The majority has cited three cases in support of its contention that confidential proceedings in this court challenging Commission jurisdiction do not violate the Federal constitution: First Amendment Coalition v. Judicial Inquiry and Review Bd., 784 F.2d 467 (3rd Cir. 1986); People ex rel. Ill. Jud. Inquiry Bd. v. Hartel, 380 N.E.2d 801 (Ill. 1978), *cert. denied,* 440 U.S. 915 (1979); Kamasinski v. Judicial Review Council, 797 F.Supp. 1083 (D. Conn. 1992). None of these cases support that contention. Each of these cases challenges the confidentiality *before a judicial discipline body,* not before a court. There is no dispute that confidentiality before judicial discipline bodies is constitutional.